## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Alternative Distribution Systems, Inc., *et al.*[1] | Case No. 09-_____ (   ) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF TIMOTHY M. MAY, CHIEF OPERATING OFFICER OF EACH OF THE DEBTORS IN SUPPORT OF FIRST DAY PLEADINGS

I, Timothy M. May, hereby declare under penalty of perjury:

1.      I am the Chief Operating Officer for each of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). In this capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2.      To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their businesses, the Debtors have requested various types of relief in their "first day" pleadings and applications (each, a "First Day Pleading"). The First Day Pleadings seek relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption of the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates. I am familiar with the contents of each First Day Pleading (including the exhibits and schedules thereto) and I believe that the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Alternative Distribution Systems, Inc. (2412); May Logistics Services, Inc. (4970); and ADS Logistics, LLC (0782).

successful restructuring of the Debtors; and (c) best serves the Debtors' estates and creditors' interests.

3.     Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents and information supplied to me by other members of the Debtors' management and the Debtors' advisors.  I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.     This Declaration (a) describes the Debtors' businesses, their capital and corporate structures and the circumstances surrounding the commencement of these chapter 11 cases (the "Chapter 11 Cases"), and (b) sets forth the relevant facts in support of each of the First Day Pleadings.[2]

## Background

5.     On the date hereof (the "Petition Date"), Alternative Distribution Systems, Inc. and two of its affiliates each filed a voluntary petition for relief under title 11 of the United States Code (11 U.S.C. §§ 101–1532, as amended, the "Bankruptcy Code"), commencing the Debtors' Chapter 11 Cases.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases and, as of the date hereof, no official committees have been appointed or designated. Concurrently herewith, the Debtors filed a motion seeking joint administration of these Chapter

---

[2]  Each capitalized term used but not otherwise defined herein shall have the meaning ascribed thereto in the relevant First Day Pleading.

11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

6.     The Debtors are a leading provider of integrated transportation, distribution and logistics services for the metals industry.   The Debtors operate a nationwide network of warehousing, shipping and distribution facilities located across fourteen states and in Canada and employ approximately 283 full-time and part-time employees, as well as 134 independent contractors.   Over the course of more than thirty years in the metals distribution business, the Debtors have developed specialized systems, equipment and expertise which enable them to handle, warehouse and transport high-value metals (primarily steel and aluminum) requiring time-sensitive delivery in coordination with end-users' increasingly sophisticated inventory management requirements.

7.     The Debtors' business is divided into three primary divisions, each of which caters specifically to the metals producing and consuming industries.   The Debtors' "Roll & Hold Division" ("Roll & Hold") provides ISO 9001:2000 certified warehousing of steel coil and other metals products, as well as services to coordinate just-in-time distribution to the Debtors' customers.   The "Area Transportation Division" ("Area Transportation") maintains a fleet of more than 300 specially-equipped trucks and provides customers with metals hauling equipment and expertise, primarily on a short-haul basis, throughout the Midwest, East and West Coasts. Finally, the Debtors' "Western Intermodal Services, Ltd. Division" ("WISL") specializes in intermodal transportation and packaging of services, combining rail, truck and barge transportation of metals products.

8.     In order to provide complete end-to-end logistics support for their customers, in addition to storing and transporting materials themselves, the Debtors also regularly enter into

brokerage agreements with an array of third-party logistics service providers in instances where the Debtors lack the capacity or the regulatory authority to provide such services directly or where third-party providers can fulfill the needs of the Debtors' customers more economically. In such instances, the Debtors typically pay the third-party provider directly, and pass such costs on to their customers in addition to charging a brokerage or placement fee.

9.     A core component of the Debtors' "ship-to" customer base is comprised of automotive manufacturers and their suppliers. Consequently, the financial performance of the Debtors' business is somewhat related to the financial performance of the automotive manufacturing industry. The severe downturn in the automotive industry, together with a confluence of other macroeconomic factors leading to a general decrease in the manufacture of durable goods (including, without limitation, lower levels of consumer confidence and economic growth, tightening credit, and high energy and gas prices), has strained the Debtors' operating performance and financial position over the past year. Specifically, the cutbacks in production and plant closures undertaken by both Chrysler and General Motors (among many others) have led to a decrease in tonnage and thus revenue for the Debtors.

10.     Despite the Debtors' declining revenues, their fixed costs have remained relatively constant. The Debtors' Roll & Hold division is particularly dependent upon revenue derived from warehousing materials shipped from metal suppliers to be used in production by automotive manufacturers. The Roll & Hold division primarily maintains highly specialized climate-controlled warehouses with heavy crane capacity in strategic locations nearby automotive manufacturing plants in order to serve the needs of the Debtors' automotive customers. As a result of various sale-leaseback transactions into which the Debtors previously

entered, many of these facilities are subject to long-term leases at above-market rental rates and are no longer profitable at the current level of operations.

11.    The Debtors had sales of $122.9 million and earnings before interest, taxes, depreciation and amortization ("EBITDA") of $5.9 million in 2008.[3]  As of July 31, 2009, the Debtors had year-to-date sales of $38.9 million and negative EBITDA of $1.2 million for 2009. These figures, representing a decrease of approximately $40.7 million in sales and $3.9 million in EBITDA from year-to-date figures from July 31, 2008, reflect the steep and rapid decline in the economy and in the industry in which the Debtors operate.

12.    Despite the challenging marketplace conditions facing the Debtors however, their business prospects remain strong.   Indeed, the Debtors' national reach and metals-specific expertise provide the Debtors with competitive advantages over their competitors in providing essential services to their customers.  In addition, the Debtors have well-established relationships with their customers, having provided service to each of their top ten customers for an average of over 20 years, which is representative of the Debtors' long-standing relationships across their entire customer base.  The Debtors have also been recognized as leaders within their industry for both service and safety.  The Debtors were named "Best Specialist Logistics Provider" by the Global Institute of Logistics in 2005 and, more recently, Area Transportation was recognized by its insurance and risk management supervisor, Aon Risk Services, for outstanding multi-year safety performance, eighteen percent better than the trucking industry's national average.

13.    The Debtors' current capital structure is as follows:

(a)    Pursuant to that certain Third Amended and Restated Credit Agreement dated as of January 18, 2008 (as amended, restated, supplemented or otherwise modified from time to time, the "First Lien

---

[3]  The Debtors' EBITDA numbers have been adjusted to account for certain "add backs" related to non-ordinary course restructuring costs incurred by the Debtors.

Credit Agreement"), by and among the Borrower, as borrower, each of the other Debtors as guarantors , GE Capital as Documentation Agent and Administrative Agent (in such capacities, the "First Lien Agent") and as a Lender and Issuing Bank, and the other lenders party thereto from time to time (collectively, the "First Lien Lenders"), the First Lien Lenders extended revolving and term credit facilities to, and issued letters of credit for, the Borrower from time to time, including, inter alia, (i) revolving loans in an aggregate committed amount of up to $4.0 million, and (ii) term loans in an aggregate original principal amount of $28.5 million. The First Lien Credit Agreement, along with any other agreements, instruments, notes, guaranties and other documents executed in connection therewith are collectively referred to in the DIP Motion as the "First Lien Credit Documents" and are available upon request from counsel to the Debtors or counsel to the First Lien Agent. All obligations of the Debtors arising under the First Lien Credit Agreement or any other First Lien Credit Document, including all loans, advances, debts, liabilities, principal, interest, fees, charges, expenses and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts, including obligations pursuant to any letters of credit, and all covenants and duties regarding such amounts, owing to the First Lien Agent or First Lien Lenders by the Debtors, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall be referred to in the DIP Motion as the "First Lien Obligations."[4]

(b)     Pursuant to that certain Senior Subordinated Loan Agreement dated as of January 18, 2008 (as amended, restated, supplemented or otherwise modified from time to time, the "Second Lien Credit Agreement"), by and among the Borrower, as borrower, each of the other Debtors as guarantors, and William Blair Mezzanine Capital Fund II, L.P. ("William Blair" or the "Second Lien Agent" and, together with the First Lien Agent, the "Prepetition Agents"), and the lender parties signatory thereto (collectively, the "Second Lien Lenders" and, together with the First Lien Lenders, the "Prepetition Secured Lenders"), the Second Lien Lenders extended loans to the Borrower in an aggregate original principal amount of $2.5 million, which together with certain "PIK Notes" issued pursuant to the Second Lien Credit Agreement, as of September 1, 2009, have an aggregate outstanding principal amount of no less than $4,072,984, plus accrued interest, fees and expenses. Pursuant to that certain Amended and Restated Subordinated Note dated as of January 18, 2008, William Blair extended a term loan to the Borrower in an aggregate original principal amount of $2.0 million, which as of September 1, 2009

---

[4] The description of the First Lien Credit Documents herein is provided for convenience only and is qualified in its entirety by the First Lien Credit Documents. In the event of any inconsistency between the First Lien Credit Documents and their description herein, the First Lien Credit Documents shall control.

has an aggregate outstanding principal amount of no less than $3,377,410, plus accrued interest, fees and expenses (the "Blair Note"). The Second Lien Credit Agreement and the Blair Note along with any agreements, instruments, notes, guaranties and other documents executed in connection therewith are collectively referred to in the DIP Motion as the "Second Lien Credit Documents" and are available upon request from counsel to the Debtors or counsel to the Second Lien Agent. All obligations of the Debtors arising under the Second Lien Credit Documents shall be referred to in the DIP Motion as the "Second Lien Obligations."[5]

(c)     On April 30, 2009, the Debtors entered into that certain Master Restructuring Agreement dated as of April 30, 2009 (the "Restructuring Agreement") by and among the Debtors, the Prepetition Secured Lenders, and certain of the Debtors' equity holders. Pursuant to the Restructuring Agreement, and in connection therewith, the Debtors entered into the following transactions: (i) Debtor Alternative Distribution Systems, Inc. amended and restated its certificate of incorporation and bylaws, entered into an amended and restated investor securities agreement governing the rights and obligations of its equity holders, and issued certain warrants (the "ADS Warrants") for the purchase of non-voting common stock, convertible into voting common stock, to the First Lien Lenders; and (ii) Debtor May Logistics Services, Inc. amended and restated its articles of incorporation and bylaws, entered into an amended and restated investor securities agreement governing the rights and obligations of its equity holders, and issued certain warrants (the "MLS Warrants") for the purchase of non-voting common stock, convertible into voting common stock, to the First Lien Lenders. As of the Petition Date none of the ADS Warrants or the MLS Warrants have been exercised and, none of the First Lien Lenders has voting control over the equity securities of any of the Debtors.[6]

14.     The Debtors have instituted these Chapter 11 Cases to streamline their operations and sell substantially all of their assets in accordance with section 363 of the Bankruptcy Code. The Debtors, the First Lien Lenders and the Second Lien Lenders (collectively, the "Lenders") have agreed to a sale process and transaction whereby the First Lien Lenders (or their designee)

---

[5] The description of the Second Lien Credit Documents herein is provided for convenience only and is qualified in its entirety by the Second Lien Credit Documents. In the event of any inconsistency between the Second Lien Credit Documents and their description herein, the Second Lien Credit Documents shall control.

[6] GE Capital currently holds 86.412 of the 7,572.47392 shares of the voting common stock of Debtor May Logistics Services, Inc. Such amount represents approximately 1.14% of May Logistics Services, Inc.'s voting common stock and approximately 0.47% on a fully diluted basis. None of the other First Lien Lenders currently has any equity interests in any of the Debtors, with the exception of the ADS Warrants and MLS Warrants, none of which have been exercised.

will credit bid at least a portion of the First Lien Obligations, in consideration for the sale and transfer of substantially all of the Debtors' assets (as more fully specified in the draft asset purchase agreement attached to the Debtors' motion to approve bidding procedures in connection with the sale (filed concurrently herewith)). Upon completion of the sale, and satisfaction of all post-petition administrative liabilities of the Debtors, it is the Debtors' intent to seek the dismissal of these cases.[7]

15.     Prior to instituting these Chapter 11 Cases, the Debtors engaged the investment banking firm EVE Partners, LLC ("EVE") to conduct a marketing process in order to determine whether any potential buyers existed who might be interested in purchasing from the Debtors some, or all, of the Roll & Hold leases and operations. Although this process resulted in a handful of interested responses, none of the potential buyers identified by EVE were ultimately prepared to consummate a sale on terms acceptable to the Debtors. At the Debtors' request, EVE later expanded its marketing process in order to determine if there were any potential buyers who might be interested in purchasing substantially all of the Debtors assets on terms more favorable to the Debtors than those set forth by the First Lien Lenders in their credit bid. Should EVE identify any such potential buyers they will be instructed to submit a competitive bid in accordance with any sale and bidding procedures that the Court may establish.

**First Day Pleadings**

**I.     PROCEDURAL PLEADINGS**

**A.     Motion of the Debtors for an Order Directing Joint Administration of Chapter 11 Cases Pursuant to Bankruptcy Rule 1015(b) (the "Joint Administration Motion")**

---

[7]  It is anticipated that there are no unencumbered assets. Accordingly, there is the likelihood that unsecured creditors will receive no distribution in these cases.

16.     The Debtors are seeking the entry of an order directing the joint administration of these Chapter 11 Cases, for procedural purposes only.

17.     The joint administration of the Chapter 11 Cases will permit the Clerk of the Court to use a single general docket for each of the Debtors' cases and to combine notices to creditors and other parties in interest of the Debtors' respective estates. The Debtors anticipate that numerous notices, applications, motions, and other pleadings, hearings and orders in these cases will affect all of the Debtors.

18.     Joint administration will save time and money and avoid duplicative and potentially confusing filings by permitting parties in interest to: (a) use a single caption on all documents that will be served and filed in the Debtors' Chapter 11 Cases; and (b) file pleadings in one case rather than in multiple cases. Joint administration will also protect parties in interest by ensuring that parties in each of the Debtors' respective Chapter 11 Cases will be apprised of the various matters before the Court in these cases. Joint administration of these Chapter 11 Cases will ease the administrative burden for the Court and all parties in interest.

19.     The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases because the relief sought in the Joint Administration Motion is purely procedural and is in no way intended to affect substantive rights. Each creditor and other party in interest will maintain whatever rights it has against the particular estate in which it allegedly has a claim or interest.

20.     To eliminate cumbersome and confusing procedures and ensure the uniformity of pleadings, the Debtors are requesting that the following official caption be used by all parties in all pleadings in the jointly administered cases be as follows (including footnote text included at bottom of page):

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Alternative Distribution Systems, Inc., *et al.*[8] | ) | Case No. 09-_____ (   ) |
|  | ) |  |
| Debtors. | ) | Joint Administration Requested |
|  | ) |  |

21.     The Debtors are also requesting a docket entry, substantially similar to the following be entered on the docket of each case to reflect the joint administration of these Chapter 11 Cases:

> "An order pursuant to Federal Rule of Bankruptcy Procedure 1015(b) has been entered in this case directing the joint administration of the chapter 11 cases of Alternative Distribution Systems, Inc. (Case No. 09-____), May Logistics Services, Inc. (Case No. 09-____) and ADS Logistics, LLC (Case No. 09-____). The case of Alternative Distribution Systems, Inc. (Case No. 09-____) has been designated the 'lead' case; accordingly, the docket in Case No. 09-____ should be consulted for all matters affecting the chapter 11 case of this debtor."

22.     Finally, the Debtors seek authority to file, on a consolidating basis, the monthly operating reports required by the United State Trustee if the Debtors determine, after consultation with the United States Trustee, that consolidating reports would further administrative economy and efficiency without prejudice to any party in interest and that consolidating reports would accurately reflect the Debtors' business operations and financial affairs.

## II.     PROFESSIONAL RETENTION AND RELATED APPLICATIONS AND MOTIONS

---

[8] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Alternative Distribution Systems, Inc. (2412); May Logistics Services, Inc. (4970); and ADS Logistics, LLC (0782).

**A. Application of the Debtors for an Order Authorizing the Employment and Retention of Proskauer Rose LLP *Nunc Pro Tunc* to the Petition Date (the "Proskauer Retention Application")**

23.     The Debtors seek the entry of an order authorizing the employment and retention of Proskauer Rose LLP ("Proskauer").

24.     The Debtors selected Proskauer because its attorneys have extensive experience, knowledge and resources in the area of debtors' and creditors' rights, and, in addition to a national bankruptcy practice, have extensive experience with the bankruptcy courts in various jurisdictions. Proskauer has the ability to commit substantial resources to legal problems on an urgent basis. The Debtors, therefore, believe that Proskauer is well qualified to represent them in these Chapter 11 Cases.

25.     In assisting the Debtors with the filing of these Chapter 11 Cases and as a result of Proskauer's prepetition representation of the Debtors, Proskauer's attorneys have become familiar with the factual and legal issues that will have to be addressed in these Chapter 11 Cases. The retention of Proskauer, with its knowledge of and experience with the Debtors and the industry in which they operate, will assist in the efficient administration of the estates, thereby minimizing the expense to the estates.

26.     Proskauer is well suited to represent the Debtors in these Chapter 11 Cases. Proskauer has extensive experience in handling large and complex chapter 11 cases, including the representations of Philadelphia Newspapers, LLC, USI Senior Holdings, Inc., G.I. Joe's, Inc., Caritas Health Care, Inc., Whitehall Jewelers, Inc., Frank's Nursery & Crafts, Inc., Lechters N.Y.C., Inc., The Museum Company, Inc., Rose's Stores, Inc., Metalforming Technologies, Inc., Happy Kids, Inc., Superior Telecom, Inc., Advanced Glassfiber Yarns, LLC, Provell, Inc., Tandycrafts, Inc., MMH Holdings, Inc., Trism, Inc., Golden Books Family Entertainment, Inc., Reeves Industries, Inc., Lone Star Industries, Inc., LJ Hooker Corporation, Inc., Todd Shipyards

Corporation, Al Copeland Enterprises, Inc. (Popeye's and Church's Fried Chicken), Vestron, Inc., Berkey, Inc., Ithaca Industries, Inc., Reeves Industries, Inc., Buster Brown Apparel, Inc., the chapter 11 trustee of Allegheny Health, Education and Research Foundation and numerous other corporations and clients for which Proskauer has provided services similar to those described in the Proskauer Retention Application. Thus, Proskauer has the requisite expertise on matters which are likely to arise in these Chapter 11 Cases including, without limitation, the handling of complex bankruptcy and debt restructuring problems and procedures arising in the chapter 11 framework.

27. The primary attorneys anticipated to work on this engagement are Jeff J. Marwil, Peter J. Young and Grayson T. Walter. Mr. Marwil is a partner, and Messrs. Young and Walter are associates, at Proskauer. Messrs. Marwil, Young and Walter are members in good standing of the bar of the State of Illinois.

28. Contemporaneously herewith, the Debtors have filed an application seeking to retain Cole, Schotz, Meisel, Forman & Leonard, P.A., as their local counsel, in these Chapter 11 Cases. Proskauer does not maintain an office in the State of Delaware and, therefore, the Debtors are required to retain local counsel.

29. The services of Cole, Schotz, Meisel, Forman & Leonard, P.A will complement, and not duplicate, the services rendered by Proskauer. Indeed, the Debtors are extremely mindful of the need to avoid duplication of services and will implement appropriate procedures to ensure that there is minimal, if any, duplication.

30. The Debtors require Proskauer to act as their counsel for insolvency and related matters and to render legal services relating to the day-to-day administration of these Chapter 11

Cases and the myriad problems that may arise in these cases, including, without limitation, the following services:

a.      advising the Debtors of their powers and duties as debtors in possession;

b.      advising the Debtors regarding matters of bankruptcy law;

c.      representing the Debtors in proceedings and hearings in the United States District and Bankruptcy Courts for the District of Delaware;

d.      preparing on behalf of the Debtors any necessary motions, applications, orders and other legal papers;

e.      providing assistance, advice and representation concerning any potential sale of the Debtors as a going concern or the sale of all or a significant portion of the Debtors' assets;

f.      providing assistance, advice and representation concerning the confirmation of any proposed plan(s) and solicitation of any acceptances or responding to rejections of such plan(s);

g.      providing assistance, advice and representation concerning any investigation of the assets, liabilities and financial condition of the Debtors that may be required under local, state or federal law;

h.      prosecuting and defending litigation matters and such other matters that might arise during these Chapter 11 Cases;

i.      providing counseling and representation with respect to assumption or rejection of executory contracts and leases, sales of assets and other bankruptcy-related matters arising from these cases;

j.      rendering advice with respect to general corporate and litigation issues relating to these cases, including, but not limited to, securities, corporate finance, labor, tax and commercial matters; and

k.      performing such other legal services as may be necessary and appropriate for the efficient and economical administration of these Chapter 11 Cases.

31.     The Debtors have determined to seek authority from this Court to employ Proskauer under an advance fee payment, at Proskauer's customary hourly rates and under Proskauer's customary reimbursement policies, as set forth in the Marwil Declaration.

32.     Subject to this Court's approval, Proskauer will charge for its legal services on an hourly basis in accordance with its hourly rates in effect on the date such services are rendered and for its actual, reasonable and necessary out-of-pocket disbursements incurred in connection therewith, as set forth in the Marwil Declaration. For the information of the Court, the range of hourly rates generally charged by Proskauer, subject to periodic adjustment, is:

| Partner | $490–$975 |
| Senior Counsel | $350–$725 |
| Associate | $180–$650 |
| Paraprofessionals | $70–$275 |

33.     Based upon the Marwil Declaration, the Debtors believe that, except as set forth therein, Proskauer's partners and associates do not hold or represent any interest adverse to the Debtors and that Proskauer and each of its partners and associates is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code.

34.     Based upon the Marwil Declaration, the Debtors believe that Proskauer's partners and associates have no connection with the Debtors, the Debtors' directors and executive management, the Debtors' other professionals, the Debtors' equity holders, the Debtors' primary secured creditors, the Debtors' largest unsecured creditors, the Judges of the United States Bankruptcy Court for the District of Delaware, the United States Trustee (Region 3) and the Assistant Trustee and Trial Attorneys for the office of the United States Trustee, except as set forth in the Marwil Declaration.

35.     The Debtors believe that the employment of Proskauer would be in the best interests of the Debtors and their estates and desire to employ Proskauer, effective as of the

Petition Date, with compensation to be determined upon application to this Court. Were the Debtors required to engage counsel other than Proskauer in connection with these proceedings, the Debtors, their estates and all parties in interest would be unduly prejudiced by the time and expense necessarily attendant to such counsel's familiarization with the intricacies of the Debtors' businesses and financial affairs.

**B.    Application of the Debtors for an Order Authorizing the Employment and Retention of Cole, Schotz, Meisel, Forman & Leonard, P.A. as Co-Counsel to the Debtors Pursuant to 11 U.S.C. 327(a) *Nunc Pro Tunc* to the Petition Date (the "Cole Schotz Retention Application")**

36.    The Debtors seek the entry of an order authorizing the employment and retention of Cole, Schotz, Meisel, Forman & Leonard, P.A. ("Cole Schotz") as bankruptcy co-counsel for the Debtors.

37.    The Debtors seek to retain Cole Schotz as their co-counsel because of the firm's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code and because Cole Schotz is familiar with the Debtors' business. In preparing for these Chapter 11 Cases, Cole Schotz has become familiar with the Debtors' business and affairs and with many of the potential legal issues which may arise in the context of these cases. Accordingly, the Debtors believe that Cole Schotz is well-qualified and uniquely able to represent them in these Chapter 11 Cases in an efficient and timely manner.

38.    The Debtors contemplate that the legal services to be rendered by Cole Schotz will include:

    a.    advising the Debtors of their rights, powers and duties as debtors in possession;

    b.    advising the Debtors regarding matters of bankruptcy law;

c. representing the Debtors in proceedings and hearings in the United States Bankruptcy Court for the District of Delaware;

d. preparing on behalf of the Debtors any necessary motions, applications, orders, responses, and other legal papers;

e. providing assistance, advice, and representation concerning the confirmation of any proposed plan(s) and solicitation of any acceptances or responding to objections to such plan(s);

f. advising the Debtors concerning, and assisting in the negotiation and documentation of, financing agreements, debt restructurings, cash collateral arrangements, and related transactions;

g. providing assistance, advice, and representation concerning any possible sale of the Debtors' assets;

h. reviewing the nature and validity of liens asserted against the property of the Debtors and advising the Debtors concerning the enforceability of such liens;

i. providing assistance, advice and representation concerning any further investigation of the assets, liabilities, and financial condition of the Debtors that may be required under local, state, or federal law;

j. prosecuting and defending litigation matters and such other matters that might arise during these Chapter 11 Cases;

k. providing counseling and representation with respect to assumption or rejection of executory contracts and leases, sales of assets, and other bankruptcy-related matters arising from these cases;

l. rendering advice with respect to general corporate and litigation issues relating to these cases, including, but not limited to, securities, corporate finance, tax, and commercial matters; and

m. performing such other legal services as may be necessary and appropriate for the efficient and economical administration of these Chapter 11 Cases.

39.     The current rates of Cole Schotz members, associates and paralegals are as follows:[9]

---

[9] These rates are subject to periodic review and adjustment. The last adjustment occurred on September 1, 2008.

| Members | $380–$675 |
|---------|-----------|
| Associates | $240–$385 |
| Paralegals | $145–$215 |

40. To the best of the Debtors' knowledge, information, and belief, and based upon the Pernick Affidavit, Cole Schotz is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code.

41. To the best of the Debtors' knowledge, information, and belief, and based upon the Pernick Affidavit, Cole Schotz does not represent any party with an interest materially adverse to the Debtors or their estates.

42. The Debtors believe that the employment of Cole Schotz would be in the best interests of the Debtors and their estates and desire to employ Cole Schotz, effective as of the Petition Date, with compensation to be determined upon application to this Court. Were the Debtors required to engage counsel other than Cole Schotz in connection with these proceedings, the Debtors, their estates and all parties in interest would be unduly prejudiced by the time and expense necessarily attendant to such counsel's familiarization with the intricacies of the Debtors' businesses and financial affairs.

**C.**  **Application of Debtors for an Order Authorizing Employment and Retention of EVE Partners, LLC, as Financial Advisor, *Nunc Pro Tunc* to the Petition Date (the "EVE Retention Application")**

43. The Debtors seek to employ and retain EVE, as financial advisor, in accordance with the terms and conditions set forth in that certain Engagement Agreement among the Debtors and EVE, dated August 17, 2009 (the "Engagement Agreement").

44. In light of the size and complexity of these Chapter 11 Cases, the Debtors require the services of a seasoned and experienced financial advisor and one that is familiar with the Debtors' business, operations and industry. In particular, the Debtors require an experienced financial advisor to assist them in the process of marketing their business as a going concern and

evaluating any such proposed transaction. Additionally, the Debtors believe that by having a financial advisor provide these services in these bankruptcy cases, other professionals in these cases – and company officers who might otherwise handle complex financial and financing matters – will be able to focus better on their respective competencies and their core tasks: to efficiently and effectively manage the Debtors' business and operations and to facilitate a successful chapter 11 process.

45.    EVE is an investment banking firm with its principal office located at 3033 Maple Drive, NE, Atlanta, Georgia. EVE provides a broad range of corporate advisory services to its clients including, without limitation, services pertaining to: (i) general financial advice, (ii) mergers, acquisitions and divestitures, (iii) equity recapitalizations, (iv) distressed mergers and acquisitions and (v) corporate restructurings.

46.    EVE's practice is concentrated on providing investment banking and financial advisory services for the transportation and logistics industry, with a focus on mergers and acquisitions and research. EVE's senior professionals have extensive experience in the reorganization and restructuring of troubled companies. The Debtors selected EVE after considering their needs and alternatives and interviewing other firms.

47.    As a result of the prepetition engagement of EVE by the Debtors, EVE is familiar with the Debtors' business operations, capital structure, financing documents and other material information and is able to assist the Debtors in their restructuring efforts. The Debtors believe that EVE is well qualified to provide its services to the Debtors in a cost-effective, efficient and timely manner. EVE has indicated a willingness to act on behalf of the Debtors and subject itself to the jurisdiction and supervision of the Court. Additionally, the Debtors have been advised by EVE that EVE will coordinate with the other retained professionals in this bankruptcy case to

eliminate unnecessary duplication or overlap of work. The Debtors submit that the employment and retention of EVE would be in the best interest of the Debtors, their estates and creditors.

48.    As further set forth in the Engagement Agreement, the Debtors have requested that EVE serve as financial advisor during these Chapter 11 Cases to perform services (the "Services") on behalf of the Debtors in connection with the sale of the Debtors' assets (the "Transaction") including:

> a.    assisting the Debtors in the preparation and distribution of materials describing the Transaction;
>
> b.    undertaking financial analysis relating to the Transaction;
>
> c.    coordinating due diligence efforts;
>
> d.    advising the Debtors regarding the economic terms of a Transaction;
>
> e.    advising the Debtors on strategy and tactics during the negotiation of a Transaction; and
>
> f.    assisting, where appropriate, in expediting the documentation for and the closing of any Transaction.

49.    As set forth more fully in the Engagement Agreement, and subject in its entirety to the terms set forth in the Engagement Agreement, EVE will be compensated for the Services, subject to Court approval, in the following manner (the "Fee Structure"):

> a.    A non-refundable retainer in the amount of $50,000; and
>
> b.    A fee (the "Fee") equal to two percent (2.0%) of the Gross Value (as defined in the Engagement Agreement) of a Transaction, provided however, no Fee will be payable to EVE for a "credit bid" transaction consummated by the Debtors' senior lenders.

50.    Subject to approval of this Court and the terms of the Engagement Agreement, the Debtors shall reimburse EVE for all out-of-pocket expenses (including reasonable fees and expenses of its counsel, travel and lodging expenses, telephone, facsimile and printing expenses and other customary expenditures) incurred by EVE in connection with the engagement.

51.     The Debtors believe that the Fee Structure is comparable to those generally charged by financial advisory and investment banking firms of similar stature to EVE and for comparable engagements, both in and out of bankruptcy proceedings, and reflect a balance between a fixed and a contingent amount which is tied to the consummation and closing of the transactions and services contemplated by the Debtors and EVE in the Engagement Agreement.

52.     The hours worked, the results achieved and the ultimate benefit to the Debtors of the work performed by EVE in connection with this engagement may vary and the Debtors have taken this into account in setting the above fees.  In order to induce EVE to do business with the Debtors, the fees were set with consideration of the difficulty of the assignment and the potential for failure (among other things).

53.     EVE's restructuring capabilities and mergers and acquisitions expertise were important factors to the Debtors in determining the Fee Structure and the Debtors believe that the ultimate benefit to the Debtors of EVE' services hereunder cannot be measured merely by reference to the number of hours to be expended by EVE' professionals in the performance of such services.

54.     The Debtors also acknowledge and agree that the Fee Structure has been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of EVE and its professionals, and in light of the fact that such commitment may foreclose other opportunities for EVE and that the actual time and commitment required of EVE and its professionals to perform the Services may vary substantially from week to week or month to month, creating "peak load" issues for the firm.

55.     In light of the foregoing, the Debtors believe that the Fee Structure is both fair and reasonable under the circumstances of this engagement.

56.     Based upon the Mamo Declaration and subject to the disclosures made therein, EVE has informed the Debtors that EVE:  (a) is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code, as modified by Section 1107(b); and (b) does not hold or represent an interest adverse to the Debtors' estates.  Furthermore, except as disclosed in the Mamo Declaration, EVE has indicated that based on the results of its conflicts research conducted to date, and to the best of its knowledge, neither EVE, nor any employee thereof, has any connection with the Debtors, its creditors, equity holders, or any other parties in interest (as reasonably known to EVE) or their respective attorneys and accountants, or the United States Trustees or any person employed in the office of the United States Trustee.

57.     EVE has informed the Debtors that it is not the general practice of investment banking firms to keep detailed time records similar to those customarily kept by attorneys and other professionals who are compensated on an hourly basis or maintain time on a "project category basis."  The Debtors believe that if EVE was required to keep detailed time entries or keep time records on a "project category" basis as required by the rules of this Court, it would be unduly burdensome and time consuming.  Thus, given that the nature of EVE's Fee Structure is not based upon the amount of time spent providing financial advisory services, the Debtors and EVE request that the Local Rules of this Court be modified with respect to EVE so as to allow EVE to submit its billing records to the court in a summary format which sets forth reasonably detailed daily descriptions of those services provided on behalf of the Debtors, the approximate time in one hour billing increments expended in providing those services and the individuals who provided professional services on behalf of the Debtors.

58.     As set forth in the Engagement Agreement and subject to the terms and conditions therein, the Debtors agreed to the following (the "Indemnity Provision"):

the Debtors agree to indemnify and hold harmless EVE, its members, directors, employees, officers, agents and controlling persons (each, an "Indemnified Party") from and against any and all losses, claims damages, liabilities (whether direct or indirect) and expenses, joint or several (including all fees of counsel and other expenses incurred by any Indemnified Party in connection with the preparation for, or defense of, any claim, action or proceeding, whether or not resulting in any liability) or any settlements relating to such claims, to which such Indemnified Party may become subject under any applicable federal or state law, or otherwise, caused by or arising out of EVE's acting for the Debtors pursuant to the Engagement Agreement, the transactions contemplated thereby, or EVE's role in connection therewith, except that the Debtors will not be held liable to the extent any loss, claim, damage, liability or expense is determined by final judgment of a court of competent jurisdiction to have resulted primarily from EVE's gross negligence or willful misconduct.

59.     The Debtors believe the Indemnity Provision is a reasonable term and condition of the EVE engagement. Unlike the market for other professionals that the Debtors may retain, indemnification is a standard term of the market for investment bankers and financial advisors. EVE and the Debtors believe that the Indemnity Provision is comparable to those generally obtained by financial advisory and investment banking firms of similar stature to EVE and for comparable engagements, both in and out of court.

60.     Pursuant to the Engagement Agreement and subject to the terms and conditions set forth therein, Debtors and EVE further agreed to the following "Arbitration Provision":

Any controversy or claim arising out of or relating to the Engagement Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules in Atlanta, Georgia, and judgment of the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

61.     The Debtors believe the Arbitration Provision is a reasonable term and condition of the engagement. An arbitration provision is a standard contract term for financial advisors and investment bankers. The Debtors believe that the Arbitration Provision is comparable to

those generally obtained by financial advisory and investment banking firms of similar stature to EVE and for comparable engagements, both in and out of court.

62. The Debtors believe that the provisions set forth above are reasonable terms and conditions of the EVE engagement. Furthermore, subject to the additional provision regarding indemnity set forth in the EVE Retention Application, the Debtors and EVE negotiated the Fee Structure in contemplation that the provisions of the Engagement Agreement would be approved by this Court in its entirety.

63. The Debtors believe that the employment of EVE would be in the best interests of the Debtors and their estates and desire to employ EVE, effective on the Petition Date, with compensation to be determined upon application to this Court. Were the Debtors required to engage a financial advisor other than EVE in connection with these proceedings, the Debtors, their estates and all parties in interest would be unduly prejudiced by the time and expense necessarily attendant to such counsel's familiarization with the intricacies of the Debtors' businesses and financial affairs.

**D.** **Debtors' Application for Entry of an Order Pursuant to Sections 105 and 363 of the Bankruptcy Code Authorizing and Approving (i) the Engagement Agreement with Robert F. Angart to Serve as Interim Chief Executive Officer of the Debtors and (ii) the Employment of Temporary Staff** *Nunc Pro Tunc* **to September 2, 2009 (the "CEO Retention Application")**

64. The Debtors are requesting entry of an order (i) authorizing and approving the Engagement Agreement with Robert F. Angart to serve as interim Chief Executive Officer ("CEO") of each of the Debtors and (ii) authorizing the employment of additional Temporary Staff.

65. The Debtors anticipate that Mr. Angart may render the following services in these cases:

a.     directing the Debtors' operations, including the efforts of other professionals in connection with the Debtors' financial restructuring, including all sale, refinancing, or liquidation activities;

b.     directing negotiations with, and reporting to, the Debtors' significant creditors, including without limitation, trade creditors and senior lenders (including any lenders under any debtor-in-possession credit arrangement and any Creditors Committee);

c.     directing the negotiations with all parties interested in the possible acquisition of the Debtors' assets within the Bankruptcy process, and evaluating all such offers for purposes of deriving the best and highest value for all such assets for the benefit of the Debtors' creditors;

d.     assisting the Debtors in complying with the requirements of the Bankruptcy Code;

e.     assisting in the development and implementation of a plan of reorganization, if appropriate;

f.     directing all cash management matters throughout the pendency of the bankruptcy process;

g.     maintaining full responsibility for all of the Debtors' operations, including, but not limited to day to day supervision of all aspects of the Debtors and their personnel;

h.     reporting to the Debtors' boards of directors and board of managers;

i.     responding to all inquiries of the Bankruptcy Court, the U.S. Trustee's Office and the Debtors' creditor constituencies during the course of the bankruptcy process, including compliance with all aspects of any debtor-in-possession operations; and

j.     other such functions as requested by the Debtors or their counsel to assist the Debtors in these Chapter 11 Cases.

66.     As indicated in the Engagement Agreement, Mr. Angart has agreed to serve as the Debtors' CEO.   Working collaboratively with the Debtors' senior management team, the Debtors' Boards of Directors and Board of Managers and the Debtors' other professionals, Mr. Angart and the Temporary Staff will assist management in the oversight of the daily operations of the Debtors' business and assist the Debtors in evaluating strategic and tactical options,

including directing the negotiations with parties interested in the acquisition of the Debtors' assets within the bankruptcy process, and providing other executive and management services during the chapter 11 process. Mr. Angart will also provide oversight with certain elements of the Debtors' cash management functions.

67.     The Debtors respectfully submit that the services to be provided by Mr. Angart will not be duplicative of those provided by the Debtors' other professionals and Mr. Angart will coordinate any services performed at the Debtors' request with the services of the Debtors' other professionals to avoid duplication of effort.

68.     The Engagement Agreement provides that Mr. Angart will be compensated for his services at the rate of $350 per hour. Moreover, the Temporary Staff to be hired by Mr. Angart will be compensated at rates ranging from $175 to $650 per hour, depending upon the relative experience of the individuals employed as Temporary Staff. Mr. Angart and the Temporary Staff will be compensated on a hourly rate basis only for the actual time spent providing services to the Debtors. The noted hourly rates are the current rates in effect, and may be increased from time to time in accordance with the normal billing practices of Mr. Angart and the Temporary Staff.

69.     Mr. Angart and the Temporary Staff will also seek reimbursement for necessary expenses incurred, which shall include airfare, hotel, meals, mileage, parking, car rentals, photocopying and other incidentals as well as any attorney fees incurred in providing professional services.

70.     Mr. Angart will submit weekly invoices to the Debtors, with copies of such invoices to the United States Trustee and any Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases. The Debtors will be authorized to pay, in the ordinary

course of their business, all reasonable amounts invoiced by Mr. Angart for fees and out of pocket expenses on a weekly basis. Mr. Angart will not be paid a profit or "markup" on any such out of pocket expenses.

71.     In the Engagement Agreement, the Debtors agreed to indemnify, hold harmless and defend Mr. Angart, the Temporary Staff and their affiliates, along with their directions, officers and principals and consultants, against all claims, liabilities, losses, damages and reasonable expenses as they are incurred, including reasonable legal fees and disbursements of counsel, as further described in the Engagement Agreement, except for claims ultimately determined by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of those parties. Notwithstanding anything in the Engagement Agreement, the Debtors request the authority to indemnify Mr. Angart and the Temporary Staff on the same terms as provided to the Debtors' other officers and directors under the corporate bylaws and applicable state law, along with insurance coverage under the Debtors' insurance policies.

72.     Furthermore, Mr. Angart and the Temporary Staff will be entitled to receive whatever indemnities are made available, during the term of the engagement, to other, officers of the Debtors, whether under the by-laws, certificates of incorporation, applicable corporate laws or contractual agreements of general applicability to such officers.

73.     The Debtors believe that Mr. Angart is highly skilled turnaround professional focused on assisting companies, and creditors of companies, that are experiencing financial difficulties.

74.     Mr. Angart has been a turnaround professional since 2000, serving clients in the manufacturing, distribution, automotive, high technology, real estate, long-term care, insurance, non-profit organization and printing industries. His assignments have included consulting roles,

president, chief operating officer, chief restructuring officer and chief financial officer positions, and investigating fraudulent transactions through forensic analysis.

75.     Mr. Angart is experienced in both large and small cases; whereby clients have ranged in size from $5 million in sales to $2 billion in sales.  He is experienced in the turnaround of companies, crisis management, out-of-court workouts, sale and liquidation of assets, restructuring and refinancing of debts, and chapter 11 restructuring and sale processes.

76.     The Debtors believe that Mr. Angart is uniquely qualified to assist them in these Chapter 11 Cases.

77.     Based on the Angart Declaration, and subject to the disclosures, exceptions and limitations set forth therein, the Debtors believe Mr. Angart to be a "disinterested person" as that term is defined in the Bankruptcy Code.

78.     Based on the Angart Declaration, and subject to the disclosures, exceptions and limitations set forth therein, the Debtors believe that Mr. Angart does not hold or represent an interest adverse to the estate with respect to the matters on which he will be employed, in accordance with section the Bankruptcy Code.

79.     Mr. Angart has informed the Debtors that (a) Mr. Angart's connections with the Debtors, creditors, equity holders, any other party in interest, or their respective attorneys and accountants, the United States Trustee, or any person employed in the Office of the United States Trustee are disclosed in the Angart Declaration; and (b) Mr. Angart is not a relative of the United States Trustee for the District of Delaware or of any known employee in the office thereof, or any United States Bankruptcy Judge of the District of Delaware.

80. Mr. Angart has informed the Debtors that he has not provided, and will not provide, professional services to any of the creditors, other parties-in-interest, or their attorneys with regard to any matter related to these Chapter 11 Cases.

81. Prior to the Petition Date, Chad Peterson and I (collectively the "QORVAL Staff"), each of whom will assist Mr. Angart as Temporary Staff during these Chapter 11 Cases, were retained by the Debtors as turnaround consultants and served as officers and directors or managers of the Debtors. Accordingly, the QORVAL Staff are not "disinterested persons" as that term is defined in section 101(14) of the Bankruptcy Code. Notwithstanding the lack of disinterestedness on account of our prior service as officers and directors or managers of the Debtors, the Debtors and Mr. Angart believe that the continued assistance of the QORVAL Staff is critical to the Debtors' successful operation of their business during the chapter 11 process. By virtue of our prepetition service, the QORVAL Staff has developed an extensive knowledge of the Debtors business and operations which will be vital to the day to day management of the Debtors business during these Chapter 11 Cases. In addition, based upon my declaration attached to the CEO Retention Application (the "QORVAL Declaration"), subject to the disclosures, exceptions and limitations set forth therein, the Debtors believe that the QORVAL Staff does not hold or represent an interest adverse to the estate with respect to the matters on which they will be employed.

82. As provided in the QORVAL Declaration, and subject to the disclosures, exceptions and limitations set forth therein, I have informed the Debtors that: (a) the QORVAL Staff's connections with the Debtors, creditors, equity holders, any other party in interest, or their respective attorneys and accountants, the United States Trustee, or any person employed in the Office of the United States Trustee are disclosed in the QORVAL Declaration; and (b) none of

the QORVAL Staff are relatives of the United States Trustee for the District of Delaware or of any known employee in the office thereof, or any United States Bankruptcy Judge of the District of Delaware.

83. I have informed the Debtors that the QORVAL Staff has not provided, and will not provide, professional services to any of the creditors, other parties in interest, or their attorneys, with regard to any matter related to these Chapter 11 Cases.

84. The Debtors submit that their employment of Mr. Angart as CEO and the Temporary Staff, pursuant to the terms and conditions of the Engagement Agreement is in the best interest of the Debtors, their estates and creditors, as the expertise of Mr. Angart and the Temporary Staff in providing restructuring and management services to chapter 11 debtors and debtors in possession, coupled with their familiarity with the Debtors, their operations and financial condition, make Mr. Angart and the Temporary Staff uniquely qualified to provide the restructuring and management (including Mr. Angart serving as CEO) contemplated in the Engagement Agreement. The Debtors submit that, based on the facts and circumstances of these Chapter 11 Cases, the relief requested in the CEO Retention Application is necessary, prudent and a sound exercise of the Debtors' business judgment.

85. The Debtors submit that the employment of Mr. Angart and the Temporary Staff under the terms contained in the Engagement Agreement would greatly benefit the Debtors' estates and creditors.

**E.  Application of Debtors for an Order Authorizing the Employment and Retention of BMC Group, Inc., as Official Claims, Notice and Solicitation Agent (the "BMC Retention Application")**

86. The Debtors seek to employ and retain BMC as Claims Agent to perform notice and claims services for the Debtors in these Chapter 11 Cases on the terms and subject to the conditions of the engagement letter attached to the BMC Retention Application.

87. The Debtors estimate that there are in excess of 500 creditors and other parties in interest in these Chapter 11 Cases, many of which are expected to file proofs of claim. The distribution of notices, and the receipt, docketing, and maintenance of proofs of claim in these Chapter 11 Cases would be unduly time consuming and burdensome for the Clerk's Office.

88. The Debtors believe that the retention of the Claims Agent as the official noticing, claims and solicitation agent in these Chapter 11 Cases to render such services is in the best interests of their estates and parties in interest. As set forth more fully in the Feil Affidavit, the Claims Agent is a nationally recognized specialist in chapter 11 administration. The Claims Agent has considerable experience in noticing and claims administration in chapter 11 cases.

89. Subject to the Court's approval, at the Debtors' or the Clerk's Office's direction, as the case may be, and in accordance with any court order in or rules applicable to the Debtors' Chapter 11 Cases (including a court order authorizing the Claims Agent's engagement), the Claims Agent will, among other things, assist the Debtors, Proskauer Rose LLP and Cole, Schotz, Meisel, Forman & Leonard, P.A, as counsel ("Counsel") for the Debtors, and/or the Clerk's Office with noticing and claims docketing, and assist the Debtors with the compilation, administration, evaluation and production of documents and information necessary to support a restructuring effort. At the Debtors', Counsel's or the Clerk's Office's direction, as the case may be, and in accordance with any court orders or rules in the Chapter 11 Cases (including any court order authorizing the Claims Agent's engagement), the Claims Agent will: (a) prepare and serve those notices required in the bankruptcy; (b) assist the Debtors and Counsel with the administrative management, reconciliation and resolution of claims; (c) assist with the preparation, maintenance and update of the Debtors master lists and databases of creditors; (d) assist with the production of reports, exhibits and schedules of information, as needed, for use by

the Debtors' Counsel; (e) provide other technical and document management services of a similar nature requested by the Debtors or the Clerk's office; and (f) facilitate or perform distributions, if requested.

90.     The Debtors proposed to compensate and reimburse the Claims Agent in accordance with the payment terms of the Agreement for all services rendered and expenses incurred in connection with the Chapter 11 Cases.  The Debtors will pay the Claims Agent's standard prices for its services, expenses and supplies at the rates or prices in effect on the day such services and/or supplies are provided to the Debtors, in accordance with the fee schedule attached to the Agreement.  The Debtors will also pay the Claims Agent for any necessarily incurred out-of-pocket reasonable expenses for transportation, lodging, meals and related items. In connection with noticing services, if necessary and upon the Claims Agent's request, the Debtors will prepay estimated postage amounts with respect to each notice or shall authorize the Claims Agent to cause the courier's charges to be stated to the Debtors' own account with the courier.  The Debtors believe that such compensation rates are reasonable and appropriate for services of this nature and comparable to those charged by (a) the Claims Agent in other chapter 11 cases in which it has served as claims and noticing agent and (b) other providers of similar services. The Claims Agent is not a prepetition creditor of the Debtors' estates.

91.     In an effort to reduce the administrative expenses related to the Claims Agent's retention, the Debtors seek authorization to pay the Claims Agent's fees and expenses on a monthly basis in accordance with the provisions of the Agreement and without the necessity of the Claims Agent filing formal fee applications with the Court.

92.     To the best of the Debtors' knowledge, neither the Claims Agent nor any of its members or employees holds or represents any interest adverse to the Debtors' estates or

creditors with respect to the services described in the BMC Retention Application and in the Agreement.

**F.     Motion of the Debtors for an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Members of Official Committees (the "Interim Compensation Motion")**

93.     The Debtors are seeking entry of an order establishing an orderly process for the allowance and payment of compensation for professional services rendered and reimbursement of expenses incurred by professionals whose retentions are approved by this Court and who will be required to file applications for allowance of compensation and reimbursement of expenses. In addition, the Debtors seek entry of an order establishing a procedure for reimbursement of reasonable out-of-pocket expenses incurred by members of any statutory committees appointed in these Chapter 11 Cases.

94.     The Debtors propose that the monthly payment of compensation and reimbursement of expenses of the Professionals (the "Compensation Procedures") be structured as follows:

> a.     On or before the 30th day of each calendar month following the month for which compensation or reimbursement is sought, or as soon as practicable thereafter (but not earlier than the 5th day of each calendar month), each Professional seeking compensation or reimbursement may file an application with the Court (a "Monthly Fee Application") for such compensation or reimbursement and serve the Monthly Fee Application, by electronic mail, U.S. mail, or overnight delivery, on: (i) Alternative Distribution Systems, Inc., 116 East 1100 North, Chesterton, Indiana, Attn: Timothy M. May, Chief Operating Officer; (ii) Proskauer Rose LLP, Three First National Plaza, 70 West Madison, Suite 3800, Chicago, IL 60602-4342, Attn: Jeff J. Marwil; (iii) Cole, Schotz, Meisel, Forman & Leonard, P.A., 500 Delaware Avenue, Suite 1410, Wilmington, DE 19801, Attn: Norman L. Pernick; (iv) attorneys for any Committees; (v) counsel to the prepetition agent for the First Lien Lenders, Sidley Austin LLP, One South Dearborn Street, Chicago, IL 60603, Attn: William A. Evanoff, and Richards Layton & Finger, 290 North King Street, Wilmington, DE 19801, Attn: Mark D. Collins; and (vi) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (collectively, the "Notice Parties").

b.      Any Professional that fails to file a Monthly Fee Application for a particular month or months may subsequently submit a consolidated Monthly Fee Application for a particular month or months. All Monthly Fee Applications will comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), applicable Third Circuit law and the Local Rules.

c.      For those Professionals who bill based on time, each Monthly Fee Application must contain a list of the individuals and their respective titles (*e.g.*, attorney, accountant, or paralegal) who provided services during the statement period, their respective billing rates, the aggregate hours spent by each individual, a reasonably detailed breakdown of the disbursements incurred, and contemporaneously maintained time entries for each individual in increments of tenths (1/10) of an hour.

d.      Each Notice Party will have until 4:00 p.m. (prevailing eastern time) on the 10th day (or the next business day if such day is not a business day) following service of a Monthly Fee Application (the "Objection Deadline") to object to the requested fees and expenses in accordance with the procedures described in subparagraph (e) below. Upon the expiration of the Objection Deadline, a Professional may file a certificate of no objection ("CNO") with the Court with respect to the unopposed portion of the fees and expenses requested in its Monthly Fee Application. After a CNO is filed, the Debtor is authorized and directed to pay the Professional an amount (the "Actual Monthly Payment") equal to the lesser of (i) 80 percent of the fees and 100 percent of the expenses requested in the applicable Monthly Fee Application (the "Maximum Monthly Payment") and (ii) 80 percent of the fees and 100 percent of the expenses requested in the applicable Monthly Fee Application that are not subject to an objection pursuant to subparagraph (e) below.

e.      If any Notice Party wishes to object to a Professional's Monthly Fee Application, it must (i) file a written objection (an "Objection") with the Court on or before the Objection Deadline and (ii) serve the Objection on the affected Professional and each of the other Notice Parties so that it is received by each of these parties on or before the Objection Deadline. Thereafter, the objecting party and the affected Professional may attempt to resolve the Objection on a consensual basis. If the parties are unable to reach a resolution of the Objection, the affected Professional may either (i) file a request with the Court for payment of the difference between the Maximum Monthly Payment and the Actual Monthly Payment made to the affected Professional (the "Incremental Amount") or (ii) forego payment of the Incremental Amount until the next interim or final fee application hearing, at which time the Court will consider and dispose of the objection if requested by the parties.

f.      Each Professional may submit its first Monthly Fee Application no earlier than the 5th day of October, 2009, the first full month of the Debtors' cases. This initial Monthly Fee Application will cover the period from the Petition Date through September 30, 2009. Thereafter, the Professionals may file Monthly Fee Applications in the manner described above.

g.      The decision by any party not to object to a Monthly Fee Statement shall not be a waiver of any kind or prejudice that party's right to object to any Application subsequently made to the Court in accordance with the Bankruptcy Code.

h.      At three-month intervals or such other intervals convenient to the Court (the "Interim Fee Period"), each of the Professionals may file with the Court and serve on the Notice Parties a request (an "Interim Fee Application Request") for interim Court approval and allowance of the compensation and reimbursement of expenses sought by such Professional in its Monthly Fee Applications, including any holdbacks, filed during the Interim Fee Period.

i.      The Debtors will request that the Court schedule a hearing on the Interim Fee Application Requests at least once every six months or at such other intervals as the Court deems appropriate. If no Objections are pending and no Additional Objections are timely filed, the Court may grant an Interim Fee Application Request without a hearing.

j.      Any Professional who fails to file an Interim Fee Application Request seeking approval of compensation and expenses previously paid under the Interim Compensation Motion when due shall be ineligible to receive further monthly payments of fees or expenses until further order of the Court.

k.      The pendency of an Objection to payment of compensation or reimbursement of expenses will not disqualify a Professional from the future payment of compensation or reimbursement of expenses under the Compensation Procedures. Any Professional that fails to file a Monthly Fee Application or an Interim Fee Application Request when due or permitted will be ineligible to receive further interim payments of fees or expenses under the Compensation Procedures until such time as a Monthly Fee Application or Interim Fee Application Request is submitted by the Professional. There will be no other penalties for failing to file a Monthly Fee Application or an Interim Fee Application Request in a timely manner.

l.      Neither the payment of, nor the failure to pay, in whole or in part, monthly compensation and reimbursement, shall have any effect on the Court's interim or final allowance of compensation and reimbursement of

expenses for any Professional. All fees and expenses paid to Professionals under the Compensation Procedures are subject to disgorgement until final allowance by the Court.

95.    The Debtors are further requesting that the Court limit service of interim and final Applications to the Notice Parties, with notice of any hearings (the "Hearing Notice") thereon to be served on any parties that have filed a notice of appearance with the Clerk of this Court and requested notice of pleadings in these Chapter 11 Cases. Serving the Applications and the Hearing Notices in this manner will permit the parties most active in these Chapter 11 Cases to review and object to the Professionals' fees and will save unnecessary duplication and mailing expenses.

96.    The Compensation Procedures will enable the Debtors to closely monitor costs of administration, maintain appropriate cash flow, and implement efficient cash management procedures. Moreover, the Compensation Procedures will allow the Court and key parties in interest to insure the reasonableness and necessity of the compensation and reimbursement sought pursuant to such procedures.

97.    The Debtors submit that the efficient administration of the chapter 11 cases will be significantly aided by establishing the foregoing interim compensation and expense reimbursement procedures. Accordingly, the relief requested is in the best interests of the Debtors, their estates, and creditors.

98.    The Debtors anticipate that the members of Committees (each, a "Committee Member") will incur certain out-of-pocket expenses and will seek reimbursement of those expenses from the Debtors. For similar reasons to those stated above with respect to the Professionals, the Compensation Procedures should also apply to the Committee Members.

99.    The proposed Compensation Procedures and other procedures proposed in the Interim Compensation Motion are designed to promote the efficient administration of these

Chapter 11 Cases, while at the same time allowing for appropriate monitoring of the Professionals' fees.

100.    The size of these cases and the amount of time and effort that will be required from the Professionals to appropriately address the Debtors' business concerns justifies the Compensation Procedures. Indeed, such Compensation Procedures are necessary to ensure that the Professionals are compensated fairly and timely for their services in these cases, and are not forced to bear undue financial burden or risk caused by delays in payment. The Debtors respectfully submit that the Compensation Procedures sought by the Interim Compensation Motion are appropriate in light of the foregoing.

**G.    Motion of the Debtors for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals in the Ordinary Course of Business (the "OCP Motion")**

101.    By the OCP Motion, the Debtors seek authorization to continue, in their sole discretion, to retain and compensate ordinary course professionals (collectively, "OCPs") on a postpetition basis in accordance with the procedures for retention and compensation of OCPs set forth in the OCP Motion.

102.    The Debtors propose to retain each OCP (subject to such OCP filing and serving a declaration of disinterestedness) and pay each OCP, without formal application to the Court by any OCP, 100% of fees and disbursements to each of the OCPs retained by the Debtors after such OCP: (a) files with the Court and serves upon the Notice Parties (as defined in the OCP Procedures) a declaration of disinterestedness in accordance with the OCP Procedures; and (b) submits to the Debtors an appropriate invoice setting forth in reasonable detail the nature of the services rendered after the Petition Date; provided that, while these Chapter 11 Cases are pending, the fees of each OCP, excluding costs and disbursements, do not exceed $15,000 per

month and that, in the aggregate, OCPs' fees, excluding disbursements, do not exceed $75,000 per month (the "OCP Cap").

103.    The Debtors proposed that if an OCP's fees, excluding costs and disbursements, exceed the OCP Cap for any given month, on or before the final day of the month following the month for which compensation is sought, such OCP shall submit a monthly statement (each, a "Monthly Statement") to the Notice Parties (as defined in the OCP Procedures). The Monthly Statement shall include reasonably detailed invoices indicating the nature of the services rendered with fees and expenses calculated in accordance with such OCP's standard billing practices. The Notice Parties (as defined in the OCP Procedures) will have twenty (20) days after service of the Monthly Statement to object to the fees requested therein. The Debtors submit that this process is necessary to avoid any disruption in the professional services that are required for the day-to-day operation of the Debtors' business while ensuring that the fees and expenses for the OCPs are monitored effectively.

104.    The Debtors respectfully submit that the continued retention and compensation of the OCPs is in the best interests of their estates, creditors and other parties in interest. While some OCPs may wish to continue to represent the Debtors on an ongoing basis, others may be unwilling to do so if the Debtors cannot pay them on a regular basis. Without the background knowledge, expertise and familiarity that the OCPs have relative to the Debtors and their operations, the Debtors undoubtedly would incur additional and unnecessary expenses in educating replacement professionals about the Debtors' business and financial operations. Moreover, the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' business. Additionally, in light of the significant costs associated with the preparation of retention

applications for professionals who will receive relatively modest fees, the Debtors submit that it would be impractical, inefficient and extremely costly for the Debtors and their legal advisors to prepare and submit individual applications and proposed retention orders for each OCP.

105.    The Debtors represent that:  (a) the retention of the OCPs is necessary for the day-to-day operations of the Debtors' business; (b) expenses for the OCPs will be monitored; and (c) except as may be disclosed in the OCP Motion, the OCPs will not perform substantial bankruptcy-related services without filing an application with this Court for separate retention as a non-ordinary course professional.

106.    Although some of the OCPs may hold minor unsecured claims against the Debtors in connection with services rendered to the Debtors prepetition, the Debtors do not believe that any of the OCPs have an interest materially adverse to the Debtors, their creditors, or other parties in interest.  In any event, the OCP Procedures include a requirement that OCPs file declarations of disinterestedness before an OCP may be compensated.  By the OCP Motion, the Debtors are not requesting authority to pay prepetition amounts owed to OCPs.

## III.    OPERATIONAL MOTIONS

A.    **Motion of Debtors for Entry of Interim and Final Orders:  (i) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. § 364; (ii) Authorizing Debtors' Limited Use of Cash Collateral Pursuant to 11 U.S.C. § 364; (iii) Granting Adequate Protection to Prepetition Secured Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; and (iv) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "DIP Financing Motion")**

107.    The Debtors request that the court grant the following relief as provided in the proposed order submitted with the DIP Financing Motion:

a.    authorizing Debtor ADS Logistics, LLC (the "Borrower") to obtain secured postpetition financing consisting of a revolving credit facility (the "DIP Facility") in an aggregate principal amount

not to exceed $4,000,000,[10] of which $2,500,000 shall be available on the Closing Date (as defined in the DIP Agreement), and for the other two Debtors (collectively, the "Guarantors") to jointly and severally guarantee the payment and performance of the Borrower's obligations under the DIP Facility from GE Capital ("GE Capital") (in such capacity, the "DIP Agent") and the lenders under the DIP Facility (collectively, the "DIP Lenders"), pursuant to the terms of the Interim Order and that certain Debtor-in-Possession Credit Agreement by and among the Borrower, the Guarantors, the DIP Agent and the DIP Lenders (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "DIP Agreement," and together with any related documents and instruments delivered pursuant to or in connection therewith (including the "Loan Documents" referenced therein, the "DIP Facility Documents");

b.    authorizing the Debtors to execute and enter into the DIP Facility Documents and to perform such other and further acts as may be required or requested by the DIP Lenders in connection with the DIP Facility Documents;

c.    authorizing the Debtors to grant security interests, liens and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and limited priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders, to secure all obligations of the Debtors under and with respect to the DIP Facility (collectively, the "DIP Obligations"), as more fully set forth in the Interim Order and the DIP Agreement;

d.    authorizing the Debtors' use of cash collateral, as such term if defined in section 363 of the Bankruptcy Code (as so defined, the "Cash Collateral"), on the terms and conditions set forth in the Interim Order;

e.    authorizing the provision of adequate protection of the liens and security interests (such liens and interests, the "Prepetition Liens") granted to the Prepetition Secured Lenders (as defined below) for the benefit of the Prepetition Agents (as defined below) and the Prepetition Secured Lenders (as defined below), securing the Debtors' obligations under the Prepetition Credit Agreements (as defined below) and all collateral and ancillary documents

---

[10] $4,000,000 less the outstanding principal balance of the revolving loans and letters of credit outstanding under the First Lien Credit Agreement on the Closing Date.

executed or delivered in connection with the Prepetition Credit Documents (as defined below), as more fully set forth in the Interim Order;

f. scheduling an emergency hearing (the "Interim Hearing") for this Court to consider entry of the Interim Order, which authorizes the Debtors, on an interim basis, to obtain from the DIP Lenders under the DIP Facility up to an aggregate principal amount not to exceed $2,500,000, pursuant to the terms of, and on the conditions contained in, the DIP Agreement;

g. upon entry of the Final Order, waiving all surcharges pursuant to section 506(c) of the Bankruptcy Code;

h. scheduling a final hearing (the "Final Hearing") on the DIP Financing Motion no later than October 2, 2009 to consider entry of a Final Order authorizing the borrowings under the DIP Facility Documents on a final basis and approval of notice procedures with respect thereto;

i. modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the (a) Debtors, (b) DIP Agent and DIP Lenders and (c) First Lien Agent and First Lien Lenders (each as defined below) to implement the terms of the Interim Order; and

j. granting the other relief described in the Interim Order.

108. The DIP Financing Motion is brought on an emergency basis in light of the immediate and irreparable harm that will suffered by the Debtors' estates if the proposed DIP Facility is not approved. Without the additional financing to be provided by the DIP Facility, the Debtors will not have sufficient liquidity available to ensure the continued operation of the their businesses pending the sale contemplated by these Chapter 11 Cases. The Debtors have an immediate need to obtain the DIP Facility and use Cash Collateral in order to permit the orderly continuation of their business operations, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs.

109. The access to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the values of the Debtors and to a successful sale of substantially all of the Debtors' assets. In the absence of suitable debtor-in-possession financing and the related use of Cash Collateral, the Debtors could be compelled to curtail or even terminate their business operations – to the material detriment of creditors, employees and other parties in interest – if there were even the slightest cash flow problem. Furthermore, it is important for the Debtors to be able to demonstrate to their customers, suppliers and vendors that they have sufficient capital to ensure ongoing operations. Failure to do so could result in such suppliers or vendors imposing unfavorable terms on the Debtors or ceasing to do business with the Debtors or such customers limiting or ceasing to do business with the Debtors.

110. The Debtors require additional working capital financing in order to preserve and maintain their business. In view of the steady deterioration of the Debtors' liquidity position and in order for the Debtors to ensure that they have sufficient liquidity to continue their operations while they consummate a sale under the Bankruptcy Code, as contemplated by the filing of these Chapter 11 Cases, the Debtors underwent a process to forecast cash receipts and disbursements on a weekly basis to determine the amount of funding required. The result of this process showed that the Debtors could require as much as $3,976,000 of incremental liquidity in addition to the use of Cash Collateral. Obtaining such additional financing proved challenging since the credit markets generally, and the debtor-in-possession loan market in particular, continue to suffer significant disruption and dislocation caused by the continuing economic crisis.

111. Nevertheless, the Debtors began their search with the most likely candidate because of their position in the Debtors' prepetition capital structure: the First Lien Lenders. In addition, the Debtors contacted various financial institutions to determine if there was any interest in the market in providing postpetition financing that would either refinance the prepetition indebtedness or be subordinate in priority to the Prepetition Secured Lenders' security interests in and liens on the Prepetition Collateral. The Debtors solicited financing proposals from these financial institutions, but did not receive any proposals. In fact, none of the financial institutions was able to suggest another institution that might be willing to provide the Debtors' with the debtor-in-possession financing that they are seeking hereby.

112. Consequently, the Debtors concluded that the DIP Facility was a good option for the Debtors because, *inter alia*, it (a) would afford the Debtors sufficient liquidity to continue their operations while they consummate a sale under the Bankruptcy Code, as contemplated by the filing of these Chapter 11 Cases, (b) would avoid a priming fight, and (c) has pricing that is at market.

113. The Debtors' negotiations on the DIP Facility culminated in an agreement with the DIP Lenders to provide the Debtors with access to the DIP Facility on the terms and subject to the conditions set forth in that certain DIP Agreement, attached to the Interim Order as Exhibit A, by and among the Borrower, the Guarantors, the DIP Agent and the DIP Lenders party thereto from time to time.

114. The DIP Agent and the DIP Lenders are willing to make the DIP Facility available to the Debtors upon the terms and conditions set forth in the DIP Agreement and the DIP Orders. The salient provisions of the DIP Agreement are as follows:

Borrower: Debtor ADS Logistics, LLC, a Delaware limited liability company, in its capacity as a debtor and debtor in possession in its Chapter 11 Case filed under the Bankruptcy Code, is the Borrower.

Guarantors: Debtor Alternative Distribution Systems, Inc., a Delaware corporation, and Debtor May Logistics Services, Inc. ("MLS"), a California corporation, in their capacities as debtors and debtors in possession in their Chapter 11 Cases filed under the Bankruptcy Code, are the Guarantors and shall unconditionally guarantee all obligations of the Borrower under the DIP Facility

DIP Agent: GE Capital.

DIP Lenders: The DIP Lenders shall be the same as the First Lien Lenders under the First Lien Credit Agreement.

Type and Amount of DIP Facility: DIP Facility with a maximum amount of up to $4,000,000[11] (the "Maximum Amount"); provided, however, that (i) from and after the entry of the Interim Order and prior to the entry of the Final Order, the Maximum Amount available to the Borrower shall be limited to $2,500,000 and (ii) the Borrower shall at all times be required to use all available Cash Collateral before being able to borrow any funds under the DIP Facility.

The commitments of the DIP Lenders under the DIP Facility (the "Commitments") shall constitute a continuation of the prepetition revolving loan commitments of the First Lien Lenders under the First Lien Credit Agreement. All postpetition collections shall be applied first to the outstanding obligations under the DIP Facility and, in the absence any such outstanding obligations at the time of any application, shall be held by the DIP Agent as Cash Collateral, which shall be disbursed to the Debtors in lieu of subsequently requested loans (subject to the budget and all other conditions to loans) under the DIP Facility prior to the making of new loans. On the Termination Date (as defined below), any Cash Collateral then held by the DIP Agent shall be applied to the repayment of prepetition revolving loans or other prepetition obligations under the First Lien Credit Agreement.

The Prepetition Secured Lenders have consented to the priming of their Prepetition Liens by the DIP Facility solely pursuant to the terms set forth in the DIP Facility and the proposed Interim Order.

Cash Collateral: The Borrower shall use all available Cash Collateral prior to any borrowing under the DIP Facility. All use of Cash Collateral must conform to the Budget (as defined below) and shall be subject to all terms and conditions set forth in the Interim Order and the DIP Agreement. The Debtors shall waive the right to seek the use of Cash Collateral other than on terms satisfactory to the DIP Agent and the DIP Lenders holding more than 66 2/3% of the aggregate Commitments (the "Requisite DIP Lenders").

---

[11] To be $4,000,000 less the outstanding principal balance of the revolving loans and letters of credit outstanding under the First Lien Credit Agreement on the Closing Date.

Borrowing Availability: The borrowing availability under the DIP Facility (the "DIP Availability") shall at all times comply with a 13-week budget acceptable in all respects to the DIP Agent and the Requisite DIP Lenders (the "Budget"), which reflects on a line-item basis the Debtors' anticipated cumulative cash receipts and expenditures on a weekly basis and all necessary and required cumulative expenses which the Debtors expect to incur during each week of the Budget starting on the Petition Date. On a day during the period from the Petition Date through such day, the aggregate initial principal amount of all advances made under the DIP Facility since the Petition Date (irrespective of any repayments) shall not exceed (i) $400,000 plus (ii) the amount of the deficiency specified in the Budget in the line item "ENDING BALANCE – BOOK CASH" for the week in which such day occurs less such reserves as may be imposed by the Requisite DIP Lenders, in their reasonable credit judgment, not to exceed the maximum amount of the Carve Out (the sum of (i), (ii) and (iii) for any day being, the "Maximum Permitted Advances").

The Borrower shall provide to the DIP Agent and the DIP Lenders, so as to actually be received by them within two (2) business days following the end of each week, weekly line-by-line variance reports, in form and substance reasonably acceptable to the DIP Agent, for the preceding weekly period and on a cumulative basis for the period from the Petition Date to the report date, comparing actual cash receipts and disbursements to amounts projected in the Budget and showing on a line-by-line basis any variance to the corresponding line item of the Budget together with an explanation for such variance.

Closing Date: The date on which the Interim Order is entered by the Bankruptcy Court or as soon as practicable thereafter.

Use of Proceeds: Proceeds of the DIP Facility and Cash Collateral shall be used to pay interest, fees and expenses associated with the DIP Facility and to fund the Debtors' general corporate and working capital requirements (including, without limitation, the costs, fees and expenses of the Chapter 11 Cases as may be approved by the Bankruptcy Court), subject to the Budget and the DIP Facility Documents.

Documentation. The DIP Facility will be evidenced by the DIP Facility Documents in form and substance satisfactory to the DIP Agent and the DIP Lenders.

Termination: The obligation of the DIP Lenders to make loans under the DIP Facility will terminate, all amounts owing under the DIP Facility will be due and payable and the Debtors' authority to use Cash Collateral will terminate on the earliest to occur of (such earliest date being, the "Termination Date"): (i) sixty (60) days after the Petition Date; (ii) thirty (30) days after entry of the Interim Order if the Final Order shall not have been entered by the Bankruptcy Court on or before such date; (iii) the effective date of a plan of reorganization or a plan of liquidation supported by the DIP Agent, the Requisite DIP Lenders, the First Lien Agent and the Requisite First Lien Lenders; (iv) the closing date of a sale of substantially all assets of the Debtors that is consented to by the DIP Agent, the Requisite DIP Lenders, the First Lien Agent and the Requisite First Lien Lenders; (v) the date of filing of a plan of reorganization or a plan of liquidation by any party other than the Debtors or the DIP Agent, or the date on which the Debtors seek or support

confirmation of a plan of reorganization or a plan of liquidation that is not acceptable to the Requisite DIP Lenders or the Requisite First Lien Lenders; (vi) the date on which the DIP Agent, (A) declares all or any portion of the commitments terminated and/or (B) rescinds permission for the Debtors to use Cash Collateral and terminates the obligation of the DIP Agent to make Cash Collateral disbursements; and (vii) the permanent reduction of the commitments to zero.

Security: To secure the DIP Obligations (as defined below), the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders, shall receive (i) pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Orders and the DIP Facility Documents, valid, enforceable and fully-perfected security interests in and liens and mortgages upon all prepetition and postpetition assets of the Debtors (collectively, the "DIP Liens"), whether now existing or hereafter acquired or arising, including, without limitation, all presently unencumbered assets of the Debtors and a pledge of 100% of the capital stock or membership interests of each Debtor (collectively, the "DIP Collateral"). The DIP Collateral shall not include any avoidance actions under Chapter 5 of the Bankruptcy Code (the "Avoidance Actions"); provided, however, that, from and after entry of the Final Order, the DIP Collateral shall include the proceeds of Avoidance Actions.

Priority: All obligations of the Debtors to the DIP Agent and the DIP Lenders under the DIP Facility (the "DIP Obligations") shall enjoy superpriority administrative expense status under 11 U.S.C. § 364(c)(1) with priority, subject to the Carve-Out (as defined below), over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 503(b) or 507(b) or any other provision of the Bankruptcy Code. Subject to the Carve-Out, the DIP Liens: (a) shall constitute first priority liens pursuant to 11 U.S.C. § 364(c)(2) in and to all DIP Collateral that is not subject to valid, perfected, enforceable and non-avoidable liens in existence as of the Petition Date; (b) pursuant to 11 U.S.C. § 364(c)(3), shall be immediately junior in priority to any and all valid, perfected, enforceable and non-avoidable consensual liens (other than the Primed Liens (as defined below)) on the DIP Collateral in existence as of and properly perfected prior to the Petition Date (collectively, the "Non-Primed Liens"); (c) pursuant to 11 U.S.C. § 364(d)(1), shall be senior to and prime (x) those liens on the DIP Collateral in favor of the First Lien Agent with respect to the Prepetition Collateral and the obligations of the Debtors under the First Lien Credit Agreement (the "Prepetition Obligations"), (y) those liens on the DIP Collateral in favor of the Senior Subordinated Lender and Subordinated Second Lien Lenders with respect to the obligations of the Debtors under the Senior Subordinated Note Documents and Subordinated Second Lien Documents, respectively, and (z) any and all valid, perfected, enforceable and non-avoidable tax or other non-consensual liens in existence as of the Petition Date and properly perfected prior to the Petition Date, and (d) shall be senior in priority to the Adequate Protection Liens (as defined below) and all other adequate protection replacement liens granted under the DIP Orders or otherwise ((c) and (d) collectively, the "Primed Liens").

Carve-Out: To the extent DIP Facility proceeds and/or unencumbered funds are not available to timely pay in full the administrative expenses of the Debtors, the DIP Liens, the Superpriority Claims, the Adequate Protection Liens, the Junior Adequate Protection

Liens (as defined in the DIP Motion) and the Primed Liens in and upon the DIP Collateral and the Prepetition Collateral and the proceeds thereof shall be subject to: (i) the allowance and payment of reasonable professional fees and expenses as may be allowed by the court, in an amount not to exceed the amount specified in the Budget, (a) that have been incurred but not yet paid as of the date on which the DIP Lenders have elected to exercise their remedies with respect to such Event of Default (the "Remedy Exercise Date"), and (b) that are incurred after such Remedy Exercise Date by the Debtors, the Committee, and any other statutory committee(s) appointed in the Chapter 11 Cases as follows: (w) fees and expenses of Proskauer Rose LLP as counsel to the Debtors in an amount not to exceed $200,000, (x) fees and expenses of Qorval LLC as consultants to the Debtors in an amount not to exceed $150,000, (y) fees and expenses of Cole, Schotz, Meisel, Forman & Leonard, P.A. as local counsel to the Debtors in an amount not to exceed $50,000, and (z) fees and expenses of any statutory committee in an amount not to exceed $100,000, in each case net of any unused retainers for such professional fees and expenses, and (ii) the payment of fees payable pursuant to 28 U.S.C. § 1930 (the "Carve-Out"). In the event the Carve-Out obligations are unpaid and there is insufficient availability, or inability to draw, under the DIP Facility to satisfy the Carve-Out obligations, the Prepetition Lenders, and the DIP Agent and the Prepetition Agent agree that: (A) the Prepetition Lenders' bid for the purchase of certain of the Debtors' assets filed concurrently herewith shall provide for the assumption of the Carve-Out obligations (including budgeted and unpaid professional fees), and the payment thereof on the schedule set forth in the Budget; or (B) in the event that these Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, any proceeds of Prepetition Collateral and/or DIP Collateral otherwise payable to the DIP Lenders, the Prepetition Lenders, and the DIP Agent and/or the Prepetition Agent shall first be used by the Prepetition Lenders, and the DIP Agent and/or the Prepetition Agent to pay and satisfy the Carve-Out obligations (including budgeted and unpaid professional fees). Estate professional fees and expenses may be paid only to the extent they are allowed by the Bankruptcy Court, or as otherwise permitted pursuant to the compensation procedures approved by the Bankruptcy Court. The Required DIP Lenders shall have the right to create a reserve against DIP Availability in the maximum amount of the Carve-Out.

Adequate Protection: As adequate protection for any diminution in the value of the First Lien Agent's and the First Lien Lenders' interests in the Prepetition Collateral resulting from (i) the Debtors' use of such collateral and cash constituting proceeds of such collateral during the Chapter 11 Cases, (ii) the granting of the DIP Liens that prime the Primed Liens, and (iii) the imposition of the automatic stay pursuant to 11 U.S.C. §362(a), the First Lien Agent, for the benefit of the First Lien Lenders, shall be granted, subject to the Carve-Out, adequate protection in the form of (1) replacement security interests in and liens and mortgages upon the DIP Collateral, whether now existing or hereafter acquired or arising ("Adequate Protection Liens") and (2) superpriority administrative expense status under 11 U.S.C. §507(b) to the extent of such diminution (the "Adequate Protection Priority Claim"), which priority claim shall be junior to the superpriority claim under Section 364(c)(1) of the Bankruptcy Code in favor of the DIP Lenders but senior to any other claims under Section 507(b). The Adequate Protection Liens shall be junior to the DIP Liens, junior to the Non-Primed Liens with respect to the

DIP Collateral encumbered by such Non-Primed Liens to the extent such Non-Primed Liens were senior to the liens securing the Prepetition Obligations as of the Petition Date, and senior to any other liens, including, without limitation, to any other adequate protection replacement liens.

As additional adequate protection, (i) the First Lien Agent and First Lien Lenders shall be entitled to the payment of their costs and expenses, including the fees and expenses of legal counsel and other professionals retained by the First Lien Agent and First Lien Lenders, as and when due and payable under the First Lien Credit Agreement; and (ii) the Debtors shall be prohibited from at any time incurring additional indebtedness having priority claims or liens equal or senior in priority to the DIP Obligations or the Prepetition Obligations, or the liens securing such obligations. The First Lien Agent and the First Lien Lenders reserve the right to seek the payment of all prepetition and post-petition interest accruing under the First Lien Credit Agreement in accordance with the terms thereof.

<u>Financial and Other Reporting</u>: The DIP Facility Documents will require the Borrower to provide to the DIP Agent and the DIP Lenders internally prepared financial statements on a monthly and quarterly basis. In addition to the Budget variance reports referenced above, the Borrower will be required to provide, among other things, (i) on a weekly basis, a rolling 13-week cash flow forecast and (ii) on a weekly basis, a monitoring report including, among other items, a reconciliation of actual cash flow to such forecasts.

<u>Conditions Precedent to the Closing of the DIP Facility/Initial Borrowing</u>: Section 2.1 of the DIP Agreement contains conditions precedent to obligations of the DIP Lenders to make their initial DIP Loans or of the DIP Agent to make any Cash Collateral disbursement thereunder.

<u>Conditions Precedent to Each Borrowing</u>: Section 2.2 of the DIP Agreement contains conditions precedent to obligations of the DIP Lenders on any date (including the Closing Date) to make any DIP Loan or of the DIP Agent on any date (including the Closing Date) to make any Cash Collateral disbursement or of an L/C Issuer (as defined in the DIP Agreement) or DIP Lender to incur any Letter of Credit Obligation (as defined in the DIP Agreement) thereunder.

<u>Interest Rate</u>: Outstanding advances under the DIP Facility shall bear interest at a the LIBO Rate (subject to a 3.5% floor) plus 6.5% or the Index Rate (subject to a 4.5% floor) plus 5.5% per annum per annum. Interest will be calculated on the basis of actual days elapsed and a 360-day year in all cases and will be payable monthly in arrears in cash.

<u>Default Interest Rate</u>: From and after the occurrence and during the continuance of an Event of Default, outstanding advances under the DIP Facility shall bear interest at the otherwise applicable rate plus 2.0% per annum.

<u>Unused Commitment Fee</u>: Unused commitment fee in an amount equal to the average daily balance of the Aggregate Revolving Loan Commitment during the preceding month, <u>less</u> the sum of (x) the average daily balance of all Revolving Loans outstanding

plus (y) the average daily amount of Letter of Credit Obligations, in each case, during the preceding month, multiplied by three quarters of one percent (0.75%) per annum, shall be due and payable in cash (on a monthly basis in arrears) to the DIP Agent for the ratable benefit of the DIP Lenders.

<u>Closing Fee</u>: The Borrower shall pay to the DIP Agent, for the ratable benefit of the Lenders, a closing fee in the amount of $100,000 (the "<u>Closing Fee</u>"), which Closing Fee is fully earned on the Closing Date and shall be due and payable in full on the DIP Facility Termination Date or such later date that is agreed to by the Agent and the Required Lenders in writing.

<u>Events of Default</u>: Section 7.1 of the DIP Agreement sets forth a list of the events of default, the occurrence of any one of which, constitutes an "<u>Event of Default</u>" under the DIP Agreement.

115.   Pursuant to and upon entry of the Interim Order but prior to entry of the Final Order, the Debtors will be permitted to borrow up to $2,500,000 under the DIP Facility. The Debtors have prepared a budget, a copy of which is attached to the Interim Order as Exhibit B (the "<u>Budget</u>"), which shows, *inter alia*, the Debtors' projected costs and expenses from the Petition Date through week ending December 31, 2009. The Debtors anticipate that during the period ending December 31, 2009, the aggregate principal balance outstanding under the DIP Facility will peak at approximately $3,976,000. The Debtors prepared these estimates based on projected cash flows using conservative projections. Under the Budget, the Debtors intend to use any funds advanced during the interim period under the DIP Facility commitment to pay, *inter alia*, (a) payroll expenses, (b) post-petition trade obligations, (c) DIP financing costs and interest, (d) various prepetition claims that are subject of other motions filed concurrently herewith, as authorized by this Court and (e) working capital and other general corporate purposes. Without such interim financing, the Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their relationships with their vendors and customers.

116.   It is vital to the preservation and maintenance of the values of the Debtors and to a successful sale of substantially all of the Debtors' assets that they immediately obtain access to

sufficient postpetition financing and access to Cash Collateral. The preservation of the Debtors' business depends heavily upon the expeditious approval of the DIP Facility and the use of Cash Collateral for general working purposes. Absent this Court's approval of the interim relief sought in the DIP Motion, the Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their relationships with their vendors and customers.

117.    Concurrent with the solicitation of interest in the DIP Facility proposed in the DIP Motion, the Debtors sought indications of interest in other subordinate debtor-in-possession financing facilities that would have been palatable to the Prepetition Secured Lenders. Each of the financing proposals received by the Debtors was on less favorable terms than the DIP Facility proposed by the DIP Lenders. The Debtors therefore believe that they have satisfied the requisite showing that credit was not available on an unsecured or even a similar subordinate basis and that the proposal offered by the DIP Lenders is the best available debtor-in-possession financing available to them at this time.

118.    In consideration of, among other things, the adequate protection and other rights and protections afforded to the Prepetition Secured Lenders under the Interim Order, including, for the First Lien Agent and First Lien Lenders, the Adequate Protection Liens, the Adequate Protection Priority Claim and the First Lien Agent's Fees and, for the Second Lien Agent and Second Lien Lenders, the Junior Adequate Protection Liens and the Junior Adequate Protection Priority Claim, the Prepetition Secured Lenders have consented to the DIP Facility Documents, the Debtors' incurrence of obligations under the DIP Facility and the Debtors' use of Cash Collateral. Accordingly, the Debtors have satisfied the consent requirement.

119. The Debtors have made a concerted, good-faith effort to obtain credit on the most favorable terms that are available. Initially, it must be observed that the universe of lenders who would commit to meet the Debtors' postpetition financing requirements was quite limited. Further, given that the prepetition credit facilities would stay in place, a debtor-in-possession financing facility provided by a lender not a party to the prepetition credit facilities would require priming the Prepetition Secured Lenders and, therefore, the Debtors required that any potential debtor-in-possession lenders have the ability to work with and gain the cooperation of the Prepetition Secured Lenders. The convergence of these factors significantly limited the potential financing sources that could satisfy the Debtors' needs. The Debtors solicited financing proposals from a variety of financial institutions, but did not receive any proposals. In fact, none of the financial institutions was able to suggest another institution that might be willing to provide the Debtors' with the debtor-in-possession financing that they are seeking. That notwithstanding, the Debtors submit that, given their search for alternative sources of funding, they know the DIP Facility to be market priced.

120. A denial of the Debtors' requested relief will cause immediate and irreparable harm to the Debtors and their estates and will also have a detrimental effect on the Prepetition Collateral. Absent access to the DIP Facility and the use of Cash Collateral, the Debtors would have no ability to meet their ongoing obligations to suppliers, vendors, employees and other creditors. If the Debtors are unable to pay their ongoing obligations, they will not be able to operate. In contrast, the Debtors' access to the DIP Facility and continued use of Cash Collateral will ensure that the value of the Debtors' assets is preserved, a value substantially greater than that which would be realized from a piecemeal liquidation of those assets if the Debtors were forced to cease operations immediately.

**B.** **Motion for Entry of an Order Authorizing, but Not Directing, Debtors to (a) Pay Certain Prepetition Compensation and Reimbursable Employee Benefits, (b) Pay and Honor Employee Medical and Other Benefits and (c) Continue Employee Wages and Benefits Programs (the "Wage Motion")**

121.    On the Petition Date, the Debtors employed approximately 283 full-time and part-time hourly-wage, piece-rate and salaried employees (each, an "Employee" and collectively, the "Employees"). In addition to these Employees, the Debtors supplement their workforce by employing approximately 134 independent contractors (collectively, the "Independent Contractors"), most of whom drive trucks or perform highly-specialized functions (operating specialized devices, commodity-specific loading, regulation adherence, etc.) for the Debtors.

122.    The Employees and the Independent Contactors perform a variety of critical functions, including, accounting, finance, human resources, customer service, management, marketing, sales, maintenance, shipping, truck driving, security and other tasks. The Employees' and the Independent Contractors' skills and their knowledge and understanding of the Debtors' operations, customer relations and infrastructure are essential to the effective prosecution of these Chapter 11 Cases and the marketing and sale process contemplated therein.

123.    The vast majority of the Debtors' Employees and Independent Contractors rely exclusively on their compensation (and, in the case of Employees, benefits) to pay their daily living expenses and these Employees and Independent Contractors will be exposed to significant financial difficulties if the Debtors are not permitted to continue paying their Employees and Independent Contractors compensation, providing their Employees benefits and maintaining certain programs benefiting their Employees (collectively, the "Employee Programs").

124.    To minimize the personal hardship that the Employees and the Independent Contractors would suffer if prepetition Employee-related obligations are not paid when due or as expected and to maintain morale and stability in the Debtors' workforce during this critical time,

the Debtors, by the Wage Motion, seek authority to pay and honor, in their sole discretion, certain prepetition claims for, among other amounts, wages, salaries, bonuses and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' shares of insurance premiums, taxes and 401(k) contributions), health insurance, retirement benefits, workers' compensation benefits, vacation time, leaves of absence, life insurance, short- and long-term disability coverage and all other benefits that the Debtors have historically provided in the ordinary course of business, to pay all costs incident to the foregoing, and to continue their prepetition Employee programs in the ordinary course of business (collectively, the "Employee Wages and Benefits"). Out of an abundance of caution, the Debtors request the right to modify, change and discontinue any of their Employee Wages and Benefits and to implement new programs, polices and benefits, in the ordinary course of business during the pendency of these Chapter 11 Cases, in their sole discretion and without the need for further Court approval, subject to applicable law.

125. In the ordinary course of business, the Debtors incur payroll obligations to the Employees and Independent Contractors. The Debtors pay their salaried Employees' salaries two weeks in arrears biweekly, every other Friday. The Debtors pay their hourly Employees' wages one week in arrears on a weekly basis each Friday. The Debtors non-exempt Employees, including all hourly Employees, receive overtime pay (one and one-half times their rate of pay) for all hours worked over forty (40) in a seven day work week, unless applicable local or state law provides otherwise. In addition, certain of the Debtors' Employees may be eligible to receive incentive-based bonuses, awarded to Employees who meet requisite targets identified by the Debtors' management. The Wage Motion seeks authority to pay incentives as part of the Employee wages and salary.

126.     Approximately sixty-five percent (65%) percent of the Debtors' Employees receive their wages and salaries by direct deposit through electronic transfer of funds directly into Employees' accounts ("Direct Deposit"), with the other thirty-five percent (35%) percent receiving checks.  The Debtors fund their own payroll accounts in advance of each pay day and are also responsible for paying all applicable withholdings and payroll taxes with respect to their Employees.  In those cases in which the Debtors cut checks to their Employees (*i.e.*, where the Employee has not requested Direct Deposit of his or her check), the Debtors use Automatic Data Processing, Inc. ("ADP"), to which, in the ordinary course of business, the Debtors provide applicable schedules in advance of the payroll payment period and ADP issues payroll checks.  The Debtors pay approximately $2,735 per month to ADP on account of payroll processing services.  The Debtors estimate that they do not owe ADP any amount on account of prepetition services.  By the Wage Motion, the Debtors request authority to continue to use ADP's payroll processing services and to pay any prepetition amounts that may be due to ADP.

127.     In addition to their obligations to their Employees, the Debtors incur compensation obligations to their Independent Contractors in the ordinary course of business.  The Debtors pay approximately $212,000 per week (which amount varies based on activity level) to the Independent Contractors on account of work performed by them.  Most of the Debtors' obligations to Independent Contractors are paid directly to the Independent Contactors; however, in a few instances, the Debtors pay such obligations to temporary employment service agencies that provide the Debtors with certain of their Independent Contactors.  The Debtors estimate that, as of the Petition Date, they owe to temporary employment service agencies approximately $72,000.

128.     As of the Petition Date, the Debtors estimate that approximately $1,100,000 in prepetition wages, salaries, overtime pay, Independent Contractor fees and other cash compensation has accrued prior to the Petition Date and remains unpaid (collectively, the "Unpaid Compensation"). Items of Unpaid Compensation were due and owing on the Petition Date because, among other things:

> a.     these chapter 11 petitions were filed during the Debtors' regular and customary salary and hourly wage payroll periods and temporary and contract worker invoice periods;
>
> b.     some payroll checks issued to Employees and invoice checks issued to or for the benefit of other Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date; and
>
> c.     Employees have not yet been paid all their salaries and wages for services performed prior to the Petition Date on behalf of the Debtors because some of the Debtors' payroll checks are issued in arrears.

129.     By the Wage Motion, the Debtors request authority, but not direction, to make payment of the Unpaid Compensation in the ordinary course of the Debtors' business. The Debtors believe that they do not owe any Employee a prepetition amount in excess of the $10,950 cap imposed by the Bankruptcy Code.

130.     During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, (a) garnishments, child support and similar deductions and (b) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed in the Wage Motion (such as an Employee's share of health care benefits and insurance premiums, 401(k) contributions, legally-ordered deductions, fees and assessments and miscellaneous deductions) (collectively, the "Deductions").

131.    The Debtors forward the amount of the Deductions to the appropriate third-party recipients.  On average, the Debtors deduct approximately $134,694.25 (non-tax items) from their Employees' paychecks per week.  Due to the commencement of these Chapter 11 Cases, however, certain Deductions that were deducted from Employees' earnings may not have been forwarded to the appropriate third-party recipients prior to the Petition Date.  The Debtors estimate that, as of the Petition Date, $19,000 in Deductions may not have been forwarded to the appropriate third-party recipients.  By the Wage Motion, the Debtors request authority, but not direction, to forward any unpaid Deductions to the appropriate third party recipients and to continue to forward these prepetition Deductions to the applicable third-party recipients on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

132.    Further, the Debtors are required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, social security and Medicare taxes for remittance to the appropriate federal, state or local taxing authority (collectively, the "Withheld Amounts").  The Withheld Amounts total approximately $36,606.68 per week.  The Debtors must match from their own funds social security and Medicare taxes (collectively, the "Employer Payroll Taxes" and, together with the Withheld Amounts, the "Payroll Taxes").  The Employer Payroll Taxes are approximately $14,073.13 per week.

133.    The Debtors estimate that, as of the Petition Date, $39,000 in Payroll Taxes have not been forwarded to the appropriate taxing authorities.  By the Wage Motion, the Debtors request authority, but not direction, to forward any outstanding Payroll Taxes to the appropriate third parties and to continue to honor and process the prepetition payments for Payroll Taxes on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

134. Prior to the Petition Date and in the ordinary course of their business, the Debtors reimbursed Employees and other workers for certain reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment (collectively, the "Reimbursable Expenses"). The Reimbursable Expenses are paid on a weekly basis and include, among other things: (a) business-related travel expenses; (b) business development expenses; (c) telephone expenses that are paid by Employees; and (d) other miscellaneous business expenses. The Reimbursable Expenses total approximately $3,800 per week.

135. As of the Petition Date, the Debtors have approximately $5,000 in pending requests for expense reimbursement from Employees. In addition, it is possible that certain Employees may have incurred prepetition expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Debtors after the Petition Date.

136. Reimbursable Expenses are all incurred on the Debtors' behalf and with the understanding that they will be reimbursed. Accordingly, to avoid harming Employees who may have incurred Reimbursable Expenses, the Debtors request the authority, to be exercised in their sole discretion, to: (a) continue paying Reimbursable Expenses in accordance with prepetition practices; (b) modify their prepetition policies relating thereto as they deem appropriate; and (c) pay all Reimbursable Expenses that relate to the prepetition period and are submitted to the Debtors postpetition.

137. The Debtors offer the Employees the ability to participate in a number of insurance and benefits programs, including, among other things, health care, prescription drug, vision and dental plans, vacation time, sick leave and other paid leaves of absence, retirement savings plans, pension plans, life insurance and short-tem and long-term disability insurance,

long-term care insurance, workers' compensation insurance and other employee benefit plans as described below (collectively the "Employee Benefit Programs").

138.   Certain Employees have elected to receive or are otherwise entitled to group health (including prescription care), dental care and vision care (collectively, the "Health Insurance Plan").

139.   The cost of the Health Insurance Plan is shared by the Debtors and the Employees.  Employees generally contribute between (a) seven percent (7%) and forty-two percent (42%) of the cost of the Employee premiums and dependent premiums related to the Health Insurance Plan (depending on the benefits and coverage elected) and the Debtors pay the remaining premium costs.  Historically, the Debtors have paid approximately $290,000 each month in amounts related to the Health Insurance Plan.

140.   Medical Plan.  The Debtors sponsor medical benefits for their Employees and approximately 207 Employees receive such benefits.  The plan offered by the Debtors is a preferred provider organization plan (a "PPO") and generally covers prescribed levels of medical care benefits, preventative care services, prescription drugs, physician services, facility services, mental health services and other covered services/items.  The monthly health care premiums differ depending on whether the Employee only or the Employee and his or her family are covered by the PPO.

141.   Dental Plan.  The Debtors provide certain dental benefits for their Employees and approximately 179 Employees receive such benefits.  The Debtors' dental plan covers prescribed levels of preventative services (100%), basic services (80%) and major services (50%), subject to an annual maximum for all coverages combined.

142.   Vision Plan.  The Debtors provide certain vision benefits for their Employees and approximately 173 Employees receive such benefits.  The Debtors' vision plan covers, subject to copayments and caps (as applicable), eye exams, lenses, contact lenses and frames.

143.   By the Wage Motion, the Debtors seek authority, in their sole discretion, to (a) continue the Health Insurance Plan for their Employees in the ordinary course of business, (b) continue making contributions to the health insurance plan and (c) pay any amounts related thereto, including on account of any premiums, claim amounts and administration fees to the extent that they remain unpaid as of the Petition Date.

144.   Workers' Compensation.  The Debtors provide workers' compensation insurance to their Employees at the statutorily-required level required for each state in which they operate (the "Workers' Compensation Program").  Generally, this insurance is provided by Zurich (the "WC Insurer").  The Debtors have paid the WC Insurer an annual premium of approximately $1,187,625 ($730,390 to cover Employees and $457,235 to cover Independent Contractors), in installments, for a policy period of January 1, 2009 through December 31, 2009.  The Debtors' workers' compensation insurance policy features a retrospective-rating plan (or a "retro") for five years, meaning that in each of those five years, the WC Insurer reviews the Debtors' actual incurred losses for such year and if, for the period, the premiums that the Debtors paid exceed claims costs, the WC Insurer refunds any surplus to the Debtors; conversely, if, for the period, claims costs exceed the premiums that the Debtors paid, the Debtors are obligated to pay the WC Insurer the amount of the shortfall.  The Debtors estimate that they will not owe the WC Insurer on account of a shortfall for the current annual period.

145.   The Debtors request authority to maintain, in their sole discretion, the Workers' Compensation Program in the ordinary course of business and to pay in their sole discretion any

and all prepetition amounts related thereto including, without limitation, any payments for workers' compensation claims, deductibles, premiums and fees owed for administrative costs and other amounts required in connection with the Workers' Compensation Programs, as such amounts become due in the ordinary course of the Debtors' business.

146.     <u>Vacation Time</u>.   The Debtors provide vacation time to their Employees, the amount and accrual rate of which is based generally on an Employee's length of employment with the Debtors (the "<u>Vacation Time</u>").  Ordinarily, when an Employee elects to take Vacation Time, that Employee is paid his or her regularly hourly or salaried rate.  Employees are required to use their Vacation Time during the year in which they earn it and may not carry unused days into the next year.  If an Employee ceases employment with the Debtors, the Employee's final paycheck will include any accrued unused Vacation Time.   The Debtors estimate that approximately $315,000 of earned but unused Vacation Time has accrued as of the Petition Date. This amount, however, is not a current cash payment obligation, as Employees are only entitled cash payment for accrued and unused Vacation Time in the event that the Employee leaves the Debtors' employment.  Any such payout to a terminated Employee will be subject to the cap imposed by the Bankruptcy Code.

147.     <u>Leaves of Absence</u>. The Debtors also allow their Employees to take certain other leaves of absence for personal reasons, many of which are required by law ("<u>Leaves of Absence</u>").  Leaves of Absence include family medical leaves, pregnancy, adoption and foster care leaves, military leaves, jury duty, voting leaves, personal leaves and bereavement leaves.

148.     By the Wage Motion, the Debtors request that they be authorized, but not directed, to continue to honor their Vacation Time and Leaves of Absence policies in the ordinary course of business and to honor and pay any prepetition amounts related thereto.

Moreover, the Debtors anticipate that their Employees will utilize any accrued Vacation Time and Leaves of Absence in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

149. 401(k) Plan. The Debtors offer certain Employees the opportunity to participate in a retirement plan qualified under § 401(k) of the Internal Revenue Code (the "401(k) Plan"). The 401(k) Plan is administered by John Hancock Life Insurance Company (U.S.A.). Under the terms of the 401(k) Plan, full-time Employees who have been employed by the Debtors for at least one year may elect to contribute a portion of their salary or wages to the 401(k) Plan. The 401(k) Plan allows for automatic, pre-tax salary deductions from a participating Employee's eligible compensation in an aggregate amount equal to or less than the lesser of: (a) fifty percent (50%) of their total compensation; or (b) the annual limit established under the Internal Revenue Code (i.e., $16,500 in 2009, plus, when applicable, a $5,500 catch-up contribution amount for employees over age 50).

150. Approximately 326 of the Debtors' current and former Employees participate in the Debtors' 401(k) Plan and, of those Employee participants, approximately 180 Employees contribute to the 401(k) Plan each month. The monthly amount withheld from participating Employees' paychecks is approximately $37,100.

151. The Debtors also provide certain of their Employees with a variety of insurance policies and various other benefits (the "Additional Employee Benefits") that the Debtors believe are important to their Employees and that will preserve morale if continued. Further, continuing these programs will allow the Debtors to attract and retain Employees during the pendency of their Chapter 11 Cases. By the Wage Motion, the Debtors seek to continue the Additional

Employee Benefits as they existed prepetition and to honor all outstanding obligations relating thereto.

152. <u>Life Insurance</u>. The Debtors provide and pay for a $25,000 (for non-exempt Employees) or $50,000 (for exempt Employees) life insurance policy for each of their full-time Employees through Lincoln National Corporation ("<u>Lincoln National</u>"), a third-party insurer (the "<u>Life Insurance</u>"). The Life Insurance costs the Debtors each year approximately $.22 per $1,000 of coverage. Exempt Employees are eligible to receive additional life insurance benefits as determined by the Debtors. Further, Employees are offered the opportunity to purchase supplemental life insurance ("<u>Supplemental Life Insurance</u>"), the premiums for which are paid entirely by the electing Employee. The Employee contributions held by the Debtors for transfer to Lincoln National are included in the Deductions described in the Wage Motion.

153. <u>Long-Term Disability</u>. In addition, the Debtors provide salaried Employees with long-term disability benefits through Lincoln National (the "<u>Long-Term Disability Benefits</u>"). The Long-Term Disability Benefits cover approximately 105 salaried Employees and cost the Debtors each month approximately $.32 per $1,000 of coverage. Employees may purchase supplemental long-term disability benefits ("<u>Supplemental Long-Term Disability Benefits</u>") at their own cost. The monthly Employee contributions for Supplemental Long-Term Disability Benefits held by the Debtors for transfer to Lincoln National are included in the Deductions from the Employees' paychecks described in the Wage Motion.

154. <u>Short-Term Disability</u>. The Debtors also maintain a short-term disability insurance plan (the "<u>Short-Term Disability Benefits</u>") for the benefit of approximately sixty-four (64) full-time salaried Employees. Under the terms of that STD insurance plan, Employees are eligible to receive up to 100% of their gross weekly pay for each week that they are disabled up

to ninety (90) days. Employees may purchase supplemental short-term disability benefits ("Supplemental Short-Term Disability Benefits") at their own cost. The monthly Employee contributions for Supplemental Short-Term Disability Benefits held by the Debtors for transfer to Lincoln National are included in the Deductions from the Employees' paychecks described in the Wage Motion.

155. The cost to the Debtors of administering the Life Insurance, Long-Term Disability Benefits and the Short-Term Disability Benefits programs is approximately $3,636 per month.

156. Tuition Reimbursement. In the ordinary course of business, the Debtors provide tuition reimbursement for graduate school, college, vocational education and high school equivalency courses. Prior approval of an Employee's supervisor is required and approved courses must directly apply to an Employee's present or prospective assignments. None of the Debtors' Employees are currently participating in the tuition reimbursement program.

157. By the Wage Motion, the Debtors seek authority, but not direction, to (a) continue the Additional Employee Benefits, (b) continue making the above-described contributions to such benefit programs, (c) pay any amounts related thereto, including on account of any premiums and claim amounts, to the extent that they remain unpaid on the Petition Date and (d) revise any of the above-described benefit programs in the ordinary course of business.

158. It is essential to the Debtors that they retain Employees to continue operations pending the marketing and sale process contemplated by these Chapter 11 Cases.

159. Many Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses. These Employees will be exposed to significant financial problems if the Debtors are not permitted to pay certain of the Employee Obligations and Employee

Payments. Moreover, the Debtors believe that if they are not granted the relief requested in the Wage Motion, Employee morale and loyalty will be jeopardized at a time when Employee support is critical, and likely waning. The Debtors believe such uncertainty will cause significant anxiety at precisely the time the Debtors need their Employees to perform their jobs at peak efficiency.

160. The Employee Deductions principally represent Employee earnings which Employees or, in the case of garnishments, judicial authorities have designated for deduction from Employee paychecks and payment accordingly. The failure to pay these benefits could result in hardship to certain Employees. The Debtors expect inquiries from garnishors regarding the Debtors' failure to submit, among other things, child support and alimony payments, which are not the Debtors' property, but rather have been withheld from Employee paychecks. Moreover, if the Debtors cannot remit these amounts, Employees may face legal action due to the Debtors' failure to submit these payments.

161. The Employees are valuable assets. Deterioration in Employee morale and welfare at this critical time undoubtedly would adversely impact the Debtors, the value of their assets and businesses, their proposed marketing and sale process contemplated by these Chapter 11 Cases and, ultimately, the Debtors' ability to maximize value for creditors.

C. **Motion of the Debtors for an Order Authorizing, but Not Directing, the Debtors to Enter Into Trade Agreements with Critical Vendors and to Pay Prepetition Obligations in Connection Therewith (the "Critical Vendor Motion")**

162. The Debtors request entry of an order authorizing, but not directing, the Debtors to enter into trade agreements and to pay prepetition amounts owed to certain "critical vendors," which, in the Debtors' reasonable judgment, are necessary to prevent the disruption of the Debtors' operations.

163.    The Critical Vendors primarily consist of: (a) fuel suppliers; and (b) container suppliers (collectively, the "Critical Vendors"). The goods and services provided by these Critical Vendors are crucial to the Debtors' continuation of their businesses and would be difficult and expensive to replace. Payment of the claims of Critical Vendors (the "Critical Vendor Claims"), pending the sale contemplated by these Chapter 11 Cases, is vital because: (a) the goods and services provided by the Critical Vendors are often the only source from which the Debtors can procure such goods and services; (b) failure to pay the Critical Vendor Claims would, in the business judgment of the Debtors, result in the Critical Vendor refusing to provide goods and/or services to the Debtors; (c) the Critical Vendors provide goods and services to the Debtors on advantageous terms; and/or (d) the Critical Vendors would themselves be irreparably damaged by the Debtors' failure to pay their prepetition claims, resulting in the Debtors being forced to obtain goods or services elsewhere that would either be at a higher price or not of the quantity or quality required by the Debtors.

164.    The Debtors have a fleet of approximately 170 trucks, of which approximately 135 are running each day, generally on short hauls. The Debtors use a diesel fuel supplier and related payment processor (collectively, the "Fuel Suppliers"), with which they have negotiated reduced rates, to supply them with the volume of fuel necessary for the truck transportation services that the Debtors provide to their customers through a network of Debtor-owned and leased equipment and brokered carriers. Payments to these critical Fuel Suppliers reaches up to $68,000 per week. As of the Petition Date, the Debtors owed the critical Fuel Suppliers approximately $41,000.

165.    The Debtors' Western Intermodal business provides door-to-door shipment of metals that need to be moved from the East Coast and Midwest to the West Coast. The product

moves in a truck-rail-truck configuration and the customer receives one bill for this service (irrespective of the multiple carriers). The "rail" components of the process are accomplished through the Debtors' use of marine containers, supplied by the only linehaul carriers that maintain coil agreements with the railroads used by the Debtors (*i.e.*, these suppliers have the ability under such agreements to haul steel and aluminum coil using the railroads) (collectively, the "Container Suppliers"). Because of the highly-specialized and unique characteristics of the containers supplied to the Debtors by the Container Suppliers, the Container Suppliers are single-source suppliers. Specifically, the Debtors seek the postpetition supply of five critical Container Suppliers. Payments to these critical Container Suppliers reaches up to $180,000 per week. As of the Petition Date, the Debtors owed the critical Container Suppliers approximately $1,000,000.

166. The Debtors seek authority to pay up to $450,000 in Critical Vendor Claims (the "Critical Vendor Cap"). Although the Debtors reserve the right to seek Court authority at a later date to increase the Critical Vendor Cap, the Debtors believe that payment of the amount specified in the Critical Vendor Motion would allow them to obtain those goods and services that are absolutely necessary to the Debtors' postpetition operations.

167. The Debtors have critically examined whether the payments of the Critical Vendor Claims described in the Critical Vendor Motion are necessary. Specifically, the Debtors have undertaken a thorough review of their accounts payable and their list of prepetition vendors and service providers to identify those vendors and providers who are essential to the Debtors' operations. The Debtors have further developed certain procedures (for which they seek this Court's approval) that, when implemented, will ensure that vendors and service providers

receiving payment for Critical Vendor Claims will continue to supply goods and services necessary to the Debtors' business on a postpetition basis.

168. In determining the amount of Critical Vendor Claims to pay pursuant to the Critical Vendor Motion, the Debtors consulted with the Debtors' management to identify those creditors that are most essential to the Debtors' operations, using criteria developed by the Debtors. These criteria included: (a) whether the vendor in question was a "sole-source" vendor; (b) whether preferences or requirements of the Debtors' customers prevent the Debtors from looking to alternative sources for a vendor's products or services; (c) whether the Debtors receive advantageous pricing or other terms from a vendor such that replacing such vendor postpetition would result in significantly higher costs to the Debtors; and (d) whether a vendor meeting the standards of (a), (b) or (c) above might additionally be forced to cease business operations (due to such vendor's own liquidity constraints) in the event its prepetition claim against the Debtors was not paid within a short time after the Petition Date.

169. After evaluating the information received in response to these inquiries, the Debtors estimated the payment amount necessary to ensure the continued supply of critical goods and services, taking into account: (a) whether failure to pay a Critical Vendor's claims would result in the Critical Vendor terminating its provision of goods and/or services to the Debtors; and (b) what percentage of the Critical Vendor's claims would need to be paid to induce it to continue providing goods and/or services to the Debtors. The Critical Vendor Cap represents this estimated amount.

170. The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of the individual Critical Vendors to continue supplying goods or services, as applicable (including, but not limited to, credit limits, pricing, cash discounts, timing of

payments, allowances, rebates, coupon reconciliation, normal product mix and availability, and other applicable terms and programs) to the Debtors on terms that are consistent with the historical trade terms between the parties (the "Customary Trade Terms"). The Debtors reserve the right to negotiate trade terms with any Critical Vendor, as a condition to payment of any Critical Vendor Claim, that vary that from the Customary Trade Terms to the extent the Debtors determine that such terms are necessary to procure essential goods or services or are otherwise in the best interests of the Debtors' estates.

171. To ensure that the Critical Vendors continue to deal with the Debtors on Customary Trade Terms, the Debtors propose that: (a) a letter substantially in the form of the letter attached to the Order as Exhibit 1 be sent to such Critical Vendors along with a copy of the Order granting the Critical Vendor Motion; and (b) checks used to pay such Critical Vendor Claims contain a legend substantially in the following form:

> Acceptance of this check is subject to the Order of the U.S. Bankruptcy Court for the District of Delaware, dated _____, 2009, Case No. 09-_____ (___).

172. The Debtors propose that the letter sent to such Critical Vendors shall include, without limitation, the following terms:

> a. The amount of such Critical Vendor's estimated prepetition trade claims, accounting for any setoffs, other credits and discounts thereto, shall be as mutually determined in good faith by the Critical Vendor and the Debtors (but such amount shall be used only for the purposes of this Order and shall not be deemed a Claim allowed by the Court and the rights of all interested persons to object to such Claim shall be fully preserved until further order of the Court), including the portion thereof to be by the Debtors to the Critical Vendor;

> b. the Critical Vendor's agreement to be bound by the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability, and other applicable terms and programs), which were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors on a historical basis for the period within 120 days of the Petition Date or such other trade terms as agreed by the Debtors

and such Critical Vendor or such other trade terms, practices and programs that are at least as favorable as those that were in effect prepetition in the Debtors' sole discretion;

c.      the Critical Vendor's agreement to provide goods and services to the Debtors based upon Customary Trade Terms, and the Debtors' agreement to pay in accordance with such terms;

d.      the Critical Vendor's agreement not to file or otherwise assert against any or all of the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (a "Lien") (regardless of the statute or other legal authority upon which such lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from agreements entered into prior to the Petition Date, and that, to the extent that the Critical Vendor has previously obtained such a Lien, the Critical Vendor shall immediately take all necessary actions to remove such Lien;

e.      the Critical Vendor's acknowledgment that it has reviewed the terms and provisions of this Order and consents to be bound hereby;

f.      the Critical Vendor's agreement that it will not separately assert or otherwise seek payment for reclamation claims outside of the terms of the Order granting the Critical Vendor Motion unless the Critical Vendor's participation in the trade payment program authorized by the Order granting the Critical Vendor Motion is terminated; provided that such claims, if thereafter raised by the Critical Vendor as permitted by the Order granting the Critical Vendor Motion, shall be treated as though raised on the date of the Order granting the Critical Vendor Motion; and

g.      if either the trade payment program or the Critical Vendor's participation therein terminates, or a Critical Vendor who has received payment of a prepetition claim later refuses to continue to supply goods to the Debtors on Customary Trade Terms, subject to defenses, any payments received by the Critical Vendor on account of such Critical Vendor's prepetition claim will be deemed to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor and that such Critical Vendor shall immediately repay to the Debtors any payments made to it on account of its prepetition claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise.

173.    The Critical Vendor payments owed to Critical Vendors are key to the preservation of the Debtors' business pending the sale contemplated by the filing of these Chapter 11 Cases.  If the Critical Vendor Motion is not granted, it is likely that Critical Vendors

will stop providing supplies and services to the Debtors on Customary Trade Terms, effectively reducing the amount of credit available to the Debtors. Moreover, certain of the Critical Vendors could stop doing business with the Debtors altogether, leaving the Debtors unable to obtain the essential materials for their business, forcing the Debtors to incur higher costs to obtain replacement materials, and, in any event, causing such substantial delays in the Debtors' operations that the Debtors may never fully recover from the harm resulting from such a delay. As further detailed below, such actions would be extremely damaging, if not devastating, to the Debtors, their estates and their creditors.

174. In particular, continued availability of trade credit in amounts and on terms consistent with those the Debtors enjoyed prepetition is vital to the Debtors' business because it allows the Debtors to maintain liquidity for operations and to maintain a high level of customer service pending the sale contemplated by the filing of these Chapter 11 Cases. Preserving working capital through the retention or reinstatement of traditional trade credit terms will enable the Debtors to maintain their competitiveness and to maximize the value of their business. Conversely, a deterioration of trade credit and a disruption or cancellation of deliveries of goods – which are not readily replaceable – would cripple the Debtors' business operations, increase the amount of funding needed by the Debtors postpetition (which funding may not be available), and ultimately impede the Debtors' ability to service their customers, thereby placing the value of their business at risk.

175. The relief requested in the Critical Vendor Motion is essential to preserving good relationships with those vendors that are essential to the continued operations of the Debtors' business. The Debtors, their creditors, and their estates would suffer immediate harm if the

Debtors are unable to secure the continued cooperation of their Critical Vendors through payment of prepetition amounts owed to those vendors in the ordinary course of business.

176. Maintaining favorable trade terms and credit is critical to preservation of the Debtors' business pending the sale contemplated by the filing of these Chapter 11 Cases and is in the best interests of all the Debtors' creditors. The payment of the prepetition Critical Vendor Payments is essential to assure such terms and credit.

177. The Debtors will have sufficient cash from: reserves, ongoing operations and/or their access to postpetition financing and cash collateral (if approved), to pay the amounts described in the Critical Vendor Motion in the ordinary course of business.

**D.      Motion of the Debtors for an Order Authorizing Maintenance of Existing Bank Accounts, Continued Use of Existing Business Forms, Continued Use of Existing Cash Management System and Granting Other Relief (the "Cash Management Motion")**

178. By the Cash Management Motion, the Debtors are seeking entry of an order authorizing the Debtors to maintain existing bank accounts, to continue to use existing business forms, to continue to use certain existing cash management systems and for related relief.

179. The Debtors understand that the United States Trustee has established Operating Guidelines for Chapter 11 Cases (the "Operating Guidelines") applicable to debtors in possession that continue to operate their businesses after the commencement of their chapter 11 cases. One provision of the Operating Guidelines requires a chapter 11 debtor in possession to open new bank accounts and to close all existing accounts. This requirement, designed to provide a clear line of demarcation between prepetition and postpetition claims and payments, helps to protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the bankruptcy filing.

180.    Prior to the Petition Date, the Debtors, in the ordinary course of their business, maintained several bank accounts.  The Debtors' existing bank accounts are listed and described in an exhibit to the Cash Management Motion (collectively, the "Bank Accounts") and the flow of each of the Debtors' funds through the Bank Accounts is illustrated in the cash relationship flow chart also attached as an exhibit to the Cash Management Motion.

181.    The Debtors seek a waiver of the Operating Guideline's requirement that the Bank Accounts be closed and new postpetition bank accounts be opened.  If enforced in these Chapter 11 Cases, this requirement would cause undue disruption to the Debtors' continued operations and would impair their efforts to maximize value through this chapter 11 process. Dismantling the Debtors' cash management system would likely disrupt the Debtors' relationships with their key stakeholders and may hinder their abilities to maintain operations pending a sale of substantially all of the Debtors' assets as contemplated by these Chapter 11 Cases.

182.    Maintenance of the Bank Accounts would greatly facilitate the Debtors' transition to postpetition operations and preserve the value of the Debtors.  To avoid delays in payment of debts incurred postpetition, and to ensure as smooth a transition into chapter 11 as possible, the Debtors should be permitted to continue to maintain the Bank Accounts.  Closing the Bank Accounts and transferring the funds in those accounts to newly created postpetition accounts would be disruptive and time consuming.  Moreover, requiring the Debtors to close or alter the Bank Accounts would greatly complicate and disrupt the cash management system currently in place, likely to the detriment of the Debtors' estates and creditors.

183.    A waiver of the account closing requirement is necessary here.  Subject to a prohibition against honoring prepetition checks without specific authorization from this Court,

the Debtors request that the Bank Accounts be deemed debtor-in-possession accounts and that the Debtors be authorized to maintain and continue the use of these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

184.     To minimize expense to their estates, the Debtors also request authority to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.) and checks existing as of the Petition Date, without reference to their status as debtors in possession.

185.     Because of the nature of the Debtors' businesses and the notice of consummation of cases that will be sent to all of the Debtors' stakeholders and creditors, parties doing business with the Debtors likely will be made aware of the Debtors' status as chapter 11 debtors in possession.     Changing correspondence and business forms would be unnecessary and burdensome to the estates, as well as expensive and disruptive to the Debtors' business operations.   For these reasons, the Debtors request authority to use their existing checks and business forms without placing the label "Debtor in Possession" on such checks or forms.

186.     The Debtors maintain current and accurate accounting records of daily cash transactions and submit that maintenance of this cash management system will prevent undue disruption to their businesses and operations, while protecting their cash for the benefit of their estates.

187.     The principal components of the Debtors' cash management system and the flow of funds among the various Bank Accounts are as follows:

- *General Depository and Accounts Payable Account (Bank of America acct. no. ending 54648).* This general depository and accounts payable account is the Debtors' primary cash account, into which receipts flow from the Debtors' lockboxes (to which the Debtors' customers make payments) and from which

general disbursements are paid. The Debtors manually transfer funds from this account to the accounts described below to fund checks written on such accounts. There is no nightly sweep of the funds maintained in this account.

- *Office Payroll (Bank of America acct. no. ending 54655).* The Debtors use this office payroll account to fund all of their employees' payroll checks, with the exception of payments to employee truck drivers (see below).

- *Settlements/Advances (Truck Driver Payments) (Bank of America acct. no. ending 54945).* The Debtors use this settlements/advances account to fund all payments to truck drivers, including employee drivers, independent contractor drivers and brokered drivers. Payments include settlements as well as advances.

- *Employee Benefits (Bank of America acct. no. ending 54663).* Using this account, the Debtors make medical bill payments that arise under the Debtors' self-funded medical plan.

- *GEN Warehouse (Minority Business Partner Deposit Account) (Bank of America acct. no. ending 234345).* This account is no longer active.

- *Canadian Disbursement Account (ABN-AMRO acct. no. ending 2971).* The Debtors use this account to fund disbursements in Canadian Dollars relating to their Pickering, Ontario warehouse.

188.    By the Cash Management Motion, the Debtors seek authority to continue utilizing their current cash management system. Given the dispersion of the Debtors' operations, the continued operation and the preservation and enhancement of their going concern value will be inhibited if there is substantial disruption in the Debtors' cash management system. It is essential, therefore, that the Debtors be permitted to continue to consolidate the management of their cash as needed and in the amounts necessary to continue the operation of their businesses.

189.    The basic structure of the Debtors' cash management system constitutes the Debtors' ordinary, usual and essential business practice. The cash management system is similar to those commonly employed by enterprises comparable in size and complexity to the Debtors. The widespread use of such systems is attributable to the numerous benefits they provide, including the ability: (a) to tightly control corporate funds; (b) to ensure cash availability; and (c)

to reduce administrative expenses by facilitating the movement and concentration of funds and the development of timely and accurate account balance and presentment information.

190.    In addition, given the corporate and financial structure of the Debtors, it would be difficult, if not impossible, for them to establish an entirely new system of accounts and a new cash management system, as of the Petition Date. For example, if the Debtors were required to open separate accounts as debtors in possession and rearrange their cash management system, there would be delays in the Debtors' ability to accept payments from their customers. Thus, under the circumstances, maintenance of the Debtors' cash management system is not only essential, it is also in the best interests of the Debtors' estates and creditors. Furthermore, preserving the usual business atmosphere (to the greatest extent possible) for employees within the Debtors' operating network and avoiding the distractions that would inevitably be attendant with any disruption in the cash management system will facilitate a sale of substantially all of the Debtors' assets contemplated by the filing of these Chapter 11 Cases.

191.    If the Debtors are not permitted to continue to use their cash management system as described in the Cash Management Motion, their operations likely will not only be impaired, but critical funds may not be collected on account of accounts receivable and valuable resources will be expended unnecessarily in implementing a new cash management system. Accordingly, the Court should authorize the Debtors' continued use of the existing cash management system.

192.    The Debtors have more than 500 creditors and the Cash Management Motion is being filed on the first day of the Debtors' cases. Accordingly, the Debtors are requesting that the Court waive the requirements of the Bankruptcy Code on an interim basis and permit them to maintain deposits in their accounts in accordance with their existing deposit practices until such

time as the Debtors obtain this Court's approval, on a final basis, to deviate from such requirements.

193.    If the Debtors are not permitted to continue to use their cash management system as described in the Cash Management Motion, their operations likely will not only be impaired, but critical funds may not be collected on account of accounts receivable and valuable resources will be expended unnecessarily in implementing a new cash management system. Accordingly, the Court should authorize the Debtors' continued use of the existing cash management system.

**E.    Motion of the Debtors Pursuant to Section 366 of the Bankruptcy Code for Entry of Interim and Final Orders:    (i) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtors on Account of Prepetition Amounts Due; (ii) Determining that Utility Companies are Adequately Assured of Future Payment; (iii) Authorizing the Debtors to Establish the Utility Deposit Account and Pay the Adequate Assurance Deposit; (iv) Establishing Procedures for Determining Requests; and (V) Granting Certain Related Relief (the "Utilities Motion")**

194.    The Debtors are seeking entry of: (a) an interim order (the "Interim Order") (i) prohibiting those utility companies (each a "Utility Company" and, collectively, the "Utility Companies") that provide service to the Debtors from altering, refusing or discontinuing services to, or discriminating against, the Debtors on account of prepetition amounts due to them from the Debtors, pending entry of a final order granting the relief sought in the Utilities Motion (the "Final Order"); (ii) approving the Adequate Assurance Deposit and, in connection therewith, authorizing the Debtors to establish the Utility Deposit Account (as defined below); (iii) approving procedures to object to the Utilities Motion; and (iv) scheduling a final hearing on the Utilities Motion (the "Final Hearing") within 30 days of the Petition Date; and (b) the Final Order.

195.    The Debtors currently use electric, natural gas, heat, water, sewer, telecommunications and other similar services provided by the Utility Companies identified on

the utility list attached to the Utilities Motion (the "Utility List"). The Debtors' Utility Companies provide traditional utility services related to the day-to-day operation of the Debtors' various facilities and offices. The Debtors estimate that their aggregate average monthly obligations to the Utility Companies on account of services rendered total approximately $167,000, including services that the Debtors no longer require on account of facility closings. The Debtors believe that they are generally current on all prepetition obligations due the Utility Companies, other than (a) the accrued, but unbilled or (b) the billed, but not yet due, prepetition obligations for utility services.

196.    Uninterrupted service from the Utility Companies is essential to the Debtors' continued operation and successful restructuring. The Debtors could not maintain their facilities in the absence of continuous service. It is therefore critical that the Utility Companies continue to provide uninterrupted services to the Debtors.

197.    The Debtors intend to timely pay their postpetition obligations to the Utility Companies. The Debtors will make these payments with cash generated during these Chapter 11 Cases and orders of this Court authorizing use of cash collateral.

198.    Although the Debtors maintain that their access to cash collateral and debtor in possession financing provides sufficient assurance of postpetition payments to Utility Companies, the Debtors propose to deposit an amount equal to two (2) weeks' of their aggregate utility services, calculated based on the historical average over the twelve (12) month period ending before the Petition Date (the "Adequate Assurance Deposit"), into an interest-bearing, newly-created segregated account (the "Utility Deposit Account"), for the benefit of all of the Utility Companies, with such Utility Deposit Account to be held pending further order of the Court.

199.     The Debtors are requesting authority to resolve, in their sole discretion, any Objection by mutual agreement with the objecting Utility Company and without further order of the Court and, in connection with any such agreement, in their sole discretion, provide a Utility Company with additional adequate assurance of payment, including but not limited to cash deposits, prepayments, and other forms of security, without further order of this Court.

200.     Receiving the relief requested in the Utilities Motion is essential for the Debtors to be able to carry out their sale efforts.  If the Utilities Motion is not granted, the Debtors could be forced to address voluminous requests by their Utility Companies in a disorganized manner at a critical point in their restructuring.  Moreover, the Debtors could be blindsided by a Utility Company unilaterally deciding, on or after the thirtieth day following the Petition Date, that it is not adequately protected and discontinuing service or making an exorbitant demand for payment to continue service.  Discontinuation of utility service, particularly gas, electric and telephone service, could essentially shut down operations, and any significant disruption of operations is likely to jeopardize the Debtors' sale efforts.

**F.     Motion of the Debtors for an Order (A) Authorizing, but not Directing, Debtors to Pay Prepetition Taxes and Fees and (B) Directing Financial Institutions to Honor and Process Checks Related to Prepetition Taxes and Regulatory Fees (the "Tax Motion")**

201.     In the ordinary course of their business, the Debtors are continuously required to collect Taxes and Fees with respect to sales of goods and services performed for customers, as well as their general business activities.  The Debtors must remit these Taxes and Fees to the various governmental entities of the jurisdictions in which the Debtors conduct business.  The process by which the Debtors remit the Taxes and Fees varies, depending on the nature of liability at issue and the Taxing Authority to which the relevant payment is made.

202. As of the Petition Date, the Debtors estimate a prepetition outstanding balance of approximately $19,000 related to Taxes and Regulatory Fees and Licensing Fees. Prior to the Petition Date, the Debtors paid, on an estimated basis, some but not all of the prepetition accrued and unpaid amounts outstanding on account of the Taxes and Fees.

203. The Debtors pay the Taxes and Fees to the Taxing Authorities on a periodic basis with funds drawn by checks ("Checks") or by means of electronic fund transfers (the "Electronic Transfers") whether sent directly to the Taxing Authorities or sent to a third-party administrator who pays the appropriate Taxing Authorities. Prior to the Petition Date, certain Taxing Authorities were sent Checks or Electronic Transfers in respect of such obligations that may not have cleared the Debtors' banks or other financial institutions (together, the "Banks") as of the Petition Date.

204. The Debtors hereby seek authority to pay, in their sole discretion, in the ordinary course of their business and on their normal due dates, all undisputed prepetition Taxes and Fees owed to the Taxing Authorities, including all Taxes and Fees subsequently determined upon audit to be owed for periods prior to the Petition Date. To the extent any Check or Electronic Transfer has not cleared the Banks as of the Petition Date, the Debtors request the Court to authorize and direct the Banks, when requested by the Debtors in their sole discretion, to receive, process, honor and pay such Checks or Electronic Transfers. To the extent the Taxing Authorities have not otherwise received payment for all prepetition Taxes and Fees owed, the Debtors seek authorization to issue replacement checks, or to provide for other means of payment to the Taxing Authorities, to the extent necessary, to pay all outstanding Taxes and Fees owing for periods prior to the Petition Date.

205. The Debtors further request that all applicable Banks be authorized and directed, when requested by the Debtors in their sole discretion, to receive, process, honor and pay any and all Checks or Electronic Transfers drawn on the Debtors' accounts to pay all prepetition Taxes and Fees owed to the Taxing Authorities, whether those Checks were presented prior to or after the Petition Date and to make other transfers provided that sufficient funds are available in the applicable accounts to make such payments. The Debtors represent that each of these Checks or Electronic Transfers can be readily identified as relating directly to the authorized payment of prepetition Taxes and Fees. Accordingly, the Debtors believe that Checks and Electronic Transfers other than those relating to authorized payments will not be inadvertently honored.

206. Any delay in paying the obligations relating to the Taxes and Fees would be detrimental to the Debtors, their creditors and their estates. Indeed, the Debtors' ability to manage and run their business operations with as little disruption as possible requires, in part, that they remain in good standing with the relevant Taxing Authorities.

**G. Motion for Entry of an Order Authorizing, but Not Directing, Debtors to Maintain and Administer Customer Programs and Honor Certain Prepetition Obligations Related Thereto (the "Customer Programs Motion")**

207. To maintain goodwill with their customers and, accordingly, to maintain their market share in their competitive industry, the Debtors, in the ordinary course of business, employ an established practice whereby they make cash payments to their customers on account of verified cargo claims (*i.e.*, arising as a result of damage occurring while freight is in transit) and verified material handling claims (*i.e.*, arising as a result of damage occurring while freight is being handled by a work crew member or members of the Debtors) (collectively, the "Customer Programs"). The Debtors believe that their Customer Programs have been successful business strategies – the costs of the Customer Programs are, in the aggregate, more than offset by the revenue generated therefrom – and serve to both promote the retention of existing

customers and help to generate new customers. As a result of the Customer Programs, the Debtors have established strong loyalty among their customers.

208. It is vital to the preservation and maintenance of the values of the Debtors, and to effectuating a successful sale of substantially all of the Debtors' assets, that they are able to retain the loyalty, confidence and goodwill of their customers and prospective customers attendant with the continuation of the Customer Programs. Indeed, the Debtors believe it will be impossible to maintain their positive customer relationships unless they are authorized to continue their Customer Programs and honor their customer obligations in the ordinary course of their business. Accordingly, by the Customer Programs Motion, the Debtors are seeking to assure their customers that, despite commencing these Chapter 11 Cases, the Debtors will nevertheless continue to operate their business consistent with past practice and with the same level of reliability and integrity for which they are well-known.

209. The Debtors seek to continue their Customer Programs without interruption during the pendency of these Chapter 11 Cases, which will inure to the benefit of the Debtors' creditors. In contrast, if the Debtors do not continue their Customer Programs postpetition or fail to pay amounts owed to customers that accrued prepetition, the Debtors risk alienating a significant number of their customers. Thus, in addition to potentially ruining their relationships with directly affected customers, nonpayment of the Customer Program Obligations could also create a marketwide perception that the Debtors do not honor the promises they make to their customers. Such a perception could erode the Debtors' customers' loyalty and adversely impact the Debtors' prospects for a successful sale of substantially all of the Debtors' assets.

210. The Debtors believe that the relief requested in the Customer Programs Motion will pay dividends with respect to the long-term viability of their business, both in terms of

profitability and the engendering of goodwill, especially at this critical time following the filing of these Chapter 11 Cases.

## H. Motion of Debtors for Entry of an Order Authorizing Assumption of Broker/Carrier Agreements (the "Broker/Carrier Motion")

211. By the Broker/Carrier Motion, the Debtors are seeking entry of an order authorizing the Debtors to assume certain broker/carrier agreements, to which Debtor ADS Logistics, LLC and those carriers listed on Exhibit B to the Broker/Carrier Motion (collectively, including three (3) agents who operate as outsourced dispatchers, the "Carriers") are parties (as described below, each a "Broker/Carrier Agreement" and, collectively, the "Broker/Carrier Agreements").

212. The Broker/Carrier Agreements consist of 103 prepetition agreements. The Carriers who are parties to the Broker/Carrier Agreements provide an essential service to the Debtors[12] and the Debtors' customers. In short, when the Debtors are unable or unwilling (e.g., on account of "surge tonnage" or overflow freight that the Debtors' available trucks are unable to carry) to haul and transport merchandise by motor vehicle (commonly referred to as "maintaining a lane") for a customer, the Debtors, as broker, will hire a Carrier or Carriers to ensure that the cargo is shipped and the relevant lane is maintained. This arrangement ensures that the Debtors' customers receive cargo on time. The Debtors estimate that, as of the date hereof, their prepetition obligations to the Carriers (in the form of commissions due and owing) total approximately $800,000, none of which is past due. Therefore, rather than making payments of the Cure Amounts as of the date of entry of the Order, the Debtors propose to continue to, in the ordinary course of business, perform under the Broker/Carrier Agreements, including paying the Cure Amounts to the Carriers in the ordinary course as they come due.

---

[12] The Debtors, as a carrier, provide similar services to other brokers.

213.    The Debtors have evaluated each of the Broker/Carrier Agreements and, in the exercise of their business judgment, have determined that the Debtors' assumption of the Broker/Carrier Agreements will promote stability and growth in the Debtors' business, by providing the Debtors' customers with the assurance that their shipping and delivery needs will be met.  Accordingly, the assumption of the Broker/Carrier Agreements is in the best interests of the Debtors, their estates, their creditors and parties in interest.

214.    The Debtors have sufficient cash from operations, other cash collateral and/or their proposed debtor-in-possession financing facility proceeds to make all payments due under the Broker/Carrier Agreements.  The Debtors fully intend to make all such payments to the counterparties to the Broker/Carrier Agreements in the ordinary course of business.

I.    **Debtors' Motion for an Order Pursuant to Sections 105(a), 363, and 364 of the Bankruptcy Code for (i) Authority to Honor Prepetition Insurance Premium Financing Agreements and Renew Such Agreements in the Ordinary Course of Business and (ii) Authorization of Financial Institutions to Honor and Process Checks and Related Transfers Thereto (the "Insurance Premium Financing Motion")**

215.    By the Insurance Premium Financing Motion, the Debtors seek entry of any order authorizing the Debtors to honor three prepetition insurance premium financing agreements (each an "Agreement" and collectively, the "Agreements") and to renew such Agreements or enter into similar replacement agreements in the ordinary course of the Debtors' business, without need for further authority or approval from the Court and authorizing the Debtors' banks or financial institutions to honor and process checks and transfers related to such obligations and Agreements.

216.    In the ordinary course of the Debtors' business, the Debtors maintain numerous insurance policies providing coverage for, among other things, general liability, excess liability, truckers auto liability, non-trucking liability, occupational accident liability, fiduciary liability,

contingent liability, director and officer liability, property, motor truck cargo, physical damage, boiler and machinery, pollution, crime and workers compensation (collectively, the "Insurance Policies"). The Insurance Policies are essential to the preservation of the Debtors' business, property and assets and, in many cases, such coverages are required by various regulations, laws and contracts that govern the Debtors' commercial activity.

217. The total annual premiums for the Debtors' Insurance Policies is approximately $3,554,026. It is not always economically advantageous for the Debtors to pay the premiums on all of the Insurance Policies on a lump-sum basis. Accordingly, in the ordinary course of the Debtors' business, the Debtors finance the premiums on some of their Insurance Policies pursuant to Agreements with Cananwill, Inc. ("Cananwill"), Premium Assignment Corporation ("PAC") and Aon Premium Finance, LLC ("Aon," and collectively with Cananwill and PAC, the "Premium Finance Companies").

218. Pursuant to the Debtors' Agreement with Cananwill, the Debtors finance the premiums for policies covering general liability, director & officer liability, fiduciary liability, pollution and crime, as well as two umbrella policies (the "Cananwill Policies"). Prior to the Petition Date, the Debtors made a cash down payment to Cananwill in the amount of $196,565.80 and financed the remaining $786,263.20 of premiums for the Cananwill Policies. In exchange for the financing, the Debtors agreed to pay ten monthly installment payments including a total finance charge of $20,139.00, representing an annual interest rate of 5.55%. In addition, the Debtors granted Cananwill a security interest in return premiums and certain loss payments to secure their payment obligations.

219. Pursuant to the Debtors' Agreement with PAC, the Debtors finance the premiums for a policy covering motor truck cargo (the "PAC Policy"). Prior to the Petition Date, the

Debtors made a cash down payment to PAC in the amount of $5,020.50 and financed the remaining $45,184.50 of premiums for the PAC Policy. In exchange for the financing, the Debtors agreed to pay ten monthly installment payments including a total finance charge of $880.70, representing an annual interest rate of 4.23%. In addition, the Debtors granted PAC a security interest in return premiums and certain loss payments to secure their payment obligations.

220.     Pursuant to the Debtors' Agreement with Aon, the Debtors finance the premiums for a policy covering their property (the "Aon Policy"). Prior to the Petition Date, the Debtors made a cash down payment to Aon in the amount of $42,128.85 and financed the remaining $238,730.15 of premiums for the Aon Policy. In exchange for the financing, the Debtors agreed to pay seven monthly installment payments including a total finance charge of $3,554.34, representing an annual interest rate of 4.45%. In addition, the Debtors granted Aon a security interest in return premiums and certain loss payments to secure their payment obligations.

221.     If the Debtors are not able to meet the Premium Financing Obligations, one or more of the Premium Finance Companies may seek relief from the automatic stay to terminate the Insurance Policies to recoup its losses. The Debtors would then be required to obtain replacement insurance on an expedited basis and at tremendous cost to the Debtors' estates. If the Debtors were required to obtain replacement insurance and pay a lump-sum premium for the insurance policy in advance, this payment would likely be greater than what the Debtors currently pay. Even if the Premium Finance Companies were not permitted to terminate the Insurance Policies, any interruption of payment would have a severe, adverse effect on the Debtors' ability to finance premiums for future policies.

222. By this Insurance Premium Financing Motion, the Debtors seek authority to continue honoring their Premium Financing Obligations. In view of the importance of maintaining insurance coverage with respect to their business activities and the preservation of the Debtors' cashflow and estates by financing the insurance premiums, the Debtors believe it is in the best interests of their estates to authorize the Debtors to fulfill their Premium Financing Obligations under the Agreements. Any other alternative would likely require considerable additional cash expenditures and would be detrimental to the Debtors' marketing and sale efforts.

223. In addition, because the Agreements may expire during the course of these Chapter 11 Cases, the Debtors seek authority to renew the Agreements or to enter into similar replacement agreements in the ordinary course of their business, without further Court approval. The Debtors will need to continue their insurance coverage throughout the entire duration of these Chapter 11 Cases. The Debtors respectfully submit that renewal of the Agreements fall squarely within their ordinary course of business, and, but for the constraints of section 364 of the Bankruptcy Code, the Debtors would not need the Court's prior approval to renew the Agreements. To reduce the administrative burden, as well as the expense of operating as debtors in possession, the Debtors seek the Court's authority now to renew the Agreements if and when necessary.

224. The Debtors further request that the Court authorize and direct all applicable banks and other financial institutions to receive, process, honor and pay any and all checks drawn or electronic funds transferred to fulfill Premium Financing Obligations under the Agreements or any future premium financing agreements, whether such checks were presented prior to or after the Petition Date. The Debtors also seek authority to issue new postpetition checks, or effect new electronic fund transfers, on account of any Premium Financing

Obligations to replace any prepetition checks or electronic fund transfer requests that may be dishonored or rejected as a result of the commencement of the Debtors' Chapter 11 Cases. The Debtors submit that they have sufficient cash reserves to pay such amounts as they become due in the ordinary course of the Debtors' business.

**J.     Omnibus Motion of Debtors for Entry of an Order:  (i) Authorizing the Rejection of Certain Executory Contracts and Unexpired Leases of Nonresidential Real Property Effective as of the Petition Date and (ii) Establishing Procedures in Connection with the Rejection of Additional Leases (the "Contract Rejection Motion")**

225.    By the Contract Rejection Motion, the Debtors seek to reject certain executory contracts (each, a "Contract" and, collectively, the "Contracts") and unexpired leases of nonresidential real property (each, a "Lease", collectively, the "Leases" and, together with the Contracts, the "Contracts and Leases"), effective as of the date hereof, and establishing procedures in connection with the rejection of additional contracts and leases.

226.    In addition to the First Day Rejected Contracts and Leases, the Debtors also anticipate rejecting certain Additional Contracts and Leases, primarily related to their Roll & Hold operations, which are unprofitable and of no continuing value to their estates, but which have not been vacated as of the Petition Date.  The Debtors seek to establish procedures to reject these Additional Contracts and Leases, in the exercise of their business judgment and in their sole discretion, once the Debtors have vacated the premises subject to the Additional Contracts and Leases.  In the sound exercise of their business judgment, the Debtors have determined that the rejection of such Additional Contracts and Leases from time to time in accordance with certain streamlined procedures set forth below, will allow the Debtors to immediately terminate ongoing administrative rent obligations under such Additional Contracts and Leases and therefore is in the best interests of the Debtors' estates and creditors.

227. Rather than filing a separate motion seeking approval to reject each of the Additional Contracts and Leases, and incurring the expenses and delay attendant thereto, the Debtors believe that the following rejection procedures (the "Rejection Procedures") proposed in the contract rejection motion are in the best interests of all parties-in-interest and should be adopted.

228. The Debtors believe that such streamlined procedures for the rejection of Additional Contracts and Leases will benefit the Debtors' estates, creditors and other parties-in-interest by minimizing the delay and expense of obtaining separate court approval for the rejection of each Contract or Lease and allowing the Debtors to immediately cut off the accrual of administrative expenses once they have determined to reject a Contract or Lease.

229. The Debtors have evaluated each of the First Day Rejected Contracts and Leases and, in the exercise of their business judgment, have determined that they are no longer useful or beneficial to the Debtors' ongoing operations. Each of the leased premises have been vacated by the Debtors. Due to the Debtors' consolidation of their operations the Debtors' no longer have any use for the First Day Rejected Contracts and Leases. Consequently, the First Day Rejected Contracts and Leases provide no benefit to the Debtors or their estates. The First Day Rejected Contracts and Leases are not sources of potential value for the Debtors' estates, creditors or interest holders.

230. The Debtors further request that this Court approve rejection of the First Day Rejected Contracts and Leases effective as of the Petition Date, which is the date of the Contract Rejection Motion but prior to the hearing thereof.

231. The balance of the equities favors the relief requested in the Contract Rejection Motion. Without a date of rejection that is retroactive from the date of the order to the Petition

Date, the Debtors may be forced to incur administrative costs (*e.g.*, rent) for which there is no corresponding benefit to the Debtors' estate. The counterparties to the First Day Rejected Contracts and Leases, on the other hand, will be able to mitigate any damages they may suffer as a consequence of this rejection. The counterparties will be relieved of their own obligations under the First Day Rejected Contracts and Leases and lessors will be able to relet the premises to other tenants.

K.  **Motion of Debtors for Orders: (a)(i) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets; (ii) Scheduling a Hearing to Consider the Sale of Assets; (iii) Approving the Form and Manner of Notice Thereof; and (iv) Approving the Expense Reimbursement; (b)(i) Approving the Asset Purchase Agreement, (ii) Authorizing and Approving the Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests and (iii) Authorizing and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (c) Granting Related Relief (the "Sale Motion")**

232.  By the Sale Motion, the Debtors are seeking the entry of orders: (a)(i) approving bidding procedures in connection with the sale of substantially all of the Debtors' assets, (ii) scheduling a hearing to consider the sale of assets, (iii) approving the form and manner of notice thereof and (iv) approving expense reimbursement; (b)(i) authorizing and approving the sale of assets free and clear of liens, claims, encumbrances and interests; and (ii) approving the assumption and assignment of executory contracts and unexpired leases, and (c) granting related relief.

233.  The Debtors are facing severe liquidity constraints as a result of the downturn in the automotive industry together with a confluence of other macroeconomic factors leading to a general decrease in the manufacture of durable goods. As a result, the Debtors do not have the financial wherewithal to continue to operate their businesses throughout a prolonged chapter 11 process.

234.     Given the Debtors' need to reduce their debt load and interest expense, and the Debtors' increasing concerns about the potential deterioration of their businesses — and concomitant degradation in value — due to rumors in the marketplace regarding the Debtors' liquidity and viability, the Debtors have determined that the value of their estates would best be maximized and preserved through a sale process. Accordingly, the Debtors have negotiated a going-concern sale of their businesses and assets to their First Lien Lenders in the form of a credit bid and commenced these Chapter 11 Cases to implement that sale, subject to a competitive sale process and the solicitation of higher and/or otherwise better offers. The Debtors believe that, unless a sale is expeditiously consummated, whether to the Buyer (as defined below) or to a purchaser submitting a higher or otherwise better offer, there will be significant value deterioration. Indeed, the Debtors' businesses are of a type that cannot endure a prolonged stay in chapter 11 without significant risk to the Debtors' survival. Accordingly, a prompt sale is essential to a successful result in these cases.

235.     In furtherance of this objective, the Debtors negotiated with their First Lien Lenders the terms and conditions of an Asset Purchase Agreement (the "Stalking Horse APA") to be executed by the Debtors and the First Lien Lenders, who shall have the right to assign their bid and designate, an acquisition vehicle to be formed by the First Lien Lenders, as the purchaser (the First Lien Lenders and such acquisition vehicle, if applicable, the "Buyers" or "Buyer"), for the sale of substantially all of the Debtors' assets (as more specifically identified in the Stalking Horse APA, the "Purchased Assets") to the Buyer, free and clear of all liens, claims, encumbrances and other Interests (as defined below) other than those expressly assumed by the Buyer. Any such non-assumed Interests against or in the Purchased Assets will attach to the net

proceeds of the sale, in the order of priority and with the same validity, force and effect that such interests may now have against such assets.

236. To obtain the maximum value for the Purchased Assets, the Debtors propose to subject the sale of the Purchased Assets to an auction process with the Stalking Horse APA serving as a basis for all future bids. In connection with the auction process, the Debtors agreed to grant the Buyer certain bidding protections, including an expense reimbursement not to exceed $500,000 (the "Expense Reimbursement"). If no other bids are received for the Purchased Assets that are higher or otherwise better than the transaction set forth in the Stalking Horse APA, the Debtors intend to sell the Purchased Assets to the Buyer pursuant to the terms of the Stalking Horse APA.

237. The sale of the Purchased Assets is subject to this Court's approval and the auction process proposed in the Sale Motion. The Debtors believe that the sale of the Purchased Assets will maximize the value of their estates for the benefit of their creditors and other interested parties.

238. The Debtors seek the Court's approval of (i) the sale of the Purchased Assets pursuant to the Stalking Horse APA free and clear of Interests, or the right to consummate a higher or otherwise better offer or transaction (a "Alternate Transaction") with an alternate buyer (an "Alternate Buyer"), (ii) the institution of certain bidding, auction and notice procedures for the solicitation and consideration of competing offers for the Purchased Assets, including the Expense Reimbursement payable to the Buyer (collectively, the "Bidding Procedures"), and (iii) the assumption, assignment and/or transfer of certain executory contracts to the Buyer or, alternatively, to such other Successful Bidder (as defined in the Bidding Procedures). In order to preserve the value of their business as a going concern, the Debtors are requesting that the Court

enter the Bidding Procedures Order no later than fifteen days after the Petition Date (which is September 17, 2009) and the Sale Order (as defined below) no later than 45 days after the Petition Date (which is October 19, 2009).

239.    More specifically, through the Sale Motion, the Debtors request that the Court enter the following orders:

> a.    <u>The Bidding Procedures Order</u>:    An order (the "<u>Bidding Procedures Order</u>") approving (i) the Bidding Procedures, (ii) the Expense Reimbursement provision of the Stalking Horse APA; (iii) the notice (the "<u>Notice of Auction and Sale Hearing</u>") establishing the dates, times, and locations of the deadline to bid on the Purchased Assets, the auction of the Purchased Assets (the "<u>Auction</u>") and the sale hearing for the Purchased Assets (the "<u>Sale Hearing</u>") pursuant to the dates proposed in the Bidding Procedures Order, subject to the Court's availability; and (iv) the notice (the "<u>Notice of Assumption and Assignment</u>") of the Debtors' intent to assume, assign and/or transfer to the Buyer or, alternatively, to such other Successful Bidder, the contracts, commitments, leases, licenses, permits, purchase orders, and any other executory contracts and unexpired leases (collectively, the "<u>Executory Contracts and Unexpired Leases</u>"), and the corresponding cure amounts required to be paid in connection with such assumption, assignment and/or transfer; and

> b.    <u>The Sale Order</u>:    Following the Auction (if any), an order (the "<u>Sale Order</u>," in substantially the form attached hereto as <u>Exhibit C</u>) for the approval of (i) the sale of the Purchased Assets free and clear of Interests, and (ii) the assumption, assignment, and/or transfer of the Executory Contracts and Unexpired Leases to the Buyer or, alternatively, to such other Successful Bidder under the Bidding Procedures.

240.    The sale of the Debtors' businesses and assets must occur quickly.  The Debtors believe that every day spent in chapter 11 increases the real and palpable risk of business loss and value deterioration.  The Debtors' business is not the type of business that can survive a prolonged stay in chapter 11.  The Debtors employ an "asset light" business model.  As such, the Debtors' primary assets are their business relationships with their customers.  Thus, in order to maximize value and ensure a successful result in these cases, a prompt and orderly sale of the Purchased Assets must take place.  Moreover, the Debtors do not have sufficient cash on hand to

fund operations through a protracted reorganization process. Absent a prompt sale pursuant to the procedures and timelines proposed, the Debtors believe that the going concern value of the Purchased Assets will be significantly compromised, and that their very viability will be at significant risk.

241. Following discussions and negotiations, the Debtors and the Buyer agreed to the terms of the Stalking Horse APA for the purchase of the Purchased Assets. Generally, the Stalking Horse APA involves a joint bid submitted by the First Lien Lenders, who may assign their rights and obligations under the Stalking Horse APA to an entity owned in whole or in part by such First Lien Lenders, comprised of: (a) the assumption or payment by the Buyer of (i) the Debtors' obligations under the DIP Facility and (ii) the Transaction Costs; (b) a credit bid of the First Lien Lender's claims under the First Lien Credit Agreement, pursuant to section 363(k) of the Bankruptcy Code, in the initial amount equal to $21,000,000; and (c) the assumption by the Buyer (or at the option of the First Lien Lenders, one or more subsidiaries of the Buyer) of the Assumed Liabilities (as defined below).

242. The significant terms of the Stalking Horse APA are:

a. **Purchased Assets:** Pursuant to the Stalking Horse APA, and upon the terms and subject to the conditions of thereof, on the Closing Date, Sellers shall sell, transfer, assign, convey and deliver to Buyers, and Buyers shall purchase from Sellers, free and clear of all Encumbrances (except Permitted Encumbrances), all right, title and interest in, to and under all of the assets, rights and properties of Sellers related to the Business (other than the Excluded Assets) existing as of the Closing Date, real or personal, tangible or intangible, including but not limited to the following (collectively, the "Purchased Assets"):

(i) Any and all real property owned by any Seller (the "Owned Real Property");

(ii) Any and all (i) owned personal property, including all computers, furniture, fixtures, machinery, tools, supplies, equipment, improvements, signage and other tangible personal property owned by Sellers (collectively, the "Owned Personal Property"), (ii) leased personal

property, including all computers, furniture, fixtures, machinery, tools, supplies, equipment, improvements, signage and other tangible personal property which are leased by Sellers pursuant to an Assumed Contract (collectively, the "Leased Personal Property," and together with the Owned Personal Property, the "Personal Property"), and (iii) rights of Sellers to the warranties, express or implied, and licenses received from manufacturers, sellers and lessors of the Personal Property;

(iii)  All supplies, items, spare parts, replacement and component parts and office and other materials and tangible items used, held for use or necessary to operate and maintain the Personal Property (the "Supplies");

(iv)  Any and all (i) cars, trucks, forklifts, other industrial vehicles and other motor vehicles owned by Sellers and (ii) cars, trucks, forklifts, other industrial vehicles and other motor vehicles leased by Sellers pursuant to an Assumed Contract;

(v)  All Software owned by Sellers or leased or licensed by Sellers pursuant to an Assumed Contract;

(vi)  All web sites owned or licensed by Sellers, including the URL addresses and related domain names;

(vii)  All goodwill associated with the Business and/or the Purchased Assets;

(viii)  All accounts receivable of Sellers;

(ix)  All Real Property Leases of Sellers designated by Buyers in accordance with Section 2.2 of the Stalking Horse APA to be assumed and assigned to Buyers pursuant to the Sale Order (the "Assumed Leases"), together with all security deposits related thereto and all permanent fixtures, improvements and appurtenances thereto and associated with such Assumed Leases;

(x)  All Contracts of Sellers designated by Buyers in accordance with Section 2.2 of the Stalking Horse APA to be assumed and assigned to Buyers pursuant to the Sale Order (together with the Assumed Leases, the "Assumed Contracts"), together with all security deposits related thereto and the right to receive income in respect of such Assumed Contracts on or after the Closing Date, and any causes of action relating breaches of the Assumed Contracts prior to the Closing;

(xi)  (i) all rights in and to Intellectual Property rights owned or licensed by Sellers to the broadest extent Sellers are permitted by law to transfer such Intellectual Property (the "Purchased Intellectual Property") and (ii) to the extent such Intellectual Property may not be transferred to

Buyers, each Seller shall be deemed to have granted to Buyers an exclusive, royalty free right and license to use the Intellectual Property from and after the Closing Date, to the broadest extent permitted by law and not prohibited by the terms of the applicable Contract;

(xii)    All of Sellers' Cash and all of Sellers' right, title and interest in and to all deposit or similar accounts, including security deposits, in which Sellers deposit Cash, all rights and interests of any Seller in any letters of credit, prepayments and enhancements;

(xiii)    All Documents that are used in, held for use in or intended to be used in the Business and operations of Sellers, including Tax Returns, financial statements, Documents relating to services of Sellers, marketing, advertising, promotional materials, Documents relating to Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), customer lists, records, literature and correspondence, whether or not physically located on Leased Real Property;

(xiv)    All Permits used by Sellers that relate to the Purchased Assets, to the extent assignable (the "Assigned Permits");

(xv)    All insurance policies and all rights of every nature and description under or arising out of such policies prior to Closing, except as provided in Section 2.3(e) of the Stalking Horse APA;

(xvi)    Any rights, claims, credits or causes of action or rights of set off of Sellers against third parties arising out of events occurring prior to the Closing Date, including any rights under or pursuant to the Assumed Contracts, Assumed Liabilities, any and all warranties, representations, guarantees, indemnities, avoidance claims and causes of action under the Bankruptcy Code or other Requirements of Law (including all rights and avoidance claims of Sellers arising under Chapter 5 of the Bankruptcy Code) and similar rights, excluding only the rights, claims and causes of action that are identified as Excluded Assets in Section 2.3 of the Stalking Horse APA;

(xvii)    All rights under the Asset Purchase Agreement, dated as of July 17, 2009, by and between iSG2 Technologies, Inc. and ADS Logistics and the ancillary documents thereto, including the warrants to purchase non-voting common stock and the note issued to a Seller thereunder;

(xviii)    All fuel inventory;

(xix)    All refunds of premiums, or receivables for such refunds, in connection with the Terminated Policies;

(xx)    only if Buyers make the election set forth in Section 8.10(b), all of the equity interests of all of the New Subsidiaries; and

(xxi)    All other tangible or intangible assets or properties not expressly identified as Excluded Assets.

b.    **Excluded Assets:**  Pursuant to Section 2.3 of the Stalking Horse APA, the Purchased Assets shall not include the following (collectively, the "Excluded Assets"):

(i)    All Excluded Contracts (including, for the avoidance of doubt, any Real Property Leases that are not Assumed Leases);

(ii)    All receivables, claims or causes of action related exclusively to any Excluded Assets;

(iii)    All Employee Plans and all fiduciary liability policies, benefit administration contracts, actuarial contracts, trusts, escrows, surety bonds, letters of credit and other contracts primarily relating to any Employee Plan, except for any employment or severance agreements expressly identified by Buyers on Schedule 2.2(a)(2) of the Stalking Horse APA;

(iv)    All rights under insurance policies relating to claims for losses related exclusively to any Excluded Asset;

(v)    All Documents exclusively related to any Excluded Asset;

(vi)    Any amounts that a Seller is entitled to in connection with all prepaid expenses, letters of credit, security deposits or claims with respect to any Excluded Contracts;

(vii)    Any minute books, stock ledgers, corporate seals and stock certificates of Sellers, and other similar books and records that Sellers are required by law to retain or that Sellers determine are reasonably necessary to retain including corporate or other entity filings; provided that Sellers shall provide Buyers reasonable access to any Excluded Asset described in this subclause (g) that is related to the Business or the Purchased Assets; and

(viii)    Any rights of Sellers under the Stalking Horse APA.

c.    **Purchase Price:**  Pursuant to Section 3.1 of the Stalking Horse APA, the aggregate consideration and purchase price (the "Purchase Price") for the sale, transfer, assignment and conveyance of the Purchased Assets will be (a) the assumption by Buyers or payment by Buyers, at their election, of the DIP Carve-Out Amount, (b) the payment by Buyers, on behalf of Sellers, of the Transaction Costs to the extent unpaid at Closing,

(c) the payment by Buyers, on behalf of Sellers, of the DIP Obligations, (d) the waiver and relinquishment by the Senior Lenders of the Senior Lender Claims in an amount equal to $21,000,000, effective upon Closing through the Mutual Waiver and Release and (e) the assumption by Buyers of the Assumed Liabilities, effective upon Closing through the Assumption and Assignment Agreement.

d.    **Assumed Liabilities:** Pursuant to <u>Section 2.4</u> of the Stalking Horse APA, and upon the terms and subject to the conditions set forth therein, at the Closing, Buyers shall assume, and thereafter pay, perform and discharge when due (in accordance with their respective terms and subject to the respective conditions thereof), only the following liabilities (the "<u>Assumed Liabilities</u>") and no others:

(i)    All obligations of Sellers under the Assumed Contracts arising after the Closing Date, except to the extent such obligations, but for a breach or default by any Seller, would have been paid, performed or otherwise discharged on or prior to the Closing Date or to the extent the same arise out of any such breach or default;

(ii)    All Postpetition Obligations;

(iii)    All Senior Lender Costs;

(iv)    The DIP Carve-Out Amount (as defined in the Interim and/or Final DIP Order) including budgeted and unpaid professional fees, solely in the event and to the extent Buyers do not elect to pay such amount on the Closing Date in accordance with <u>Section 3.2</u> of the Stalking Horse APA;

(v)    All other liabilities expressly set forth on <u>Schedule 2.4(e)</u> of the Stalking Horse APA

e.    **Excluded Liabilities:** Pursuant to <u>Section 2.5</u> of the Stalking Horse APA, and notwithstanding anything contained therein to the contrary, none of the Buyers shall assume or be obligated to pay, perform or otherwise discharge any other liability or obligation of Sellers whatsoever or any liabilities or obligations constituting an Encumbrance upon the Purchased Assets, regardless of whether any such liabilities or obligations are absolute or contingent, known or unknown, liquidated or unliquidated, or otherwise. Sellers shall remain liable for all liabilities or obligations other than the Assumed Liabilities (collectively, the "<u>Excluded Liabilities</u>"), including any liabilities or obligations arising prior to Closing, including under any Assumed Contract, any liabilities and obligations related to any Excluded Assets, any liabilities and obligations arising under the Excluded Contracts and all liabilities and obligations in respect of Taxes for which Sellers are liable pursuant to <u>Section 8.3</u> of the

Stalking Horse APA. Without limiting the generality of the foregoing, in no event shall any Buyer assume any of the following liabilities or obligations:

(i)     All liabilities and obligations of any Seller relating to Excluded Assets;

(ii)     All liabilities and obligations of any Seller for: (i) payments made to or fees and expenses accrued with respect to professionals retained or employed in connection with the Chapter 11 Cases or any official committee of creditors appointed in the Chapter 11 Cases, except to the extent specifically assumed pursuant to Section 2.4 of the Stalking Horse APA, (ii) reclamation Claims and (iii) any prepetition, priority or other Tax Claims;

(iii)     Any liability or obligation of Sellers or their directors, officers, stockholders or agents, arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including, without limitation, all finder's or broker's fees and expenses and any and all fees and expenses of any representatives of Sellers;

(iv)     Any liability or obligation relating to (i) events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or (ii) the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business);

(v)     Any liability or obligation to any Person at any time employed by Sellers or Affiliates or their predecessors-in-interest at any time or to any such Person's spouse, children, other dependents or beneficiaries, including with respect to incidents, events, exposures or circumstances occurring at any time during the period or periods of any such Person's employment by Sellers or their predecessors-in-interest, whenever such claims mature or are asserted, including, without limitation, all liabilities arising (i) under the Employee Plans, any other employment, change in control, termination, severance or similar agreement, (ii) under any employment, wage and hour law or restriction, equal opportunity, discrimination, plant closing or immigration and naturalization laws, or any other applicable laws related to employment or termination thereof, (iii) under any collective bargaining laws, agreements or arrangements or (iv) in connection with any workers' compensation or any other employee health, accident, disability or safety claims;

(vi)    any liability or obligation of Sellers under Title IV of ERISA;

(vii)   any liability or obligation of Sellers under COBRA;

(viii)  any incentive compensation, bonus, change in control, severance, pension or retirement liability or obligation of any Seller to its current or former employees whether or not accrued as of the Closing Date, whether or not under any Employee Plan, unless expressly identified on Schedule 2.4(e) of the Stalking Horse APA as an Assumed Liability;

(ix)    any liability or obligation of any Seller, or any member of any consolidated, affiliated, combined or unitary group of which any Seller is or has been a member, for (i) Taxes, or (ii) Taxes of any Person, pursuant to an agreement or otherwise;

(x)     any liability or obligation incurred by (i) Sellers or (ii) their respective directors, officers, stockholders, agents or employees after the Closing Date;

(xi)    any liability of Sellers to any Person on account of any proceeding, including those proceedings set forth on Schedule 5.16 of the Stalking Horse APA;

(xii)   any liability or obligation arising out of the conduct of the Business prior to the Closing Date or arising out of the ownership or operation of an Excluded Asset;

(xiii)  any liability or obligation of Sellers under any Indebtedness, including, without limitation, any Indebtedness owed to any stockholder or other Affiliate of any Seller, and any Contract evidencing any such financing arrangement;

(xiv)   any liability or obligation, whether known or unknown, (i) under Environmental Laws attributable or relating to or incurred as a result of any acts, omissions, or conditions first occurring or in existence as of or prior to the Closing Date, including, but not limited to, any liability or obligation with respect to the release, handling, discharge, treatment, storage, generation, disposal, or presence of Hazardous Substances at any location (it being understood that Buyers shall be responsible for any liability or obligation arising out of or relating to its actions following the Closing), (ii) with respect to claims relating to health and safety, including claims for injury, sickness, disease or death of any Person (to the extent relating to or incurred as a result of any acts, omissions, or conditions first occurring or in existence as of or prior to the Closing Date ) or (iii) with respect to compliance with any legal requirement relating to any of the foregoing, to the extent relating to periods prior to the Closing; and

(xv)   fees or expenses of Sellers incurred with respect to the transactions contemplated in the Sale Motion, except to the extent that Buyers elect to treat the DIP Carve-Out Amount as an Assumed Liability in accordance with Section 3.2 of the Stalking Horse APA.

f.   **Employees:** Section 8.1 of the Stalking Horse APA provides that:

(i)   Unless otherwise agreed to by Buyers, between the date hereof and Closing, each Seller shall use its commercially reasonable efforts to continue to employ all of the Business Employees, subject to normal workplace practices and discipline. In addition, between the date hereof and Closing, Sellers shall inform Buyers if any such Business Employee has terminated or given notice of their intent to terminate employment.

(ii)   Between the date hereof and Closing, Buyers may interview some or all of Sellers' employees to determine whether to offer employment to any of them (all of the Business Employees who accept such an offer and actually commence employment with Buyers after the Closing Date, the "Transferred Employees"). Buyers shall have no obligation to hire any Business Employee.

(iii)   Nothing in the Sale Motion contained shall be considered or construed as an agreement to employ any Business Employee for any period of time. Except as specifically provided for in the Sale Motion, Buyers assume no obligation with respect to any of Sellers' employees, whether hired by a Buyer or not, for any benefit, perquisite or remuneration accrued or earned while under Sellers' employ. Without limiting the generality of the foregoing, Buyers shall have no obligation or liability for such employees' accrued vacation time, bonuses, awards, commissions, salaries, reimbursements of any kind, health or disability benefit, insurance, severance pay, pension or profit sharing interests or any other benefits, compensation or remuneration of any nature whatsoever.

(iv)   No provision of this Section 8.1 shall create any third party beneficiary or other rights in any Business Employee (including any beneficiary or dependent thereof, and further including the Transferred Employees) of Sellers or of any of their Affiliates in respect of employment with any Buyer or any of their Affiliates, and no provision of this Section 8.1 shall create any rights in any such Persons in respect of any benefits that may be provided, directly or indirectly, under any Employee Plan or any plan or arrangement which may be established by any Buyers or any of their Affiliates. No provision of this Agreement shall constitute a limitation on rights to amend, modify or terminate after Closing any such plans or arrangements of any Buyers or any of their Affiliates.

g.    **Preservation of Records and Access to Information:**  Sellers shall retain any minute books, stock ledgers, corporate seals and stock certificates of Sellers, and other similar books and records that Sellers are required by law to retain or that Sellers determine are reasonably necessary to retain including corporate or other entity filings pursuant to Section 2.3(g) of the Stalking Horse APA.

h.    **Expense Reimbursement:**  Pursuant to Section 7.2 of the Stalking Horse APA, Sellers agree, in the event that the Bankruptcy Court enters an order that becomes final approving a transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of the Purchased Assets to a purchaser or purchasers other than Buyers (an "Alternate Buyer") or effecting any other transaction (including a plan of reorganization, refinancing or liquidation) the consummation of which would be substantially inconsistent with the transactions contemplated hereby (any such transaction (or series of transactions) an "Alternate Transaction"), Sellers shall owe to Buyers an amount equal to all of the out-of-pocket expenses, up to a total of $500,000, incurred by Buyers or their Affiliates in connection with the transactions contemplated by the Stalking Horse APA (the "Expense Reimbursement"), which amount shall be paid immediately upon entry of the order approving such Alternate Transaction, in each case, without further order of the Bankruptcy Court. The Expense Reimbursement is intended to compensate Buyers and their Affiliates for the time and expense dedicated to this transaction and the value added by Buyers and their Affiliates in (i) establishing a bid standard or minimum for other bidders, (ii) placing Sellers' estate property in a sales configuration mode attracting other bidders to the auction and (iii) for serving, by its name and its expressed interest, as a catalyst for other potential or actual bidders. The Expense Reimbursement shall constitute an allowed super priority administrative claim against Sellers' estates under Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

i.    **Termination:**  Pursuant to Section 10.1 of the Stalking Horse APA, and notwithstanding anything contained therein to the contrary, the Stalking Horse APA may be terminated at any time prior to the Closing Date as follows:

(i)    by the mutual written consent of Buyers and Sellers;

(ii)    by Buyers if the Sale Procedures Order shall not have been entered by the Bankruptcy Court in substantially the form attached to the Stalking Horse APA as Exhibit E-1 without modification or the imposition of any conditions or limitations with respect thereto (except for such immaterial modifications, conditions or limitations which do not individually or in the aggregate adversely affect Buyers) on or prior to the 15th calendar day following the date of the Petition Date;

(iii)    by Buyers if the Sale Order shall not have been entered by the Bankruptcy Court in substantially the form attached to the Stalking Horse APA as <u>Exhibit E-2</u> approving the Stalking Horse APA and the transactions contemplated thereby without modification or the imposition of any conditions or limitations with respect thereto (except for such immaterial modifications, conditions or limitations which do not individually or in the aggregate adversely affect Buyers) on or prior to the 50th calendar day following the Petition Date;

(iv)    by Buyers in the event of any material breach by any Seller of any of Sellers' agreements, covenants, representations or warranties contained in the Sale Motion and such material breach is incapable of being cured or, if capable of being cured, shall not have been cured within fifteen (15) days following receipt by such Seller of notice of such material breach from Buyers;

(v)    by Sellers in the event of any material breach by any Buyer of any of Buyers' agreements, covenants, representations or warranties contained in the Sale Motion and such material breach is incapable of being cured or, if capable of being cured, shall not have been cured within fifteen (15) days following receipt by such Buyer of notice of such material breach from Sellers;

(vi)    by Buyers, if Sellers' Chapter 11 Cases are (i) dismissed, (ii) converted to Chapter 7 or (iii) a trustee is appointed with respect to any Seller;

(vii)    by Buyers, if (i) the DIP Credit Agreement is terminated or (ii) if any Seller is in default or breach of the DIP Credit Agreement, or a condition precedent to its borrowing thereunder has not been satisfied, and such default, breach or condition precedent is not waived and materially limits any Seller's ability to borrow funds thereunder; unless, in each case, such Seller obtains substitute financing on terms that are not materially less favorable to such Seller than the terms of the DIP Credit Agreement;

(viii)    by either Buyers, on the one hand, or Sellers, on the other hand, if (a) an Alternate Transaction is consummated, or (b) the Bankruptcy Court shall have approved an Alternate Transaction; <u>provided however</u>, that if Buyers are the "Back-up Bidder" (as defined in the Sale Procedures Order), neither Buyers nor Sellers will terminate this Agreement, pursuant to this <u>Section 10.1(h)</u>, until fifteen (15) days after entry of the order approving such Alternate Transaction;

(ix)    by either Buyers or Sellers if any Governmental Body (as defined in the Stalking Horse APA) shall have issued a final and

nonappealable order, decree or ruling permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; or

(x)     by either Buyers or Sellers if the Closing shall not have occurred on or before sixty (60) days after the Petition Date (or such later date as may be mutually agreed to in writing by Buyers and Sellers); provided, that the party seeking to exercise such right of termination has not breached its obligations hereunder.

j.     **DOT Matters.** Section 8.10 of the Stalking Horse APA provides that:

(i)     Without limiting the obligations imposed by Section 8.5 of the Stalking Horse APA, Buyers shall, with the assistance and cooperation of Sellers, use their reasonable best efforts to obtain either consents to the Transfer or replacements of the Required Material Permit

(ii)     Upon Buyers' election, which shall be made in writing and delivered to Sellers no less than six business days prior to the Closing Date, the Buyers and Sellers shall take the following actions on or prior to the Closing Date (provided that the parties may mutually agree to amend such actions from time to time): (a) approximately three to five days prior to the Closing (i) Sellers shall form one or more wholly owned subsidiaries of Sellers With names provided by Buyers (the "New Subsidiaries") and (ii) Buyers shall prepare and deliver, with the assistance and cooperation of Sellers, a Name Change Petition to the Federal Motor Carrier Safety Administration and/or the United States Department of Transportation (collectively, the "DOT") requesting that (A) the approval of the name change for the applicable material Permit (all of which are set forth on Schedule 8.10(b), collectively the "Required Material Permits") and (B) the name of the applicable New Subsidiary be reflected in the DOT's records with respect to the applicable Required Material Permit. Upon the granting of the petition, Buyers shall file a Form MCS 150 with the DOT to reflect the New Subsidiaries' name(s) and address(es) with respect to the applicable Required Material Permit. At the Closing, all of the equity interests of the New Subsidiaries will be transferred to the Buyers as Purchased Assets (unless the Buyers elect to exclude such Purchased Assets prior to the Closing.

k.     **Subject to Court Approval**:  The Stalking Horse APA is subject to Court approval.

243.    The Debtors believe the proposed Bidding Procedures will maximize the realizable value of the Purchased Assets for the benefit of the Debtors' estates, creditors and other interested parties.   The Bidding Procedures contemplate an auction process pursuant to which bids for the Purchased Assets will be subject to higher or otherwise better offers.   While the Bidding Procedures afford the Buyer some measure of protection for its "stalking horse" bid by virtue of the Expense Reimbursement, they primarily benefit the Debtors by creating a bidding process that ensures, among other things:  (a) structure and certainty to the process; (b) the Debtors' ability to compare the relative values of competing offers, if any; (c) that any potential Alternate Buyer has the financial wherewithal to timely consummate its purchase; and (d) meaningful bidding increments.   The Debtors seek to implement a competitive bidding process designed to maximize recovery for the benefit of their estates.   As described below and more fully in the Bidding Procedures, only Qualified Bidders who timely submit Qualified Bids will be eligible to participate in the Auction.

244.    The Debtors believe that the Bidding Procedures are fair and reasonable, and are not likely to dissuade any serious potential alternative purchaser from bidding in a manner permitted under the preceding paragraph.

245.    The Debtors request that the Court schedule the Sale Hearing prior to October 19, 2009.  The Debtors further request that the objection deadline with respect to the sale of the Purchased Assets be at least seven business days prior to such hearing.

246.    The Debtors submit that more than ample business justification exists to sell the Purchased Assets to the Buyer (or other Successful Bidder) pursuant to the Bidding Procedures. The prompt sale of the Purchased Assets presents the best opportunity to maximize the value for the estates in light of the need to manage and transition the Purchased Assets to a Buyer.   In

addition, the Debtors believe that the Bidding Procedures are the best method by which they can obtain the best price for the Purchased Assets and provide interested parties with accurate and reasonable notice of the Sale. The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Purchased Assets by helping ensure a competitive and fair bidding process.

247. The Debtors believe the sale of their businesses and assets must occur quickly in order to maximize value in these cases, and that every day spent in chapter 11 increases the risk of business loss and value deterioration. Absent a prompt sale pursuant to the procedures and timelines proposed, the Debtors believe that the going concern value of the Purchased Assets will be significantly compromised. The success of the Debtors' businesses relies in great part on their reputations as reliable and efficient providers of logistics services. Their customers rely on them to provide seamless distribution and just-in-time delivery services. Every day that the Debtors remain in chapter 11 more of their customers will lose faith in their ability to provide the services on which their own businesses rely. This will lead to customers turning to competitors and result in the Debtors losing significant revenue. Moreover, the Debtors' precarious cash position and the terms of their DIP Facility require that the Sale occur quickly. It is therefore imperative that the Debtors affect a Sale as early on in these cases as possible. The Debtors further believe that a targeted sale process is most likely to achieve the highest and best price for the Purchased Assets and will do so in an efficient and timely manner, enabling the Debtors' businesses to emerge successfully from these cases. The Debtors respectfully submit that the

relief sought by the Sale Motion not only is reasonable, but necessary, to maximize the value of these estates for the benefit of the Debtors and their stakeholders.

248. The Bidding Procedures are also designed to maximize the value received for the Purchased Assets. The process proposed by the Debtors allows for a timely auction process while providing bidders ample time and information to submit a timely bid. Along with the Debtors' marketing process, the Bidding Procedures are designed to ensure that the Purchased Assets will be sold for the highest or otherwise best possible purchase price. The Debtors are subjecting the value of the Purchased Assets to market testing and permitting prospective purchasers to bid on the Purchased Assets, thereby subjecting the proposed sale to a market check through the solicitation of competing bids in a court-supervised auction process. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Purchased Assets will be fair and reasonable.

249. The sale of the Purchased Assets and the assignment and/or transfer of the Executory Contracts and Unexpired Leases, which have been designated by the Buyer in the Stalking Horse APA and/or will be designated by any Successful Bidder, is or will be in good faith. As discussed throughout the Sale Motion, and as will be further demonstrated at the Sale Hearing, any sale agreement will be the culmination of a solicitation and negotiation process in which all parties will be represented by counsel. No known potential bidder for the Purchased Assets is an insider of the Debtors and all negotiations have been and will continue to be conducted on an arms length, good faith basis. Moreover, there is no evidence of fraud or collusion in terms of the proposed sale. With respect to the potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.

Under the circumstances, the Buyer or any Alternate Buyer should be afforded the protections provides to a good faith purchaser.

Dated: September 2, 2009
      Wilmington, Delaware

**Alternative Distribution Systems, Inc.**
**May Logistics Services, Inc.**
**ADS Logistics, LLC**

/s/ Timothy M. May
Timothy M. May
Chief Operating Officer