# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Alternative Distribution Systems, Inc., *et al.*[1] | Case No. 09-_____ ( ) |
| Debtors. | Joint Administration Requested |

## MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. § 364; (II) AUTHORIZING THE DEBTORS' LIMITED USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364; AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby move this Court (the "Motion") for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders"): (i) authorizing the Debtors to obtain postpetition financing pursuant to 11 U.S.C. § 364; (ii) authorizing the Debtors' limited use of cash collateral pursuant to 11 U.S.C. § 363; (iii) granting adequate protection to prepetition secured parties pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; and (iv) scheduling a final hearing pursuant to Fed. R. Bankr. P. 4001. In support of this Motion, the Debtors respectfully represent as follows:

### Jurisdiction

1. The Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334.

2. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Alternative Distribution Systems, Inc. (2412); May Logistics Services, Inc. (4970); and ADS Logistics, LLC (0782).

3.     Venue of these chapter 11 cases in this District is proper under 28 U.S.C. §§ 1408 and 1409.

4.     The statutory and rule-based predicates for the relief requested herein are sections 361, 362, 363 and 364 of title 11 of the United States Code (11 U.S.C. §§ 101–1532, as amended, the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

5.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under title 11 of the Bankruptcy Code, commencing the Debtors' chapter 11 cases (the "Chapter 11 Cases"). The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases and, as of the date of the filing of this Motion, no official committees have been appointed or designated. Concurrently herewith, the Debtors filed a motion seeking joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

6.     The factual background relating to the Debtors' commencement of these Chapter 11 Cases is set forth in detail in the *Declaration of Timothy M. May, Chief Operating Officer of each of the Debtors, in Support of First Day Pleadings* (the "May Declaration") filed on the Petition Date and incorporated herein by reference.

## Relief Requested

7.     By this Motion, pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rule 4001, the Debtors request that this Court enter an order:

> authorizing Debtor ADS Logistics, LLC (the "Borrower") to obtain secured postpetition financing consisting of a revolving credit facility (the "DIP Facility") in an aggregate principal amount not to exceed

2

$4,000,000,[2] of which $2,500,000 shall be available on the Closing Date (as defined in the DIP Agreement), and for the other two Debtors (collectively, the "Guarantors") to jointly and severally guarantee the payment and performance of the Borrower's obligations under the DIP Facility from GE Capital ("GE Capital") (in such capacity, the "DIP Agent") and the lenders under the DIP Facility (collectively, the "DIP Lenders"), pursuant to the terms of the Interim Order and that certain Debtor-in-Possession Credit Agreement by and among the Borrower, the Guarantors, the DIP Agent and the DIP Lenders, substantially in the form attached as Exhibit A to the Interim Order (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "DIP Agreement," and together with any related documents and instruments delivered pursuant to or in connection therewith (including the "Loan Documents" referenced therein, the "DIP Facility Documents");

authorizing the Debtors to execute and enter into the DIP Facility Documents and to perform such other and further acts as may be required or requested by the DIP Lenders in connection with the DIP Facility Documents;

authorizing the Debtors to grant security interests, liens and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and limited priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders, to secure all obligations of the Debtors under and with respect to the DIP Facility (collectively, the "DIP Obligations"), as more fully set forth in the Interim Order and the DIP Agreement;

authorizing the Debtors' use of cash collateral, as such term if defined in section 363 of the Bankruptcy Code (as so defined, the "Cash Collateral"), on the terms and conditions set forth in the Interim Order;

authorizing the provision of adequate protection of the liens and security interests (such liens and interests, the "Prepetition Liens") granted to the Prepetition Secured Lenders (as defined below) for the benefit of the Prepetition Agents (as defined below) and the Prepetition Secured Lenders (as defined below), securing the Debtors' obligations under the Prepetition Credit Agreements (as defined below) and all collateral and ancillary documents executed or delivered in connection with the Prepetition Credit Documents (as defined below), as more fully set forth in the Interim Order;

---

[2] $4,000,000 less the outstanding principal balance of the revolving loans and letters of credit outstanding under the First Lien Credit Agreement on the Closing Date.

3

scheduling an emergency hearing (the "Interim Hearing") for this Court to consider entry of the Interim Order, which authorizes the Debtors, on an interim basis, to obtain from the DIP Lenders under the DIP Facility up to an aggregate principal amount not to exceed $2,500,000, pursuant to the terms of, and on the conditions contained in, the DIP Agreement;

upon entry of the Final Order, waiving all surcharges pursuant to section 506(c) of the Bankruptcy Code;

scheduling a final hearing (the "Final Hearing") on the Motion no later than October 2, 2009 to consider entry of a Final Order authorizing the borrowings under the DIP Facility Documents on a final basis and approval of notice procedures with respect thereto;

modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the (a) Debtors, (b) DIP Agent and DIP Lenders and (c) First Lien Agent and First Lien Lenders (each as defined below) to implement the terms of the Interim Order; and

granting the other relief described in the Interim Order.

## Basis for Relief

8.     This Motion is brought on an emergency basis in light of the immediate and irreparable harm that will suffered by the Debtors' estates if the proposed DIP Facility is not approved. Without the additional financing to be provided by the DIP Facility, the Debtors will not have sufficient liquidity available to ensure the continued operation of the their businesses pending the sale contemplated by these Chapter 11 Cases. *See* May Declaration at ¶ 108. The Debtors have an immediate need to obtain the DIP Facility and use Cash Collateral in order to permit the orderly continuation of their business operations, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs. *Id.*

9.     The access to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the values of the Debtors and to

4

a successful sale of substantially all of the Debtors' assets. *See* May Declaration at ¶ 109. In the absence of suitable debtor-in-possession financing and the related use of Cash Collateral, the Debtors could be compelled to curtail or even terminate their business operations – to the material detriment of creditors, employees and other parties in interest – if there were even the slightest cash flow problem. *Id.* Furthermore, it is important for the Debtors to be able to demonstrate to their customers, suppliers and vendors that they have sufficient capital to ensure ongoing operations. *Id.* Failure to do so could result in such suppliers or vendors imposing unfavorable terms on the Debtors or ceasing to do business with the Debtors or such customers limiting or ceasing to do business with the Debtors.

## The Debtors' Prepetition Debt Structure

10.     The Debtors' prepetition debt structure is comprised of two components: (a) the First Lien Credit Agreement (as hereinafter defined) and (b) the Second Lien Credit Agreement (as hereinafter defined). As of the Petition Date, the Debtors' obligations under the First Lien Credit Agreement and the Second Lien Credit Agreement totaled approximately $34,113,777.

### *The First Lien Credit Agreement*

11.     Pursuant to that certain Third Amended and Restated Credit Agreement dated as of January 18, 2008 (as amended, restated, supplemented or otherwise modified from time to time, the "First Lien Credit Agreement"), by and among the Borrower, as borrower, each of the other Debtors, as guarantors, GE Capital, as Documentation Agent and Administrative Agent (in such capacities, the "First Lien Agent") and as a Lender and Issuing Bank, and the other lenders party thereto from time to time (collectively, the "First Lien Lenders"), the First Lien Lenders extended revolving and term credit facilities to, and issued letters of credit for, the Borrower from time to time, including, *inter alia*, (i) revolving loans in an aggregate committed amount of up to $4.0 million, and (ii) term loans in an aggregate original principal amount of $28.5 million.

5

The First Lien Credit Agreement, along with any other agreements, instruments, notes, guaranties and other documents executed in connection therewith are collectively referred to herein as the "First Lien Credit Documents" and are available upon request from counsel to the Debtors or counsel to the First Lien Agent. All obligations of the Debtors arising under the First Lien Credit Agreement or any other First Lien Credit Document, including all loans, advances, debts, liabilities, principal, interest, fees, charges, expenses and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts, including obligations pursuant to any letters of credit, and all covenants and duties regarding such amounts, owing to the First Lien Agent or First Lien Lenders by the Debtors, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall hereinafter be referred to as the "First Lien Obligations."

12. Pursuant to certain Collateral Documents (as defined in the First Lien Credit Agreement), each as reaffirmed or dated as of January 18, 2008 (as amended, restated, supplemented or otherwise modified from time to time, the "First Lien Collateral Documents"), by and among each of the Debtors, the First Lien Agent and any other parties which may be party thereto, each Debtor granted to the First Lien Agent, for the benefit of itself and the First Lien Lenders, to secure such Debtor's obligations under the First Lien Credit Documents, a first priority security interest in and continuing lien on substantially all of such Debtor's assets, including, but not limited to, all of such Debtor's accounts, chattel paper, documents, general intangibles, goods (including, without limitation, inventory, fixtures and equipment), instruments, intellectual property, investment property, certificated and uncertificated securities, letter of credit rights, money, deposit accounts, receivables and receivable records, real property, commercial tort claims, insurance policies, including claims or rights to payment thereunder,

6

liens, guaranties and other rights and privileges pertaining thereto, and a pledge of one hundred percent (100%) of the capital stock of each of its subsidiaries, and all books, ledgers, books of account, records, writings, data bases, information and other property of such Debtor relating to, used or useful in connection with the foregoing, and all proceeds, distributions, products, accessions, rents, issues, returns and profits of or in respect of any of the foregoing, in each case whether then owned or existing or thereafter acquired or arising. All such collateral granted or pledged by the Debtors pursuant to the First Lien Credit Documents shall collectively be referred to herein as the "Prepetition Collateral."

13.     As of the Petition Date, the aggregate amount outstanding under the First Lien Credit Agreement was approximately $30,061,081.

### *The Second Lien Credit Agreement*

14.     Pursuant to that certain Senior Subordinated Loan Agreement dated as of January 18, 2008 (as amended, restated, supplemented or otherwise modified from time to time, the "Second Lien Credit Agreement" and, together with the First Lien Credit Agreement, the "Prepetition Credit Agreements"), by and among the Borrower, as borrower, each of the other Debtors, as guarantors, and William Blair Mezzanine Capital Fund II, L.P. ("William Blair" or the "Second Lien Agent" and, together with the First Lien Agent, the "Prepetition Agents"), and the lender parties signatory thereto (collectively, the "Second Lien Lenders" and, together with the First Lien Lenders, the "Prepetition Secured Lenders"), the Second Lien Lenders extended term loans to the Borrower in an aggregate original principal amount of $2.5 million. Pursuant to that certain Amended and Restated Subordinated Note dated as of January 18, 2008, William Blair extended a term loan to the Borrower in an aggregate original principal amount of $2.0 million (the "Blair Note"), which as of September 1, 2009 has an aggregate outstanding principal amount of no less than $3,377,410. The Second Lien Credit Agreement and the Blair Note along

7

with any agreements, instruments, notes, guaranties and other documents executed in connection therewith are collectively referred to herein as the "Second Lien Credit Documents" (and, together with the First Lien Credit Documents, the "Prepetition Credit Documents") and are available upon request from counsel to the Debtors or counsel to the Second Lien Agent. All obligations of the Debtors arising under the Second Lien Credit Documents shall hereinafter be referred to as the "Second Lien Obligations."

15. Pursuant to certain Second Lien Credit Documents, each as reaffirmed or dated as of January 18, 2008 (as amended, restated, supplemented or otherwise modified from time to time, the "Second Lien Collateral Documents"), by and among each of the Debtors, the Second Lien Agent and any other parties which may be party thereto, each Debtor granted to the Second Lien Agent, for the benefit of itself and the Second Lien Lenders, to secure such Debtor's obligations under the Second Lien Credit Documents, a second priority security interest in and lien on all of such Debtor's right, title and interest in the Prepetition Collateral.

16. As of the Petition Date, the aggregate amount outstanding under the Second Lien Credit Agreement was approximately $4,052,696.

**_Intercreditor Agreement_**

17. Pursuant to that certain Subordination Agreement dated as of January 18, 2008 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Intercreditor Agreement") by and among the First Lien Agent, Second Lien Agent and the Second Lien Lenders, the Second Lien Agent and the Second Lien Lenders agreed: (i) to subordinate their liens in the Prepetition Collateral to the DIP Liens and the Adequate Protection Liens, (ii) that they will raise no objection to the Debtors entering into the financing arrangements contemplated by this Order and the DIP Credit Documents, and to the Debtors' continued use of Cash Collateral on the terms and conditions set forth in this Order, and (iii) that

8

they will not request adequate protection or any other relief in connection with the Debtors' entry into the DIP Facility or their continued use of Cash Collateral, except as expressly agreed to by the First Lien Agent or to the extent permitted under the Prepetition Intercreditor Agreement.

## The Proposed Postpetition Financing

18.     As discussed in the May Declaration, the Debtors require additional working capital financing in order to preserve and maintain their business.   In view of the steady deterioration of the Debtors' liquidity position and in order for the Debtors to ensure that they have sufficient liquidity to continue their operations while they consummate a sale under the Bankruptcy Code, as contemplated by the filing of these Chapter 11 Cases, the Debtors underwent a process to forecast cash receipts and disbursements on a weekly basis to determine the amount of funding required.  The result of this process showed that the Debtors could require as much as $3,976,000 of incremental liquidity in addition to the use of Cash Collateral. Obtaining such additional financing proved challenging since the credit markets generally, and the debtor-in-possession loan market in particular, continue to suffer significant disruption and dislocation caused by the continuing economic crisis.

19.     Nevertheless, the Debtors began their search with the most likely candidate because of their position in the Debtors' prepetition capital structure: the First Lien Lenders. In addition, the Debtors contacted various financial institutions to determine if there was any interest in the market in providing postpetition financing that would either refinance the prepetition indebtedness or be subordinate in priority to the Prepetition Secured Lenders' security interests in and liens on the Prepetition Collateral.  The Debtors solicited financing proposals from these financial institutions, but did not receive any proposals.  In fact, none of the financial institutions was able to suggest another institution that might be willing to provide the Debtors' with the debtor-in-possession financing that they are seeking hereby.

9

20.     Consequently, the Debtors concluded that the DIP Facility was a good option for the Debtors because, *inter alia*, it (a) would afford the Debtors sufficient liquidity to continue their operations while they consummate a sale under the Bankruptcy Code, as contemplated by the filing of these Chapter 11 Cases, (b) would avoid a priming fight, and (c) has pricing that is at market.

21.     The Debtors' negotiations on the DIP Facility culminated in an agreement with the DIP Lenders to provide the Debtors with access to the DIP Facility on the terms and subject to the conditions set forth in that certain DIP Agreement, attached to the Interim Order as Exhibit A, by and among the Borrower, the Guarantors, the DIP Agent and the DIP Lenders party thereto from time to time.

## Summary of Principal Terms of the DIP Facility

22.     The DIP Agent and the DIP Lenders are willing to make the DIP Facility available to the Debtors upon the terms and conditions set forth in the DIP Agreement and the DIP Orders.  The salient provisions of the DIP Agreement are as follows:[3]

> Borrower:  Debtor ADS Logistics, LLC, a Delaware limited liability company, in its capacity as a debtor and debtor in possession in its Chapter 11 Case filed under the Bankruptcy Code, is the Borrower.
>
> Guarantors:   Debtor Alternative Distribution Systems, Inc., a Delaware corporation, and Debtor May Logistics Services, Inc. ("MLS"), a California corporation, in their capacities as debtors and debtors in possession in their Chapter 11 Cases filed under the Bankruptcy Code, are the Guarantors and shall unconditionally guarantee all obligations of the Borrower under the DIP Facility

---

[3] The following description of the terms of the DIP Facility (as provided below) is intended to provide the Court and interested parties with a brief overview of the significant terms thereof.  For a complete description of the terms and conditions of the DIP Facility, reference should be made to the DIP Facility Documents.  This summary is qualified in its entirety by reference to the DIP Facility Documents.  In the event of any conflict or inconsistency between the provisions of this Motion and the DIP Facility Documents, the DIP Facility Documents shall control in all aspects.  The terms of the DIP Agreement are still being reviewed by the parties as of the filing of this Motion and a final version of the DIP Agreement will be presented at the Interim Hearing.  Each capitalized term used in this section of the Motion but not otherwise defined herein shall have the meaning ascribed thereto in the DIP Agreement.

CURRENT 15539246v3
47705/0001-5961898v1

<u>DIP Agent</u>:  GE Capital.

<u>DIP Lenders</u>:  The DIP Lenders shall be the same as the First Lien Lenders under the First Lien Credit Agreement.

<u>Type and Amount of DIP Facility</u>:  DIP Facility with a maximum amount of up to $4,000,000[4] (the "<u>Maximum Amount</u>"); <u>provided</u>, <u>however</u>, that (i) from and after the entry of the Interim Order and prior to the entry of the Final Order, the Maximum Amount available to the Borrower shall be limited to $2,500,000 and (ii) the Borrower shall at all times be required to use all available Cash Collateral before being able to borrow any funds under the DIP Facility.

The commitments of the DIP Lenders under the DIP Facility (the "<u>Commitments</u>") shall constitute a continuation of the prepetition revolving loan commitments of the First Lien Lenders under the First Lien Credit Agreement. All postpetition collections shall be applied first to the outstanding obligations under the DIP Facility and, in the absence any such outstanding obligations at the time of any application, shall be held by the DIP Agent as Cash Collateral, which shall be disbursed to the Debtors in lieu of subsequently requested loans (subject to the budget and all other conditions to loans) under the DIP Facility prior to the making of new loans.  On the Termination Date (as defined below), any Cash Collateral then held by the DIP Agent shall be applied to the repayment of prepetition revolving loans or other prepetition obligations under the First Lien Credit Agreement.

The Prepetition Secured Lenders have consented to the priming of their Prepetition Liens by the DIP Facility solely pursuant to the terms set forth in the DIP Facility and the proposed Interim Order.

<u>Cash Collateral</u>:  The Borrower shall use all available Cash Collateral prior to any borrowing under the DIP Facility.  All use of Cash Collateral must conform to the Budget (as defined below) and shall be subject to all terms and conditions set forth in the Interim Order and the DIP Agreement.  The Debtors shall waive the right to seek the use of Cash Collateral other than on terms satisfactory to the DIP Agent and the DIP Lenders holding more than 66 2/3% of the aggregate Commitments (the "<u>Requisite DIP Lenders</u>").

<u>Borrowing Availability</u>:  The borrowing availability under the DIP Facility (the "<u>DIP Availability</u>") shall at all times comply with a 13-week budget acceptable in all respects to the DIP Agent and the Requisite DIP Lenders (the "<u>Budget</u>"), which reflects on a line-item basis the Debtors' anticipated cumulative cash receipts and expenditures on a weekly basis and all necessary and required cumulative expenses which the Debtors expect to incur during each week of the Budget starting on the Petition Date.  On a day during the period from the Petition

---

[4] To be $4,000,000 <u>less</u> the outstanding principal balance of the revolving loans and letters of credit outstanding under the First Lien Credit Agreement on the Closing Date.

CURRENT 15539246v3
47705/0001-5961898v1

Date through such day, the aggregate initial principal amount of all advances made under the DIP Facility since the Petition Date (irrespective of any repayments) shall not exceed (i) $400,000 plus (ii) the amount of the deficiency specified in the Budget in the line item "ENDING BALANCE – BOOK CASH" for the week in which such day occurs less such reserves as may be imposed by the Requisite DIP Lenders, in their reasonable credit judgment, not to exceed the maximum amount of the Carve Out (the sum of (i), (ii) and (iii) for any day being, the "Maximum Permitted Advances").

The Borrower shall provide to the DIP Agent and the DIP Lenders, so as to actually be received by them within two (2) business days following the end of each week, weekly line-by-line variance reports, in form and substance reasonably acceptable to the DIP Agent, for the preceding weekly period and on a cumulative basis for the period from the Petition Date to the report date, comparing actual cash receipts and disbursements to amounts projected in the Budget and showing on a line-by-line basis any variance to the corresponding line item of the Budget together with an explanation for such variance.

Closing Date:  The date on which the Interim Order is entered by the Bankruptcy Court or as soon as practicable thereafter.

Use of Proceeds:  Proceeds of the DIP Facility and Cash Collateral shall be used to pay interest, fees and expenses associated with the DIP Facility and to fund the Debtors' general corporate and working capital requirements (including, without limitation, the costs, fees and expenses of the Chapter 11 Cases as may be approved by the Bankruptcy Court), subject to the Budget and the DIP Facility Documents.

Documentation.  The DIP Facility will be evidenced by the DIP Facility Documents in form and substance satisfactory to the DIP Agent and the DIP Lenders.

Termination:  The obligation of the DIP Lenders to make loans under the DIP Facility will terminate, all amounts owing under the DIP Facility will be due and payable and the Debtors' authority to use Cash Collateral will terminate on the earliest to occur of (such earliest date being the "Termination Date"): (i) sixty (60) days after the Petition Date; (ii) thirty (30) days after entry of the Interim Order if the Final Order shall not have been entered by the Bankruptcy Court on or before such date; (iii) the effective date of a plan of reorganization or a plan of liquidation supported by the DIP Agent, the Requisite DIP Lenders, the First Lien Agent and the Requisite First Lien Lenders; (iv) the closing date of a sale of substantially all assets of the Debtors that is consented to by the DIP Agent, the Requisite DIP Lenders, the First Lien Agent and the Requisite First Lien Lenders; (v) the date of filing of a plan of reorganization or a plan of liquidation by any party other than the Debtors or the DIP Agent, or the date on which the Debtors seek or support confirmation of a plan of reorganization or a plan of liquidation that is not acceptable to the Requisite DIP Lenders or the Requisite First Lien

12

Lenders; (vi) the date on which the DIP Agent, (A) declares all or any portion of the commitments terminated and/or (B) rescinds permission for the Debtors to use Cash Collateral and terminates the obligation of the DIP Agent to make Cash Collateral disbursements; and (vii) the permanent reduction of the commitments to zero.

Security: To secure the DIP Obligations (as defined below), the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders, shall receive (i) pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Orders and the DIP Facility Documents, valid, enforceable and fully-perfected security interests in and liens and mortgages upon all prepetition and postpetition assets of the Debtors (collectively, the "DIP Liens"), whether now existing or hereafter acquired or arising, including, without limitation, all presently unencumbered assets of the Debtors and a pledge of 100% of the capital stock or membership interests of each Debtor (collectively, the "DIP Collateral"). The DIP Collateral shall not include any avoidance actions under Chapter 5 of the Bankruptcy Code (the "Avoidance Actions"); provided, however, that, from and after entry of the Final Order, the DIP Collateral shall include the proceeds of Avoidance Actions.

Priority: All obligations of the Debtors to the DIP Agent and the DIP Lenders under the DIP Facility (the "DIP Obligations") shall enjoy superpriority administrative expense status under 11 U.S.C. § 364(c)(1) with priority, subject to the Carve-Out (as defined below), over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 503(b) or 507(b) or any other provision of the Bankruptcy Code. Subject to the Carve-Out, the DIP Liens: (a) shall constitute first priority liens pursuant to 11 U.S.C. § 364(c)(2) in and to all DIP Collateral that is not subject to valid, perfected, enforceable and non-avoidable liens in existence as of the Petition Date; (b) pursuant to 11 U.S.C. § 364(c)(3), shall be immediately junior in priority to any and all valid, perfected, enforceable and non-avoidable consensual liens (other than the Primed Liens (as defined below)) on the DIP Collateral in existence as of and properly perfected prior to the Petition Date (collectively, the "Non-Primed Liens"); (c) pursuant to 11 U.S.C. § 364(d)(1), shall be senior to and prime (x) those liens on the DIP Collateral in favor of the First Lien Agent with respect to the Prepetition Collateral and the obligations of the Debtors under the First Lien Credit Agreement (the "Prepetition Obligations"), (y) those liens on the DIP Collateral in favor of the Senior Subordinated Lender and Subordinated Second Lien Lenders with respect to the obligations of the Debtors under the Senior Subordinated Note Documents and Subordinated Second Lien Documents, respectively, and (z) any and all valid, perfected, enforceable and non-avoidable tax or other non-consensual liens in existence as of the Petition Date and properly perfected prior to the Petition Date, and (d) shall be senior in priority to the Adequate Protection Liens (as defined below) and all other adequate protection replacement liens granted under the DIP Orders or otherwise ((c) and (d) collectively, the "Primed Liens").

CURRENT 15539246v3
47705/0001-5961898v1

Carve-Out: To the extent DIP Facility proceeds and/or unencumbered funds are not available to timely pay in full the administrative expenses of the Debtors, the DIP Liens, the Superpriority Claims, the Adequate Protection Liens, the Junior Adequate Protection Liens (as hereinafter defined) and the Primed Liens in and upon the DIP Collateral and the Prepetition Collateral and the proceeds thereof shall be subject to: (i) the allowance and payment of reasonable professional fees and expenses as may be allowed by the court, in an amount not to exceed the amount specified in the Budget, (a) that have been incurred but not yet paid as of the date on which the DIP Lenders have elected to exercise their remedies with respect to such Event of Default (the "Remedy Exercise Date"), and (b) that are incurred after such Remedy Exercise Date by the Debtors, the Committee, and any other statutory committee(s) appointed in the Chapter 11 Cases as follows: (w) fees and expenses of Proskauer Rose LLP as counsel to the Debtors in an amount not to exceed $200,000, (x) fees and expenses of Qorval LLC as consultants to the Debtors in an amount not to exceed $150,000, (y) fees and expenses of Cole, Schotz, Meisel, Forman & Leonard, P.A. as local counsel to the Debtors in an amount not to exceed $50,000, and (z) fees and expenses of any statutory committee in an amount not to exceed $100,000, in each case net of any unused retainers for such professional fees and expenses, and (ii) the payment of fees payable pursuant to 28 U.S.C. § 1930 (the "Carve-Out"). In the event the Carve-Out obligations are unpaid and there is insufficient availability, or inability to draw, under the DIP Facility to satisfy the Carve-Out obligations, the DIP Lenders, the Prepetition Lenders, and the DIP Agent and the Prepetition Agent agree that: (A) the Prepetition Lenders' bid for the purchase of certain of the Debtors' assets filed concurrently herewith shall provide for the assumption of the Carve-Out obligations (including budgeted and unpaid professional fees), and the payment thereof on the schedule set forth in the Budget; or (B) in the event that these Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, any proceeds of Prepetition Collateral and/or DIP Collateral otherwise payable to the DIP Lenders, the Prepetition Lenders, and the DIP Agent and/or the Prepetition Agent shall first be used by the Prepetition Lenders, and the DIP Agent and/or the Prepetition Agent to pay and satisfy the Carve-Out obligations (including budgeted and unpaid professional fees). Estate professional fees and expenses may be paid only to the extent they are allowed by the Bankruptcy Court, or as otherwise permitted pursuant to the compensation procedures approved by the Bankruptcy Court. The Required DIP Lenders shall have the right to create a reserve against DIP Availability in the maximum amount of the Carve-Out.

Adequate Protection: As adequate protection for any diminution in the value of the First Lien Agent's and the First Lien Lenders' interests in the Prepetition Collateral resulting from (i) the Debtors' use of such collateral and cash constituting proceeds of such collateral during the Chapter 11 Cases, (ii) the granting of the DIP Liens that prime the Primed Liens, and (iii) the imposition of the automatic stay pursuant to 11 U.S.C. §362(a), the First Lien Agent, for the benefit of the First Lien Lenders, shall be granted, subject to the Carve-Out, adequate protection in the form of (1) replacement security interests in and liens

14

and mortgages upon the DIP Collateral, whether now existing or hereafter acquired or arising ("Adequate Protection Liens") and (2) superpriority administrative expense status under 11 U.S.C. §507(b) to the extent of such diminution (the "Adequate Protection Priority Claim"), which priority claim shall be junior to the superpriority claim under Section 364(c)(1) of the Bankruptcy Code in favor of the DIP Lenders but senior to any other claims under Section 507(b). The Adequate Protection Liens shall be junior to the DIP Liens, junior to the Non-Primed Liens with respect to the DIP Collateral encumbered by such Non-Primed Liens to the extent such Non-Primed Liens were senior to the liens securing the Prepetition Obligations as of the Petition Date, and senior to any other liens, including, without limitation, to any other adequate protection replacement liens.

As additional adequate protection, (i) the First Lien Agent and First Lien Lenders shall be entitled to the payment of their costs and expenses, including the fees and expenses of legal counsel and other professionals retained by the First Lien Agent and First Lien Lenders, as and when due and payable under the First Lien Credit Agreement; and (ii) the Debtors shall be prohibited from at any time incurring additional indebtedness having priority claims or liens equal or senior in priority to the DIP Obligations or the Prepetition Obligations, or the liens securing such obligations. The First Lien Agent and the First Lien Lenders reserve the right to seek the payment of all prepetition and post-petition interest accruing under the First Lien Credit Agreement in accordance with the terms thereof.

Financial and Other Reporting: The DIP Facility Documents will require the Borrower to provide to the DIP Agent and the DIP Lenders internally prepared financial statements on a monthly and quarterly basis. In addition to the Budget variance reports referenced above, the Borrower will be required to provide, among other things, (i) on a weekly basis, a rolling 13-week cash flow forecast and (ii) on a weekly basis, a monitoring report including, among other items, a reconciliation of actual cash flow to such forecasts.

Conditions Precedent to the Closing of the DIP Facility/Initial Borrowing: Section 2.1 of the DIP Agreement contains conditions precedent to obligations of the DIP Lenders to make their initial DIP Loans or of the DIP Agent to make any Cash Collateral disbursement thereunder.

Conditions Precedent to Each Borrowing: Section 2.2 of the DIP Agreement contains conditions precedent to obligations of the DIP Lenders on any date (including the Closing Date) to make any DIP Loan or of the DIP Agent on any date (including the Closing Date) to make any Cash Collateral disbursement or of an L/C Issuer (as defined in the DIP Agreement) or DIP Lender to incur any Letter of Credit Obligation (as defined in the DIP Agreement) thereunder.

Interest Rate: Outstanding advances under the DIP Facility shall bear interest at a the LIBO Rate (subject to a 3.5% floor) plus 6.5% or the Index Rate (subject to a 4.5% floor) plus 5.5% per annum per annum. Interest will be calculated on the

CURRENT 15539246v3
47705/0001-5961898v1

basis of actual days elapsed and a 360-day year in all cases and will be payable monthly in arrears in cash.

<u>Default Interest Rate</u>: From and after the occurrence and during the continuance of an Event of Default, outstanding advances under the DIP Facility shall bear interest at the otherwise applicable rate plus 2.0% per annum.

<u>Unused Commitment Fee</u>: Unused commitment fee in an amount equal to the average daily balance of the Aggregate Revolving Loan Commitment during the preceding month, <u>less</u> the sum of (x) the average daily balance of all Revolving Loans outstanding plus (y) the average daily amount of Letter of Credit Obligations, in each case, during the preceding month, multiplied by three quarters of one percent (0.75%) per annum, shall be due and payable in cash (on a monthly basis in arrears) to the DIP Agent for the ratable benefit of the DIP Lenders.

<u>Closing Fee</u>: The Borrower shall pay to the DIP Agent, for the ratable benefit of the Lenders, a closing fee in the amount of $100,000 (the "<u>Closing Fee</u>"), which Closing Fee is fully earned on the Closing Date and shall be due and payable in full on the DIP Facility Termination Date or such later date that is agreed to by the Agent and the Required Lenders in writing.

<u>Events of Default</u>: Section 7.1 of the DIP Agreement sets forth a list of the events of default, the occurrence of any one of which, constitutes an "<u>Event of Default</u>" under the DIP Agreement.

23.     Pursuant to and upon entry of the Interim Order but prior to entry of the Final Order, the Debtors will be permitted to borrow up to $2,500,000 under the DIP Facility. The Debtors have prepared a budget, a copy of which is attached to the Interim Order as Exhibit B (the "<u>Budget</u>"), which shows, *inter alia*, the Debtors' projected costs and expenses from the Petition Date through week ending December 31, 2009. The Debtors anticipate that during the period ending November 20, 2009, the aggregate principal balance outstanding under the DIP Facility will peak at approximately $3,976,000. The Debtors prepared these estimates based on projected cash flows using conservative projections. *See* May Declaration at ¶ 112. Under the Budget, the Debtors intend to use any funds advanced during the interim period under the DIP Facility commitment to pay, *inter alia*, (a) payroll expenses, (b) post-petition trade obligations, (c) DIP financing costs and interest, (d) various prepetition claims that are subject of other

16

motions filed concurrently herewith, as authorized by this Court and (e) working capital and other general corporate purposes. *Id.* Without such interim financing, the Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their relationships with their vendors and customers. *Id.*

## Adequate Protection for Prepetition Secured Lenders

24. <u>First Lien Lenders' Adequate Protection</u>. As adequate protection to the protect the interests of the First Lien Agent and the First Lien Lenders, the Debtors propose, among other things (as set forth in the Interim Order), the following:

> (a)     pursuant to sections 361, 363 and 364 of the Bankruptcy Code, replacement security interests in and liens and real estate mortgages upon (collectively, the "<u>Adequate Protection Liens</u>") all of the DIP Collateral (including, upon entry of the Final Order and subject to the terms thereof, liens on proceeds of Avoidance Actions);

> (b)     a superpriority administrative expense claim under section 507(b) of the Bankruptcy Code (the "<u>Adequate Protection Priority Claim</u>"), which Adequate Protection Priority Claim shall be subordinate in priority only to the superpriority claim under section 364(c)(1) of the Bankruptcy Code in favor of the DIP Lenders; and

> (c)     current cash payment to the First Lien Agent and First Lien Lenders of all of their fees and expenses in accordance with the terms of the First Lien Credit Agreement, including, but not limited to, the fees and expenses of legal counsel and other professionals retained by the First Lien Agent and First Lien Lenders (the "<u>First Lien Agent's Fees</u>").

25. <u>Second Lien Lenders' Adequate Protection</u>. As adequate protection to protect the interests of the Second Lien Agent and the Second Lien Lenders, the Debtors propose, among other things (as set forth in the Interim Order), the following:

> pursuant to sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code, replacement liens and security interests (the "<u>Junior Adequate Protection Liens</u>") in all of the DIP Collateral (including, upon entry of the Final Order and subject to the terms thereof, liens on proceeds of Avoidance Actions); and

> an administrative priority claim under section 507(b) of the Bankruptcy Code (the "<u>Junior Adequate Protection Priority Claim</u>").

17

26.     Accordingly, the Debtors believe that the protections to be provided to the First Lien Agent, First Lien Lenders, Second Lien Agent and Second Lien Lenders are sufficient to protect any diminution in value of their interests during the period their Prepetition Collateral is used by the Debtors are fair and reasonable.

## Disclosure Under Local Rule 4001-2

27.     The Debtors believe that the following provisions of the Order and the DIP Agreement are required to be indentified in accordance with Rule 4001-2 of the Local Rules of for the United States Bankruptcy Court for the District of Delaware (the "Local Rules") and that such provisions are necessary and justified in the context and circumstances of these Chapter 11 Cases:

> Rule 4001(a)(i)(B) Binding the Estate to Validity, Perfection or Amount of Secured Debt. The Interim Order includes certain stipulations by the Debtors related to the validity, perfection or amount of the First Lien Credit Documents, the liens on and security interests of the First Lien Lenders in the Prepetition Collateral, the First Lien Obligations, the Second Lien Credit Documents, the liens on and security interests of the Second Lien Lenders in the Prepetition Collateral and the Second Lien Obligations. *See* Interim Order ¶ D.

> Rule 4001-2(a)(i)(C) Waiver of 506(c) Surcharge. The proposed waiver of the estates' rights will only be effective after entry of the Final Order granting such relief. *See* Interim Order ¶ 22.

> Rule 4001-2(a)(i)(D) Liens on Avoidance Actions. The proposed granting of liens on Avoidance Actions will only be effective after entry of the Final Order granting such relief. *See* Interim Order ¶¶ H, 10, 13, 20.

> Adequate Protection or Priority for a Claim that Arose Before the Commencement of the Case. *See* Interim Order ¶¶ H, 19, 20.

> Waiver or Modification of the Automatic Stay. *See* Interim Order ¶ 11, 27.

## Applicable Authority

28.     As described above, it is vital to the preservation and maintenance of the values of the Debtors and to a successful sale of substantially all of the Debtors' assets that they

immediately obtain access to sufficient postpetition financing and access to Cash Collateral. The preservation of the Debtors' business depends heavily upon the expeditious approval of the DIP Facility and the use of Cash Collateral for general working purposes. Absent this Court's approval of the interim relief sought herein, the Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their relationships with their vendors and customers.

29.    This Court should approve the DIP Facility and the requested use of Cash Collateral because: (a) the Debtors are unable to obtain financing on an unsecured basis; (b) the Prepetition Secured Lenders' interests in the Prepetition Collateral are adequately protected; (c) the proposed financing is on market terms; and (d) approval of the DIP Facility is in the best interests of the Debtors' estates.

## I.    Approval for Incurrence of Secured Debt and the Use of Cash Collateral Under Sections 363 and 364 of the Bankruptcy Code

30.    The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code[5] is a finding, made after notice and a hearing, that the debtors in possession are "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." *See In re Garland Corp.*, 6 B.R. 456, 461 n.11 (1st Cir. B.A.P. 1980) (secured credit under section 364(c)(2) is authorized, after notice and a hearing, upon showing that unsecured credit cannot be obtained); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa.), *modified on other grounds*, 75 B.R. 553(1987) (debtor seeking secured

---

[5]  Section 364 of the Bankruptcy Code provides that:

(c)  If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

    (1)  with priority over any and all administrative expenses of the kind specified in § 503(b) or 507(b) of this title;

    (2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or

    (3)  secured by a junior lien on property of the estate that is subject to a lien.

credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code).

31.     Section 363(c)(2) of the Bankruptcy Code permits debtors in possession to use, sell or lease "cash collateral" under section (c)(1) only if either of two alternative circumstances exist:

> (A)     each entity that has an interest in such cash collateral consents; or
>
> (B)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

32.     In addition, section 364(d)(1) of the Bankruptcy Code authorizes a debtor in possession to incur superpriority senior secured or "priming" liens if: (a) the debtor is unable to obtain financing from another source and (b) the interests of the secured creditors whose liens are being primed by the debtor-in-possession financing are adequately protected. *See* 11 U.S.C. § 364(d)(1)(A) and (B).

33.     Accordingly, the Debtors may incur "priming" liens and use Cash Collateral if the Debtors are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Secured Lenders have consented or (b) the Prepetition Secured Lenders' interests in the Prepetition Collateral are adequately protected.  Here, the Prepetition Secured Lenders have consented to the proposed priming liens and use of Cash Collateral, solely pursuant to the terms and conditions of the DIP Facility and the proposed Interim Order, and thus, the requirements of section 364(d)(1) of the Bankruptcy Code are satisfied.

## II.     Financing Is Not Available on an Unsecured Basis.

CURRENT 15539246v3
47705/0001-5961898v1

34.     As set forth in the May Declaration, and as the evidence at the Final Hearing will demonstrate, the Debtors sought but were unable to obtain on an unsecured basis postpetition financing on the terms and of the type and magnitude required in these Chapter 11 Cases.

35.     To show that the credit required is not available on an unsecured basis, the debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to the prospective DIP Lenders by sections 364(c) and 364(d) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.* at 1088; *see also Ames*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing when it selected the least onerous financing option from the remaining two lenders); *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) ("Given the 'time is of the essence' of this type of financing, we would not require this or any debtor to contact a seemingly infinite number of possible lenders."). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 199 B.R. 117, 120n.4 (N.D. Ga. 1989).

36.     As set forth above, concurrent with the solicitation of interest in the DIP Facility proposed herein, the Debtors sought indications of interest in other subordinate debtor-in-possession financing facilities that would have been palatable to the Prepetition Secured Lenders. Each of the financing proposals received by the Debtors was on less favorable terms than the DIP Facility proposed by the DIP Lenders. The Debtors therefore believe that they have

CURRENT 15539246v3
47705/0001-5961898v1

satisfied the requisite showing that credit was not available on an unsecured or even a similar subordinate basis and that the proposal offered by the DIP Lenders is the best available debtor-in-possession financing available to them at this time.

## III. The Prepetition Secured Lenders Have Consented to the Priming.

37.     If a debtor is unable to obtain credit under the provisions of 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien (*i.e.*, a "priming lien"). *See* 11 U.S.C. § 364(d). Such relief may be granted so long as there is adequate protection of the interests of the holder of the lien on the property on which the senior lien is proposed to be granted or if the parties whose interests are being affected have consented.

38.     As described above, in consideration of, among other things, the adequate protection and other rights and protections afforded to the Prepetition Secured Lenders under the Interim Order, including, for the First Lien Agent and First Lien Lenders, the Adequate Protection Liens, the Adequate Protection Priority Claim and the First Lien Agent's Fees and, for the Second Lien Agent and Second Lien Lenders, the Junior Adequate Protection Liens and the Junior Adequate Protection Priority Claim, the Prepetition Secured Lenders have consented to the DIP Facility Documents, the Debtors' incurrence of obligations under the DIP Facility and the Debtors' use of Cash Collateral. Accordingly, the Debtors have satisfied the consent requirement.

## IV. The DIP Facility Is on Market Terms.

39.     The Debtors have made a concerted, good-faith effort to obtain credit on the most favorable terms that are available. Initially, it must be observed that the universe of lenders who would commit to meet the Debtors' postpetition financing requirements was quite limited. Further, given that the prepetition credit facilities would stay in place, a debtor-in-possession

22

financing facility provided by a lender not a party to the prepetition credit facilities would require priming the Prepetition Secured Lenders and, therefore, the Debtors required that any potential debtor-in-possession lenders have the ability to work with and gain the cooperation of the Prepetition Secured Lenders. The convergence of these factors significantly limited the potential financing sources that could satisfy the Debtors' needs. The Debtors solicited financing proposals from a variety of financial institutions, but did not receive any proposals. In fact, none of the financial institutions was able to suggest another institution that might be willing to provide the Debtors' with the debtor-in-possession financing that they are seeking. That notwithstanding, the Debtors submit that, given their search for alternative sources of funding, they know the DIP Facility to be market priced.

40. Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [, were] reasonable under the circumstances and in the best interests of [the debtor] and its creditors"); *cf. Group of Inst'l Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 318 U.S. 523 (1943) (holding that decisions regarding assumption or rejection of leases are left to business judgment of the debtor); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgment standard should be left to the board room and not to this Court."). In fact, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co.

23

v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985). Consistent with this authority, the Debtors respectfully submit that the Court should approve the Debtors' decision to accept and enter into the DIP Facility.

## V. Approval of the DIP Facility Is in the Best Interests of the Debtors' Estates.

41.     A denial of the Debtors' requested relief will cause immediate and irreparable harm to the Debtors and their estates and will also have a detrimental effect on the Prepetition Collateral. Absent access to the DIP Facility and the use of Cash Collateral, the Debtors would have no ability to meet their ongoing obligations to suppliers, vendors, employees and other creditors. If the Debtors are unable to pay their ongoing obligations, they will not be able to operate. In contrast, the Debtors' access to the DIP Facility and continued use of Cash Collateral will ensure that the value of the Debtors' assets is preserved, a value substantially greater than that which would be realized from a piecemeal liquidation of those assets if the Debtors were forced to cease operations immediately.

42.     The Debtors submit that for all of these reasons ample justification exists for the relief requested herein.

## Request for Interim Relief

43.     Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the fifteen-day period following the filing of a motion to use cash collateral "as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2). Similarly, Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for authority to obtain financing during the same period "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c)(2). In examining such requests under Bankruptcy Rule 4001, courts apply the same business judgment standard as is applicable to other business decisions. *See, e.g.,*

24

*Ames*, 115 B.R. at 38. The Debtors submit that, for the reasons set forth herein, authority to obtain postpetition funding and use of Cash Collateral on an interim basis as set forth in the Motion is necessary to avert immediate and irreparable harm to the Debtors' business.

## Request for Final Hearing

44.     Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), the Debtors respectfully request that the Court set a date for the Final Hearing that is no later than thirty (30) days following the Petition Date.

## Notice

45.     Notice of this Motion has been given to:  (a) the United States Trustee; (b) the First Lien Agent; (c) counsel for the First Lien Agent; (d) the Second Lien Agent; (e) counsel for the Second Lien Agent; (f) the Debtors' thirty largest unsecured creditors as set forth in the consolidated list filed with the Debtors' petitions; (g) all required governmental agencies; and (h) the Debtors' cash management banks.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested, the Debtors submit that no further notice is required.

CURRENT 15539246v3
47705/0001-5961898v1

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that this Court: (a) enter an order substantially in the form attached hereto as **Exhibit A**, granting the relief sought herein; and (b) grant to the Debtors such other and further relief as the Court may deem proper.

Dated: Wilmington, Delaware
September 2, 2009

**COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.**

_____
Norman L. Pernick (No. 2290)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

-and-

**PROSKAUER ROSE LLP**
Jeff J. Marwil (*pro hac vice* pending)
Peter J. Young (*pro hac vice* pending)
Grayson T. Walter (*pro hac vice* pending)
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois 60602
Telephone: (312) 962-3550
Facsimile: (312) 962-3551

*Proposed Co-Counsel for Debtors and Debtors in Possession*