# EXHIBIT B

**$[4,000,000] DEBTOR-IN-POSSESSION CREDIT FACILITY**

**DIP CREDIT AGREEMENT**

**Dated as of September __, 2009**

**by and among**

**ADS LOGISTICS, LLC,**

**as the Borrower,**

**ALTERNATIVE DISTRIBUTION SYSTEMS, INC.
and MAY LOGISTICS SERVICES, INC.,**

**as Guarantors,**

**GENERAL ELECTRIC CAPITAL CORPORATION
for itself, as a Lender, as L/C Issuer and as the Agent for all Lenders,**

**THE OTHER FINANCIAL INSTITUTIONS PARTY HERETO**

**as Lenders,**

**and**

**GE CAPITAL MARKETS, INC.,
as Sole Lead Arranger and Bookrunner**

# TABLE OF CONTENTS

Page

ARTICLE I THE CREDITS.................................................................................2

1.1     The Commitments; Cash Collateral Disbursements..................................2
1.2     Notes.............................................................................................6
1.3     Interest...........................................................................................6
1.4     Loan Accounts..................................................................................6
1.5     Procedure for Revolving Credit Borrowing and Cash Collateral
        Disbursements..................................................................................7
1.6     Conversion and Continuation Elections..................................................8
1.7     Optional Repayments.........................................................................9
1.8     Mandatory Repayments......................................................................9
1.9     Fees..............................................................................................10
1.10    Payments by the Borrower.................................................................11
1.11    Payments by the Lenders to the Agent; Settlement..................................12
1.12    Super Priority Nature of Obligations and Lenders' Liens..........................14
1.13    Payment of Obligations.....................................................................14
1.14    No Discharge; Survival of Claims.......................................................14
1.15    Release.........................................................................................14
1.16    Waiver of any Primary Rights.............................................................15

ARTICLE II CONDITIONS PRECEDENT............................................................15

2.1     Conditions of Initial Loans or Cash Collateral Disbursement.....................15
2.2     Conditions Precedent to Each Loan and Cash Collateral Disbursement.........16

ARTICLE III REPRESENTATIONS AND WARRANTIES.........................................18

3.1     Corporate Existence and Power...........................................................18
3.2     Corporate Authorization; No Contravention...........................................18
3.3     Governmental Authorization...............................................................19
3.4     Binding Effect.................................................................................19
3.5     Litigation.......................................................................................19
3.6     No Default......................................................................................20
3.7     ERISA Compliance...........................................................................20
3.8     Use of Proceeds; Margin Regulations...................................................20
3.9     Title to Properties............................................................................20
3.10    Taxes............................................................................................20
3.11    [Reserved].....................................................................................21
3.12    Environmental Matters......................................................................21
3.13    Regulated Entities............................................................................22
3.14    [Reserved].....................................................................................22
3.15    Labor Relations...............................................................................22
3.16    Intellectual Property.........................................................................22

| | | |
|---|---|---|
| 3.17 | Subsidiaries | 22 |
| 3.18 | Brokers' Fees; Transaction Fees | 22 |
| 3.19 | Insurance | 23 |
| 3.20 | Full Disclosure | 23 |
| 3.21 | Foreign Assets Control Regulations and Anti-Money Laundering. | 23 |
| 3.22 | The Budget | 23 |
| 3.23 | Prepetition Obligations; Defenses | 24 |
| 3.24 | Chapter 11 Case Matters. | 24 |

ARTICLE IV AFFIRMATIVE COVENANTS ............ 24

| | | |
|---|---|---|
| 4.1 | Deliveries | 25 |
| 4.2 | Other Information | 25 |
| 4.3 | Notices | 26 |
| 4.4 | Preservation of Corporate Existence, Etc | 27 |
| 4.5 | Maintenance of Property | 28 |
| 4.6 | Insurance. | 28 |
| 4.7 | Payment of Obligations | 29 |
| 4.8 | Compliance with Laws. | 29 |
| 4.9 | Inspection of Property and Books and Records | 30 |
| 4.10 | Use of Proceeds. | 30 |
| 4.11 | Cash Management Systems | 31 |
| 4.12 | Landlord Agreements | 31 |
| 4.13 | Further Assurances | 31 |
| 4.14 | Consultants and Financial Advisors | 32 |

ARTICLE V NEGATIVE COVENANTS ............ 32

| | | |
|---|---|---|
| 5.1 | Limitation on Liens | 33 |
| 5.2 | Disposition of Assets | 34 |
| 5.3 | Consolidations and Mergers | 35 |
| 5.4 | Loans and Investments | 35 |
| 5.5 | Limitation on Indebtedness | 35 |
| 5.6 | Transactions with Affiliates | 36 |
| 5.7 | Management Fees and Compensation | 36 |
| 5.8 | Use of Proceeds | 36 |
| 5.9 | Contingent Obligations | 36 |
| 5.10 | Compliance with ERISA | 37 |
| 5.11 | Restricted Payments | 37 |
| 5.12 | Change in Business | 37 |
| 5.13 | Change in Structure | 37 |
| 5.14 | Accounting Changes | 38 |

5.15    Amendments to Prepetition Indebtedness..............................................38
5.16    No Negative Pledges...............................................................................38
5.17    OFAC.......................................................................................................38
5.18    Press Release and Related Matters .........................................................38
5.19    Sale-Leasebacks......................................................................................38
5.20    Hazardous Materials ...............................................................................38
5.21    Repayment of Indebtedness ....................................................................39
5.22    Reclamation Claims ................................................................................39
5.23    Chapter 11 Claims...................................................................................39

ARTICLE VI [RESERVED] .........................................................................................39

ARTICLE VII EVENTS OF DEFAULT .......................................................................39

7.1    Event of Default.......................................................................................39
7.2    Remedies..................................................................................................44
7.3    Rights Not Exclusive ..............................................................................44
7.4    Cash Collateral for Letters of Credit ......................................................44

ARTICLE VIII THE AGENT .......................................................................................45

8.1    Appointment and Duties. ........................................................................45
8.2    Binding Effect..........................................................................................46
8.3    Use of Discretion. ...................................................................................46
8.4    Delegation of Rights and Duties .............................................................46
8.5    Reliance and Liability..............................................................................46
8.6    Agent Individually ..................................................................................48
8.7    Lender Credit Decision ...........................................................................48
8.8    Expenses; Indemnities. ...........................................................................48
8.9    Resignation of Agent or L/C Issuer. .......................................................49
8.10    Release of Collateral or Guarantors ........................................................50
8.11    Additional Secured Parties......................................................................50

ARTICLE IX MISCELLANEOUS .................................................................................51

9.1    Amendments and Waivers. ......................................................................51
9.2    Notices. ....................................................................................................52
9.3    Electronic Transmissions. .......................................................................53
9.4    No Waiver; Cumulative Remedies ..........................................................54
9.5    Costs and Expenses..................................................................................54
9.6    Indemnity. ................................................................................................54

# TABLE OF CONTENTS
## (Continued)

| | | |
|---|---|---|
| 9.7 | Marshaling; Payments Set Aside | 55 |
| 9.8 | Successors and Assigns | 56 |
| 9.9 | Assignments and Participations; Binding Effect. | 56 |
| 9.10 | Confidentiality | 58 |
| 9.11 | Set-off; Sharing of Payments. | 59 |
| 9.12 | Counterparts | 60 |
| 9.13 | Severability; Facsimile Signature | 60 |
| 9.14 | Captions | 60 |
| 9.15 | Independence of Provisions | 60 |
| 9.16 | Interpretation | 60 |
| 9.17 | No Third Parties Benefited | 60 |
| 9.18 | Governing Law and Jurisdiction. | 60 |
| 9.19 | Waiver of Jury Trial | 61 |
| 9.20 | Entire Agreement; Release; Survival. | 61 |
| 9.21 | Patriot Act | 62 |
| 9.22 | [Reserved] | 62 |
| 9.23 | Joint and Several | 62 |
| 9.24 | Creditor-Debtor Relationship. | 63 |
| 9.25 | Parties Including Trustees; Bankruptcy Court Proceedings | 63 |
| 9.26 | Prepetition Credit Agreement | 63 |

ARTICLE X TAXES, YIELD PROTECTION AND ILLEGALITY ... 63

| | | |
|---|---|---|
| 10.1 | Taxes. | 63 |
| 10.2 | Illegality | 65 |
| 10.3 | Increased Costs and Reduction of Return. | 66 |
| 10.4 | Funding Losses | 67 |
| 10.5 | Inability to Determine Rates | 68 |
| 10.6 | Reserves on LIBOR Rate Loans | 68 |
| 10.7 | Certificates of Lenders | 68 |

ARTICLE XI DEFINITIONS ... 68

| | | |
|---|---|---|
| 11.1 | Defined Terms | 68 |
| 11.2 | Other Interpretive Provisions. | 85 |
| 11.3 | Accounting Terms and Principles | 86 |
| 11.4 | Payments | 86 |

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Revolving Loan Commitments |
| Schedule 3.2 | Capitalization |
| Schedule 3.5 | Litigation |
| Schedule 3.7 | ERISA |
| Schedule 3.12 | Environmental |
| Schedule 3.15 | Labor Relations |
| Schedule 3.23 | Prepetition Obligations |
| Schedule 5.1 | Liens |
| Schedule 5.4 | Investments |
| Schedule 5.5 | Indebtedness |
| Schedule 5.9 | Contingent Obligations |

## EXHIBITS

| | |
|---|---|
| Exhibit 1.1(c) | Form of L/C Request |
| Exhibit 1.6 | Form of Notice of Conversion/Continuation |
| Exhibit 2.1 | Closing Checklist |
| Exhibit 11.1(a) | Form of Assignment |
| Exhibit 11.1(c) | Form of Notice of Borrowing |
| Exhibit 11.1(d) | Form of Revolving Note |
| Exhibit A | Budget |
| Exhibit B | Interim Order |

# DIP CREDIT AGREEMENT

This DIP CREDIT AGREEMENT (including all exhibits and schedules hereto, as the same may be amended, modified and/or restated from time to time, this "Agreement") is entered into as of _____, 2009, by and among ADS Logistics, LLC, a Delaware limited liability company (the "Borrower"), Alternative Distribution Systems, Inc., a Delaware corporation ("ADS") and May Logistics Services, Inc., a California corporation ("MLS" or the "Borrower Administrator"), as guarantors (ADS and MLS, collectively, the "Guarantors" and individually each a "Guarantor"), General Electric Capital Corporation, a Delaware corporation (in its individual capacity, "GE Capital"), as Agent for the several financial institutions from time to time party to this Agreement (collectively, the "Lenders" and individually each a "Lender") and for itself as a Lender and L/C Issuer, and such Lenders.

## WITNESSETH:

WHEREAS, on _____, 2009 (the "Petition Date"), the Borrower and the Guarantors (collectively, the "Credit Parties") commenced Chapter 11 Case Nos. [_____],[_____] and [_____] (each, a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization under Chapter 11, 11 U.S.C. 101 et. seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Credit Parties continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, the Lenders provided financing to the Borrowers pursuant to that certain Third Amended and Restated Secured Credit Agreement, dated as of January 18, 2008 (as amended, supplemented or otherwise modified through the Petition Date, the "Prepetition Credit Agreement") among the Credit Parties, the lenders party thereto, GE Capital, as issuing bank, and GE Capital, as administrative agent and documentation agent (collectively in such capacities, together with its successors and assigns, the "Prepetition Agent").

WHEREAS, the Credit Parties have requested that (i) the Lenders provide a senior secured super priority revolving credit facility to the Borrower of up to [Four Million Dollars ($4,000,000)][1] in the aggregate and (ii) the Agent make available Cash Collateral, in each case to fund working capital requirements during the pendency of the Chapter 11 Cases;

WHEREAS, the Lenders are willing to make certain Postpetition loans of up to such amount;

WHEREAS, the Agent is willing to make available Cash Collateral to the Borrowers upon the terms and conditions set forth herein; and

---

[1]  To be $4 million less the aggregate principal balance of revolving loans and face amount of letters of credit outstanding under the Prepetition Credit Agreement.

WHEREAS, the Credit Parties have agreed to secure all of their obligations under this Agreement and the other Loan Documents by granting to the Agent, for the benefit of the Secured Parties under and pursuant to the Loan Documents and the Financing Order, a security interest in and lien upon the Collateral having the priority specified in the Financing Order.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

ARTICLE I
THE CREDITS

1.1    <u>The Commitments; Cash Collateral Disbursements</u>.

(a) <u>The Revolving Credit</u>.  Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Credit Parties contained herein, each Lender severally and not jointly agrees to make Loans to the Borrower (each such Loan, a "<u>Revolving Loan</u>") from time to time on any Business Day during the period from the Closing Date to the DIP Facility Termination Date, in an aggregate amount not to exceed at any time outstanding the amount set forth opposite such Lender's name in <u>Schedule 1.1(a)</u> under the heading "<u>Revolving Loan Commitment</u>" (such amount as the same may be reduced from time to time as a result of one or more assignments pursuant to <u>Section 9.9</u>, being referred to herein as such Lender's "<u>Revolving Loan Commitment</u>") less the aggregate amount of outstanding Letter of Credit Obligations; <u>provided</u>, <u>however</u>, that, after giving effect to any Borrowing of Revolving Loans on any day, the aggregate outstanding principal balance of all Revolving Loans and L/C Reimbursement Obligations for all Letters of Credit shall not exceed (i) $400,000 <u>plus</u> (ii) the amount of the deficiency specified in the Budget in the line item "ENDING BALANCE – BOOK CASH" for the week in which such day occurs <u>less</u> such Reserves as may be imposed by the Required Lenders, in their reasonable credit judgment, not to exceed the maximum amount of the Carve Out (the sum of (i) and (ii) for any day being, the "<u>Maximum Permitted Advances</u>").

If at any time the then outstanding principal balance of Revolving Loans exceeds the Aggregate Revolving Loan Commitment or the aggregate outstanding principal balance of all Revolving Loans and L/C Reimbursement Obligations for all Letters of Credit exceeds the Maximum Permitted Advances, then in either case the Borrower shall immediately repay outstanding Revolving Loans in an amount sufficient to eliminate such excess.

(b) <u>Cash Collateral Disbursements</u>.  Subject to the terms and conditions hereof, the Agent agrees to make available to the Borrower from time to time until the DIP Facility Termination Date available balances of Cash Collateral on deposit in the Cash Collateral Account (any amount so disbursed, a "<u>Cash Collateral Disbursement</u>") for use by the Borrower in accordance with <u>Section 4.10</u> and the Budget and as approved by the Bankruptcy Court. Notwithstanding anything in this Agreement to the contrary, (i) if at any time the available balance of the Cash Collateral Account shall exceed the Cash Collateral Maximum Amount at such time, the Agent shall apply such excess Cash Collateral in accordance with <u>Section 1.10</u> and (ii) on the DIP Facility Termination Date, all available balances of Cash Collateral on deposit in the Cash Collateral Account shall be withdrawn therefrom and applied by the Agent in accordance with <u>Section 1.10</u>.

(c) <u>Letters of Credit</u>. (i) <u>Commitment and Conditions</u>. On the terms and subject to the conditions contained herein, each L/C Issuer agrees to Issue, at the request of the Borrower, in accordance with such L/C Issuer's usual and customary business practices, and for the account of the Borrower (or, as long as the Borrower remains responsible for the payment in full of all amounts drawn thereunder and related fees, costs and expenses, for the account of Holdings or any Subsidiary of Borrower), Letters of Credit (denominated in Dollars) from time to time on any Business Day during the period from the Closing Date through the earlier of the DIP Facility Termination Date and seven (7) days prior to the date specified in clause (a) of the definition of DIP Facility Termination Date; <u>provided</u>, <u>however</u>, that such L/C Issuer shall not be under any obligation to Issue any Letter of Credit upon the occurrence of any of the following, after giving effect to such Issuance:

(A)     (i) the aggregate outstanding principal balance of all Revolving Loans and Letter of Credit Obligations for all Letters of Credit would exceed the Aggregate Revolving Loan Commitment, (ii) the aggregate outstanding principal balance of all Revolving Loans and L/C Reimbursement Obligations for all Letters of Credit would exceed the Maximum Permitted Advances or (iii) the Letter of Credit Obligations for all Letters of Credit would exceed $500,000 (the "<u>L/C Sublimit</u>");

(B)     the expiration date of such Letter of Credit (i) is not a Business Day, (ii) is more than one (1) year after the date of issuance thereof or (iii) is later than seven (7) days prior to Scheduled DIP Facility Termination Date; <u>provided</u>, <u>however</u>, that any Letter of Credit with a term not exceeding one (1) year may provide for its renewal for additional periods not exceeding one (1) year as long as (x) each of the Borrower and such L/C Issuer have the option to prevent such renewal before the expiration of such term or any such period and (y) neither such L/C Issuer nor the Borrower shall permit any such renewal to extend such expiration date beyond the date set forth in clause (iii) above; or

(C)     (i) any fee due in connection with, and on or prior to, such Issuance has not been paid, (ii) such Letter of Credit is requested to be issued in a form that is not acceptable to such L/C Issuer or (iii) such L/C Issuer shall not have received, each in form and substance reasonably acceptable to it and duly executed by the Borrower (and, if such Letter of Credit is issued for the account of Holdings or any Subsidiary of Borrower, such Person), the documents that such L/C Issuer generally uses in the ordinary course of its business for the Issuance of letters of credit of the type of such Letter of Credit (collectively, the "<u>L/C Reimbursement Agreement</u>").

For each such Issuance, the applicable L/C Issuer may, but shall not be required to, determine that, or take notice whether, the conditions precedent set forth in <u>Section 2.2</u> have been satisfied or waived in connection with the Issuance of any Letter of Credit; <u>provided</u>, <u>however</u>, that no Letter of Credit shall be Issued during the period starting on the first Business Day after the receipt by such L/C Issuer of notice from the Required Lenders that any condition precedent contained in <u>Section 2.2</u> is not satisfied and ending on the date all such conditions are satisfied or duly waived.

(ii)     Notice of Issuance.  The Borrower shall give the relevant L/C Issuer and the Agent a notice of any requested Issuance of any Letter of Credit, which shall be effective only if received by such L/C Issuer and the Agent not later than 11:00 a.m. (Chicago time) on the fourth (4th) Business Day prior to the date of such requested Issuance.  Such notice may be made in a writing substantially in the form of Exhibit 1.1(c) duly completed or in a writing in any other form acceptable to such L/C Issuer (an "L/C Request") or by telephone if confirmed promptly, but in any event within one Business Day and prior to such Issuance, with such an L/C Request.

(iii)     Reporting Obligations of L/C Issuers.  Each L/C Issuer agrees to provide the Agent (which, after receipt, the Agent shall provide to each Revolving Lender), in form and substance satisfactory to the Agent, each of the following on the following dates: (A) (i) on or prior to any Issuance of any Letter of Credit by such L/C Issuer, (ii) immediately after any drawing under any such Letter of Credit or (iii) immediately after any payment (or failure to pay when due) by the Borrower of any related L/C Reimbursement Obligation, notice thereof, which shall contain a reasonably detailed description of such Issuance, drawing or payment; (B) upon the request of the Agent (or any Lender through the Agent), copies of any Letter of Credit Issued by such L/C Issuer and any related L/C Reimbursement Agreement and such other documents and information as may reasonably be requested by the Agent; and (C) on the first Business Day of each calendar week, a schedule of the Letters of Credit Issued by such L/C Issuer, in form and substance reasonably satisfactory to the Agent, setting forth the Letter of Credit Obligations for such Letters of Credit outstanding on the last Business Day of the previous calendar week.

(iv)     Acquisition of Participations.  Upon any Issuance of a Letter of Credit in accordance with the terms of this Agreement resulting in any increase in the Letter of Credit Obligations, each Lender shall be deemed to have acquired, without recourse or warranty, an undivided interest and participation in such Letter of Credit and the related Letter of Credit Obligations in an amount equal to its Commitment Percentage of such Letter of Credit Obligations.

(v)     Reimbursement Obligations of the Borrower.  The Borrower agrees to pay to the L/C Issuer of any Letter of Credit each L/C Reimbursement Obligation owing with respect to such Letter of Credit no later than the first Business Day after the Borrower receives notice from such L/C Issuer that payment has been made under such Letter of Credit or that such L/C Reimbursement Obligation is otherwise due (the "L/C Reimbursement Date") with interest thereon computed as set forth in clause (A) below.  In the event that any L/C Reimbursement Obligation is not repaid by the Borrower as provided in this clause (v) (or any such payment by the Borrower is rescinded or set aside for any reason), such L/C Issuer shall promptly notify the Agent of such failure (and, upon receipt of such notice, the Agent shall forward a copy to each Lender) and, irrespective of whether such notice is given, such L/C Reimbursement Obligation shall be payable on demand by the Borrower with interest thereon computed (A) from the date on which such L/C Reimbursement Obligation arose to the L/C Reimbursement Date, at the interest rate applicable during such period to Revolving

Loans that are Base Rate Loans and (B) thereafter until payment in full, at the interest rate applicable during such period to past due Revolving Loans that are Base Rate Loans.

(vi)    <u>Reimbursement Obligations of the Revolving Credit Lenders</u>. Upon receipt of the notice described in clause (v) above from the Agent, each Lender shall pay to the Agent for the account of such L/C Issuer its Commitment Percentage of the Letter of Credit Obligation in respect of such L/C Reimbursement Obligation. By making such payment, such Lender shall be deemed to have made a Revolving Loan to the Borrower, which, upon receipt thereof by such L/C Issuer, the Borrower shall be deemed to have used in whole to repay such L/C Reimbursement Obligation. Any such payment that is not deemed a Revolving Loan shall be deemed a funding by such Lender of its participation in the applicable Letter of Credit and the Letter of Credit Obligation in respect of the related L/C Reimbursement Obligations. Such participation shall not otherwise be required to be funded. Following receipt by any L/C Issuer of any payment from any Lender pursuant to this clause (vi) with respect to any portion of any L/C Reimbursement Obligation, such L/C Issuer shall promptly pay over to such Lender all payments received by such L/C Issuer with respect to such portion of such L/C Reimbursement Obligation.

(vii)    <u>Obligations Absolute</u>. The obligations of the Borrower and the Lenders pursuant to clauses (iv), (v) and (vi) above shall be absolute, unconditional and irrevocable and performed strictly in accordance with the terms of this Agreement irrespective of (A) (i) the invalidity or unenforceability of any term or provision in any Letter of Credit, any document transferring or purporting to transfer a Letter of Credit, any Loan Document (including the sufficiency of any such instrument), or any modification to any provision of any of the foregoing, (ii) any document presented under a Letter of Credit being forged, fraudulent, invalid, insufficient or inaccurate in any respect or failing to comply with the terms of such Letter of Credit or (iii) any loss or delay, including in the transmission of any document, (B) the existence of any setoff, claim, abatement, recoupment, defense or other right that any Person (including any Credit Party) may have against the beneficiary of any Letter of Credit or any other Person, whether in connection with any Loan Document or any other Contractual Obligation or transaction, or the existence of any other withholding, abatement or reduction, (C) in the case of the obligations of any Lender, (i) the failure of any condition precedent set forth in <u>Section 2.2</u> to be satisfied (each of which conditions precedent the Lenders hereby irrevocably waive) or (ii) any adverse change in the condition (financial or otherwise) of any Credit Party and (D) any other act or omission to act or delay of any kind of Agent, any Lender or any other Person or any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this <u>subsection 1.1(c)(vii)</u>, constitute a legal or equitable discharge of any obligation of the Borrower or any Lender hereunder. No provision hereof shall be deemed to waive or limit the Borrower's right to seek repayment of any payment of any L/C Reimbursement Obligations from the L/C Issuer under the terms of the applicable L/C Reimbursement Agreement or applicable law.

1.2     Notes. The Revolving Loans made by each Lender shall be evidenced by this Agreement and, if requested by such Lender, a Revolving Note payable to the order of such Lender in an amount equal to such Lender's Revolving Loan Commitment.

1.3     Interest.

(a) Subject to subsection 1.3(c), each Loan shall bear interest on the outstanding principal amount thereof from the date when made at a rate per annum equal to the LIBOR or the Base Rate, as the case may be, plus the Applicable Margin. Each determination of an interest rate by the Agent shall be conclusive and binding on the Borrower and the Lenders in the absence of demonstrable error. All computations of fees and interest payable under this Agreement shall be made on the basis of a three-hundred sixty (360)-day year and actual days elapsed. Interest and fees shall accrue during each period during which interest or such fees are computed from the first day thereof to the last day thereof.

(b) Interest on each Loan shall be paid in arrears on each Interest Payment Date. Interest shall also be paid on the date of any payment or prepayment of Loans in full.

(c) At the election of the Required Lenders while any Event of Default exists, the Borrower shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the Obligations under the Loan Documents from and after the date of occurrence of such Event of Default, at a rate per annum which is determined by adding two percent (2.0%) per annum to the Applicable Margin then in effect for such Loans (plus the LIBOR or Base Rate, as the case may be) and, in the case of Obligations under the Loan Documents not subject to an Applicable Margin (other than the fees described in subsection 1.9(b)), at a rate per annum equal to the rate per annum applicable to Revolving Loans which are Base Rate Loans (including the Applicable Margin with respect thereto) plus two percent (2.0%). All such interest shall be payable on demand of the Agent acting at the direction of the Required Lenders.

1.4     Loan Accounts.

(a) The Agent, on behalf of the Lenders, shall record on its books and records the amount of each Loan made, the interest rate applicable, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding. The Agent shall deliver to the Borrower on a monthly basis a loan statement setting forth such record for the immediately preceding month. Such record shall, absent manifest error, be conclusive evidence of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so, or any failure to deliver such loan statement shall not, however, limit or otherwise affect the obligation of the Borrower hereunder (and under any Note) to pay any amount owing with respect to the Loans or provide the basis for any claim against the Agent.

(b) The Agent, acting as agent of the Borrower solely for tax purposes and solely with respect to the actions described in this subsection 1.4(b), shall establish and maintain at its address referred to in Section 9.2 (or at such other address as the Agent may notify the Borrower) (A) a record of ownership (the "Register") in which the Agent agrees to register by book entry

the interests (including any rights to receive payment hereunder) of the Agent and each Lender in the Revolving Loans, L/C Reimbursement Obligations and Letter of Credit Obligations, each of their obligations under this Agreement to participate in each Loan, Letter of Credit, Letter of Credit Obligation and L/C Reimbursement Obligation and any assignment of any such interest, obligation or right and (B) accounts in the Register in accordance with its usual practice in which it shall record (1) the names and addresses of the Lenders and the L/C Issuers (and each change thereto pursuant to Section 9.9), (2) the Commitments of each Lender, (3) the amount of each Loan and each funding of any participation described in clause (A) above, for LIBOR Rate Loans, the Interest Period applicable thereto, (4) the amount of any principal or interest due and payable or paid, (5) the amount of the L/C Reimbursement Obligations due and payable or paid in respect of Letters of Credit and (6) any other payment received by the Agent from the Borrower and its application to the Obligations.

(c) Notwithstanding anything to the contrary contained in this Agreement, the Loans (including any Notes evidencing such Loans and, in the case of Revolving Loans, the corresponding obligations to participate in Letter of Credit Obligations) and the L/C Reimbursement Obligations are registered obligations, the right, title and interest of the Lenders and the L/C Issuers and their assignees in and to such Loans or L/C Reimbursement Obligations, as the case may be, shall be transferable only upon notation of such transfer in the Register and no assignment thereof shall be effective until recorded therein. This Section 1.4 and Section 9.9 shall be construed so that the Loans and L/C Reimbursement Obligations are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(d) The Credit Parties, the Agent, the Lenders and the L/C Issuers shall treat each Person whose name is recorded in the Register as a Lender or L/C Issuer, as applicable, for all purposes of this Agreement. Information contained in the Register with respect to any Lender or any L/C Issuer shall be available for access by the Borrower, the Agent, such Lender or such L/C Issuer at any reasonable time and from time to time upon reasonable prior notice. No Lender or L/C Issuer shall, in such capacity, have access to or be otherwise permitted to review any information in the Register other than information with respect to such Lender or L/C Issuer unless otherwise agreed by the Agent.

1.5     Procedure for Revolving Credit Borrowing and Cash Collateral Disbursements.

(a) Each Borrowing of a Revolving Loan or Cash Collateral Disbursement shall be made upon the Borrower's irrevocable (subject to Section 10.5 hereof) written notice delivered to the Agent in the form of a Notice of Borrowing, which notice must be received by the Agent prior to noon (Chicago time) (i) on the requested Borrowing date in the case of each Base Rate Loan or Cash Collateral Disbursement and (ii) on the day which is three (3) Business Days prior to the requested Borrowing date in the case of each LIBOR Rate Loan. Such Notice of Borrowing shall specify:

(i)      the amount of the Borrowing (which shall be in an aggregate minimum principal amount of $50,000 and multiples of $5,000 in excess thereof);

(ii)     the requested Borrowing date, which shall be a Business Day;

(iii)     whether the Borrowing is to be comprised of LIBOR Rate Loans, Base Rate Loans or Cash Collateral Disbursements; and

(iv)     if the Borrowing is to be LIBOR Rate Loans, the Interest Period applicable to such Loans.

(b) Upon receipt of a Notice of Borrowing, the Agent will promptly notify each Lender of such Notice of Borrowing and of the amount of such Lender's Commitment Percentage of the Borrowing.

(c) Unless the Agent is otherwise directed in writing by the Borrower, the proceeds of each requested Borrowing after the Closing Date will be made available to the Borrower by the Agent by wire transfer of such amount to the Borrower pursuant to the wire transfer instructions specified on the signature page hereto.

1.6     Conversion and Continuation Elections.

(a) Borrower shall have the option to (i) request that any Revolving Loan be made as a LIBOR Rate Loan, (ii) convert at any time all or any part of outstanding Loans from Base Rate Loans to LIBOR Rate Loans, (iii) convert any LIBOR Rate Loan to a Base Rate Loan, subject to Section 10.4 if such conversion is made prior to the expiration of the Interest Period applicable thereto, or (iv) continue all or any portion of any Loan as a LIBOR Rate Loan upon the expiration of the applicable Interest Period. Any Loan or group of Loans having the same proposed Interest Period to be made or converted into, a LIBOR Rate Loan must be in a minimum amount of $100,000 and integral multiples of $5,000 in excess of such amount. Any such election must be made by noon (Chicago time) on the 3rd Business Day prior to (1) the date of any proposed Revolving Loan which is to bear interest at LIBOR, (2) the end of each Interest Period with respect to any LIBOR Rate Loans to be continued as such, or (3) the date on which Borrower wishes to convert any Base Rate Loan to a LIBOR Rate Loan for a Interest Period designated by Borrower in such election. If no election is received with respect to a LIBOR Rate Loan by noon (Chicago time) on the 3rd Business Day prior to the end of the Interest Period with respect thereto, that LIBOR Rate Loan shall be converted to a Base Rate Loan at the end of its Interest Period. Borrower must make such election by notice to Agent in writing, by fax, overnight courier, or by Electronic Transmission (or by telephone, to be confirmed in writing on such day). In the case of any conversion or continuation, such election must be made pursuant to a written notice (a "Notice of Conversion/Continuation") in the form of Exhibit 1.6. No Loan shall be made, converted into or continued as a LIBOR Rate Loan, if an Event of Default has occurred and is continuing and the Required Lenders have determined not to make or continue any Loan as a LIBOR Rate Loan as a result thereof.

(b) Upon receipt of a Notice of Conversion/Continuation, the Agent will promptly notify each Lender thereof. In addition, the Agent will, with reasonable promptness, notify the Borrower and the Lenders of each determination of LIBOR; provided that any failure to do so shall not relieve the Borrower of any liability hereunder or provide the basis for any claim against the Agent. All conversions and continuations shall be made pro rata according to the respective outstanding principal amounts of the Loans held by each Lender with respect to which the notice was given.

(c) Notwithstanding any other provision contained in this Agreement, after giving effect to any Borrowing, or to any continuation or conversion of any Loans, there shall not be more than seven (7) different Interest Periods in effect.

1.7    Optional Repayments.  The Borrower may at any time repay the Loans in whole or in part, in each instance, without penalty or premium except as provided in Section 10.4.

1.8    Mandatory Repayments.

(a) DIP Facility Termination Date.  The Borrower shall repay to the Lenders in full on the DIP Facility Termination Date the aggregate principal amount of the Revolving Loans and L/C Reimbursement Obligations outstanding on the DIP Facility Termination Date together with all accrued and unpaid interest thereon, any amounts owing under Section 10.4 with respect thereto, all accrued and unpaid Unused Commitment Fees and Letter of Credit Fees and all other accrued and unpaid Obligations.

(b) Asset Dispositions.  If the Borrower or any of its Subsidiaries shall at any time or from time to time:

(i)    make or agree to make a Disposition (excluding Dispositions of rolling stock permitted by Section 5.2(c) that, in the aggregate, yield proceeds of less than $50,000); or

(ii)    suffer an Event of Loss;

then (A) the Borrower shall promptly notify the Agent of such proposed Disposition or Event of Loss (including the amount of the estimated Net Proceeds to be received by the Borrower and/or such Subsidiary in respect thereof) and (B) promptly upon receipt by the Borrower and/or such Subsidiary of the Net Proceeds of such Disposition or Event of Loss, the Borrower shall deliver, or cause to be delivered, such Net Proceeds to the Agent for distribution to the Lenders as a repayment of the Obligations, which repayment shall be applied in accordance with subsection 1.10(c).

(c) Issuance of Securities.  Immediately upon the receipt by any Credit Party or any Subsidiary of any Credit Party of the Net Issuance Proceeds of the issuance of Stock or Stock Equivalents (including any capital contribution) or debt securities (other than Net Issuance Proceeds from the issuance of debt securities in respect of Indebtedness permitted hereunder), the Borrower shall deliver, or cause to be delivered, to the Agent an amount equal to such Net Issuance Proceeds, for application to the Obligations in accordance with subsection 1.10(c).

(d) Cash Dominion.  If the Borrower or any of its Subsidiaries shall at any time or from time to time have cash on deposit in an account subject to a Control Agreement under which the Agent has exercised its springing cash dominion rights, the Borrower shall immediately deliver, or cause to be immediately delivered, all such cash to the Agent for distribution to the Lenders as a repayment of the Obligations, which repayment shall be applied in accordance with subsection 1.10(c).

(e) [Reserved]

(f) <u>Application of Repayments</u>. Together with each repayment under this Section 1.8, the Borrower shall pay any amounts required pursuant to Section 10.4 hereof.

(g) <u>No Implied Consent</u>. Provisions contained in this Section 1.8 for the application of proceeds of certain transactions shall not be deemed to constitute consent of the Lenders to transactions that are not otherwise permitted by the terms hereof.

1.9    <u>Fees</u>.

(a) <u>Unused Commitment Fee</u>. The Borrower shall pay to the Agent, for the ratable benefit of the Lenders, a fee (the "<u>Unused Commitment Fee</u>") in an amount equal to

(i)    the average daily balance of the Aggregate Revolving Loan Commitment during the preceding month, less

(ii)    the sum of (x) the average daily balance of all Revolving Loans outstanding plus (y) the average daily amount of Letter of Credit Obligations, in each case, during the preceding month,

multiplied by three quarters of one percent (0.75%) per annum. Such fee shall be payable monthly in arrears on the first day of the month following the date hereof and the first day of each month thereafter. The Unused Commitment Fee provided in this subsection 1.9(a) shall accrue at all times from and after mutual execution and delivery of this Agreement.

(b) <u>Letter of Credit Fee</u>. The Borrower agrees to pay to Agent for the ratable benefit of the Lenders, as compensation to such Lenders for Letter of Credit Obligations incurred hereunder, (i) without duplication of costs and expenses otherwise payable to Agent or Lenders hereunder or fees otherwise paid by the Borrower, all reasonable costs and expenses incurred by Agent or any Lender on account of such Letter of Credit Obligations, and (ii) for each month during which any Letter of Credit Obligation shall remain outstanding, a fee (the "<u>Letter of Credit Fee</u>") in an amount equal to the product of the average daily undrawn face amount of all Letters of Credit issued, guaranteed or supported by risk participation agreements multiplied by a per annum rate equal to the Applicable Margin with respect to Revolving Loans which are LIBOR Rate Loans; <u>provided</u>, <u>however</u>, at the Required Lenders' option, while an Event of Default exists, such rate shall be increased by two percent (2.00%) per annum. Such fee shall be paid to Agent for the benefit of the Lenders in arrears, on the first day of each calendar month and on the DIP Facility Termination Date. In addition, the Borrower shall pay to any L/C Issuer, on demand, such reasonable fees, without duplication of fees otherwise payable hereunder (including all per annum fees), charges and expenses of such L/C Issuer in respect of the issuance, negotiation, acceptance, amendment, transfer and payment of such Letter of Credit or otherwise payable pursuant to the application and related documentation under which such Letter of Credit is issued.

(c) <u>Closing Fee</u>. The Borrower shall pay to the Agent, for the ratable benefit of the Lenders, a closing fee in the amount of $100,000 (the "<u>Closing Fee</u>"), which Closing Fee is fully earned on the Closing Date and shall be due and payable in full on the DIP Facility Termination Date or such later date that is agreed to by the Agent and the Required Lenders in writing.

1.10    Payments by the Borrower.

(a) All payments to be made by each Credit Party on account of principal, interest, fees and other amounts required hereunder shall be made without set off, recoupment, counterclaim or deduction of any kind, shall, except as otherwise expressly provided herein, be made to the Agent (for the ratable account of the Persons entitled thereto) at the address for payment specified in the signature page hereof in relation to the Agent (or such other address as the Agent may from time to time specify in accordance with Section 9.2), and shall be made in Dollars and in immediately available funds, no later than 1:00 p.m. (Chicago time) on the date due. Any payment which is received by the Agent later than 1:00 p.m. (Chicago time) shall be deemed to have been received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue. Borrower and each other Credit Party hereby irrevocably waives the right to direct the application during the continuance of an Event of Default of any and all payments in respect of any Obligation and any proceeds of Collateral. The Borrower hereby authorizes the Agent and each Lender to make a Revolving Loan (which shall be a Base Rate Loan) to pay (i) interest, principal, L/C Reimbursement Obligations, agent fees, Unused Commitment Fees and Letter of Credit Fees, in each instance, on the date due, or (ii) after five (5) days' prior notice to the Borrower, other fees, costs or expenses payable by the Borrower or any of its Subsidiaries hereunder or under the other Loan Documents.

(b) Subject to the provisions set forth in the definition of "Interest Period" herein, if any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.

(c) Notwithstanding any provision herein to the contrary, unless otherwise directed by the Required Lenders in writing, the Agent shall apply any and all payments in respect of any Obligation at any time, including without limitation all amounts collected or received by the Agent after any or all of the Obligations have been accelerated and all proceeds received by the Agent as a result of the exercise of its remedies under the Collateral Documents, as follows:

first, on a pro rata basis, to payment of costs and expenses, including Attorney Costs, of the Agent and the Lenders payable or reimbursable by the Credit Parties under the Loan Documents that are then due and payable;

second, to payment of all accrued unpaid interest on the Obligations and fees owed to the Agent, Lenders and L/C Issuers that are then due and payable;

third, to payment of principal of the Obligations including, without limitation, L/C Reimbursement Obligations then due and payable and cash collateralization of unmatured L/C Reimbursement Obligations to the extent not then due and payable;

fourth, to payment of any other amounts owing constituting Obligations that are then due and payable;

*fifth*, to a cash collateral account (the "Cash Collateral Account") maintained by the Agent in an amount such that the aggregate Cash Collateral on deposit therein does not exceed the Cash Collateral Maximum Amount; and

*sixth*, on or after the DIP Facility Termination Date, to the Prepetition Agent, for application to the Prepetition Obligations in accordance with Section 13.3 of the Prepetition Credit Agreement on a weekly basis (or more frequently as the Prepetition Agent shall specify).

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category and (ii) each of the Lenders or other Persons entitled to payment shall receive an amount equal to its *pro rata* share of amounts available to be applied pursuant to clauses second, third and fourth above. Repayments of Loans pursuant to clause third above shall be applied first to any Base Rate Loans then outstanding and then to outstanding LIBOR Rate Loans beginning with the shortest Interest Periods remaining.

1.11    Payments by the Lenders to the Agent; Settlement.

(a) Agent may, on behalf of Lenders, disburse funds to the Borrower for Loans requested. Each Lender shall reimburse Agent on demand for all funds disbursed on its behalf by Agent, or if Agent so requests, each Lender will remit to Agent its Commitment Percentage of any Loan before Agent disburses same to the Borrower. If Agent elects to require that each Lender make funds available to Agent prior to disbursement by Agent to the Borrower, Agent shall advise each Lender by telephone or fax of the amount of such Lender's Commitment Percentage of the Loan requested by Borrower no later than noon (Chicago time) on the scheduled Borrowing date applicable thereto, and each such Lender shall pay Agent such Lender's Commitment Percentage of such requested Loan, in same day funds, by wire transfer to Agent's account on such scheduled Borrowing date. If any Lender fails to pay its Commitment Percentage within one (1) Business Day after Agent's demand, Agent shall promptly notify Borrower, and the Borrower shall immediately repay such amount to Agent. Any repayment required pursuant to this subsection 1.11(a) shall be without premium or penalty. Nothing in this subsection 1.11(a) or elsewhere in this Agreement or the other Loan Documents, including the remaining provisions of this Section 1.11, shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Agent or Borrower may have against any Lender as a result of any default by such Lender hereunder.

(b) At least once each calendar week or more frequently at Agent's election (each, a "Settlement Date"), Agent shall advise each Lender by telephone or fax of the amount of such Lender's Commitment Percentage of principal, interest and Fees paid for the benefit of Lenders with respect to each applicable Loan. Provided that each Lender has funded all payments required to be made by it and funded all purchases of participations required to be funded by it under this Agreement and the other Loan Documents as of such Settlement Date, Agent shall pay to each Lender such Lender's Commitment Percentage of principal, interest and fees paid by the Borrower since the previous Settlement Date for the benefit of such Lender on the Loans held by it; Such payments shall be made by wire transfer to such Lender) not later than

1:00 p.m. (Chicago time) on the next Business Day following each Settlement Date. To the extent that any Lender (a "Non-Funding Lender") has failed to fund all such payments or failed to fund the purchase of all such participations required to be funded by such Lender pursuant to this Agreement, Agent shall be entitled to set off the funding shortfall against that Non-Funding Lender's Commitment Percentage of all payments received from the Borrower.

(c) Availability of Lender's Commitment Percentage. Agent may assume that each Lender will make its Commitment Percentage of each Revolving Loan available to Agent on each Borrowing date. If such Commitment Percentage is not, in fact, paid to Agent by such Lender when due, Agent will be entitled to recover such amount on demand from such Lender without setoff, counterclaim or deduction of any kind. If any Lender fails to pay the amount of its Commitment Percentage forthwith upon Agent's demand, Agent shall promptly notify the Borrower and the Borrower shall immediately repay such amount to Agent. Nothing in this subsection 1.11(c) or elsewhere in this Agreement or the other Loan Documents shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder. To the extent that Agent advances funds to the Borrower on behalf of any Lender and is not reimbursed therefor on the same Business Day as such advance is made, Agent shall be entitled to retain for its account all interest accrued on such advance until reimbursed by the applicable Lender.

(d) Return of Payments.

(i) If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from the Borrower and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind.

(ii) If Agent determines at any time that any amount received by Agent under this Agreement must be returned to any Credit Party or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, Agent will not be required to distribute any portion thereof to any Lender. In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to Borrower or such other Person, without setoff, counterclaim or deduction of any kind.

(e) Non-Funding Lenders. The failure of any Non-Funding Lender to make any Revolving Loan or any payment required by it hereunder, or to fund any purchase of any participation to be made or funded by it on the date specified therefor shall not relieve any other Lender (each such other Lender, an "Other Lender") of its obligations to make such loan or fund the purchase of any such participation on such date, but neither any Other Lender nor Agent shall be responsible for the failure of any Non-Funding Lender to make a loan, fund the purchase of a participation or make any other payment required hereunder. Notwithstanding anything set forth herein to the contrary, a Non-Funding Lender shall not have any voting or consent rights under or with respect to any Loan Document or constitute a "Lender" (or be included in the calculation

of "Required Lenders" hereunder) for any voting or consent rights under or with respect to any Loan Document unless and until the failures giving rise to such Non-Funding Lender's status as a Non-Funding Lender have been cured to the satisfaction of the Required Lenders (determined without including such Non-Funding Lender in the calculation thereof).

1.12    Super Priority Nature of Obligations and Lenders' Liens.    (a) The liens and security interests granted to the Agent and the Lenders on the Collateral owned by the Credit Parties shall have the super priority administrative expense and senior secured status afforded by Sections 364(c) and 364(d) of the Bankruptcy Code to the extent provided and as more fully set forth in the Financing Orders.

(b) The Agent's and the Lenders' Liens on the Collateral owned by the Credit Parties and its administrative claim under Sections 364(c) and 364(d) of the Bankruptcy Code shall also have priority over any claims arising under Section 506(c) of the Bankruptcy Code to the extent provided and as more fully set forth in the Financing Orders. Except as set forth herein or in the Financing Orders, no other claim having a priority superior or *pari passu* to that granted to the Agent and the Lenders by the Financing Orders shall be granted or approved while any Obligations under this Agreement remain outstanding.

1.13    Payment of Obligations.    Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement, Agent and Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

1.14    No Discharge; Survival of Claims.    The Credit Parties agree that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in any Chapter 11 Case (and each Credit Party hereby waives pursuant to Section 1141(d)(4) of the Bankruptcy Code any such discharge) and (ii) the super priority administrative claim granted to Agent and Lenders pursuant to the Financing Orders and described in Section 1.12 and the Liens granted to Agent pursuant to the Financing Orders and described in Section 1.12 shall not be affected in any manner by the entry of an order confirming a plan of reorganization in the Chapter 11 Case.

1.15    Release. The Credit Parties hereby acknowledge effective upon entry of the Final Order, that the Credit Parties have no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Credit Parties' liability to repay the Agent or any Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from the Agent or any Lender. Each Credit Party, in its own right and on behalf of its bankruptcy estate, and on behalf of all its successors, assigns, Subsidiaries and Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "Releasing Parties"), hereby fully, finally and forever release and discharge the Agent and Lenders and all of the Agent's and Lenders' past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses,

losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Interim Order, the Final Order and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

1.16 <u>Waiver of any Primary Rights</u>. Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligation shall be outstanding, each Credit Party hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to, except as otherwise consented to in writing by the Agent, grant any Lien of equal or greater priority than the Lien securing the Obligations, or approve a claim of equal or greater priority than the Obligations.

ARTICLE II
CONDITIONS PRECEDENT

2.1 <u>Conditions of Initial Loans or Cash Collateral Disbursement</u>. The obligation of each Lender to make its initial Loans or of the Agent to make any Cash Collateral Disbursement hereunder is subject to satisfaction of the following conditions:

(a) <u>Certain Documents</u>. The Agent shall have received on or prior to the Closing Date each of the following, each dated the Closing Date unless otherwise agreed by the Required Lenders, in each case in form and substance reasonably satisfactory to the Required Lenders:

(i) this Agreement duly executed by the Borrower and each Guarantor and, for the account of each Lender having requested the same, Notes conforming to the requirements set forth in <u>Section 1.2</u>;

(ii) the Guaranty and Security Agreement, duly executed by each Credit Party;

(iii) a copy of each Organization Document of each Credit Party that is on file with any Governmental Authority in its jurisdiction of organization, certified as of a recent date by such Governmental Authority, together with, if applicable, certificates attesting to the good standing of such Credit Party in such jurisdiction;

(iv) a certificate of the secretary or other officer on behalf of each Credit Party in charge of maintaining books and records of such Credit Party certifying as to (A) the names and signatures of each officer of such Credit Party authorized to execute and delivery any Loan Document, (B) the Organization Documents of such Credit Party

attached to such certificate are complete and correct copied of such Organization Documents as in effect on the date of such certification, and (C) the resolutions of such Credit Party's board of directors or other appropriate governing body approving and authorizing the execution, delivery and performance of each Loan Document to which such Credit Party is a party; and

(v)      continuation of a cash management system for the Credit Parties substantially similar to the existing cash management arrangements in favor of the Prepetition Agent and the Prepetition Lenders in connection with the Senior Credit Agreement, except as may be modified to conform to the terms of the DIP Facility.

(vi)      the other documents listed on the Closing Checklist attached hereto as <u>Exhibit 2.1</u> and all other documentation requested by the Agent or any Lender.

(b)  <u>Fees and Expenses</u>.  There shall have been paid to the Agent, for the account of the Agent, its Related Persons or any Lender, as the case may be, all fees and all reimbursements of costs or expenses, including fees and expenses of legal counsel and financial advisors to the Agent, the Lenders, the Prepetition Agent and the Prepetition Lenders, in each case due and payable under any Loan Document (which condition may be satisfied with the proceeds of the initial Loan or Cash Collateral Advance hereunder).

(c)  <u>Interim Order</u>.  The Interim Order, in form and substance satisfactory to the Required Lenders, shall have been entered and shall be in full force and effect no later than three (3) days after the Chapter 11 Cases are commenced.

(d)  <u>First Day Orders</u>.  All "first day orders," including, without limitation, all employee related orders and critical vendor orders entered at or about the time of the commencement of the Credit Parties' Chapter 11 Cases, shall be in form and substance satisfactory to the Required Lenders.

(e)  <u>Approvals</u>.  The Credit Parties shall have received all necessary or appropriate (as determined by the Required Lenders in their sole discretion) third party governmental waivers, approvals and consents.

(f)  <u>Litigation</u>.  No litigation shall have commenced which has not been stayed by the automatic stay or by the Bankruptcy Court and which, if successful, would have a material adverse impact on the Credit Parties, their businesses or ability to repay their obligations, or which would challenge the transactions under consideration.

(g)  <u>Lien Documentation</u>.  The Agent and the Lenders shall have received and reviewed all lien search reports and lien perfection documentation it deems necessary or appropriate with respect to the Collateral, and such reports and documentation shall be satisfactory to the Required Lenders acting in their sole discretion.

2.2    <u>Conditions Precedent to Each Loan and Cash Collateral Disbursement</u>.  The obligation of each Lender on any date (including the Closing Date) to make any Loan of the Agent on any date (including the Closing Date) to make any Cash Collateral Disbursement or of

an L/C Issuer or Lender to incur any Letter of Credit Obligation is subject to the satisfaction of each of the following conditions precedent:

(a) <u>Request</u>. The Agent shall have received a written, timely and duly executed and completed Notice of Borrowing in form and substance satisfactory to it.

(b) <u>Representations and Warranties; No Defaults</u>. The following statements shall be true on such date, both before and after giving effect to such Loan, Cash Collateral Disbursement or Letter of Credit Obligation, as applicable: (i) the representations and warranties set forth in any Loan Document shall be true and correct in all material respects on and as of such date or, to the extent such representations and warranties expressly relate to an earlier date, on and as of such earlier date and (ii) no Default or Event of Default shall have occurred and be continuing.

(c) <u>Continuing Validity of Bankruptcy Court Orders</u>. (i) If such Borrowing or incurrence of Letter of Credit Obligations is to be made on or after the date that is thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order on or prior to such date, (ii) the Interim Order or the Final Order, as the case may be, shall not have been vacated, reversed, modified or amended without the Required Lenders' and Required Prepetition Lenders' consent, (iii) no motion for reconsideration of any such order shall have been timely filed and (iv) no appeal of any such order shall have been timely filed or, if such order is the subject of a pending appeal in any respect, none of the making of any Loans, the use of Cash Collateral in accordance with this Agreement, the granting of super priority claim status with respect to the Obligations, the granting of the Liens described herein and the performance by any Credit Party of its obligations under this Agreement shall be the subject of a presently effective stay pending appeal.

(d) <u>Borrowing Availability</u>. With respect to a Borrowing of Revolving Loans or the incurrence of Letter of Credit Obligations, after giving effect to any Revolving Loans borrowed or Letter of Credit Obligations incurred on such date, (i) the aggregate outstanding principal balance of all Revolving Loans and Letter of Credit Obligations for all Letters of Credit shall not exceed the Aggregate Revolving Loan Commitment, (ii) the aggregate outstanding principal balance of all Revolving Loans and L/C Reimbursement Obligations for all Letters of Credit shall not exceed the Maximum Permitted Advances, (iii) the Letter of Credit Obligations for all Letters of Credit shall not exceed the L/C Sublimit and (iv) after giving effect to any Cash Collateral Disbursement on such date, the balance of the Cash Collateral Account shall be zero.

(e) <u>Cash Collateral Availability</u>. With respect to a Borrowing consisting of a Cash Collateral Disbursement, the amount thereof shall not exceed Cash Collateral Availability.

(f) <u>Absence of Material Adverse Change</u>. Except for the commencement of the Chapter 11 Cases and as may otherwise be disclosed in writing to the Agent and the Lenders prior to the Closing Date pursuant to the Loan Documents, no material adverse change, individually or in the aggregate, in the business, financial or other condition of the Credit Parties taken as a whole, in the Collateral, or in the prospects or projections of the Credit Parties shall have occurred.

The request and acceptance by Borrower of the proceeds of any Loan or Cash Collateral Disbursement or the incurrence of any Letter of Credit Obligations shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by Borrower that the conditions in this Section 2.2 have been satisfied and (ii) a reaffirmation by each Credit Party of the granting and continuance of Agent's Liens, on behalf of itself and Lenders, pursuant to the Collateral Documents.

ARTICLE III
REPRESENTATIONS AND WARRANTIES

The Credit Parties, jointly and severally, represent and warrant to the Agent and each Lender that, on and as of the Closing Date and each date from which a Borrowing or incurrence of a Letter of Credit Obligation is requested or made, the following are true, correct and complete:

3.1     Corporate Existence and Power.  Each Credit Party and each of their respective Subsidiaries:

(a) is a corporation, limited liability company or limited partnership, as applicable, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, organization or formation, as applicable;

(b) subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, has the power and authority and all governmental licenses, authorizations, Permits, consents and approvals to own its assets, carry on its business and execute, deliver, and perform its obligations under, the Loan Documents;

(c) is duly qualified as a foreign corporation, limited liability company or limited partnership, as applicable, and licensed and in good standing, under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification or license; and

(d) is in compliance with all Requirements of Law;

except, in each case referred to in clause (c) or clause (d), to the extent that the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

3.2     Corporate Authorization; No Contravention.

(a) The execution, delivery and performance by each of the Credit Parties of this Agreement, and by each of the Credit Parties and each of their respective Subsidiaries of any other Loan Document to which such Person is party, have been duly authorized by all necessary action, and do not and will not:

(i)     contravene the terms of any of that Person's Organization Documents;

(ii)     conflict with or result in any material breach or contravention of, or result in the creation of any Lien under, any document evidencing any material Contractual Obligation to which such Person is a party or any order, injunction, writ or decree of any Governmental Authority to which such Person or its Property is subject; or

(iii)    violate any material Requirement of Law in any material respect.

(b) Schedule 3.2 sets forth the authorized Stock and Stock Equivalents of each of the Credit Parties and each of their respective Subsidiaries. All issued and outstanding Stock and Stock Equivalents of each of the Credit Parties and each of their respective Subsidiaries are duly authorized and validly issued, fully paid, non-assessable, and free and clear of all Liens other than, with respect to the Stock and Stock Equivalents of Borrower and Subsidiaries of the Borrower, those in favor of the Agent, for the benefit of the Secured Parties. All such securities were issued in compliance with all applicable state and federal laws concerning the issuance of securities. As of the Closing Date, all of the issued and outstanding Stock and Stock Equivalents of each of the Credit Parties is owned by the Persons and in the amounts set forth on Schedule 3.2. Except as set forth on Schedule 3.2, there are no pre-emptive or other outstanding rights, options, warrants, conversion rights or other similar agreements or understandings for the purchase or acquisition of any Stock and Stock Equivalents of any Credit Party.

3.3     Governmental Authorization. Subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Credit Party or any Subsidiary of any Credit Party of this Agreement, any other Loan Document.

3.4     Binding Effect. Subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, this Agreement and each other Loan Document to which any Credit Party or any Subsidiary of any Credit Party is a party constitute the legal, valid and binding obligations of each such Person which is a party thereto, enforceable against such Person in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

3.5     Litigation. Except as specifically disclosed in Schedule 3.5, there are no actions, suits, proceedings, claims or disputes pending, or to the best knowledge of each Credit Party, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, against any Credit Party, any Subsidiary of any Credit Party or any of their respective Properties which:

(a) purport to affect or pertain to this Agreement, any other Loan Document, or any of the transactions contemplated hereby or thereby; or

(b) would reasonably be expected to have individually or in the aggregate, a Material Adverse Effect.

No injunction, writ, temporary restraining order or any order of any nature has been issued by any court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of this Agreement or any other Loan Document, or directing that the transactions provided for herein or therein not be consummated as herein or therein provided. As of the Closing Date, no Credit Party or any Subsidiary of any Credit Party is the subject of an audit by the IRS or other Governmental Authority or, to each Credit Party's knowledge, any review or investigation by the IRS or other Governmental Authority concerning the violation or possible violation of any Requirement of Law.

3.6 No Default. No Default or Event of Default exists or would result from the incurring of any Obligations by any Credit Party or the grant or perfection of the Agent's Liens on the Collateral. No Credit Party and no Subsidiary of any Credit Party is in default under or with respect to any Contractual Obligation in any respect which, individually or together with all such defaults, would reasonably be expected to have a Material Adverse Effect.

3.7 ERISA Compliance. Schedule 3.7 sets forth, as of the Closing Date, a complete and correct list of, and that separately identifies, (a) all Title IV Plans, (b) all Multiemployer Plans and (c) all material Benefit Plans. Each Benefit Plan, and each trust thereunder, intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Requirements of Law so qualifies. Except for those that would not, in the aggregate, have a Material Adverse Effect, (x) each Benefit Plan is in compliance with applicable provisions of ERISA, the Code and other Requirements of Law, (y) there are no existing or pending (or to the knowledge of any Credit Party, threatened) claims (other than routine claims for benefits in the normal course), sanctions, actions, lawsuits or other proceedings or investigation involving any Benefit Plan to which any Credit Party incurs or otherwise has or could have an obligation or any Liability and (z) no ERISA Event is reasonably expected to occur. On the Closing Date, no ERISA Event has occurred in connection with which obligations and liabilities (contingent or otherwise) remain outstanding. No ERISA Affiliate would have any Withdrawal Liability as a result of a complete withdrawal from any Multiemployer Plan on the date this representation is made.

3.8 Use of Proceeds; Margin Regulations. The proceeds of the Loans are intended to be and shall be used solely for the purposes set forth in and permitted by Section 4.10, and are intended to be and shall be used in compliance with Section 5.8. No Credit Party and no Subsidiary of any Credit Party is engaged in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock. Proceeds of the Loans shall not be used for the purpose of purchasing or carrying Margin Stock.

3.9 Title to Properties. Each of the Credit Parties and each of their respective Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all real Property, and good and valid title to all owned personal property and valid leasehold interests in all leased personal property, in each instance, necessary or used in the ordinary conduct of their respective businesses. The Property of the Credit Parties and its Subsidiaries is subject to no Liens, other than Permitted Liens.

3.10 Taxes. All federal, state, local and foreign income and franchise and other material tax returns, reports and statements (collectively, the "Tax Returns") required to be filed by any Tax Affiliate have been filed with the appropriate Governmental Authorities in all

jurisdictions in which such Tax Returns are required to be filed, all such Tax Returns are true and correct in all material respects, and all taxes, charges and other impositions reflected therein or otherwise due and payable have been paid prior to the date on which any Liability may be added thereto for non-payment thereof except for those contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are maintained on the books of the appropriate Tax Affiliate in accordance with GAAP. As of the Closing Date, no Tax Return is under audit or examination by any Governmental Authority and no notice of such an audit or examination or any assertion of any claim for Taxes has been given or made by any Governmental Authority. Proper and accurate amounts have been withheld by each Tax Affiliate from their respective employees for all periods in full and complete compliance with the tax, social security and unemployment withholding provisions of applicable Requirements of Law and such withholdings have been timely paid to the respective Governmental Authorities. No Tax Affiliate has participated in a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4(b) or has been a member of an affiliated, combined or unitary group other than the group of which a Tax Affiliate is the common parent.

3.11 [Reserved]

3.12 Environmental Matters. Except as set forth on Schedule 3.12, (a) the operations of each Credit Party and each Subsidiary of each Credit Party are and have been in compliance with all applicable Environmental Laws, including obtaining, maintaining and complying with all Permits required by any applicable Environmental Law, other than non-compliances that, in the aggregate, would not have a reasonable likelihood of resulting in Material Environmental Liabilities to any Credit Party or any Subsidiary of any Credit Party, (b) no Credit Party and no Subsidiary of any Credit Party is party to, and no Credit Party and no Subsidiary of any Credit Party and no real property currently (or to the knowledge of any Credit Party previously) owned, leased, subleased, operated or otherwise occupied by or for any such Person is subject to or the subject of, any Contractual Obligation or any pending (or, to the knowledge of any Credit Party, threatened) order, action, investigation, suit, proceeding, audit, claim, demand, dispute or notice of violation or of potential liability or similar notice relating in any manner to any Environmental Law other than those that, in the aggregate, are not reasonably likely to result in Material Environmental Liabilities to any Credit Party or any Subsidiary of any Credit Party, (c) no Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities has attached to any property of any Credit Party or any Subsidiary of any Credit Party and, to the knowledge of any Credit Party, no facts, circumstances or conditions exist that could reasonably be expected to result in any such Lien attaching to any such property, (d) no Credit Party and no Subsidiary of any Credit Party has caused or suffered to occur a Release of Hazardous Materials at, to or from any real property of any such Person and each such real property is free of contamination by any Hazardous Materials except for such Release or contamination that could not reasonably be expected to result, in the aggregate, in Material Environmental Liabilities to any Credit Party or any Subsidiary of any Credit Party, (e) no Credit Party and no Subsidiary of any Credit Party (i) is or has been engaged in, or has permitted any current or former tenant to engage in, operations or (ii) knows of any facts, circumstances or conditions, including receipt of any information request or notice of potential responsibility under the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §§ 9601 *et seq.*) or similar Environmental Laws, that, in the aggregate, would have a reasonable likelihood of resulting in Material Environmental Liabilities to any Credit Party or any Subsidiary of any Credit Party and

(f) each Credit Party has made available to Agent copies of all existing environmental reports, reviews and audits and all documents pertaining to actual or potential Environmental Liabilities, in each case to the extent such reports, reviews, audits and documents are in their possession, custody or control.

3.13    Regulated Entities.  None of any Credit Party, any Person controlling any Credit Party, or any Subsidiary of any Credit Party, is (a) an "investment company" within the meaning of the Investment Company Act of 1940 or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code, or any other Federal or state statute, rule or regulation limiting its ability to incur Indebtedness, pledge its assets or perform its Obligations under the Loan Documents.

3.14    [Reserved]

3.15    Labor Relations.  There are no strikes, work stoppages, slowdowns or lockouts existing, pending (or, to the knowledge of any Credit Party, threatened) against or involving any Credit Party or any Subsidiary of any Credit Party, except for those that would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 3.15, as of the Closing Date, (a) there is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of any Credit Party or any Subsidiary of any Credit Party, (b) no petition for certification or election of any such representative is existing or pending with respect to any employee of any Credit Party or any Subsidiary of any Credit Party and (c) no such representative has sought certification or recognition with respect to any employee of any Credit Party or any Subsidiary of any Credit Party.

3.16    Intellectual Property.  Each Credit Party and each Subsidiary of each Credit Party owns, or is licensed to use, all Intellectual Property necessary to conduct its business as currently conducted except for such Intellectual Property the failure of which to own or license would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  To the knowledge of each Credit Party, (a) the conduct and operations of the businesses of each Credit Party and each Subsidiary of each Credit Party does not infringe, misappropriate, dilute, violate or otherwise impair any Intellectual Property owned by any other Person and (b) no other Person has contested any right, title or interest of any Credit Party or any Subsidiary of any Credit Party in, or relating to, any Intellectual Property, other than, in each case, as cannot reasonably be expected to affect the Loan Documents and the transactions contemplated therein and would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.17    Subsidiaries.  As of the Closing Date, no Credit Party has any Subsidiaries or equity investments in any other corporation or entity other than those specifically disclosed in Schedule 3.2.

3.18    Brokers' Fees; Transaction Fees.  Except for fees payable to the Agent and Lenders, none of the Credit Parties or any of their respective Subsidiaries has any obligation to any Person in respect of any finder's, broker's or investment banker's fee in connection with the transactions contemplated hereby.

3.19    Insurance.  Each of the Credit Parties and each of their respective Subsidiaries and their respective Properties are insured with financially sound and reputable insurance companies which are not Affiliates of the Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar Properties in localities where such Person operates.  A true and complete listing of such insurance, including issuers, coverages and deductibles, has been provided to the Agent.

3.20    Full Disclosure.  None of the representations or warranties made by any Credit Party or any of their Subsidiaries in the Loan Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement or certificate furnished by or on behalf of any Credit Party or any of their Subsidiaries in connection with the Loan Documents (including the offering and disclosure materials, if any, delivered by or on behalf of any Credit Party to the Lenders prior to the Closing Date), contains, to the best of their knowledge, any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.

3.21    Foreign Assets Control Regulations and Anti-Money Laundering.

(a)    OFAC.  Neither any Credit Party nor any Subsidiary of any Credit Party (i) is a person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such person in any manner violative of Section 2, or (iii) is a person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order.

(b)    Patriot Act.    Each of the Credit Parties and each of their respective Subsidiaries are in compliance, in all material respects, with the Patriot Act.  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

3.22    The Budget.  The Budget reasonably presents, in all material respects, on a pro forma basis, the projected cash receipts and cash disbursements of the Credit Parties for the period specified therein and such projections in the view of the management of the Credit Parties, are reasonably achievable based upon reasonable assumptions and other information available to the Credit Parties as of the first day of such period.  None of the expenses or disbursements specified in the Budget relate to the confirmation of a Chapter 11 plan, the pursuit of confirmation of a Chapter 11 plan or approval of a disclosure statement.

3.23    Prepetition Obligations; Defenses.    As of the Petition Date, the aggregate outstanding principal balance of the Prepetition Obligations of the Credit Parties, all accrued and unpaid interest, fees and expenses constituting Prepetition Obligations of the Credit Parties, and the aggregate face amount of all outstanding loans and letter of credit reimbursement obligations constituting Prepetition Obligations of the Credit Parties, are approximately as set forth in Schedule 3.23 attached hereto, and the Credit Parties are truly and justly indebted (as an allowed secured claim) to the Prepetition Agent and the Prepetition Lenders with respect to the Prepetition Obligations of the Credit Parties without setoff, defense or counterclaim.

3.24    Chapter 11 Case Matters.

(a) The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for the hearing for the approval of the Interim Order has been given and proper notice for the hearing for the approval of the Final Order will be given.

(b) After the entry of the Interim Order, the Obligations will constitute allowed super priority administrative expense claims in the Chapter 11 Case having priority over all other administrative expense claims, priority claims and unsecured claims against the Credit Parties now existing or hereafter arising, of any kind whatsoever, to the extent provided and as more fully set forth in the Financing Orders.

(c) After the entry of the Interim Order, the Obligations will be secured by a valid and perfected, enforceable and unavoidable first priority, priming Lien with priority over the Liens of the Prepetition Agent on all of the Collateral to the extent provided and as more fully set forth in the Financing Orders.

(d) The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on or after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended.

(e) Notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court, as more fully set forth in the Financing Orders.

## ARTICLE IV
## AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied:

4.1    <u>Deliveries</u>. The Credit Parties shall deliver to the Agent each of the following:

(a) <u>Bankruptcy Matters</u>. Copies of all monthly operating reports, projections or other material information respecting Credit Parties' business or financial condition or prospects prepared by a Credit Party, as well as all pleadings, motions, applications and judicial information filed by or on behalf of the Credit Parties with the Bankruptcy Court or provided by the U.S. Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or the Committee to a Credit Party, or provided to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or the Committee by a Credit Party at the time such document is filed with the Bankruptcy Court, or within a reasonable time after such item provided by the U.S. Trustee (or any monitor or interim receiver, if any appointed in the Chapter 11 Cases) or the Committee to a Credit Party, or provided to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or the Committee by a Credit Party.

(b) <u>Budget Analysis</u>. Not later than the second (2nd) Business Day of each calendar week, a weekly line-by-line Budget variance report, in form and scope reasonably acceptable to the Required Lenders, for the preceding weekly period and on a cumulative basis for the period from the Petition Date to the report date, comparing actual cash receipts and disbursements to amounts projected in the Budget and showing on a line-by-line basis any variance to the corresponding line item of the Budget together with an explanation for such variance.

(c) <u>Cash Flow Projections</u>. No later than the second (2nd) Business Day of each calendar week, in addition to the Budget variance reports referenced in <u>subsection 4.1(b)</u> above, the (i) a rolling 13-week cash flow forecast beginning with such week and (ii) a monitoring report including, among other items, a reconciliation of actual cash flow to previous such forecasts, in each case in form and scope reasonably acceptable to the Agent. The Credit Parties will also deliver, on an as requested basis, all other information reasonably requested by the Required Lenders.

(d) <u>Financial Statements</u>. As soon as available, but not later than thirty (30) days after the end of each fiscal month of each year, a copy of the unaudited consolidated and consolidating balance sheets of MLS and each of its Subsidiaries (including ADS and the Borrower), and the related consolidated and consolidating statements of income, shareholders' equity and cash flows as of the end of such month and for the portion of the fiscal year then ended, all certified on behalf of the Borrower by an appropriate Responsible Officer as being complete and correct and fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of MLS and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures.

4.2    <u>Other Information</u>. The Credit Parties shall furnish to the Agent and each Lender, promptly, such additional business, financial, corporate affairs and other information and such perfection certificates in each case as the Agent or any Lender may from time to time reasonably request.

4.3     Notices.  The Borrower shall notify promptly the Agent and each Lender of each of the following (and in no event later than one (1) Business Days after a Responsible Officer becoming aware thereof):

(a) the occurrence or existence of any Default or Event of Default, or any event or circumstance that foreseeably will become a Default or Event of Default;

(b) any breach or non performance of, or any default under, any Contractual Obligation of any Credit Party or any Subsidiary of any Credit Party, or any violation of, or non-compliance with, any Requirement of Law, which would reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect, including a description of such breach, non-performance, default, violation or non-compliance and the steps, if any, such Person has taken, is taking or proposes to take in respect thereof;

(c) any dispute, litigation, investigation, proceeding or suspension which may exist at any time between any Credit Party or any Subsidiary of any Credit Party and any Governmental Authority which would reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect;

(d) the commencement of, or any material development in, any litigation or proceeding affecting any Credit Party or any Subsidiary of any Credit Party (i) in which the amount of damages claimed is $100,000 (or its equivalent in another currency or currencies) or more, (ii) in which injunctive or similar relief is sought and which, if adversely determined, would reasonably be expected to have a Material Adverse Effect, or (iii) in which the relief sought is an injunction or other stay of the performance of this Agreement or any other Loan Document;

(e) (i) the receipt by any Credit Party of any notice of violation of or potential liability or similar notice under Environmental Law, (ii)(A) unpermitted Releases, (B) the existence of any condition that could reasonably be expected to result in violations of or liabilities under, any Environmental Law or (C) the commencement of, or any material change to, any action, investigation, suit, proceeding, audit, claim, demand, dispute alleging a violation of or liability under any Environmental Law, that, for each of clauses (A), (B) and (C) above (and, in the case of clause (C), if adversely determined), in the aggregate for each such clause, could reasonably be expected to result in Environmental Liabilities in excess of $100,000, (iii) the receipt by any Credit Party of notification that any property of any Credit Party is subject to any Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities and (iv) any proposed acquisition or lease of real property, if such acquisition or lease would have a reasonable likelihood of resulting in aggregate Environmental Liabilities in excess of $100,000;

(f) (i) on or prior to any filing by any ERISA Affiliate of any notice of intent to terminate any Title IV Plan, a copy of such notice and (ii) promptly, and in any event within ten (10) days, after any officer of any ERISA Affiliate knows or has reason to know that a request for a minimum funding waiver under Section 412 of the Code has been filed with respect to any Title IV Plan or Multiemployer Plan, a notice (which may be made by telephone if promptly confirmed in writing) describing such waiver request and any action that any ERISA Affiliate

proposes to take with respect thereto, together with a copy of any notice filed with the PBGC or the IRS pertaining thereto;

(g) any Material Adverse Effect subsequent to the Petition Date;

(h) any material change in accounting policies or financial reporting practices by any Credit Party or any Subsidiary of any Credit Party;

(i) any labor controversy resulting in or threatening to result in any strike, work stoppage, boycott, shutdown or other labor disruption against or involving any Credit Party or any Subsidiary of any Credit Party if the same would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(j) the creation, establishment or acquisition of any Subsidiary or the issuance by or to any Credit Party of any Stock or Stock Equivalent (other than issuances by Holdings of Stock or Stock Equivalent not requiring a mandatory repayment hereunder); and

(k) (i) the creation, or filing with the IRS or any other Governmental Authority, of any Contractual Obligation or other document extending, or having the effect of extending, the period for assessment or collection of any taxes with respect to any Tax Affiliate and (ii) the creation of any Contractual Obligation of any Tax Affiliate, or the receipt of any request directed to any Tax Affiliate, to make any adjustment under Section 481(a) of the Code, by reason of a change in accounting method or otherwise, which would have a Material Adverse Effect.

Each notice pursuant to this Section shall be in electronic form accompanied by a statement by a Responsible Officer on behalf of the Credit Parties setting forth details of the occurrence referred to therein, and stating what action the Credit Parties or other Person proposes to take with respect thereto and at what time. Each notice under subsection 4.3(a) shall describe with particularity any and all clauses or provisions of this Agreement or other Loan Document that have been breached or violated.

4.4    Preservation of Corporate Existence, Etc. Each Credit Party shall, and shall cause each of its Subsidiaries to:

(a) preserve and maintain in full force and effect its organizational existence and good standing under the laws of its jurisdiction of incorporation, organization or formation, as applicable, except, with respect to the Borrower's Subsidiaries, in connection with transactions permitted by Section 5.3;

(b) preserve and maintain in full force and effect all rights, privileges, qualifications, permits, licenses and franchises necessary in the normal conduct of its business except in connection with transactions permitted by Section 5.3 and sales of assets permitted by Section 5.2 and except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(c) use its reasonable efforts, in the Ordinary Course of Business, to preserve its business organization and preserve the goodwill and business of the customers, suppliers and others having material business relations with it; and

(d) preserve or renew all of its registered trademarks, trade names and service marks, the non preservation of which would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.5    Maintenance of Property. Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, and preserve all its Property which is used or useful in its business in good working order and condition, ordinary wear and tear excepted and shall make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.6    Insurance.

(a) Each Credit Party shall, and shall cause each of its Subsidiaries to, (i) maintain or cause to be maintained in full force and effect all policies of insurance of any kind with respect to the material property and businesses of the Credit Parties and such Subsidiaries (including policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation, business interruption and employee health and welfare insurance) with financially sound and reputable insurance companies or associations (in each case that are not Affiliates of Borrower) of a nature and providing such coverage as is sufficient and as is customarily carried by businesses of the size and character of the business of the Credit Parties and (ii) cause all such insurance relating to any property or business of any Credit Party to name Agent as additional insured or loss payee, as appropriate. All policies of insurance on real and personal property of the Credit Parties will contain an endorsement, in form and substance acceptable to Agent, showing loss payable to Agent (Form CP 12 18 or equivalent) and extra expense and business interruption endorsements. Such endorsement, or an independent instrument furnished to Agent, will provide that the insurance companies will give Agent at least thirty (30) days' prior written notice before any such policy or policies of insurance shall be altered or canceled and that no act or default of Borrower or any other Person shall affect the right of Agent to recover under such policy or policies of insurance in case of loss or damage. Each Credit Party shall direct all present and future insurers under its "All Risk" policies of property insurance to pay all proceeds payable thereunder directly to Agent. If any insurance proceeds are paid by check, draft or other instrument payable to any Credit Party and Agent jointly, Agent may endorse such Credit Party's name thereon and do such other things as Agent may deem advisable to reduce the same to cash. Agent reserves the right at any time, upon review of each Credit Party's risk profile, to require additional forms and limits of insurance.

(b) Unless the Borrower provides the Agent with evidence of the insurance coverage required by this Agreement, the Agent may purchase insurance at the Credit Parties' expense to protect the Agent's and Lenders' interests in the Credit Parties' and their Subsidiaries' properties. This insurance may, but need not, protect the Credit Parties' and their Subsidiaries' interests. The coverage that the Agent purchases may not pay any claim that any Credit Party or any Subsidiary of any Credit Party makes or any claim that is made against such Credit Party or any Subsidiary in connection with said Property. The Borrower Administrator on behalf of the Borrower may later cancel any insurance purchased by the Agent, but only after providing the Agent with evidence that there has been obtained insurance as required by this

Agreement. If the Agent purchases insurance, the Credit Parties will be responsible for the costs of that insurance, including interest and any other charges the Agent may impose in connection with the placement of insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance shall be added to the Obligations. The costs of the insurance may be more than the cost of insurance the Borrower may be able to obtain on its own.

4.7 **Payment of Obligations.** Such Credit Party shall, and shall cause each of its Subsidiaries to, subject to the Financing Orders and the automatic stay imposed under the Chapter 11 Cases, pay, discharge and perform as the same shall become due and payable or required to be performed, all their respective obligations and liabilities, including:

(a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently prosecuted which stay the enforcement of any Lien and for which adequate reserves in accordance with GAAP are being maintained by such Person;

(b) all lawful claims which, if unpaid, would by law become a Lien upon its Property unless the same are being contested in good faith by appropriate proceedings diligently prosecuted which stay the imposition or enforcement of the Lien and for which adequate reserves in accordance with GAAP are being maintained by such Person;

(c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained herein and/or in any instrument or agreement evidencing such Indebtedness;

(d) the performance of all obligations under any Contractual Obligation to such Credit Party or any of its Subsidiaries is bound, or to which it or any of its properties is subject, except where the failure to perform would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and

(e) payments to the extent necessary to avoid the imposition of a Lien with respect to or the involuntary termination of any underfunded Benefit Plan.

4.8 **Compliance with Laws.**

(a) Each Credit Party shall, and shall cause each of its Subsidiaries to, comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business, except where the failure to comply would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(b) Without limiting the generality of the foregoing, each Credit Party shall, and shall cause each of its Subsidiaries to, comply with, and maintain its real property, whether owned, leased, subleased or otherwise operated or occupied, in compliance with, all applicable Environmental Laws (including by implementing any Remedial Action necessary to achieve such compliance or that is required by orders and directives of any Governmental Authority) except for failures to comply that would not, in the aggregate, have a Material Adverse Effect. Without limiting the foregoing, if an Event of Default is continuing or if Agent at any time has a reasonable basis to believe that there exist violations of Environmental Laws by any Credit Party

or any Subsidiary of any Credit Party or that there exist any Environmental Liabilities, in each case, that would have, in the aggregate, a Material Adverse Effect, then each Credit Party shall, promptly upon receipt of request from Agent, cause the performance of, and allow Agent and its Related Persons access to such real property for the purpose of conducting, such environmental audits and assessments, including subsurface sampling of soil and groundwater, and cause the preparation of such reports, in each case as Agent may from time to time reasonably request. Such audits, assessments and reports, to the extent not conducted by Agent or any of its Related Persons, shall be conducted and prepared by reputable environmental consulting firms reasonably acceptable to Agent and shall be in form and substance reasonably acceptable to Agent.

4.9    Inspection of Property and Books and Records. Each Credit Party shall maintain and shall cause each of its Subsidiaries to maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Person. Each Credit Party shall, and shall cause each of its Subsidiaries to, with respect to each owned, leased, or controlled material property, during normal business hours and upon reasonable advance notice (unless an Event of Default shall have occurred and be continuing, in which event no notice shall be required and Agent and Lenders shall have access at any and all times during the continuance thereof): (a) provide access to such property to the Agent, the Lenders and any of their respective Related Persons, as frequently any of them determines to be appropriate; (b) permit the Agent, the Lenders and any of their respective Related Persons to inspect, audit and make extracts and copies (or take originals if reasonably necessary) from all of such Credit Party's books and records; (c) permit the Agent, the Lenders and any of their respective Related Persons to inspect, review, evaluate and make physical verifications and appraisals of the inventory and other Collateral in any manner and through any medium that such Person considers advisable; and (d) permit the Agent, the Lenders and any of their respective Related Persons to discuss its business, operations and financial condition with its officers and certified public accountants, in each instance, at the Credit Parties' expense.

4.10    Use of Proceeds. The Credit Parties shall utilize the Cash Collateral and the proceeds of the Loans solely (a) to pay interest, fees and expenses owing to the Agent and the Lenders pursuant to this Agreement, (b) to pay the fees and expenses of legal counsel and other professionals retained by the Prepetition Agent, (c) in accordance with the Budget and the Financing Orders and (d) for certain other prepetition expenses that are approved by the Bankruptcy Court and consented to by the Agent, the Required Lenders, the Prepetition Agent and the Prepetition Required Lenders. The Credit Parties shall not be permitted to use the Cash Collateral or the proceeds of the Loans (i) for payment of interest and principal with respect to any Indebtedness (other than the Obligations or, pursuant to Section 1.10, the Prepetition Obligations), (ii) to finance in any way any action, suit arbitration, proceeding, application, motion or other litigation challenging the validity, perfection, priority, extent or enforceability of the Obligations or the Liens of the Agent on the Collateral or of the Prepetition Obligations or the Liens of the Prepetition Agent on the Prepetition Collateral, (iii) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation challenging the validity, perfection, priority, extent or enforceability of the obligations of the Credit Parties under the Prepetition Credit Agreement or the Liens of the Prepetition Agent on the Prepetition Collateral, (iv) to make any distribution under a plan of reorganization or a plan of liquidation in

the Chapter 11 Case, (v) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior consent of the Agent and the Required Lenders, except as contemplated by the Budget or (vi) to pay any expenses other than the itemized amounts set forth in the Budget unless Agent and the Required Lenders consent to such non-conforming payment in writing.

4.11    Cash Management Systems.    Each Credit Party (i) shall, and shall cause each Domestic Subsidiary of each Credit Party to, maintain, and shall cause each depository, securities intermediary or commodities intermediary to maintain, all Control Agreements with respect to each deposit, securities, commodity or similar account maintained by such Person (other than any payroll account so long as such payroll account is a zero balance account and withholding tax and fiduciary accounts) as of the Petition Date and (ii) shall enter into, and shall cause each Domestic Subsidiary of each Credit Party to enter into, and shall cause each depository, securities intermediary or commodities intermediary to enter into, Control Agreements with respect to each deposit, securities, commodity or similar account that becomes maintained by such Person (other than any payroll account so long as such payroll account is a zero balance account and withholding tax and fiduciary accounts) after the Petition Date.

4.12    Landlord Agreements.    Upon request of the Agent, each Credit Party shall, and shall cause each of its Domestic Subsidiaries to, use commercially reasonable efforts to obtain a landlord agreement or bailee or mortgagee waivers, as applicable, from the lessor of each leased property, bailee in possession of any Collateral or mortgagee of any owned property with respect to each location where any Collateral is stored or located, which agreement shall be reasonably satisfactory in form and substance to Agent.

4.13    Further Assurances.

(a)  Each Credit Party shall ensure that all written information, exhibits and reports furnished to the Agent or the Lenders do not and will not contain any untrue statement of a material fact and do not and will not omit to state any material fact or any fact necessary to make the statements contained therein not misleading in light of the circumstances in which made, and will promptly disclose to the Agent and the Lenders and correct any defect or error that may be discovered therein or in any Loan Document or in the execution, acknowledgement or recordation thereof.

(b)  Promptly upon request by the Agent, the Credit Parties shall (and, subject to the limitations hereinafter set forth, shall cause each of their Subsidiaries to) take such additional actions as the Agent may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement or any other Loan Document, (ii) to subject to the Liens created by any of the Collateral Documents any of the Properties, rights or interests covered by any of the Collateral Documents, (iii) to perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document or under any other document executed in connection therewith. Without limiting the generality of the foregoing and except as otherwise approved in writing by Required Lenders, the Credit Parties shall cause each of their Domestic Subsidiaries

to guaranty the Obligations and to cause each such Subsidiary to grant to the Agent, for the benefit of the Secured Parties, a security interest in, subject to the limitations hereinafter set forth, all of such Subsidiary's Property to secure such guaranty. Furthermore and except as otherwise approved in writing by Required Lenders, each Credit Party shall, and shall cause each of its Domestic Subsidiaries to, pledge all of the Stock and Stock Equivalents of each of its Domestic Subsidiaries, to the Agent, for the benefit of the Secured Parties, to secure the Obligations. In connection with each pledge of Stock and Stock Equivalents, the Credit Parties shall deliver, or cause to be delivered, to the Agent, irrevocable proxies and stock powers and/or assignments, as applicable, duly executed in blank. In the event any Credit Party or any Domestic Subsidiary of any Credit Party acquires any real Property, simultaneously with such acquisition, such Person shall execute and/or deliver, or cause to be executed and/or delivered, to the Agent, (x) a fully executed Mortgage, in form and substance reasonably satisfactory to the Agent together with an A.L.T.A. lender's title insurance policy issued by a title insurer reasonably satisfactory to the Agent, in form and substance and in an amount reasonably satisfactory to the Agent insuring that the Mortgage is a valid and enforceable first priority Lien on the respective property, free and clear of all defects, encumbrances and Liens, (y) then current A.L.T.A. surveys, certified to the Agent by a licensed surveyor sufficient to allow the issuer of the lender's title insurance policy to issue such policy without a survey exception and (z) an environmental site assessment prepared by a qualified firm reasonably acceptable to the Agent, in form and substance satisfactory to the Agent.

4.14    Consultants and Financial Advisors.

(a) At all times after the Closing Date, the Borrower agrees to maintain the engagement of Qorval, LLC or obtain and maintain the engagement of another financial advisor reasonably acceptable to the Required Lenders, which Person shall in either case provide organizational management and financial consulting services to the Borrower as the Required Lenders have approved or consented to.

(b) As soon as available, the Credit Parties shall furnish or cause to be furnished to the Agent and each Lender a copy of any Qorval Report. The Credit Parties agree to implement such material changes recommended in the Qorval Reports to the extent, and as and when, reasonably requested by the Required Lenders and the Agent.

(c) At all times after the Closing Date, the Borrower agrees to maintain the engagement of EVE Partners, LLC, which Person shall market for sale the assets of the Credit Parties for purposes of complying with the sale process described in subsection 7.1(m).

ARTICLE V
NEGATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied:

5.1    Limitation on Liens.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its Property, whether now owned or hereafter acquired, other than the following ("Permitted Liens"):

(a)    Liens (i) existing on the Closing Date and (ii) (A) set forth on Schedule 5.1 or (B) permitted under Section 11.14 of the Prepetition Credit Agreement;

(b)    any Lien created under any Loan Document;

(c)    Liens in favor of the Prepetition Agent, for the benefit of the Lender Parties (as defined in the Prepetition Credit Agreement);

(d)    Liens for taxes, fees, assessments or other governmental charges (i) which are not delinquent or remain payable without penalty, or (ii) the non payment of which is permitted by Section 4.7;

(e)    carriers',    warehousemen's,    mechanics',    landlords',    materialmen's, repairmen's or other similar Liens arising in the Ordinary Course of Business which are not delinquent for more than ninety (90) days or remain payable without penalty or which are being contested in good faith and by appropriate proceedings diligently prosecuted, which proceedings have the effect of preventing the forfeiture or sale of the Property subject thereto and for which adequate reserves in accordance with GAAP are being maintained;

(f)    Liens (other than any Lien imposed by ERISA) consisting of pledges or deposits required in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other social security legislation or to secure the performance of tenders, statutory obligations, surety, stay, customs and appeals bonds, bids, leases, governmental contract, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or to secure liability to insurance carriers;

(g)    Liens consisting of judgment or judicial attachment liens, provided that the enforcement of such Liens is effectively stayed and all such Liens secure claims in the aggregate at any time outstanding for the Credit Parties and their Subsidiaries not exceeding $100,000;

(h)    easements, rights of way, zoning and other restrictions, minor defects or other irregularities in title, and other similar encumbrances incurred in the Ordinary Course of Business which, either individually or in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the Property subject thereto or interfere in any material respect with the ordinary conduct of the businesses of any Credit Party or any Subsidiary of any Credit Party;

(i)    Liens on any Property acquired or held by any Credit Party or any Subsidiary of any Credit Party securing Indebtedness incurred or assumed for the purpose of financing (or refinancing) all or any part of the cost of acquiring such Property and permitted under subsection 5.5(d); provided that (i) any such Lien attaches to such Property concurrently with or within twenty (20) days after the acquisition thereof, (ii) such Lien attaches solely to the Property

so acquired in such transaction, and (iii) the principal amount of the debt secured thereby does not exceed 100% of the cost of such Property;

(j) any interest or title of a lessor or sublessor under any lease permitted by this Agreement;

(k) Liens arising from precautionary uniform commercial code financing statements filed under any lease permitted by this Agreement;

(l) licenses, sublicenses, leases or subleases granted to third parties in the Ordinary Course of Business not interfering with the business of the Credit Parties or any of their Subsidiaries;

(m) Liens in favor of collecting banks arising under Section 4-210 of the UCC;

(n) Liens (including the right of set-off) in favor of a bank or other depository institution arising as a matter of law encumbering deposits;

(o) Liens arising out of consignment or similar arrangements for the sale of goods entered into by the Borrower or any of its Subsidiaries in the Ordinary Course of Business; and

(p) Liens in favor of customs and revenue authorities arising as a matter of law which secure payment of customs duties in connection with the importation of goods in the Ordinary Course of Business.

The prohibition provided for in this <u>Section 5.1</u> specifically includes, without limitation, any effort by the Credit Parties to prime or create *pari passu* to any claims or interests of the Agent and Lenders any Lien (other than the Carve Out) irrespective of whether such claims or interests may be "adequately protected".

5.2    <u>Disposition of Assets</u>. No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, sell, assign, lease, convey, transfer or otherwise dispose of (whether in one or a series of transactions) any Property (including accounts and notes receivable, with or without recourse) or enter into any agreement to do any of the foregoing, except:

(a) any sale or lease of inventory in the ordinary course of business;

(b) any sale or trade-in of obsolete or unusable items of equipment (other than rolling stock, trucks and similar titled vehicles) which promptly are replaced with new items of equipment of like function and at least comparable value to such items of equipment when the same were new or not obsolete or unusable, as the case may be; and

(c) any sale or trade-in of rolling stock, trucks and similar titled vehicles pursuant to such Credit Party's usual and customary business practices in effect on the Closing Date which promptly are replaced with new items of equipment of like function and at least comparable value to such items of equipment when the same were new; <u>provided</u>, that from and

after the Closing Date, the aggregate net book value of equipment transferred pursuant to this clause (c) shall not exceed $100,000.

5.3     Consolidations and Mergers.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, merge, consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person.

5.4     Loans and Investments.  No Credit Party shall and no Credit Party shall suffer or permit any of its Subsidiaries to (i) purchase or acquire, or make any commitment to purchase or acquire any Stock or Stock Equivalents, or any obligations or other securities of, or any interest in, any Person, including the establishment or creation of a Subsidiary, or (ii) make or commit to make any Acquisitions, or any other acquisition of all or substantially all of the assets of another Person, or of any business or division of any Person, including without limitation, by way of merger, consolidation or other combination or (iii) make or commit to make any advance, loan, extension of credit or capital contribution to or any other investment in, any Person including any Affiliate of the Borrower or any Subsidiary of the Borrower (the items described in clauses (i), (ii) and (iii) are referred to as "Investments"), except for:

        (a) Investments in cash and Cash Equivalents maintained in a deposit account subject to a Control Agreement;

        (b) loans or advances to, and investments in, Borrower; provided, that each such loan or advance shall be fully subordinated to the Obligations and shall be evidenced by an intercompany promissory note in form and substance satisfactory to the Agent that is pledged to the Agent pursuant to the Guaranty and Security Agreement;

        (c) Investments acquired in connection with the settlement of delinquent Accounts in the Ordinary Course of Business or in connection with the bankruptcy or reorganization of suppliers or customers; and

        (d) Investments (i) existing on the Closing Date and (ii) (A) set forth on Schedule 5.4 or (B) permitted under Section 11.26 of the Prepetition Credit Agreement.

No Credit Party shall establish, create or acquire any new Subsidiary.

5.5     Limitation on Indebtedness.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

        (a) Indebtedness incurred pursuant to this Agreement;

        (b) the Prepetition Obligations;

        (c) Indebtedness (i) existing on the Closing Date and (ii) (A) set forth on Schedule 5.5 or (B) permitted under Section 11.13 of the Prepetition Credit Agreement;

(d) Indebtedness not to exceed $100,000 in the aggregate at any time outstanding, secured by Liens permitted by subsection 5.1(i).

(e) subordinated unsecured intercompany Indebtedness permitted pursuant to subsection 5.4(b); and

(f) Indebtedness consisting of Contingent Obligations described in clause (i) of the definition thereof and permitted pursuant to Section 5.9.

5.6    Transactions with Affiliates.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, enter into any transaction with any Affiliate of the Borrower or of any such Subsidiary, except:

(a) as expressly permitted by this Agreement; or

(b) in the Ordinary Course of Business and pursuant to the reasonable requirements of the business of such Credit Party or such Subsidiary provided that, in the case of this clause (b), upon fair and reasonable terms no less favorable to such Credit Party or such Subsidiary than would be obtained in a comparable arm's length transaction with a Person not an Affiliate of the Borrower or such Subsidiary and which are disclosed in writing to the Agent.

5.7    Management Fees and Compensation.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, pay any management, consulting or similar fees to any Affiliate of any Credit Party or to any officer, director or employee of any Credit Party or any Affiliate of any Credit Party except:

(a) payment of reasonable compensation to officers and employees (including those provided by the financial advisor described in subsection 4.14(a)) for actual services rendered to the Credit Parties and their Subsidiaries in the Ordinary Course of Business;

(b) payment of directors' fees and reimbursement of actual out-of-pocket expenses incurred in connection with attending board of director meetings not to exceed in the aggregate, with respect to all such items, $250,000 in any fiscal year of the Borrower.

5.8    Use of Proceeds.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, use any portion of the Loan proceeds, directly or indirectly, to purchase or carry Margin Stock or repay or otherwise refinance Indebtedness of any Credit Party or others incurred to purchase or carry Margin Stock, or otherwise in any manner which is in contravention of any Requirement of Law or in violation of this Agreement.

5.9    Contingent Obligations.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Contingent Obligations except in respect of the Obligations and except:

(a) endorsements for collection or deposit in the Ordinary Course of Business;

(b) Contingent Obligations of the Credit Parties and their Subsidiaries existing as of the Closing Date and listed in Schedule 5.9, including extension and renewals thereof which

do not increase the amount of such Contingent Obligations as of the date of such extension or renewal;

(c) Contingent Obligations incurred in the Ordinary Course of Business with respect to surety and appeal bonds, performance bonds and other similar obligations;

(d) Contingent Obligations arising under indemnity agreements to title insurers to cause such title insurers to issue to the Agent title insurance policies;

(e) Contingent Obligations arising with respect to customary indemnification obligations in favor of (i) sellers in connection with Acquisitions permitted hereunder and (ii) purchasers in connection with dispositions permitted under subsection 5.2(b);

(f) Contingent Obligations arising under Letters of Credit and letters of credit issued under the Prepetition Credit Agreement; and

(g) Contingent Obligations arising under guarantees made in the Ordinary Course of Business of obligations of the Borrower, which obligations are otherwise permitted hereunder; provided that if such obligation is subordinated to the Obligations, such guarantee shall be subordinated to the same extent.

5.10    Compliance with ERISA.  No ERISA Affiliate shall cause or suffer to exist (a) any event that could result in the imposition of a Lien on any asset of a Credit Party or a Subsidiary of a Credit Party with respect to any Title IV Plan or Multiemployer Plan or (b) any other ERISA Event, that would, in the aggregate, have a Material Adverse Effect.  No Credit Party shall cause or suffer to exist any event that could result in the imposition of a Lien with respect to any Benefit Plan.

5.11    Restricted Payments.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (i) declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any Stock or Stock Equivalent or (ii) purchase, redeem or otherwise acquire for value any Stock or Stock Equivalent now or hereafter outstanding (the items described in clauses (i) and (ii) above are referred to as "Restricted Payments"); except that any Wholly-Owned Subsidiary of the Borrower may declare and pay dividends to the Borrower or any Wholly-Owned Subsidiary of the Borrower.

5.12    Change in Business.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, engage in any material line of business substantially different from those lines of business carried on by it immediately prior to the Petition Date.  Neither Guarantor shall engage in any business activities other than (i) ownership of the Stock and Stock Equivalents of Borrower and (ii) activities incidental to maintenance of its corporate existence.

5.13    Change in Structure.  Except as expressly permitted under Section 5.3, no Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, make any material changes in its equity capital structure (including in the terms of its outstanding Stock or Stock Equivalents), or amend any of its Organization Documents in any material respect or in any respect adverse to the Agent or Lenders.

5.14 <u>Accounting Changes</u>. No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, make any significant change in accounting treatment or reporting practices, except as required by GAAP, or change the fiscal year or method for determining fiscal quarters of any Credit Party or of any consolidated Subsidiary of any Credit Party.

5.15 <u>Amendments to Prepetition Indebtedness</u>. No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries directly or indirectly to, change or amend the terms of any Related Credit Documents, Senior Subordinated Note Documents or Subordinated Second Lien Documents (as each term is defined in the Prepetition Credit Agreement).

5.16 <u>No Negative Pledges</u>. No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to from and after the Petition Date, directly or indirectly, enter into, assume or become subject to any Contractual Obligation prohibiting or otherwise restricting the existence of any Lien upon any of its assets in favor of the Agent, whether now owned or hereafter acquired except in connection with any document or instrument governing Liens permitted pursuant to <u>subsection 5.1(i)</u> provided that any such restriction contained therein relates only to the asset or assets subject to such permitted Liens.

5.17 <u>OFAC</u>. No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to (i) become a person whose property or interests in property are blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engage in any dealings or transactions prohibited by Section 2 of such executive order, or be otherwise associated with any such person in any manner violative of Section 2, or (iii) otherwise become a person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other OFAC regulation or executive order.

5.18 <u>Press Release and Related Matters</u>. No Credit Party shall, and no Credit Party shall permit any of its Affiliates to, issue any press release or other public disclosure (other than any document filed with any Governmental Authority relating to a public offering of securities of any Credit Party) using the name, logo or otherwise referring to the Agent or any Lender, any of their respective Affiliates, the Loan Documents or any transaction contemplated therein to which the Agent or any Lender is party without the prior consent of the Agent or the applicable Lender, as the case may be, except to the extent required to do so under applicable Requirements of Law and then, only after consulting with the Agent or the applicable Lender, as the case may be, prior thereto.

5.19 <u>Sale-Leasebacks</u>. No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, engage in a sale leaseback, synthetic lease or similar transaction involving any of its assets.

5.20 <u>Hazardous Materials</u>. No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, cause or suffer to exist any Release of any Hazardous Material at, to or from any real property owned, leased, subleased or otherwise operated or occupied by any Credit Party or any Subsidiary of any Credit Party that would violate any Environmental Law, form the

basis for any Environmental Liabilities or otherwise adversely affect the value or marketability of any real property (whether or not owned by any Credit Party or any Subsidiary of any Credit Party), other than such violations, Environmental Liabilities and effects that would not, in the aggregate, have a Material Adverse Effect.

5.21     Repayment of Indebtedness.  Except as specifically permitted hereunder or under the Financing Orders, no Credit Party shall, without the express prior written consent of the Agent and the Required Lenders or pursuant to an order of the Bankruptcy Court after notice and hearing, make any payment or transfer with respect to any Lien or Indebtedness incurred or arising prior to the filing of the Chapter 11 Cases that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

5.22     Reclamation Claims.  No Credit Party shall enter into any agreement to return any of their inventory to any of their creditors for application against any Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims under Section 546(g) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise without the prior written consent of the Agent, the Required Lenders, the Prepetition Agent and the Required Prepetition Lenders or as otherwise permitted by order of the Bankruptcy Court.

5.23     Chapter 11 Claims.  No Credit Party shall incur, create, assume, suffer to exist or permit any other super priority administrative claim (including, without limitation, any administrative expenses of the kind specified in Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b) or 726 of the Bankruptcy Code) which is pari passu with or senior to the claims of the Agent and the Lenders against the Loan Parties, except with respect to the Carve-Out or as set forth in Section 1.12.

ARTICLE VI
[RESERVED]

ARTICLE VII
EVENTS OF DEFAULT

7.1     Event of Default.     Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court or any notice to any Credit Party, the occurrence of each of the following (regardless of the reason therefor) shall be an "Event of Default":

(a)     Non-Payment.  Any Credit Party fails to pay when and as required to be paid herein, any amount of principal of any Loan, including after maturity of the Loans, or to pay any L/C Reimbursement Obligation, interest on any Loan, any fee or any other amount payable hereunder or pursuant to any other Loan Document; or

(b)     Representation or Warranty.  Any representation, warranty or certification by or on behalf of any Credit Party or any of its Subsidiaries made or deemed made herein, in any other Loan Document, or which is contained in any certificate, document or financial or other

statement by any such Person, or their respective Responsible Officers, furnished at any time under this Agreement, or in or under any other Loan Document, shall prove to have been incorrect in any material respect on or as of the date made or deemed made; or

(c) <u>Specific Defaults</u>. Any Credit Party fails to perform or observe any term, covenant or agreement contained in any of <u>Sections 4.1</u>, <u>4.3(a)</u>, <u>4.6</u>, <u>4.9</u>, <u>4.10</u>, <u>4.14</u> or <u>Article V</u> hereof; or

(d) <u>Other Defaults</u>. Any Credit Party or Subsidiary of any Credit Party fails to perform or observe any other term, covenant or agreement contained in this Agreement or any other Loan Document, and such default shall continue unremedied for a period of fifteen (15) days after the earlier to occur of (i) the date upon which a Responsible Officer of any Credit Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Borrower by the Agent at the request of the Required Lenders; or

(e) <u>Cross Default</u>. Except as occasioned by the filing of the Chapter 11 Cases and obligations with respect to which the Bankruptcy Code prohibits any Credit Party from complying or permits any Credit Party not to comply, a default or breach occurs under any other agreement, document or instrument entered into either (x) Prepetition and which is affirmed after the Petition Date or is not subject to the automatic stay provisions of Section 362 of the Bankruptcy Code or (y) Postpetition, to which any Credit Party is a party that is not cured within any applicable grace period therefor, and such default or breach arose due to (i) the failure to make any payment in respect of any Indebtedness (other than the Obligations) or Contingent Obligation having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than $500,000 when due (whether by scheduled maturity, required repayment, acceleration, demand, or otherwise); or (ii) the failure to perform or observe any other condition or covenant, or any other event shall occur or condition exist, under any agreement or instrument relating to any such Indebtedness or Contingent Obligation of more than $500,000, if the effect of such failure, event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause such Indebtedness to be declared to be due and payable prior to its stated maturity (without regard to any subordination terms with respect thereto), or such Contingent Obligation to become payable or cash collateral in respect thereof to be demanded; or

(f) [Reserved]

(g) [Reserved]

(h) <u>Monetary Judgments</u>. One or more judgments, non-interlocutory orders, decrees or arbitration awards shall be entered against any one or more of the Credit Parties or any of their respective Subsidiaries involving in the aggregate a liability (to the extent not covered by independent third-party insurance) as to any single or related series of transactions, incidents or conditions, of $500,000 or more, and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of thirty (30) days after the entry thereof; or

(i) Non Monetary Judgments.  One or more non-monetary judgments, orders or decrees shall be rendered against any one or more of the Credit Parties or any of their respective Subsidiaries which has or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and there shall be any period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(j) Collateral.  Any material provision of any Loan Document shall for any reason cease to be valid and binding on or enforceable against any Credit Party or any Subsidiary of any Credit Party thereto or any Credit Party or any Subsidiary of any Credit Party shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or any Collateral Document shall for any reason (other than pursuant to the terms thereof) cease to create a valid security interest in the Collateral purported to be covered thereby (other than as a result of any action of Agent or a Lender) or such security interest shall for any reason (other than the failure of the Agent to take any action within its control) cease to be a perfected and first priority security interest subject only to Permitted Liens; or

(k) Ownership.  A "Change in Ownership" as defined in the Prepetition Credit Agreement shall occur; or

(l) Chapter 11 Cases.  Any of the following shall have occurred in any Chapter 11 Case:

(i)  the bringing of a motion, taking of any action or the filing of any plan of reorganization or plan of liquidation or disclosure statement attendant thereto by any Credit Party in the Chapter 11 Case: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Liens upon or affecting any Collateral; (C) except as provided in the Interim Order or Final Order, as the case may be, to use Cash Collateral under Section 363(c) of the Bankruptcy Code without the prior written consent of the Agent, the Required Lenders, the Prepetition Agent and the Required Prepetition Lenders; or (D) any other action or actions adverse to the Agent, the Lenders, the Prepetition Agent or the Prepetition Lenders or their rights and remedies hereunder or under the Prepetition Loan Documents or their interest in the Collateral or Prepetition Collateral, including, without limitation, any such action or actions which seek to reduce, set-off or subordinate the Obligations or the Prepetition Obligations or challenge the Agent's Lien in any of the Collateral or the Prepetition Agent's Lien in any of the Prepetition Collateral;

(ii)  the Bankruptcy Court shall not have entered the Final Order on or before the date that is thirty (30) days after the Petition Date;

(iii)  (A) the filing of any plan of reorganization or plan of liquidation or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Person other than the Credit Parties, the Agent at the direction of the Required Lenders or the Prepetition Agent at the direction of the Required Prepetition Lenders, (B) the filing or support by any of the Credit Parties of any

plan of reorganization or plan of liquidation that is not acceptable to the Required Lenders and the Required Prepetition Lenders or (C) a Credit Party's exclusive right to file a plan of reorganization has expired or been terminated;

(iv)     the entry of an order in any Chapter 11 Case confirming a plan or plans of reorganization that does not contain a provision for termination of the Commitments and repayment in full in cash of all the Obligations and the Prepetition Obligations on or before the effective date of such plan or plans;

(v)     the entry of an order amending, supplementing, staying, vacating or otherwise modifying this Agreement or the Interim Order (except in the case of the replacement of the Interim Order with the entry of the Final Order) or the Final Order without the written consent of the Agent, the Required Lenders, the Prepetition Agent and the Required Prepetition Lenders;

(vi)     the payment of, or application for authority to pay, any Prepetition claim without the Agent's, the Required Lenders', the Prepetition Agent's and the Required Prepetition Lenders' prior consent;

(vii)     the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or other similar provision at law or equity against the Agent, any Lender or any of the Collateral or against the Prepetition Agent, any Prepetition Lender or any Prepetition Collateral;

(viii)     the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of any Credit Party; or the sale without the Agent's, the Lenders', the Prepetition Agent's and the Prepetition Lenders' consent, of all or substantially all of any Credit Party's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization or plan of liquidation in the Chapter 11 Case or otherwise that does not provide for payment in full of the Obligations and the Prepetition Obligations and termination of the Lenders' commitment to make Loans;

(ix)     the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code;

(x)     the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a Lien on any Collateral or Prepetition Collateral in excess of $500,000 in the aggregate, (B) to permit the perfection of any Lien on the Collateral or the Prepetition Collateral unless such Lien is or shall be junior in priority to the Liens of the Agent and Prepetition Agent, respectively, therein and (C) with respect to any Lien of or the granting of any Lien on any Collateral or Prepetition Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a Material Adverse Effect;

(xi)     the entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(xii)     the failure of any Credit Party to perform any of its obligations under, or comply with the terms of, the Interim Order or the Final Order;

(xiii)     the entry of an order in the Chapter 11 Case granting any other super priority administrative claim or Lien equal or superior to that granted to the Agent, on behalf of itself and the Lenders, other than the Carve Out;

(xiv)     the entry by the Bankruptcy Court of an order terminating any Credit Party's use of Cash Collateral for any of the purposes set forth in Section 4.10; or

(xv)     the Final Order ceases to be in full force and effect; or

(m) Sale Process.  Pursuant to the Chapter 11 Cases:

(i)     A motion seeking approval of bid procedures, in form and substance reasonably acceptable to the Agent and the Required Lenders, for the sale of substantially all of the Credit Parties' assets pursuant to a "stalking horse" credit bid by the Prepetition Lenders shall not have been submitted to the bankruptcy court on or prior to the fifth (5th) Business Day following the Petition Date; or

(ii)     an order of the bankruptcy court (the "Bid Procedures Order"), in form and substance reasonably acceptable to the Agent and the Required Lenders, establishing the bid procedures described in clause (a) above shall not have been obtained on or prior to the fifteenth (15th) day following the Petition Date; or

(iii)     (x) the verbal approval by the Bankruptcy Court of the sale of substantially all assets of the Credit Parties in accordance with the Bid Procedures Order shall not have been obtained on or prior to the forty-fifth (45th) day following the Petition Date or (y) an order of the Bankruptcy Court, in form and substance acceptable to the Agent and the Required Lenders, evidencing such approval shall not have been obtained on or prior to the fiftieth (50th) day following the Petition Date; or

(iv)     the closing of the sale of substantially all assets of the Credit Parties in accordance with the Bid Procedures Order shall not have occurred on or prior to the sixtieth (60th) day following the Petition Date.

(n) Change in Management.  Either (i) Bob Enghart ceases to be the chief executive officer of each Credit Party or ceases to retain the powers of duties that accompany such position as in effect on the Closing Date, or (ii) Tim May ceases to be the chief operating officer of each Credit Party or ceases to retain the powers of duties that accompany such position as in effect on the Closing Date, and, in either case, a replacement satisfactory to the Required Lenders has not been appointed.

7.2     Remedies.  Upon the occurrence and during the continuance of any Event of Default, notwithstanding the provisions of Section 362 of the Bankruptcy Code but subject to the terms of the Financing Order, without any application, motion or notice to, hearing before or order from, the Bankruptcy Court, the Agent shall at the request of the Required Lenders:

(a) declare all or any portion of the Commitment of each Lender to make Loans or of the L/C Issuer to issue Letters of Credit to be terminated, whereupon such Commitments shall forthwith be terminated;

(b) rescind permission for the Credit Parties to use Cash Collateral and terminate the obligation of the Agent to make Cash Collateral Disbursements hereunder;

(c) declare all or any portion of the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable; without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Credit Party;

(d) enter onto the premises of any Credit Party in connection with an orderly liquidation of the Collateral;

(e) direct any or all of the Credit Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to the Agent and the Required Lenders pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Credit Party to assume and assign any lease or executory contract included in the Collateral to the Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code); and/or

(f) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable law;

and pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated, to the extent set forth therein, to permit the Agent and Lenders to exercise their remedies under this Agreement, without further application or motion to, hearing before or order from, the Bankruptcy Court.

7.3     Rights Not Exclusive.  The rights provided for in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

7.4     Cash Collateral for Letters of Credit.  If an Event of Default has occurred and is continuing, the DIP Facility Termination Date occurs or this Agreement (or the Revolving Loan Commitments) shall be terminated for any reason, then the Agent may, and upon request of Required Lenders, shall, demand (which demand shall be deemed to have been delivered automatically upon any acceleration of the Loans and other obligations hereunder pursuant to Section 7.2 hereof), and the Borrower shall thereupon deliver to the Agent, to be held for the benefit of the L/C Issuer, Agent and the Lenders entitled thereto, an amount of cash equal to

105% of the amount of Letter of Credit Obligations as additional collateral security for Obligations in respect of any outstanding Letter of Credit. The Agent may at any time apply any or all of such cash and cash collateral to the payment of any or all of the Credit Parties' Obligations in respect of any Letters of Credit. Pending such application, the Agent may (but shall not be obligated to) invest the same in an interest bearing account in the Agent's name, for the benefit of the L/C Issuer, Agent and the Lenders entitled thereto, under which deposits are available for immediate withdrawal, at such bank or financial institution as the L/C Issuer and Agent may, in their discretion, select.

ARTICLE VIII
THE AGENT

8.1    Appointment and Duties.

(a) Appointment of Agent. Each Lender and each L/C Issuer hereby appoints GE Capital (together with any successor Agent pursuant to Section 8.9) as the Agent hereunder and authorizes the Agent to (i) execute and deliver the Loan Documents and accept delivery thereof on its behalf from any Credit Party, (ii) take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to the Agent under such Loan Documents and (iii) exercise such powers as are reasonably incidental thereto.

(b) Duties as Collateral and Disbursing Agent. Without limiting the generality of clause (a) above, the Agent shall have the sole and exclusive right and authority (to the exclusion of the Lenders and L/C Issuers), and is hereby authorized, to (i) act as the disbursing and collecting agent for the Lenders and the L/C Issuers with respect to all payments and collections arising in connection with the Loan Documents, and each Person making any payment in connection with any Loan Document to any Secured Party is hereby authorized to make such payment to the Agent, (ii) act as collateral agent for each Secured Party for purposes of the perfection of all Liens created by such agreements and all other purposes stated therein, (iii) manage, supervise and otherwise deal with the Collateral, (iv) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Loan Documents, (v) except as may be otherwise specified in any Loan Document, exercise all remedies given to the Agent and the other Secured Parties with respect to the Collateral, whether under the Loan Documents, applicable Requirements of Law or otherwise and (vi) execute any amendment, consent or waiver under the Loan Documents on behalf of any Lender that has consented in writing to such amendment, consent or waiver; provided, however, that the Agent hereby appoints, authorizes and directs each Lender and L/C Issuer to act as collateral sub-agent for the Agent, the Lenders and the L/C Issuers for purposes of the perfection of all Liens with respect to the Collateral, including any deposit account maintained by a Credit Party with, and cash and Cash Equivalents held by, such Lender or L/C Issuer, and may further authorize and direct the Lenders and the L/C Issuers to take further actions as collateral sub-agents for purposes of enforcing such Liens or otherwise to transfer the Collateral subject thereto to the Agent, and each Lender and L/C Issuer hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed.

(c) Limited Duties. Under the Loan Documents, the Agent (i) is acting solely on behalf of the Lenders and the L/C Issuers (except to the limited extent provided in

subsection 1.4(b) with respect to the Register), with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Agent", the terms "agent", "Agent" and "collateral agent" and similar terms in any Loan Document to refer to the Agent, which terms are used for title purposes only, (ii) is not assuming any obligation under any Loan Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any Lender, L/C Issuer or any other Person and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Loan Document, and each Lender and L/C Issuer hereby waives and agrees not to assert any claim against the Agent based on the roles, duties and legal relationships expressly disclaimed in clauses (i) through (iii) above.

8.2    Binding Effect.  Each Lender and each L/C Issuer agrees that (i) any action taken by the Agent or the Required Lenders (or, if expressly required hereby, a greater proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken by the Agent in reliance upon the instructions of Required Lenders (or, where so required, such greater proportion) and (iii) the exercise by the Agent or the Required Lenders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Secured Parties.

8.3    Use of Discretion.

(a) No Action without Instructions.  The Agent shall not be required to exercise any discretion or take, or to omit to take, any action, including with respect to enforcement or collection, except any action it is required to take or omit to take (i) under any Loan Document or (ii) pursuant to instructions from the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders).

(b) Right Not to Follow Certain Instructions.  Notwithstanding clause (a) above, the Agent shall not be required to take, or to omit to take, any action (i) unless, upon demand, the Agent receives an indemnification satisfactory to it from the Lenders (or, to the extent applicable and acceptable to the Agent, any other Person) against all Liabilities that, by reason of such action or omission, may be imposed on, incurred by or asserted against the Agent or any Related Person thereof or (ii) that is, in the opinion of the Agent or its counsel, contrary to any Loan Document or applicable Requirement of Law.

8.4    Delegation of Rights and Duties.  The Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Secured Party). Any such Person shall benefit from this Article VIII to the extent provided by the Agent.

8.5    Reliance and Liability.

(a) The Agent may, without incurring any liability hereunder, (i) treat the payee of any Note as its holder until such Note has been assigned in accordance with Section 9.9, (ii) rely on the Register to the extent set forth in Section 1.4, (iii) consult with any of its Related Persons and, whether or not selected by it, any other advisors, accountants and other experts

(including advisors to, and accountants and experts engaged by, any Credit Party) and (iv) rely and act upon any document and information (including those transmitted by Electronic Transmission) and any telephone message or conversation, in each case believed by it to be genuine and transmitted, signed or otherwise authenticated by the appropriate parties.

(b) None of the Agent and its Related Persons shall be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and each Lender, L/C Issuer, Holdings, the Borrower and each other Credit Party hereby waive and shall not assert (and each of Holdings and the Borrower shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting primarily from the gross negligence or willful misconduct of the Agent or, as the case may be, such Related Person (each as determined in a final, non-appealable judgment by a court of competent jurisdiction) in connection with the duties expressly set forth herein. Without limiting the foregoing, the Agent:

(i) shall not be responsible or otherwise incur liability for any action or omission taken in reliance upon the instructions of the Required Lenders or for the actions or omissions of any of its Related Persons selected with reasonable care (other than employees, officers and directors of the Agent, when acting on behalf of the Agent);

(ii) shall not be responsible to any Lender, L/C Issuer or other Person for the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Loan Document;

(iii) makes no warranty or representation, and shall not be responsible, to any Lender, L/C Issuer or other Person for any statement, document, information, representation or warranty made or furnished by or on behalf of any Credit Party or any Related Person of any Credit Party in connection with any Loan Document or any transaction contemplated therein or any other document or information with respect to any Credit Party, whether or not transmitted or (except for documents expressly required under any Loan Document to be transmitted to the Lenders) omitted to be transmitted by the Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by the Agent in connection with the Loan Documents; and

(iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document, whether any condition set forth in any Loan Document is satisfied or waived, as to the financial condition of any Credit Party or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from the Borrower, any Lender or L/C Issuer describing such Default or Event of Default clearly labeled "notice of default" (in which case the Agent shall promptly give notice of such receipt to all Lenders);

and, for each of the items set forth in clauses (i) through (iv) above, each Lender, L/C Issuer, Holdings and the Borrower hereby waives and agrees not to assert (and each of Holdings and the Borrower shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action it might have against the Agent based thereon.

8.6    Agent Individually.  The Agent and its Affiliates may make loans and other extensions of credit to, acquire Stock and Stock Equivalents of, engage in any kind of business with, any Credit Party or Affiliate thereof as though it were not acting as Agent and may receive separate fees and other payments therefor.  To the extent the Agent or any of its Affiliates makes any Loan or otherwise becomes a Lender hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other Lender and the terms "Lender", "Required Lender" and any similar terms shall, except where otherwise expressly provided in any Loan Document, include, without limitation, the Agent or such Affiliate, as the case may be, in its individual capacity as Lender or as one of the Required Lenders, respectively.

8.7    Lender Credit Decision.  Each Lender and each L/C Issuer acknowledges that it shall, independently and without reliance upon the Agent, any Lender or L/C Issuer or any of their Related Persons or upon any document (including any offering and disclosure materials in connection with the syndication of the Loans) solely or in part because such document was transmitted by the Agent or any of its Related Persons, conduct its own independent investigation of the financial condition and affairs of each Credit Party and make and continue to make its own credit decisions in connection with entering into, and taking or not taking any action under, any Loan Document or with respect to any transaction contemplated in any Loan Document, in each case based on such documents and information as it shall deem appropriate. Except for documents expressly required by any Loan Document to be transmitted by the Agent to the Lenders or L/C Issuers, the Agent shall not have any duty or responsibility to provide any Lender or L/C Issuer with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Credit Party or any Affiliate of any Credit Party that may come in to the possession of the Agent or any of its Related Persons.

8.8    Expenses; Indemnities.

(a)    Each Lender agrees to reimburse the Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party) promptly upon demand, severally and ratably, of any costs and expenses (including fees, charges and disbursements of financial, legal and other advisors and Other Taxes paid in the name of, or on behalf of, any Credit Party) that may be incurred by the Agent or any of its Related Persons in connection with the preparation, syndication, execution, delivery, administration, modification, consent, waiver or enforcement (whether through negotiations, through any work-out, bankruptcy, restructuring or other legal or other proceeding or otherwise) of, or legal advice in respect of its rights or responsibilities under, any Loan Document.

(b)    Each Lender further agrees to indemnify the Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party), severally and ratably, from and against Liabilities (including taxes, interests and penalties imposed for not properly withholding

or backup withholding on payments made to on or for the account of any Lender) that may be imposed on, incurred by or asserted against the Agent or any of its Related Persons in any matter relating to or arising out of, in connection with or as a result of any Loan Document, any Related Document or any other act, event or transaction related, contemplated in or attendant to any such document, or, in each case, any action taken or omitted to be taken by the Agent or any of its Related Persons under or with respect to any of the foregoing; provided, however, that no Lender shall be liable to the Agent or any of its Related Persons to the extent such liability has resulted primarily from the gross negligence or willful misconduct of the Agent or, as the case may be, such Related Person, as determined by a court of competent jurisdiction in a final non-appealable judgment or order.

8.9    Resignation of Agent or L/C Issuer.

(a) The Agent may resign at any time by delivering notice of such resignation to the Lenders and the Borrower, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date such notice shall be effective. If the Agent delivers any such notice, the Required Lenders shall have the right to appoint a successor Agent. If, within thirty (30) days after the retiring Agent having given notice of resignation, no successor Agent has been appointed by the Required Lenders that has accepted such appointment, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent from among the Lenders.

(b) Effective immediately upon its resignation, (i) the retiring Agent shall be discharged from its duties and obligations under the Loan Documents, (ii) the Lenders shall assume and perform all of the duties of the Agent until a successor Agent shall have accepted a valid appointment hereunder, (iii) the retiring Agent and its Related Persons shall no longer have the benefit of any provision of any Loan Document other than with respect to any actions taken or omitted to be taken while such retiring Agent was, or because such Agent had been, validly acting as Agent under the Loan Documents and (iv) subject to its rights under Section 8.3, the retiring Agent shall take such action as may be reasonably necessary to assign to the successor Agent its rights as Agent under the Loan Documents. Effective immediately upon its acceptance of a valid appointment as Agent, a successor Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent under the Loan Documents.

(c) Any L/C Issuer may resign at any time by delivering notice of such resignation to the Agent, effective on the date set forth in such notice or, if no such date is set forth therein, on the date such notice shall be effective. Upon such resignation, the L/C Issuer shall remain an L/C Issuer and shall retain its rights and obligations in its capacity as such (other than any obligation to Issue Letters of Credit but including the right to receive fees or to have Lenders participate in any L/C Reimbursement Obligation thereof) with respect to Letters of Credit issued by such L/C Issuer prior to the date of such resignation and shall otherwise be discharged from all other duties and obligations under the Loan Documents.

8.10    Release of Collateral or Guarantors. Each Lender and L/C Issuer hereby consents to the release and hereby directs the Agent to release (or, in the case of clause (b)(ii) below, release or subordinate) the following:

(a) any Subsidiary of the Borrower from its guaranty of any Obligation if all of the Stock and Stock Equivalents of such Subsidiary owned by any Credit Party are sold or transferred in a transaction permitted under the Loan Documents (including pursuant to a waiver or consent), to the extent that, after giving effect to such transaction, such Subsidiary would not be required to guaranty any Obligations pursuant to Section 4.13; and

(b) any Lien held by the Agent for the benefit of the Secured Parties against (i) any Collateral that is sold, transferred, conveyed or otherwise disposed of by a Credit Party in a transaction permitted by the Loan Documents (including pursuant to a valid waiver or consent), to the extent all Liens required to be granted in such Collateral pursuant to Section 4.13 after giving effect to such transaction have been granted, (ii) any property subject to a Lien permitted hereunder in reliance upon subsection 5.1(i) and (iii) all of the Collateral and all Credit Parties, upon (A) termination of the Revolving Loan Commitments, (B) payment and satisfaction in full of all Loans, all L/C Reimbursement Obligations and all other Obligations under the Loan Documents that the Agent has theretofore been notified in writing by the holder of such Obligation are then due and payable, (C) deposit of cash collateral with respect to all contingent Obligations (or, in the case of any Letter of Credit Obligation, receipt by Agent of a back-up letter of credit) in amounts and on terms and conditions and with parties satisfactory to the Agent and each Indemnitee that is, or may be, owed such Obligations and (D) to the extent requested by the Agent, receipt by Agent and the Secured Parties of liability releases from the Credit Parties each in form and substance acceptable to the Agent.

Each Lender and L/C Issuer hereby directs the Agent, and the Agent hereby agrees, upon receipt of reasonable advance notice from the Borrower, to execute and deliver or file such documents and to perform other actions reasonably necessary to release the guaranties and Liens when and as directed in this Section 8.10.

8.11    Additional Secured Parties. The benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not a Lender or L/C Issuer party hereto as long as, by accepting such benefits, such Secured Party agrees, as among the Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by the Agent, shall confirm such agreement in a writing in form and substance acceptable to the Agent) this Article VIII, Section 9.3, Section 9.9, Section 9.10, Section 9.11, Section 9.17, Section 9.24 and Section 10.1 and the decisions and actions of the Agent and the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders or other parties hereto as required herein) to the same extent a Lender is bound; provided, however, that, notwithstanding the foregoing, (a) such Secured Party shall be bound by Section 8.8 only to the extent of Liabilities, costs and expenses with respect to or otherwise relating to the Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of *pro rata* share or similar concept, (b) each of the Agent, the Lenders and the L/C Issuers party hereto shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter

remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (c) except as otherwise set forth herein, such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

ARTICLE IX
MISCELLANEOUS

9.1     Amendments and Waivers.

(a) No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Credit Party therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by the Agent with the consent of the Required Lenders) and the Borrower and acknowledged by the Agent, and, if and to the extent required under the Financing Order, approved by the Bankruptcy Court, and then such waiver shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such waiver, amendment, or consent shall, unless in writing and signed by all the Lenders directly affected thereby (or by the Agent with the consent of all the Lenders directly affected thereby), in addition to the Required Lenders (or by the Agent with the consent of the Required Lenders), the Borrower and acknowledged by the Agent, do any of the following:

(i)     increase or extend the Commitment of any Lender (or reinstate any Commitment terminated pursuant to subsection 7.2(a));

(ii)     postpone or delay any date fixed for, or waive, any scheduled installment of principal or any payment of interest, fees or other amounts due to the Lenders (or any of them) or L/C Issuer hereunder or under any other Loan Document (other than repayments pursuant to subsection 1.8(b);

(iii)     reduce the principal of, or the rate of interest specified herein or the amount of interest payable in cash specified herein on any Loan, or of any fees or other amounts payable hereunder or under any other Loan Document, including L/C Reimbursement Obligations;

(iv)     change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans which shall be required for the Lenders or any of them to take any action hereunder;

(v)     amend this Section 9.1 or the definition of Required Lenders or any provision providing for consent or other action by all Lenders; or

(vi)     discharge any Credit Party from its respective payment Obligations under the Loan Documents, or release all or substantially all of the Collateral, except as otherwise may be provided in this Agreement or the other Loan Documents;

it being agreed that all Lenders shall be deemed to be directly affected by an amendment or waiver of the type described in the preceding clauses (iv), (v) and (vi).

(b) No amendment, waiver or consent shall, unless in writing and signed by the Agent or the L/C Issuer, as the case may be, in addition to the Required Lenders or all Lenders directly affected thereby, as the case may be (or by the Agent with the consent of the Required Lenders or all the Lenders directly affected thereby, as the case may be), affect the rights or duties of the Agent or the L/C Issuer, as applicable, under this Agreement or any other Loan Document.

(c) Notwithstanding anything to the contrary contained in this Section 9.1, the Agent may amend Schedule 1.1(a) to reflect assignments entered in pursuant to Section 9.9.

9.2    Notices.

(a) Addresses.    All notices, demands, requests, directions and other communications required or expressly authorized to be made by this Agreement shall, whether or not specified to be in writing but unless otherwise expressly specified to be given by any other means, be given in writing and (i) addressed to the address set forth on the applicable signature page hereto, (ii) posted to Intralinks® (to the extent such system is available and set up by or at the direction of the Agent prior to posting) in an appropriate location by uploading such notice, demand, request, direction or other communication to www.intralinks.com, faxing it to 866-545-6600 with an appropriate bar-code fax coversheet or using such other means of posting to Intralinks® as may be available and reasonably acceptable to the Agent prior to such posting, (iii) posted to any other E-System set up by or at the direction of Agent or (iv) addressed to such other address as shall be notified in writing (A) in the case of the Borrower and the Agent, to the other parties hereto and (B) in the case of all other parties, to the Borrower and the Agent. Transmission by electronic mail (including E-Fax, even if transmitted to the fax numbers set forth above) shall not be sufficient or effective to transmit any such notice under this clause (a) unless such transmission is an available means to post to any E-System.

(b) Effectiveness. All communications described in clause (a) above and all other notices, demands, requests and other communications made in connection with this Agreement shall be effective and be deemed to have been received (i) if delivered by hand, upon personal delivery, (ii) if delivered by overnight courier service, 1 Business Day after delivery to such courier service, (iii) if delivered by mail, when deposited in the mails, (iv) if delivered by facsimile (other than to post to an E-System pursuant to clause (a)(ii) or (a)(iii) above), upon sender's receipt of confirmation of proper transmission, and (v) if delivered by posting to any E-System, on the later of the date of such posting and the date access to such posting is given to the recipient thereof in accordance with the standard procedures applicable to such E-System; provided, however, that no communications to Agent pursuant to Article I shall be effective until received by Agent.

(c) Each Lender shall notify the Agent in writing of any changes in the address to which notices to such Lender should be directed, of addresses of its Lending Office, of payment instructions in respect of all payments to be made to it hereunder and of such other administrative information as the Agent shall reasonably request.

9.3    <u>Electronic Transmissions</u>.

(a) _Authorization_. Subject to the provisions of _Section 9.2(a)_, each of Agent, Lenders, each Credit Party and each of their Related Persons, is authorized (but not required) to transmit, post or otherwise make or communicate, in its sole discretion, Electronic Transmissions in connection with any Loan Document and the transactions contemplated therein. Each Credit Party and each Secured Party hereto acknowledges and agrees that the use of Electronic Transmissions is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the transmission of Electronic Transmissions.

(b) _Signatures_. Subject to the provisions of _Section 9.2(a)_, (i)(A) no posting to any E-System shall be denied legal effect merely because it is made electronically, (B) each E Signature on any such posting shall be deemed sufficient to satisfy any requirement for a "signature" and (C) each such posting shall be deemed sufficient to satisfy any requirement for a "writing", in each case including pursuant to any Loan Document, any applicable provision of any UCC, the federal Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural Requirement of Law governing such subject matter, (ii) each such posting that is not readily capable of bearing either a signature or a reproduction of a signature may be signed, and shall be deemed signed, by attaching to, or logically associating with such posting, an E-Signature, upon which each Secured Party and each Credit Party may rely and assume the authenticity thereof, (iii) each such posting containing a signature, a reproduction of a signature or an E-Signature shall, for all intents and purposes, have the same effect and weight as a signed paper original and (iv) each party hereto or beneficiary hereto agrees not to contest the validity or enforceability of any posting on any E-System or E-Signature on any such posting under the provisions of any applicable Requirement of Law requiring certain documents to be in writing or signed; _provided_, _however_, that nothing herein shall limit such party's or beneficiary's right to contest whether any posting to any E-System or E-Signature has been altered after transmission.

(c) _Separate Agreements_. All uses of an E-System shall be governed by and subject to, in addition to _Section 9.2_ and this _Section 9.3_, separate terms and conditions posted or referenced in such E-System and related Contractual Obligations executed by Agent and Credit Parties in connection with the use of such E-System.

(d) LIMITATION OF LIABILITY. ALL E-SYSTEMS AND ELECTRONIC TRANSMISSIONS SHALL BE PROVIDED "AS IS" AND "AS AVAILABLE". NONE OF AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS WARRANTS THE ACCURACY, ADEQUACY OR COMPLETENESS OF ANY E-SYSTEMS OR ELECTRONIC TRANSMISSION AND DISCLAIMS ALL LIABILITY FOR ERRORS OR OMISSIONS THEREIN. NO WARRANTY OF ANY KIND IS MADE BY AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS IN CONNECTION WITH ANY E SYSTEMS OR ELECTRONIC COMMUNICATION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS. Each of Borrower, each other Credit Party executing this Agreement and each Secured Party agrees that Agent has no responsibility for maintaining or providing any

equipment, software, services or any testing required in connection with any Electronic Transmission or otherwise required for any E-System.

9.4     No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Agent or any Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  No course of dealing between any Credit Party, any Affiliate of any Credit Party, the Agent or any Lender shall be effective to amend, modify or discharge any provision of this Agreement or any of the other Loan Documents.

9.5     Costs and Expenses.  Any action taken by any Credit Party under or with respect to any Loan Document, even if required under any Loan Document or at the request of Agent or Required Lenders, shall be at the expense of such Credit Party, and neither Agent nor any other Secured Party shall be required under any Loan Document to reimburse any Credit Party or any Subsidiary of any Credit Party therefor except as expressly provided therein.  In addition, the Borrower agrees to pay or reimburse upon demand (a) each of the Agent and the Lenders for all reasonable out-of-pocket costs and expenses incurred by it or any of its Related Persons, in connection with the investigation, development, preparation, negotiation, syndication, execution, interpretation or administration of, any modification of any term of or termination of, any Loan Document, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, in each case including Attorney Costs to the Agent and the Lenders, (b) each of the Agent and the Lenders for all reasonable costs and expenses incurred by it or any of its Related Persons in connection with internal audit reviews, field examinations and Collateral examinations (which shall be reimbursed, in addition to the out-of-pocket costs and expenses of such examiners, at the per diem rate per individual charged by the Agent or such Lender, as applicable, for its examiners), (c) each of the Agent and the Lenders, their Related Persons, and the L/C Issuer for all costs and expenses incurred in connection with (i) the enforcement or preservation of any right or remedy under any Loan Document, any Obligation, with respect to the Collateral or any other related right or remedy or (ii) the commencement, defense, conduct of, intervention in, or the taking of any other action with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to any Credit Party, any Subsidiary of any Credit Party, Loan Document or Obligation (or the response to and preparation for any subpoena or request for document production relating thereto), including Attorney Costs, and (d) such other costs and expenses for which payment or reimbursement by the Borrower may be permitted pursuant to the Financing Orders.

9.6     Indemnity.

(a) Each Credit Party agrees to indemnify, hold harmless and defend Agent, each Lender, each L/C Issuer and each of their respective Related Persons (each such Person being an "Indemnitee") from and against all Liabilities (including brokerage commissions, fees and other compensation) that may be imposed on, incurred by or asserted against any such Indemnitee in any matter relating to or arising out of, in connection with or as a result of (i) any Loan Document, any Obligation (or the repayment thereof), any Letter of Credit, the use or intended

use of the proceeds of any Loan or Cash Collateral Disbursement or the use of any Letter of Credit or any securities filing of, or with respect to, any Credit Party, (ii) any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of any Credit Party or any Affiliate of any of them in connection with any of the foregoing and any Contractual Obligation entered into in connection with any E-Systems or other Electronic Transmissions, (iii) any actual or prospective investigation, litigation or other proceeding, whether or not brought by any such Indemnitee or any of its Related Persons, any holders of securities or creditors (and including attorneys' fees in any case), whether or not any such Indemnitee, Related Person, holder or creditor is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Requirement of Law or theory thereof, including common law, equity, contract, tort or otherwise or (iv) any other act, event or transaction related, contemplated in or attendant to any of the foregoing (collectively, the "Indemnified Matters"); provided, however, that no Credit Party shall have any liability under this Section 9.6 to any Indemnitee with respect to any Indemnified Matter, and no Indemnitee shall have any liability with respect to any Indemnified Matter other than (to the extent otherwise liable), to the extent such liability has resulted primarily from the gross negligence or willful misconduct of such Indemnitee, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. Furthermore, each of Borrower and each other Credit Party executing this Agreement waives and agrees not to assert against any Indemnitee, and shall cause each other Credit Party to waive and not assert against any Indemnitee, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted against any Related Person.

(b) Without limiting the foregoing, "Indemnified Matters" includes all Environmental Liabilities, including those arising from, or otherwise involving, any property of any Credit Party or any Related Person of any Credit Party or any actual, alleged or prospective damage to property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such property or natural resource or any property on or contiguous to any real property of any Credit Party or any Related Person or any Credit Party, whether or not, with respect to any such Environmental Liabilities, any Indemnitee is a mortgagee pursuant to any leasehold mortgage, a mortgagee in possession, the successor-in-interest to any Credit Party or any Related Person of any Credit Party or the owner, lessee or operator of any property of any Related Person through any foreclosure action, in each case except to the extent such Environmental Liabilities (i) are incurred solely following foreclosure by Agent or following Agent or any Lender having become the successor-in-interest to any Credit Party or any Related Person of any Credit Party and (ii) are attributable solely to acts of such Indemnitee.

9.7 Marshaling; Payments Set Aside. No Secured Party shall be under any obligation to marshal any property in favor of any Credit Party or any other Person or against or in payment of any Obligation. To the extent that any Secured Party receives a payment from Borrower, from any other Credit Party, from the proceeds of the Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part

thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

9.8     Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that any assignment by any Lender shall be subject to the provisions of Section 9.9 hereof, and provided further that the Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the Agent and each Lender.

9.9     Assignments and Participations; Binding Effect.

(a) This Agreement shall become effective when it shall have been executed by Holdings, the Borrower, the other Credit Parties signatory hereto and the Agent and when the Agent shall have been notified by each Lender and the initial L/C Issuer that such Lender or L/C Issuer has executed it.  Thereafter, it shall be binding upon and inure to the benefit of, but only to the benefit of, the Borrower, the other Credit Parties hereto (in each case except for Article VIII), the Agent, each Lender and L/C Issuer party hereto and, to the extent provided in Section 8.11, each other Secured Party and, in each case, their respective successors and permitted assigns. Except as expressly provided in any Loan Document (including in Section 8.9), none of the Borrower, any other Credit Party, any L/C Issuer or the Agent shall have the right to assign any rights or obligations hereunder or any interest herein.

(b) Each Lender may sell, transfer, negotiate or assign (a "Sale") all or a portion of its rights and obligations hereunder (including all or a portion of its Commitments and its rights and obligations with respect to Loans and Letters of Credit) to (i) a Qualified Assignee or (ii) any other Person provided that, so long as no Default or Event of Default has occurred and is continuing, the written consent of the Agent is obtained, which consent shall not be unreasonably withheld or delayed; provided, however, that (x) such Sales must be ratable among the obligations owing to and owed by such Lender with respect to the Revolving Loans and (y) for each Loan, the aggregate outstanding principal amount (determined as of the effective date of the applicable Assignment) of the Loans, Commitments and Letter of Credit Obligations subject to any such Sale shall be in a minimum amount of $100,000, unless such Sale is made to an existing Lender or an Affiliate or Approved Fund of any existing Lender, is of the assignor's (together with its Affiliates and Approved Funds) entire interest in such Facility or is made with the prior consent of the Borrower and the Agent.

(c) The parties to each Sale made in reliance on clause (b) above (other than those described in clause (e) or (f) below) shall execute and deliver to the Agent an Assignment via an electronic settlement system designated by the Agent (or, if previously agreed with the Agent, via a manual execution and delivery of the Assignment) evidencing such Sale, together with any existing Note subject to such Sale (or any affidavit of loss therefor acceptable to the Agent), any tax forms required to be delivered pursuant to Section 10.1 and payment of an assignment fee in the amount of $3,500, provided that (1) if a Sale by a Lender is made to an Affiliate or an Approved Fund of such assigning Lender, then no assignment fee shall be due in connection with such Sale, and (2) if a Sale by a Lender is made to an assignee that is not an Affiliate or Approved Fund of such assignor Lender, and concurrently to one or more Affiliates or Approved Funds of such Assignee, then only one assignment fee of $3,500 shall be due in connection with

such Sale. Upon receipt of all the foregoing and, if such assignment is made in accordance with Section 9.9(b)(iii), upon the Agent consenting to such assignment, and conditioned upon such receipt, from and after the effective date specified in such Assignment, the Agent shall record or cause to be recorded in the Register the information contained in such Assignment.

(d) Subject to the recording of an Assignment by the Agent in the Register pursuant to Section 1.4(b), (i) the assignee thereunder shall become a party hereto and, to the extent that rights and obligations under the Loan Documents have been assigned to such assignee pursuant to such Assignment, shall have the rights and obligations of a Lender, (ii) any applicable Note shall be transferred to such assignee through such entry and (iii) the assignor thereunder shall, to the extent that rights and obligations under this Agreement have been assigned by it pursuant to such Assignment, relinquish its rights (except for those surviving the termination of the Commitments and the payment in full of the Obligations) and be released from its obligations under the Loan Documents, other than those relating to events or circumstances occurring prior to such assignment (and, in the case of an Assignment covering all or the remaining portion of an assigning Lender's rights and obligations under the Loan Documents, such Lender shall cease to be a party hereto).

(e) In addition to the other rights provided in this Section 9.9, each Lender may grant a security interest in, or otherwise assign as collateral, any of its rights under this Agreement, whether now owned or hereafter acquired (including rights to payments of principal or interest on the Loans), to (A) any federal reserve bank (pursuant to Regulation A of the Federal Reserve Board), without notice to the Agent or (B) any holder of, or trustee for the benefit of the holders of, such Lender's Indebtedness or equity securities, by notice to the Agent; provided, however, that no such holder or trustee, whether because of such grant or assignment or any foreclosure thereon (unless such foreclosure is made through an assignment in accordance with clause (b) above), shall be entitled to any rights of such Lender hereunder and no such Lender shall be relieved of any of its obligations hereunder.

(f) In addition to the other rights provided in this Section 9.9, each Lender may, (x) with notice to the Agent, grant to an SPV the option to make all or any part of any Loan that such Lender would otherwise be required to make hereunder (and the exercise of such option by such SPV and the making of Loans pursuant thereto shall, if both shall occur, satisfy the obligation of such Lender to make such Loans hereunder) and such SPV may assign to such Lender the right to receive payment with respect to any Obligation and (y) without notice to or consent from the Agent or the Borrower, sell participations to one or more Persons in or to all or a portion of its rights and obligations under the Loan Documents (including all its rights and obligations with respect to the Revolving Loans and Letters of Credit); provided, however, that, whether as a result of any term of any Loan Document or of such grant or participation, (i) no such SPV or participant shall have a commitment, or be deemed to have made an offer to commit, to make Loans hereunder, and, except as provided in the applicable option agreement, none shall be liable for any obligation of such Lender hereunder, (ii) such Lender's rights and obligations, and the rights and obligations of the Credit Parties and the Secured Parties towards such Lender, under any Loan Document shall remain unchanged and each other party hereto shall continue to deal solely with such Lender, which shall remain the holder of the Obligations in the Register, except that (A) each such participant and SPV shall be entitled to the benefit of Article X, but, with respect to Section 10.1, only to the extent such participant or SPV delivers

the tax forms such Lender is required to collect pursuant to subsection 10.1(f) and then only to the extent of any amount to which such Lender would be entitled in the absence of any such grant or participation and (B) each such SPV may receive other payments that would otherwise be made to such Lender with respect to Loans funded by such SPV to the extent provided in the applicable option agreement and set forth in a notice provided to the Agent by such SPV and such Lender, provided, however, that in no case (including pursuant to clause (A) or (B) above) shall an SPV or participant have the right to enforce any of the terms of any Loan Document, and (iii) the consent of such SPV or participant shall not be required (either directly, as a restraint on such Lender's ability to consent hereunder or otherwise) for any amendments, waivers or consents with respect to any Loan Document or to exercise or refrain from exercising any powers or rights such Lender may have under or in respect of the Loan Documents (including the right to enforce or direct enforcement of the Obligations), except for those described in clauses (ii) and (iii) of subsection 9.1(a) with respect to amounts, or dates fixed for payment of amounts, to which such participant or SPV would otherwise be entitled and, in the case of participants, except for those described in clause (vi) of subsection 9.1(a). No party hereto shall institute (and each of Borrower and Holdings shall cause each other Credit Party not to institute) against any SPV grantee of an option pursuant to this clause (f) any bankruptcy, reorganization, insolvency, liquidation or similar proceeding, prior to the date that is one (1) year and one (1) day after the payment in full of all outstanding commercial paper of such SPV; provided, however, that each Lender having designated an SPV as such agrees to indemnify each Indemnitee against any Liability that may be incurred by, or asserted against, such Indemnitee as a result of failing to institute such proceeding (including a failure to get reimbursed by such SPV for any such Liability). The agreement in the preceding sentence shall survive the termination of the Commitments and the payment in full of the Obligations.

9.10    Confidentiality.  (a) Each Lender, L/C Issuer and the Agent agrees to use all reasonable efforts to maintain, in accordance with its customary practices, the confidentiality of information obtained by it pursuant to any Loan Document and designated in writing by any Credit Party as confidential for a period of two (2) years following the date on which this Agreement terminates in accordance with the terms hereof, except that such information may be disclosed (i) with the Borrower's consent, (ii) to Related Persons of such Lender, L/C Issuer or the Agent, as the case may be, or to any Person that any L/C Issuer causes to issue Letters of Credit hereunder, that are advised of the confidential nature of such information and are instructed to keep such information confidential, (iii) to the extent such information presently is or hereafter becomes available to such Lender, L/C Issuer or the Agent, as the case may be, on a non-confidential basis from a source other than any Credit Party, (iv) to the extent disclosure is required by applicable Requirements of Law or other legal process or requested or demanded by any Governmental Authority, (v) to the extent necessary or customary for inclusion in league table measurements or in any tombstone or other advertising materials (and the Credit Parties consent to the publication of such tombstone or other advertising materials by the Agent, any Lender, any L/C Issuer or any of their Related Persons), (vi) (A) to the National Association of Insurance Commissioners or any similar organization, any examiner or any nationally recognized rating agency or (B) otherwise to the extent consisting of general portfolio information that does not identify borrowers, (vii) to current or prospective assignees, SPVs (including the investors therein) or participants, in each case to the extent such assignees, investors or participants, agree to be bound by provisions substantially similar to the provisions of this Section 9.10 and (viii) in connection with the exercise of any remedy under any Loan Document. In the event of any

conflict between the terms of this Section 9.10 and those of any other Contractual Obligation entered into with any Credit Party (whether or not a Loan Document), the terms of this Section 9.10 shall govern.

(b) Each Credit Party consents to the publication by Agent or any Lender of advertising material relating to the financing transactions contemplated by this Agreement using Borrower's or any other Credit Party's name, product photographs, logo or trademark. Agent or such Lender shall provide a draft of any advertising material to Borrower for review and comment prior to the publication thereof.

9.11    Set-off; Sharing of Payments.

(a) Right of Setoff. Each of the Agent, each Lender, each L/C Issuer and each Affiliate (including each branch office thereof) of any of them is hereby authorized, without notice or demand (each of which is hereby waived by each Credit Party), at any time and from time to time during the continuance of any Event of Default and to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (whether general or special, time or demand, provisional or final) at any time held and other Indebtedness, claims or other obligations at any time owing by the Agent, such Lender, such L/C Issuer or any of their respective Affiliates to or for the credit or the account of the Borrower or any other Credit Party against any Obligation of any Credit Party now or hereafter existing, whether or not any demand was made under any Loan Document with respect to such Obligation and even though such Obligation may be unmatured. No Lender or L/C Issuer shall exercise any such right of set-off without the prior consent of the Required Lenders. Each of the Agent, each Lender and each L/C Issuer agrees promptly to notify the Borrower and, if applicable, the Agent after any such setoff and application made by such Lender or its Affiliates; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application. The rights under this Section 9.11 are in addition to any other rights and remedies (including other rights of setoff) that the Agent, the Lenders, the L/C Issuers, their Affiliates and the other Secured Parties, may have.

(b) Sharing of Payments, Etc. If any Lender, directly or through an Affiliate or branch office thereof, obtains any payment of any Obligation of any Credit Party (whether voluntary, involuntary or through the exercise of any right of setoff or the receipt of any Collateral or "proceeds" (as defined under the applicable UCC) of Collateral) other than pursuant to Article X and such payment exceeds the amount such Lender would have been entitled to receive if all payments had gone to, and been distributed by, the Agent in accordance with the provisions of the Loan Documents, such Lender shall purchase for cash from other Lenders such participations in their Obligations as necessary for such Lender to share such excess payment with such Lenders to ensure such payment is applied as though it had been received by the Agent and applied in accordance with this Agreement (or, if such application would then be at the discretion of the Borrower, applied to repay the Obligations in accordance herewith); provided, however, that (a) if such payment is rescinded or otherwise recovered from such Lender or L/C Issuer in whole or in part, such purchase shall be rescinded and the purchase price therefor shall be returned to such Lender or L/C Issuer without interest and (b) such Lender shall, to the fullest extent permitted by applicable Requirements of Law, be able to exercise all its rights of payment

(including the right of setoff) with respect to such participation as fully as if such Lender were the direct creditor of the applicable Credit Party in the amount of such participation.

9.12    Counterparts.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Agreement by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

9.13    Severability; Facsimile Signature.  The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.  Any Loan Document, or other agreement, document or instrument, delivered by facsimile transmission shall have the same force and effect as if the original thereof had been delivered.

9.14    Captions.  The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

9.15    Independence of Provisions.  The parties hereto acknowledge that this Agreement and other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters, and that such limitations, tests and measurements are cumulative and must each be performed, except as expressly stated to the contrary in this Agreement.

9.16    Interpretation.  This Agreement is the result of negotiations among and has been reviewed by counsel to the Agent, each Lender and other parties hereto, and is the product of all parties hereto.  Accordingly, this Agreement and the other Loan Documents shall not be construed against the Lenders or the Agent merely because of the Agent's or Lenders' involvement in the preparation of such documents and agreements.

9.17    No Third Parties Benefited.  This Agreement is made and entered into for the sole protection and legal benefit of the Borrower, the Lenders, the L/C Issuer, the Agent and, subject to the provisions of Section 8.11 hereof, each other Secured Party, and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents.  Neither the Agent nor any Lender shall have any obligation to any Person not a party to this Agreement or the other Loan Documents.

9.18    Governing Law and Jurisdiction.

(a)  Governing Law.  The laws of the State of Illinois and any applicable laws of the United States of America (including the Bankruptcy Code) shall govern all matters arising out of, in connection with or relating to this Agreement, including, without limitation, its validity, interpretation, construction, performance and enforcement.

(b) Submission to Jurisdiction. EACH CREDIT PARTY HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE CREDIT PARTIES, THE AGENT, THE LENDERS, THE PREPETITION AGENT AND THE PREPETITION LENDERS PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT; PROVIDED, THAT THE AGENT, LENDERS, THE PREPETITION AGENT AND EACH CREDIT PARTY ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED, FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE AGENT. EACH CREDIT PARTY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND HOLDINGS AND EACH BORROWER HEREBY WAIVES ANY OBJECTION THAT SUCH CREDIT PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

(c) Service of Process. Each Credit Party hereby irrevocably waives personal service of any and all legal process, summons, notices and other documents and other service of process of any kind and consents to such service in any suit, action or proceeding brought in the United States of America with respect to or otherwise arising out of or in connection with any Loan Document by any means permitted by applicable Requirements of Law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of Borrower specified herein (and shall be effective when such mailing shall be effective, as provided therein). Each Credit Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

9.19 **Waiver of Jury Trial**. THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY. THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

9.20 Entire Agreement; Release; Survival.

(a) THE LOAN DOCUMENTS EMBODY THE ENTIRE AGREEMENT OF THE PARTIES AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER THEREOF AND ANY PRIOR LETTER OF INTEREST, COMMITMENT LETTER, CONFIDENTIALITY AND SIMILAR

AGREEMENTS INVOLVING ANY CREDIT PARTY AND ANY LENDER OR ANY L/C ISSUER OR ANY OF THEIR RESPECTIVE AFFILIATES RELATING TO A FINANCING OF SUBSTANTIALLY SIMILAR FORM, PURPOSE OR EFFECT. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT, THE TERMS OF THIS AGREEMENT SHALL GOVERN (UNLESS SUCH TERMS OF SUCH OTHER LOAN DOCUMENTS ARE NECESSARY TO COMPLY WITH APPLICABLE REQUIREMENTS OF LAW, IN WHICH CASE SUCH TERMS SHALL GOVERN TO THE EXTENT NECESSARY TO COMPLY THEREWITH). NOTWITHSTANDING THE FOREGOING, HOWEVER, THE FINANCING ORDERS SHALL CONTINUE TO GOVERN THE TERMS AND CONDITIONS OF THE TRANSACTIONS CONTEMPLATED HEREBY TO THE EXTENT THEY ARE INCONSISTENT WITH, OR ADDRESS MATTERS NOT ADDRESSED IN, THIS AGREEMENT.

(b) Execution of this Agreement by the Credit Parties constitutes a full, complete and irrevocable release of any and all claims which each Credit Party may have at law or in equity in respect of all prior discussions and understandings, oral or written, relating to the subject matter of this Agreement and the other Loan Documents. In no event shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings). Each of Borrower and each other Credit Party signatory hereto hereby waives, releases and agrees (and shall cause each other Credit Party to waive, release and agree) not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c) (i) Any indemnification or other protection provided to any Indemnitee pursuant to Article VIII (The Agent), Section 9.5 (Costs and Expenses), Section 9.6 (Indemnity), this Section 9.20, and Article X (Taxes, Yield Protection and Illegality) of this Agreement, (ii) solely for the two (2) year time period specified therein, the provisions of Section 9.10 of this Agreement and (iii) the provisions of Section [8.1] of the Guaranty and Security Agreement, in each case, shall (x) survive the termination of the Commitments and the payment in full of all other Obligations and (y) with respect to clause (i) hereof, inure to the benefit of any Person that at any time held a right thereunder (as an Indemnitee or otherwise) and, thereafter, its successors and permitted assigns.

9.21    Patriot Act.  Each Lender that is subject to the Patriot Act hereby notifies the Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

9.22    **[Reserved]**

9.23    Joint and Several.  The obligations of the Credit Parties hereunder and under the other Loan Documents are joint and several.

9.24 <u>Creditor-Debtor Relationship</u>. The relationship between Agent, each Lender and the L/C Issuer, on the one hand, and the Credit Parties, on the other hand, is solely that of creditor and debtor. No Secured Party has any fiduciary relationship or duty to any Credit Party arising out of or in connection with, and there is no agency, tenancy or joint venture relationship between the Secured Parties and the Credit Parties by virtue of, any Loan Document or any transaction contemplated therein.

9.25 <u>Parties Including Trustees; Bankruptcy Court Proceedings</u>. This Agreement, the other Loan Documents and all Liens created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Credit Party, the estate of each Credit Party, and any trustee or successor in interest to any Credit Party in any Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Agent and the Lenders and their respective assigns, transferees and endorsees. The Liens created by this Agreement, the Guaranty and Security Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Credit Party to a case under Chapter 7 of the Bankruptcy Code or in the event dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Lenders or the Agent file financing statements or otherwise perfect their security interests or Liens under applicable law.

9.26 <u>Prepetition Credit Agreement</u>. Each Credit Party hereby agrees that (a) this Agreement is separate and distinct from the Prepetition Credit Agreement, (b) the Prepetition Credit Agreement is in full force and effect and (c) and that the Commitments hereunder constitute a continuation of the revolving loan commitments of the Prepetition Lenders under the Prepetition Credit Agreement. Each Credit Party further agrees that by entering into this Agreement, the Agent and, the Lenders do not waive any Default or Event of Default under (and as defined in) the Prepetition Credit Agreement or any of their liens, claims, priorities, rights and remedies thereunder.

ARTICLE X
<u>TAXES, YIELD PROTECTION AND ILLEGALITY</u>

10.1 <u>Taxes</u>.

(a) Except as otherwise provided in this <u>Section 10.1</u>, each payment by any Credit Party under any Loan Document shall be made free and clear of all present or future taxes, levies, imposts, deductions, charges or withholdings and all liabilities with respect thereto (and without deduction for any of them) (collectively, but excluding the taxes set forth in <u>clauses (i)</u> and <u>(ii)</u> below, the "<u>Taxes</u>") other than for (i) taxes measured by net income (including branch profits taxes) and franchise taxes imposed in lieu of net income taxes, in each case imposed on any Secured Party as a result of a present or former connection between such Person and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than such connection arising solely from any Secured Party having executed, delivered or performed its obligations or received a payment under, or enforced, any Loan Document) or (ii) taxes that are directly attributable to the failure (other than

as a result of a change in any Requirement of Law) by Agent or any Lender to deliver the documentation required to be delivered pursuant to clause (f) below.

(b) If any Taxes shall be required by law to be deducted from or in respect of any amount payable under any Loan Document to any Secured Party (i) such amount shall be increased as necessary to ensure that, after all required deductions for Taxes are made (including deductions applicable to any increases to any amount under this Section 10.1), such Secured Party receives the amount it would have received had no such deductions been made, (ii) the relevant Credit Party shall make such deductions, (iii) the relevant Credit Party shall timely pay the full amount deducted to the relevant taxing authority or other authority in accordance with applicable Requirements of Law and (iv) within thirty (30) days after such payment is made, the relevant Credit Party shall deliver to the Agent an original or certified copy of a receipt evidencing such payment; provided, however, that no such increase shall be made with respect to, and no Credit Party shall be required to indemnify any Secured Party pursuant to clause (d) below for, withholding taxes to the extent that the obligation to withhold amounts existed on the date that such Person became a "Secured Party" under this Agreement in the capacity under which such Person makes a claim under this clause (b), except in each case to the extent such Person is a direct or indirect assignee of any other Secured Party that was entitled, at the time the assignment to such Person became effective, to receive additional amounts under this clause (b).

(c) In addition, the Borrower agrees to pay, and authorizes the Agent to pay in its name, any stamp, documentary, excise or property tax, charges or similar levies imposed by any applicable Requirement of Law or Governmental Authority and all Liabilities with respect thereto (including by reason of any delay in payment thereof), in each case arising from the execution, delivery or registration of, or otherwise with respect to, any Loan Document or any transaction contemplated therein (collectively, "Other Taxes"). Within thirty (30) days after the date of any payment of Taxes or Other Taxes by any Credit Party, the Borrower shall furnish to the Agent, at its address referred to in Section 9.2, the original or a certified copy of a receipt evidencing payment thereof.

(d) The Borrower shall reimburse and indemnify, within thirty (30) days after receipt of demand therefor (with copy to the Agent), each Secured Party for all Taxes and Other Taxes (including any Taxes and Other Taxes imposed by any jurisdiction on amounts payable under this Section 10.1) paid by such Secured Party and any Liabilities arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted. A certificate of the Secured Party (or of the Agent on behalf of such Secured Party) claiming any compensation under this clause (d), setting forth the amounts to be paid thereunder and delivered to the Borrower with copy to the Agent, shall be conclusive, binding and final for all purposes, absent manifest error. In determining such amount, the Agent and such Secured Party may use any reasonable averaging and attribution methods.

(e) Any Lender claiming any additional amounts payable pursuant to this Section 10.1 shall use its reasonable efforts (consistent with its internal policies and Requirements of Law) to change the jurisdiction of its lending office if such a change would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the sole determination of such Lender, be otherwise disadvantageous to such Lender.

(f)  (i) Each Non-U.S. Lender Party that, at any of the following times, is entitled to an exemption from United States withholding tax or, after a change in any Requirement of Law, is subject to such withholding tax at a reduced rate under an applicable tax treaty, shall (w) on or prior to the date such Non-U.S. Lender Party becomes a "Non-U.S. Lender Party" hereunder, (x) on or prior to the date on which any such form or certification expires or becomes obsolete, (y) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (i) and (z) from time to time if requested by the Borrower or the Agent (or, in the case of a participant or SPV, the relevant Lender), provide the Agent and the Borrower (or, in the case of a participant or SPV, the relevant Lender) with two completed originals of each of the following, as applicable:  (A) Forms W-8ECI (claiming exemption from U.S. withholding tax because the income is effectively connected with a U.S. trade or business), W-8BEN (claiming exemption from, or a reduction of, U.S. withholding tax under an income tax treaty) and/or W-8IMY or any successor forms, (B) in the case of a Non-U.S. Lender Party claiming exemption under Sections 871(h) or 881(c) of the Code, Form W-8BEN (claiming exemption from U.S. withholding tax under the portfolio interest exemption) or any successor form and a certificate in form and substance acceptable to the Agent that such Non-U.S. Lender Party is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code or (C) any other applicable document prescribed by the IRS certifying as to the entitlement of such Non-U.S. Lender Party to such exemption from United States withholding tax or reduced rate with respect to all payments to be made to such Non-U.S. Lender Party under the Loan Documents.  Unless the Borrower and the Agent have received forms or other documents satisfactory to them indicating that payments under any Loan Document to or for a Non-U.S. Lender Party are not subject to United States withholding tax or are subject to such tax at a rate reduced by an applicable tax treaty, the Credit Parties and the Agent shall withhold amounts required to be withheld by applicable Requirements of Law from such payments at the applicable statutory rate.

(ii)     Each U.S. Lender Party shall (A) on or prior to the date such U.S. Lender Party becomes a "U.S. Lender Party" hereunder, (B) on or prior to the date on which any such form or certification expires or becomes obsolete, (C) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (f) and (D) from time to time if requested by the Borrower or the Agent (or, in the case of a participant or SPV, the relevant Lender), provide the Agent and the Borrower (or, in the case of a participant or SPV, the relevant Lender) with two completed originals of Form W-9 (certifying that such U.S. Lender Party is entitled to an exemption from U.S. backup withholding tax) or any successor form.

(iii)    Each Lender having sold a participation in any of its Obligations or identified an SPV as such to the Agent shall collect from such participant or SPV the documents described in this clause (f) and provide them to the Agent.

10.2    Illegality.  If after the date hereof any Lender shall determine that the introduction of any Requirement of Law, or any change in any Requirement of Law or in the interpretation or administration thereof, has made it unlawful, or that any central bank or other Governmental

Authority has asserted that it is unlawful, for any Lender or its Lending Office to make LIBOR Rate Loans, then, on notice thereof by such Lender to the Borrower through the Agent, the obligation of that Lender to make LIBOR Rate Loans shall be suspended until such Lender shall have notified the Agent and the Borrower that the circumstances giving rise to such determination no longer exists.

(a) Subject to clause (c) below, if any Lender shall determine that it is unlawful to maintain any LIBOR Rate Loan, the Borrower shall repay in full all LIBOR Rate Loans of such Lender then outstanding, together with interest accrued thereon, either on the last day of the Interest Period thereof if such Lender may lawfully continue to maintain such LIBOR Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBOR Rate Loans, together with any amounts required to be paid in connection therewith pursuant to Section 10.4.

(b) If the obligation of any Lender to make or maintain LIBOR Rate Loans has been terminated, the Borrower may elect, by giving notice to such Lender through the Agent that all Loans which would otherwise be made by any such Lender as LIBOR Rate Loans shall be instead Base Rate Loans.

(c) Before giving any notice to the Agent pursuant to this Section 10.2, the affected Lender shall designate a different Lending Office with respect to its LIBOR Rate Loans if such designation will avoid the need for giving such notice or making such demand and will not, in the judgment of the Lender, be illegal or otherwise disadvantageous to the Lender.

10.3    Increased Costs and Reduction of Return.

(a) If any Lender or L/C Issuer shall determine that, due to either (i) the introduction of, or any change in, or in the interpretation of, any law or regulation or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in the case of either clause (i) or (ii) subsequent to the date hereof, there shall be any increase in the cost to such Lender or L/C Issuer of agreeing to make or making, funding or maintaining any LIBOR Rate Loans or of issuing or maintain any Letter of Credit, then the Borrower shall be liable for, and shall from time to time, within thirty (30) days of demand therefor by such Lender or L/C Issuer (with a copy of such demand to the Agent), pay to the Agent for the account of such Lender or L/C Issuer, additional amounts as are sufficient to compensate such Lender or L/C Issuer for such increased costs; provided, that the Borrower shall not be required to compensate any Lender or L/C Issuer pursuant to this Section for any increased costs incurred more than one-hundred eighty (180) days prior to the date that such Lender or L/C Issuer notifies the Borrower, in writing of the increased costs and of such Lender's or L/C Issuer's intention to claim compensation thereof; provided, further, that if the circumstance giving rise to such increased costs is retroactive, then the one-hundred eighty (180)-day period referred to above shall be extended to include the period of retroactive effect thereof.

(b) If any Lender or L/C Issuer shall have determined that:

(i)    the introduction of any Capital Adequacy Regulation;

(ii)     any change in any Capital Adequacy Regulation;

(iii)    any change in the interpretation or administration of any Capital Adequacy Regulation by any central bank or other Governmental Authority charged with the interpretation or administration thereof; or

(iv)     compliance by such Lender or L/C Issuer (or its Lending Office) or any entity controlling the Lender or L/C Issuer, with any Capital Adequacy Regulation;

affects the amount of capital required or expected to be maintained by such Lender or L/C Issuer or any entity controlling such Lender or L/C Issuer and (taking into consideration such Lender's or such entities' policies with respect to capital adequacy and such Lender's or L/C Issuer's desired return on capital) determines that the amount of such capital is increased as a consequence of its Commitment(s), loans, credits or obligations under this Agreement, then, within thirty (30) days of demand of such Lender or L/C Issuer (with a copy to the Agent), the Borrower shall pay to such Lender or L/C Issuer, from time to time as specified by such Lender or L/C Issuer, additional amounts sufficient to compensate such Lender or L/C Issuer (or the entity controlling the Lender or L/C Issuer) for such increase; provided, that the Borrower shall not be required to compensate any Lender or L/C Issuer pursuant to this Section for any amounts incurred more than one-hundred eighty (180) days prior to the date that such Lender or L/C Issuer notifies the Borrower, in writing of the amounts and of such Lender's or L/C Issuer's intention to claim compensation thereof; provided, further, that if the event giving rise to such increase is retroactive, then the one-hundred eighty (180)-day period referred to above shall be extended to include the period of retroactive effect thereof.

10.4    _Funding Losses_. The Borrower agrees to reimburse each Lender and to hold each Lender harmless from any loss or expense which such Lender may sustain or incur as a consequence of:

(a) the failure of the Borrower to make any payment or mandatory repayment of principal of any LIBOR Rate Loan (including payments made after any acceleration thereof);

(b) the failure of the Borrower to borrow, continue or convert a Loan after the Borrower has given (or is deemed to have given) a Notice of Borrowing or a Notice of Conversion/Continuation;

(c) the repayment (including pursuant to Section 1.8) of a LIBOR Rate Loan on a day which is not the last day of the Interest Period with respect thereto; or

(d) the conversion pursuant to Section 1.6 of any LIBOR Rate Loan to a Base Rate Loan on a day that is not the last day of the applicable Interest Period;

including any such loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain its LIBOR Rate Loans hereunder or from fees payable to terminate the deposits from which such funds were obtained. Solely for purposes of calculating amounts payable by the Borrower to the Lenders under this Section 10.4 and under subsection 10.3(a): each LIBOR Rate Loan made by a Lender (and each related reserve, special deposit or similar requirement) shall be conclusively deemed to have been funded at the LIBOR used in

determining the interest rate for such LIBOR Rate Loan by a matching deposit or other borrowing in the interbank eurodollar market for a comparable amount and for a comparable period, whether or not such LIBOR Rate Loan is in fact so funded.

10.5    Inability to Determine Rates.  If the Agent shall have determined in good faith that for any reason adequate and reasonable means do not exist for ascertaining the LIBOR for any requested Interest Period with respect to a proposed LIBOR Rate Loan or that the LIBOR applicable pursuant to subsection 1.3(a) for any requested Interest Period with respect to a proposed LIBOR Rate Loan does not adequately and fairly reflect the cost to the Lenders of funding such Loan, the Agent will forthwith give notice of such determination to the Borrower and each Lender.  Thereafter, the obligation of the Lenders to make or maintain LIBOR Rate Loans hereunder shall be suspended until the Agent revokes such notice in writing.  Upon receipt of such notice, the Borrower may revoke any Notice of Borrowing or Notice of Conversion/Continuation then submitted by it.  If the Borrower does not revoke such notice, the Lenders shall make, convert or continue the Loans, as proposed by the Borrower, in the amount specified in the applicable notice submitted by the Borrower, but such Loans shall be made, converted or continued as Base Rate Loans.

10.6    Reserves on LIBOR Rate Loans.  The Borrower shall pay to each Lender, as long as such Lender shall be required under regulations of the Federal Reserve Board to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional costs on the unpaid principal amount of each LIBOR Rate Loan equal to actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent demonstrable error), payable on each date on which interest is payable on such Loan provided the Borrower shall have received at least fifteen (15) days' prior written notice (with a copy to the Agent) of such additional interest from the Lender.  If a Lender fails to give notice fifteen (15) days prior to the relevant Interest Payment Date, such additional interest shall be payable fifteen (15) days from receipt of such notice.

10.7    Certificates of Lenders.  Any Lender claiming reimbursement or compensation pursuant to this Article X shall deliver to the Borrower (with a copy to the Agent) a certificate setting forth in reasonable detail the amount payable to such Lender hereunder and such certificate shall be conclusive and binding on the Borrower in the absence of manifest error.

ARTICLE XI
DEFINITIONS

11.1    Defined Terms.  The following terms are defined in the Sections or subsections referenced opposite such terms:

| | |
|---|---|
| "Borrower" | Preamble |
| "Event of Default" | 7.1 |
| "Indemnified Matters" | 9.6 |
| "Indemnitee" | 9.6 |
| "L/C Reimbursement Agreement" | 1.1(c) |
| "L/C Sublimit" | 1.1(c) |

| | |
|---|---|
| "Lender" | Preamble |
| "Letter of Credit Fee" | 1.9(b) |
| "Maximum Permitted Advances" | 1.1(a) |
| "Non-Funding Lender" | 1.11(b) |
| "Other Taxes" | 10.1(c) |
| "Permitted Liens" | 5.1 |
| "Register" | 1.4(b) |
| "Restricted Payments" | 5.10(a) |
| "Revolving Loan Commitment" | 1.1(a) |
| "Revolving Loan" | 1.1(b) |
| "Sale" | 9.9(a) |
| "Settlement Date" | 1.11(b) |
| "Taxes" | 10.1(a) |
| "Unused Commitment Fee" | 1.9(a) |

In addition to the terms defined elsewhere in this Agreement, the following terms have the following meanings:

"Account" means, as at any date of determination, all "accounts" (as such term is defined in the UCC) of the Borrower and its Subsidiaries, including, without limitation, the unpaid portion of the obligation of a customer of the Borrower or any of its Subsidiaries in respect of Inventory purchased by and shipped to such customer and/or the rendition of services by the Borrower or such Subsidiary, as stated on the respective invoice of the Borrower or such Subsidiary, net of any credits, rebates or offsets owed to such customer.

"Acquisition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (b) the acquisition of in excess of fifty percent (50%) of the Stock and Stock Equivalents of any Person or otherwise causing any Person to become a Subsidiary of the Borrower, or (c) a merger or consolidation or any other combination with another Person.

"Affiliate" means, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract or otherwise. Without limitation, any director, executive officer or beneficial owner of five percent (5%) or more of the Stock (either directly or through ownership of Stock Equivalents) of a Person shall for the purposes of this Agreement, be deemed to control the other Person. Notwithstanding the foregoing, neither the Agent nor any Lender shall be deemed an "Affiliate" of any Credit Party or of any Subsidiary of any Credit Party.

"Agent" means GE Capital in its capacity as Agent for the Lenders hereunder, and any successor Agent.

"Aggregate Revolving Loan Commitment" means the combined Revolving Loan Commitments of the Lenders, which shall initially be in the amount of $[4,000,000],[2] as such amount may be reduced from time to time pursuant to this Agreement.

"Applicable Margin" means with respect to Revolving Loans: (i) if a Base Rate Loan, five and one-half percent (5.5%) per annum and (ii) if a LIBOR Rate Loan, six and one-half percent (6.5%) per annum.

"Approved Fund" means, with respect to any Lender, any Person (other than a natural Person) that (a) (i) is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business or (ii) temporarily warehouses loans for any Lender or any Person described in clause (i) above and (b) is advised or managed by (i) such Lender, (ii) any Affiliate of such Lender or (iii) any Person (other than an individual) or any Affiliate of any Person (other than an individual) that administers or manages such Lender.

"Assignment" means an assignment agreement entered into by a Lender, as assignor, and any Person, as assignee, pursuant to the terms and provisions of Section 9.9 (with the consent of any party whose consent is required by Section 9.9), accepted by the Agent, in substantially the form of Exhibit 11.1(a) or any other form approved by the Agent.

"Attorney Costs" means and includes all reasonable fees and disbursements of any law firm or other external counsel.

"Bankruptcy Code" means the Federal Bankruptcy Reform Act of 1978 (11 U.S.C. § 101, et seq.), as amended and in effect from time to time and the regulations issued from time to time thereunder.

"Base Rate" means, for any day, a rate per annum equal to the highest of (a) the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by Agent) or any similar release by the Federal Reserve Board (as determined by Agent), (b) the sum of 3.0% per annum and the Federal Funds Rate, (c) the sum of (x) LIBOR, as defined herein, calculated for each such day based on an Interest Period of three (3) months determined two (2) Business Days prior to such day, *plus* (y) the excess of the Applicable Margin for LIBOR Rate Loans over the Applicable Margin for Base Rate Loans, and (d) 4.5% per annum, in each instance, as of such day. Any change in the Base Rate due to a change in any of the foregoing shall be effective on the effective date of such change in the "bank prime loan" rate, the Federal Funds Rate, or LIBOR for an Interest Period of three (3) months.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

---

[2]    To be $4 million less the aggregate principal balance of revolving loans and face amount of letters of credit outstanding under the Prepetition Credit Agreement.

"Benefit Plan" means any employee benefit plan as defined in Section 3(3) of ERISA (whether governed by the laws of the United States or otherwise) to which any Credit Party incurs or otherwise has any obligation or liability, contingent or otherwise.

"Borrowing" means (a) a borrowing hereunder consisting of Loans made to or for the benefit of the Borrower on the same day by the Lenders pursuant to Article I or (b) a Cash Collateral Disbursement.

"Budget" means the budget of the Credit Parties' cash receipts and expenditures for the period commencing on the Petition Date and ending on the date specified therein, in the form attached hereto as Exhibit A, as amended from time to time with the written consent of the Agent and the Required Lenders.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in Chicago, Illinois or New York, New York are authorized or required by law to close and, if the applicable Business Day relates to any LIBOR Rate Loan, a day on which dealings are carried on in the London interbank market.

"Capital Adequacy Regulation" means any guideline, request or directive of any central bank or other Governmental Authority, or any other law, rule or regulation, whether or not having the force of law, in each case, regarding capital adequacy of any Lender or of any corporation controlling a Lender.

"Capital Lease" means any leasing or similar arrangement which, in accordance with GAAP, is classified as a capital lease.

"Capital Lease Obligations" means all monetary obligations of any Credit Party or any Subsidiary of any Credit Party under any Capital Leases.

"Carve Out" shall have the meaning assigned to it in the Financing Order.

"Cash Collateral" means, all "Cash Collateral" as defined by Section 363 of the Bankruptcy Code, all deposits subject to setoff and cash arising from the collection or other conversion to cash of property of the Credit Parties in which the Prepetition Agent or the Agent has a security interest, Lien or mortgage, whether such security interests, liens or mortgages existed as of the commencement of the Chapter 11 Case or arise thereafter pursuant to a Financing Order, and whether the property converted to cash existed as of the commencement of the Chapter 11 Case or arose or was generated thereafter, including, without limitation, all proceeds from the sale or other disposition of the Prepetition Collateral or Collateral and all cash and deposit account balances maintained in the Cash Collateral Account.

"Cash Collateral Account" has the meaning specified in Section 1.10(c).

"Cash Collateral Availability" means, as of any date of determination, the balance of the available funds in Cash Collateral Account as of such date.

"Cash Collateral Disbursement" has the meaning specified in Section 1.1(b).

"Cash Collateral Maximum Amount" means, as of any date of determination, an amount equal to the sum of (a) of $400,000 and (b) the aggregate amount that the Credit Parties are projected to disburse in accordance with the Budget from the beginning of the then-current calendar week through the Scheduled DIP Facility Termination Date minus (B) the aggregate amount of projected receipts and collections for such period as set forth in the Budget.

"Cash Equivalents" means: (a) securities issued or fully guaranteed or insured by the United States Government or any agency thereof having maturities of not more than six (6) months from the date of acquisition; (b) certificates of deposit, time deposits, repurchase agreements, reverse repurchase agreements, or bankers' acceptances, having in each case a tenor of not more than six (6) months, issued by any Lender, or by any U.S. commercial bank or any branch or agency of a non U.S. bank licensed to conduct business in the U.S. having combined capital and surplus of not less than $250,000,000; (c) commercial paper of an issuer rated at least A-1 by Standard & Poor's Corporation or P-1 by Moody's Investors Service Inc. and in either case having a tenor of not more than three (3) months and (d) money market funds provided that substantially all of the assets of such fund are comprised of securities of the type described in clauses (a) through (c).

"Closing Date" means [_____], 2009.

"Code" means the Internal Revenue Code of 1986, and regulations promulgated thereunder.

"Collateral" means all Property and interests in Property and proceeds thereof now owned or hereafter acquired by any Credit Party, any of their respective Subsidiaries and any other Person who has granted a Lien to the Agent, in or upon which a Lien now or hereafter exists in favor of any Lender or the Agent for the benefit of the Agent, Lenders and other Secured Parties, whether under this Agreement or under any other documents executed by any such Persons and delivered to the Agent.

"Collateral Documents" means, collectively, the Guaranty and Security Agreement, the Mortgages (if any), each Control Agreement and all other security agreements, pledge agreements, patent and trademark security agreements, lease assignments, guarantees and other similar agreements, and all amendments, restatements, modifications or supplements thereof or thereto, by or between any one or more of any Credit Party, any of their respective Subsidiaries or any other Person pledging or granting a lien on Collateral or guaranteeing the payment and performance of the Obligations, and any Lender or the Agent for the benefit of the Agent, the Lenders and other Secured Parties now or hereafter delivered to the Lenders or the Agent pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or hereafter filed in accordance with the UCC or comparable law) against any such Person as debtor in favor of any Lender or the Agent for the benefit of the Agent, the Lenders and the other Secured Parties, as secured party, as any of the foregoing may be amended, restated and/or modified from time to time.

"Commitment" means, for each Lender, its Revolving Loan Commitment.

"Commitment Percentage" means, as to any Lender, the percentage equivalent of such Lender's Revolving Loan Commitment divided by the Aggregate Revolving Loan Commitment.

"Committees" shall mean, collectively, the official committee of unsecured creditors and any other committee formed, appointed or approved in the Chapter 11 Cases and each of such Committees shall be referred to herein as a Committee.

"Contingent Obligation" means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person: (i) with respect to any Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto; (ii) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (iii) under any Rate Contracts; (iv) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (v) for the obligations of another Person through any agreement to purchase, repurchase or otherwise acquire such obligation or any Property constituting security therefor, to provide funds for the payment or discharge of such obligation or to maintain the solvency, financial condition or any balance sheet item or level of income of another Person. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if not a fixed and determined amount, the maximum amount so guaranteed or supported.

"Contractual Obligations" means, as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement to which such Person is a party or by which it or any of its Property is bound.

"Control Agreement" means a tri-party deposit account, securities account or commodities account control agreement by and among the applicable Credit Party, Agent (or the Prepetition Agent, with respect to those entered into Prepetition) and the depository, securities intermediary or commodities intermediary, and each in form and substance reasonably satisfactory in all respects to Agent and in any event providing to Agent "control" of such deposit account, securities or commodities account within the meaning of Articles 8 and 9 of the UCC.

"Conversion Date" means any date on which the Borrower converts a Base Rate Loan to a LIBOR Rate Loan or a LIBOR Rate Loan to a Base Rate Loan.

"Copyrights" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to copyrights and all mask work, database and design rights, whether or not registered or published, all registrations and recordations thereof and all applications in connection therewith.

"Credit Parties" means the Borrower, the Guarantors and each other Person (i) which executes this Agreement as a "Credit Party," (ii) which executes a guaranty of the Obligations,

(iii) which grants a Lien on all or substantially all of its assets to secure payment of the Obligations and (iv) all of the Stock of which is pledged to Agent for the benefit of the Secured Parties.

"Default" means any event or circumstance which, with the giving of notice, the lapse of time, or both, would (if not cured or otherwise remedied during such time) constitute an Event of Default.

"DIP Facility Termination Date" means the earliest to occur of: (i) the date that is sixty (60) days after the Petition Date; (ii) thirty (30) days after entry of the Interim Order if the Final Order shall not have been entered by the Bankruptcy Court on or before such date; (iii) the effective date of a plan of reorganization or a plan of liquidation supported by the Agent, the Required Lenders, the Prepetition Agent and the Required Prepetition Lenders; (iv) the closing date of a sale of substantially all assets of the Credit Parties that is consented to by the Agent, the Required Lenders, the Prepetition Agent and the Required Prepetition Lenders; (v) the date of filing of a plan of reorganization or a plan of liquidation by any party other than the Credit Parties or the Agent, or the date on which the Credit Parties seek or support confirmation of a plan of reorganization or a plan of liquidation that is not acceptable to the Required Lenders or the Required Prepetition Lenders; (vi) the date on which the Agent, pursuant to Section 7.2, (A) declares all or any portion of the Commitments terminated and/or (B) rescinds permission for the Credit Parties to use Cash Collateral and terminates the obligation of the Agent to make Cash Collateral Disbursements; and (vii) the permanent reduction of the Commitments to zero.

"Disposition" means (a) the sale, lease, conveyance or other disposition of Property, other than sales or other dispositions expressly permitted under subsection 5.2(a), 5.2(b) and 5.2(c), and (b) the sale or transfer by the Borrower or any Subsidiary of the Borrower of any Stock or Stock Equivalent issued by any Subsidiary of the Borrower and held by such transferor Person.

"Dollars", "dollars" and "$" each mean lawful money of the United States of America.

"Domestic Subsidiary" means, with respect to any Person, a Subsidiary of such Person, which Subsidiary is incorporated or otherwise organized under the laws of a state of the United States of America.

"Electronic Transmission" means each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail or E-Fax, or otherwise to or from an E-System or other equivalent service.

"Environmental Laws" means all present and future Requirements of Law and Permits imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the environment and natural resources, and including public notification requirements and environmental transfer of ownership, notification or approval statutes.

"Environmental Liabilities" means all Liabilities (including costs of Remedial Actions, natural resource damages and costs and expenses of investigation and feasibility studies) that may be imposed on, incurred by or asserted against any Credit Party or any Subsidiary of any

Credit Party as a result of, or related to, any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law or otherwise, arising under any Environmental Law or in connection with any environmental, health or safety condition or with any Release and resulting from the ownership, lease, sublease or other operation or occupation of property by any Credit Party or any Subsidiary of any Credit Party, whether on, prior or after the date hereof.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means, collectively, any Credit Party and any Person under common control or treated as a single employer with, any Credit Party, within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"ERISA Event" means any of the following: (a) a reportable event described in Section 4043(b) of ERISA (or, unless the thirty (30)-day notice requirement has been duly waived under the applicable regulations, Section 4043(c) of ERISA) with respect to a Title IV Plan; (b) the withdrawal of any ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any ERISA Affiliate from any Multiemployer Plan; (d) with respect to any Multiemployer Plan, the filing of a notice of reorganization, insolvency or termination (or treatment of a plan amendment as termination) under Section 4041A of ERISA; (e) the filing of a notice of intent to terminate a Title IV Plan (or treatment of a plan amendment as termination) under Section 4041 of ERISA; (f) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (g) the failure to make any required contribution to any Title IV Plan or Multiemployer Plan when due; (h) the imposition of a lien under Section 430 of the Code or Section 302 or 4068 of ERISA on any property (or rights to property, whether real or personal) of any ERISA Affiliate; (i) the failure of a Benefit Plan or any trust thereunder intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Requirements of Law to qualify thereunder; and (j) any other event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the imposition of any liability upon any ERISA Affiliate under Title IV of ERISA other than for PBGC premiums due but not delinquent.

"Event of Loss" means, with respect to any Property, any of the following: (a) any loss, destruction or damage of such Property; (b) any pending or threatened institution of any proceedings for the condemnation or seizure of such Property or for the exercise of any right of eminent domain; or (c) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property.

"E-Fax" means any system used to receive or transmit faxes electronically.

"E-Signature" means the process of attaching to or logically associating with an Electronic Transmission an electronic symbol, encryption, digital signature or process (including the name or an abbreviation of the name of the party transmitting the Electronic Transmission) with the intent to sign, authenticate or accept such Electronic Transmission.

"E-System" means any electronic system, including Intralinks® and ClearPar® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Agent, any of its Related Persons or any other Person, providing for access to data protected by passcodes or other security system.

"Federal Funds Rate" means, for any day, the rate per annum (rounded upward to the nearest 1/100th of 1%) equal to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to the Agent on such day on such transactions as determined by the Agent in a commercially reasonable manner.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System, or any entity succeeding to any of its principal functions.

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to the Agent, the Required Lenders, the Prepetition Agent and the Prepetition Required Lenders, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied (unless the Agent, the Required Lenders, the Prepetition Agent and the Prepetition Required Lenders waive such requirement), together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes the Credit Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, provides for the super priority of the Agent's and the Lenders' claim and authorizes the use by the Credit Parties of their Cash Collateral in accordance with the terms of this Agreement.

"Financing Order" means, the Interim Order or the Final Order, whichever is in effect at the time of any determination made hereunder, and "Financing Orders" means the Interim Order and the Final Order, collectively.

"Foreign Subsidiary" means, with respect to any Person, a Subsidiary of such Person, which Subsidiary is not a Domestic Subsidiary.

"GAAP" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), which are applicable to the circumstances as of the date of determination.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or

pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"Guaranty and Security Agreement" means that certain Guaranty and Security Agreement, dated as of even date herewith, in form and substance reasonably acceptable to the Agent and Borrower, made by the Credit Parties in favor of the Agent, for the benefit of the Secured Parties, as the same may be amended, restated and/or modified from time to time.

"Hazardous Materials" means any substance, material or waste that is classified, regulated or otherwise characterized under any Environmental Law as hazardous, toxic, a contaminant or a pollutant or by other words of similar meaning or regulatory effect, including petroleum or any fraction thereof, asbestos, polychlorinated biphenyls and radioactive substances.

"Indebtedness" of any Person means, without duplication:  (a) all indebtedness for borrowed money; (b) all obligations issued, undertaken or assumed as the deferred purchase price of Property or services (other than trade payables entered into in the Ordinary Course of Business); (c) the face amount of all letters of credit issued for the account of such Person and without duplication, all drafts drawn thereunder and all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments issued by such Person; (d) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of Property, assets or businesses; (e) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to Property acquired by the Person (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such Property); (f) all Capital Lease Obligations; (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing product; (h) [reserved]; (i) all indebtedness referred to in clauses (a) through (h) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in Property (including accounts and contracts rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness; and (j) all Contingent Obligations described in clause (i) of the definition thereof in respect of indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above.

"Intellectual Property" means all rights, title and interests in or relating to intellectual property and industrial property arising under any Requirement of Law and all IP Ancillary Rights relating thereto, including all Copyrights, Patents, Trademarks, Internet domain names, Trade Secrets and IP Licenses.

"Interest Payment Date" means, (a) with respect to any LIBOR Rate Loan, the last day of each Interest Period applicable to such Loan, and (b) with respect to Base Rate Loan, the first day of each calendar month.

"Interest Period" means, with respect to any LIBOR Rate Loan, the period commencing on the Business Day such Loan is disbursed or continued or on the Conversion Date on which a

Base Rate Loan is converted to the LIBOR Rate Loan and ending on the date one month thereafter; provided that:

(a)     if any Interest Period pertaining to a LIBOR Rate Loan would otherwise end on a day which is not a Business Day, that Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month, in which event such Interest Period shall end on the immediately preceding Business Day;

(b)     any Interest Period pertaining to a LIBOR Rate Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)     no Interest Period for any Revolving Loan shall extend beyond the DIP Facility Termination Date.

"Interim Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extension, modifications and amendments thereto, in form and substance satisfactory to the Agent, the Required Lenders, the Prepetition Agent and the Prepetition Required Lenders, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Credit Parties to execute and perform under the terms of this Agreement and authorizes the use by the Credit Parties of their Cash Collateral in accordance with the terms of this Agreement, substantially in the form of Exhibit B.

"Inventory" means all of the "inventory" (as such term is defined in the UCC) of the Borrower and its Subsidiaries, including, but not limited to, all merchandise, raw materials, parts, supplies, work in process and finished goods intended for sale, together with all the containers, packing, packaging, shipping and similar materials related thereto, and including such inventory as is temporarily out of the Borrower's or such Subsidiary's custody or possession, including inventory on the premises of others and items in transit.

"IP Ancillary Rights" means, with respect to any other Intellectual Property, as applicable, all foreign counterparts to, and all divisionals, reversions, continuations, continuations-in-part, reissues, reexaminations, renewals and extensions of, such Intellectual Property and all income, royalties, proceeds and Liabilities at any time due or payable or asserted under or with respect to any of the foregoing or otherwise with respect to such Intellectual Property, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, dilution, violation or other impairment thereof, and, in each case, all rights to obtain any other IP Ancillary Right.

"IP License" means all Contractual Obligations (and all related IP Ancillary Rights), whether written or oral, granting any right, title and interest in or relating to any Intellectual Property.

"IRS" means the Internal Revenue Service of the United States and any successor thereto.

"Issue" means, with respect to any Letter of Credit, to issue, extend the expiration date of, renew (including by failure to object to any automatic renewal on the last day such objection is permitted), increase the face amount of, or reduce or eliminate any scheduled decrease in the face amount of, such Letter of Credit, or to cause any Person to do any of the foregoing. The terms "Issued" and "Issuance" have correlative meanings.

"L/C Issuer" means GE Capital or a Subsidiary thereof or a bank or other legally authorized Person selected by or acceptable to Agent in its sole discretion, in such Person's capacity as an issuer of Letters of Credit hereunder.

"L/C Reimbursement Obligation" means, for any Letter of Credit, the obligation of the Borrower to the L/C Issuer thereof, as and when matured, to pay all amounts drawn under such Letter of Credit.

"Lending Office" means, with respect to any Lender, the office or offices of such Lender specified as its "Lending Office" beneath its name on the applicable signature page hereto, or such other office or offices of such Lender as it may from time to time notify the Borrower and the Agent.

"Letter of Credit" means documentary or standby letters of credit issued for the account of the Borrower by L/C Issuers, and bankers' acceptances issued by the Borrower, for which Agent and Lenders have incurred Letter of Credit Obligations.

"Letter of Credit Obligations" means all outstanding obligations incurred by Agent and Lenders at the request of the Borrower, whether direct or indirect, contingent or otherwise, due or not due, in connection with the issuance of Letters of Credit by L/C Issuers or the purchase of a participation as set forth in Section 1.1(c) with respect to any Letter of Credit. The amount of such Letter of Credit Obligations shall equal the maximum amount that may be payable by Agent and Lenders thereupon or pursuant thereto.

"Liabilities" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, taxes, commissions, charges, disbursements and expenses, in each case of any kind or nature (including interest accrued thereon or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"LIBOR" means, for each Interest Period, the greater of (a) 3.5% per annum and (b) offered rate per annum for deposits of Dollars for the applicable Interest Period that appears on Reuters Screen LIBOR01 Page as of 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in such Interest Period. If no such offered rate exists, such rate will be the rate of interest per annum, as determined by the Agent (rounded upwards, if necessary, to the nearest 1/100 of 1%) at which deposits of Dollars in immediately available funds are offered at 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in such Interest Period by major financial institutions reasonably satisfactory to the Agent in the London interbank market for such Interest Period for the applicable principal amount on such date of determination.

"LIBOR Rate Loan" means a Loan that bears interest based on LIBOR.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge or deposit arrangement, encumbrance, lien (statutory or otherwise) or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including those created by, arising under or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a Capital Lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of any financing statement naming the owner of the asset to which such lien relates as debtor, under the UCC or any comparable law) and any contingent or other agreement to provide any of the foregoing, but not including the interest of a lessor under a lease which is not a Capital Lease.

"Loan" means an extension of credit by a Lender to the Borrower pursuant to Article I hereof, and may be a Base Rate Loan or a LIBOR Rate Loan.

"Loan Documents" means this Agreement, the Notes, the Fee Letter, the Collateral Documents and all documents delivered to the Agent and/or any Lender in connection with any of the foregoing.

"Margin Stock" means "margin stock" as such term is defined in Regulation T, U or X of the Federal Reserve Board.

"Material Adverse Effect" means: (a) a material adverse change in, or a material adverse effect upon, the operations, business, Properties, condition (financial or otherwise) or prospects of any Credit Party or the Credit Parties and the Subsidiaries taken as a whole; (b) a material impairment of the ability of any Credit Party, any Subsidiary of any Credit Party or any other Person (other than the Agent or Lenders) to perform in any material respect its obligations under any Loan Document; or (c) a material adverse effect upon (i) the legality, validity, binding effect or enforceability of any Loan Document, or (ii) the perfection or priority of any Lien granted to the Lenders, the Agent, the other Secured Parties or the Prepetition Agent under any of the Collateral Documents.

"Material Environmental Liabilities" means Environmental Liabilities exceeding $500,000 in the aggregate.

"Mortgage" means any deed of trust, leasehold deed of trust, mortgage, leasehold mortgage, deed to secure debt, leasehold deed to secure debt or other document creating a Lien on real Property or any interest in real Property.

"Multiemployer Plan" means any multiemployer plan, as defined in Section 4001(a)(3) of ERISA, as to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"Net Issuance Proceeds" means, in respect of any issuance of debt or equity, cash proceeds (including cash proceeds as and when received in respect of non-cash proceeds received or receivable in connection with such issuance), net of underwriting discounts and reasonable out-of-pocket costs and expenses paid or incurred in connection therewith in favor of any Person not an Affiliate of the Borrower.

"Net Proceeds" means proceeds in cash, checks or other cash equivalent financial instruments (including Cash Equivalents) as and when received by the Person making a Disposition and insurance proceeds received on account of an Event of Loss, net of: (a) in the event of a Disposition (i) the direct costs relating to such Disposition excluding amounts payable to the Borrower or any Affiliate of the Borrower, (ii) sale, use or other transaction taxes paid or payable as a result thereof, and (iii) amounts required to be applied to repay principal, interest and prepayment premiums and penalties on Indebtedness secured by a Lien on the asset which is the subject of such Disposition and (b) in the event of an Event of Loss, (i) all money actually applied to repair or reconstruct the damaged Property or Property affected by the condemnation or taking, (ii) all of the costs and expenses reasonably incurred in connection with the collection of such proceeds, award or other payments, and (iii) any amounts retained by or paid to parties having superior rights to such proceeds, awards or other payments.

"Non-U.S. Lender Party" means each of the Agent, each Lender, each L/C Issuer, each SPV and each participant, in each case that is not a United States person under and as defined in Section 7701(a)(30) of the Code.

"Note" means any Revolving Note and "Notes" means all such Notes.

"Notice of Borrowing" means a notice given by the Borrower to the Agent pursuant to Section 1.5, in substantially the form of Exhibit 11.1(c) hereto.

"Obligations" means all Loans, and other Indebtedness, advances, debts, liabilities, obligations, covenants and duties owing by any Credit Party to any Lender, the Agent, any L/C Issuer or any other Person required to be indemnified, that arises under any Loan Document, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.

"Ordinary Course of Business" means, in respect of any transaction involving any Credit Party or any Subsidiary of any Credit Party, the ordinary course of such Person's business, as conducted by any such Person in accordance with past practice and undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any Loan Document.

"Organization Documents" means, (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation, any shareholder rights agreement, (b) for any partnership, the partnership agreement and, if applicable, certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or (d) any other document setting forth the manner of election or duties of the officers, directors, managers or other similar persons, or the designation, amount or relative rights, limitations and preference of the Stock of a Person.

"Patents" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to letters patent and applications therefor.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56, as amended.

"PBGC" means the United States Pension Benefit Guaranty Corporation any successor thereto.

"Permits" means, with respect to any Person, any permit, approval, authorization, license, registration, certificate, concession, grant, franchise, variance or permission from, and any other Contractual Obligations with, any Governmental Authority, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture or Governmental Authority.

"Postpetition" means the time period beginning upon the filing of the Chapter 11 Cases.

"Prepetition" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"Prepetition Collateral" means all "Collateral" (as defined in the Prepetition Credit Agreement), together with any assets of the Credit Parties upon which the Prepetition Agent shall be granted a lien as "adequate protection".

"Prepetition Lenders" shall mean the lenders party to the Prepetition Credit Agreement.

"Prepetition Loan Documents" means the "Loan Documents" (as defined in the Prepetition Credit Agreement).

"Prepetition Obligations" means the "Obligations" (as defined in the Prepetition Credit Agreement)

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"Qorval Report" means any report prepared from time to time by Qorval LLC, in its capacity as financial advisor for the Credit Parties, with respect to (a) the financial condition of the Credit Parties, (b) its recommendations for modifications to the operational and financial performance of the Credit Parties' business, and (c) any other matter approved or consented to by the Required Lenders.

"Qualified Assignee" means (a) any Lender, any Affiliate of any Lender and, with respect to any Lender that is an investment fund that invests in commercial loans, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor, and (b) any commercial bank, savings and loan association or savings bank or any other entity which is an "accredited investor" (as defined in Regulation D under the Securities Act of 1933) which

extends credit or buys loans as one of its businesses, including insurance companies, mutual funds, lease financing companies and commercial finance companies, in each case, through its applicable lending office, is capable of lending to borrowers without the imposition of any withholding or similar taxes; <u>provided</u> that absent the existence of an Event of Default, no Person determined by Agent to be acting in the capacity of a vulture fund or distressed debt purchaser shall be a Qualified Assignee; <u>provided further</u>, no Affiliate of any Credit Party shall be a Qualified Assignee.

"<u>Rate Contracts</u>" means swap agreements (as such term is defined in Section 101 of the Bankruptcy Code) and any other agreements or arrangements designed to provide protection against fluctuations in interest or currency exchange rates.

"<u>Related Persons</u>" means, with respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisor (including those retained in connection with the satisfaction or attempted satisfaction of any condition set forth in Article II) and other consultants and agents of or to such Person or any of its Affiliates.

"<u>Releases</u>" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material into or through the environment.

"<u>Remedial Action</u>" means all actions required to (a) clean up, remove, treat or in any other way address any Hazardous Material in the indoor or outdoor environment, (b) prevent or minimize any Release so that a Hazardous Material does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or (c) perform pre remedial studies and investigations and post-remedial monitoring and care with respect to any Hazardous Material.

"<u>Required Lenders</u>" means at any time (a) Lenders then holding at least sixty six and two-thirds percent (66 2/3%) of the sum of the Aggregate Revolving Loan Commitment then in effect, or (b) if the Aggregate Revolving Loan Commitments have been terminated, Lenders then having at least sixty six and two-thirds percent (66-2/3%) of the sum of the aggregate unpaid principal amount of Revolving Loans then outstanding plus outstanding Letter of Credit Obligations.

"<u>Required Prepetition Lenders</u>" means the "Requisite Lenders" under and as defined in the Prepetition Credit Agreement.

"<u>Requirement of Law</u>" means, as to any Person, any law (statutory or common), ordinance, treaty, rule, regulation, order, policy, other legal requirement or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"<u>Responsible Officer</u>" means the chief executive officer, chief restructuring officer or the president of a Credit Party, or any other officer having substantially the same authority and responsibility; or, with respect to compliance with financial covenants or delivery of financial

information, the chief financial officer, chief restructuring officer or the treasurer of the a Credit Party, or any other officer having substantially the same authority and responsibility.

"Revolving Note" means a promissory note of the Borrower payable to the order of a Lender in substantially the form of Exhibit 11.1(d) hereto, evidencing Indebtedness of the Borrower under the Revolving Loan Commitment of such Lender.

"Scheduled DIP Facility Termination Date" means the date set forth in clause (i) of the definition of "DIP Facility Termination Date".

"Secured Party" means the Agent, each Lender, each L/C Issuer, each other Indemnitee and each other holder of any Obligation of a Credit Party.

"SPV" means any special purpose funding vehicle identified as such in a writing by any Lender to the Agent.

"Stock" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"Stock Equivalents" means all securities convertible into or exchangeable for Stock or any other Stock Equivalent and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Stock or any other Stock Equivalent, whether or not presently convertible, exchangeable or exercisable.

"Subsidiary" of a Person means any corporation, association, limited liability company, partnership, joint venture or other business entity of which more than fifty percent (50%) of the voting Stock, is owned or controlled directly or indirectly by the Person, or one or more of the Subsidiaries of the Person, or a combination thereof.

"Tax Affiliate" means, (a) Borrower and its Subsidiaries and (b) any Affiliate of Borrower with which Borrower files or is eligible to file consolidated, combined or unitary tax returns.

"Title IV Plan" means a pension plan subject to Title IV of ERISA, other than a Multiemployer Plan, to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"Trade Secrets" means all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trade secrets.

"Trademark" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers and, in each case, all goodwill associated therewith, all registrations and recordations thereof and all applications in connection therewith.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Illinois.

"United States" and "U.S." each means the United States of America.

"U.S. Lender Party" means each of the Agent, each Lender, each L/C Issuer, each SPV and each participant, in each case that is a United States person under and as defined in Section 7701(a)(30) of the Code.

"Wholly-Owned Subsidiary" means any Subsidiary in which (other than directors' qualifying shares required by law) one hundred percent (100%) of the Stock and Stock Equivalents, at the time as of which any determination is being made, is owned, beneficially and of record, by any Credit Party, or by one or more of the other Wholly-Owned Subsidiaries, or both.

"Withdrawal Liabilities" means, at any time, any liability incurred (whether or not assessed) by any ERISA Affiliate and not yet satisfied or paid in full at such time with respect to any Multiemployer Plan pursuant to Section 4201 of ERISA.

11.2   Other Interpretive Provisions.

(a) Defined Terms.  Unless otherwise specified herein or therein, all terms defined in this Agreement or in any other Loan Document shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.  The meanings of defined terms shall be equally applicable to the singular and plural forms of the defined terms. Terms (including uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the meanings therein described.

(b) The Agreement.  The words "hereof", "herein", "hereunder" and words of similar import when used in this Agreement or any other Loan Document shall refer to this Agreement or such other Loan Document as a whole and not to any particular provision of this Agreement or such other Loan Document; and subsection, section, schedule and exhibit references are to this Agreement or such other Loan Documents unless otherwise specified.

(c) Certain Common Terms.  The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.  The term "including" is not limiting and means "including without limitation."

(d) Performance; Time.  Whenever any performance obligation hereunder or under any other Loan Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including."  If any provision of this Agreement or any other Loan Document refers to any action taken or to be taken by any Person, or which such Person is prohibited from taking, such provision shall be interpreted to encompass any and all means, direct or indirect, of taking, or not taking, such action.

(e) _Contracts_.  Unless otherwise expressly provided herein or in any other Loan Document, references to agreements and other contractual instruments, including this Agreement and the other Loan Documents, shall be deemed to include all subsequent amendments, thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document.

(f) _Laws_.  References to any statute or regulation are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

11.3  _Accounting Terms and Principles_.  All accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in accordance with GAAP.

11.4  _Payments_.  The Agent may set up standards and procedures to determine or redetermine the equivalent in Dollars of any amount expressed in any currency other than Dollars and otherwise may, but shall not be obligated to, rely on any determination made by any Credit Party or any L/C Issuer.  Any such determination or redetermination by the Agent shall be conclusive and binding for all purposes, absent manifest error.  No determination or redetermination by any Secured Party or any Credit Party and no other currency conversion shall change or release any obligation of any Credit Party or of any Secured Party (other than the Agent and its Related Persons) under any Loan Document, each of which agrees to pay separately for any shortfall remaining after any conversion and payment of the amount as converted.  The Agent may round up or down, and may set up appropriate mechanisms to round up or down, any amount hereunder to nearest higher or lower amounts and may determine reasonable de minimis payment thresholds.

[Balance of page intentionally left blank; signature page follows.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

ADS LOGISTICS, LLC

By:
Title:

FEIN:

Address for notices:

_____
_____
_____
Attn: _____
Facsimile: _____

Address for Wire Transfers:

_____
_____
_____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

ALTERNATIVE DISTRIBUTION SYSTEMS, INC.

By:
Title:

FEIN:

Address for notices:

_____
_____
_____
Attn: _____
Facsimile: _____

MAY LOGISTICS, INC.

By:
Title:

FEIN:

Address for notices:

_____
_____
_____
Attn: _____
Facsimile: _____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

GENERAL ELECTRIC CAPITAL
CORPORATION, as the Agent, as an L/C Issuer
and as a Lender

By: _____
Title:  Its Duly Authorized Signatory

Address for Notices:

General Electric Capital Corporation
500 West Monroe Street
Chicago, Illinois 60661
Attn: _____ Account Officer
Facsimile:  (312) 441-7211

With a copy to:

General Electric Capital Corporation
201 Merritt 7
P.O. Box 5201
Norwalk, Connecticut 06851
Attn:  General Counsel-Global Sponsor Finance
Facsimile:  (203) 956-4216

and

General Electric Capital Corporation
500 West Monroe Street
Chicago, Illinois 60661
Attn:  Corporate Counsel-Global Sponsor Finance
Facsimile:  (312) 441-6876

Address for payments:

ABA No. 021-001-033
Account Number 50279791
Deutsche Bank Trust Company Americas
New York, New York
Account Name:  GECC/CAF DEPOSITORY
Reference:  CFN___/May Logistics

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written

REGIMENT CAPITAL SPECIAL SITUATIONS
FUND III, L.P., as a Lender

By: Regiment Capital GP, LLC
     its General Partner

By: _____

Title:_____

Address for notices:

Lending office:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written

GLOBAL LEVERAGED CAPITAL CREDIT
OPPORTUNITY FUND I, as a Lender

By: Global Leveraged Capital Management, LLC,
as a Collateral Manager

By: _____

Title:_____

Address for notices:

Lending office:

Schedule 1.1(a)

Revolving Loan Commitments

General Electric Capital Corporation:

After entry of the Interim Order but prior to entry of the Final Order, [$_____], and after entry of the Final Order, [$_____]

Regiment Capital Advisors, LLC:

After entry of the Interim Order but prior to entry of the Final Order, [$_____], and after entry of the Final Order, [$_____]

Global Leveraged Capital Credit Opportunity Fund I:

After entry of the Interim Order but prior to entry of the Final Order, [$_____], and after entry of the Final Order, [$_____]