## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Alternative Distribution Systems, Inc., *et al.*[1] | ) | Case No. 09-_____ ( ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**MOTION OF DEBTORS FOR ORDERS: (A)(I) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) SCHEDULING A HEARING TO CONSIDER THE SALE OF ASSETS, (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (IV) APPROVING EXPENSE REIMBURSEMENT; (B)(I) APPROVING THE ASSET PURCHASE AGREEMENT, (II) AUTHORIZING AND APPROVING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (III) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or "Sellers"), through their undersigned counsel, submit this motion (the "Motion"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of orders: (A)(I) approving bidding procedures in connection with the sale of substantially all of the Debtors' assets, (II) scheduling a hearing to consider the sale of assets, (III) approving the form and manner of notice thereof, and (IV) approving expense reimbursement; (B)(I) authorizing and approving the sale of assets free and clear of liens, claims, encumbrances and interests, and (II) approving the assumption and assignment of executory contracts and unexpired leases; and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Alternative Distribution Systems, Inc. (2412); May Logistics Services, Inc. (4970); and ADS Logistics, LLC (0782).

(C) granting related relief.  In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363, 365, 503 and 507, as supplemented by Bankruptcy Rules 2002, 6004, 6006 and 9014.

## BACKGROUND

2.    On the date hereof (the "Petition Date"), Alternative Distribution Systems, Inc. and two of its affiliates each filed a voluntary petition for relief under title 11 of the Bankruptcy Code, commencing the Debtors' chapter 11 cases (the "Chapter 11 Cases").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases and, as of the date of the filing of this Motion, no official committees have been appointed or designated.  Concurrently herewith, the Debtors filed a motion seeking joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

3.    The factual background relating to the Debtors' commencement of these Chapter 11 Cases is set forth in detail in the *Declaration of Timothy M. May, Chief Operating Officer of each of the Debtors, in Support of First Day Pleadings* (the "May Declaration") filed on the Petition Date and incorporated herein by reference.

2

## DEBTORS' DECISION TO SELL THE PURCHASED ASSETS

4.     As described in more detail in the May Declaration, the Debtors are facing severe liquidity constraints as a result of the downturn in the automotive industry together with a confluence of other macroeconomic factors leading to a general decrease in the manufacture of durable goods.  As a result, the Debtors do not have the financial wherewithal to continue to operate their businesses throughout a prolonged chapter 11 process.

5.     Given the Debtors' need to reduce their debt load and interest expense, and the Debtors' increasing concerns about the potential deterioration of their businesses — and concomitant degradation in value — due to rumors in the marketplace regarding the Debtors' liquidity and viability, the Debtors have determined that the value of their estates would best be maximized and preserved through a sale process.  Accordingly, the Debtors have negotiated a going-concern sale of their businesses and assets to their First Lien Lenders in the form of a credit bid and commenced these Chapter 11 Cases to implement that sale pursuant to section 363 of the Bankruptcy Code, subject to a competitive sale process and the solicitation of higher and/or otherwise better offers.  The Debtors believe that, unless a sale is expeditiously consummated, whether to the Buyer (as defined below) or to a purchaser submitting a higher or otherwise better offer, there will be significant value deterioration.  Indeed, the Debtors' businesses are of a type that cannot endure a prolonged stay in chapter 11 without significant risk to the Debtors' survival.  Accordingly, a prompt sale is essential to a successful result in these cases.

CURRENT 15545314v6

6.     In furtherance of this objective, the Debtors negotiated with their First Lien Lenders the terms and conditions of an Asset Purchase Agreement (the "Stalking Horse APA")[2] to be executed by the Debtors and the First Lien Lenders, who shall have the right to assign their bid and designate, an acquisition vehicle to be formed by the First Lien Lenders,[3] as the purchaser (the First Lien Lenders and such acquisition vehicle, if applicable, the "Buyers" or "Buyer"), for the sale of substantially all of the Debtors' assets (as more specifically identified in the Stalking Horse APA, the "Purchased Assets") to the Buyer, free and clear of all liens, claims, encumbrances and other Interests (as defined below) other than those expressly assumed by the Buyer. Any such non-assumed Interests against or in the Purchased Assets will attach to the net proceeds of the sale, in the order of priority and with the same validity, force and effect that such interests may now have against such assets.

7.     To obtain the maximum value for the Purchased Assets, the Debtors propose to subject the sale of the Purchased Assets to an auction process with the Stalking Horse APA serving as a basis for all future bids. In connection with the auction process, the Debtors agreed to grant the Buyer certain bidding protections, including an expense reimbursement not to exceed $500,000 (the "Expense Reimbursement"). If no other bids are received for the Purchased Assets that are higher or otherwise better than the transaction set forth in the Stalking Horse APA, the Debtors intend to sell the Purchased Assets to the Buyer pursuant to the terms of the Stalking Horse APA.

---

[2] A copy of the Stalking Horse APA, in substantially final form but excluding schedules and exhibits, is annexed hereto as Exhibit A. Parties in interest may obtain a complete copy of the Stalking Horse APA upon written request directed to the Debtors' counsel and entry into appropriate confidentiality arrangements.

[3] It is anticipated that a minority portion of the equity interests in the contemplated acquisition vehicle will be held by the party with a second lien interest in the Debtors' assets. Information pertinent to such equity interest can be obtained from counsel to the Senior Lenders upon request.

4

8. The sale of the Purchased Assets is subject to this Court's approval and the auction process proposed herein. The Debtors believe that the sale of the Purchased Assets will maximize the value of their estates for the benefit of their creditors and other interested parties.

## SUMMARY OF RELIEF REQUESTED

9. The Debtors seek, pursuant to sections 105, 363, 365, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014, the Court's approval of (i) the sale of the Purchased Assets pursuant to the Stalking Horse APA free and clear of Interests, or the right to consummate a higher or otherwise better offer or transaction (a "Alternate Transaction") with an alternate buyer (an "Alternate Buyer"), (ii) the institution of certain bidding, auction and notice procedures for the solicitation and consideration of competing offers for the Purchased Assets, including the Expense Reimbursement payable to the Buyer (collectively, the "Bidding Procedures," attached hereto as Schedule 1 to the Bidding Procedures Order (as defined below)), and (iii) the assumption, assignment and/or transfer of certain executory contracts to the Buyer or, alternatively, to such other Successful Bidder (as defined in the Bidding Procedures). In order to preserve the value of their business as a going concern, the Debtors request that the Court enter the Bidding Procedures Order no later than 15 days after the Petition Date (which is September 17, 2009) and the Sale Order (as defined below) no later than 45 days after the Petition Date (which is October 19, 2009).

10. More specifically, through this Motion, the Debtors request that the Court enter the following orders:

(i)     The Bidding Procedures Order: An order (the "Bidding Procedures Order," in substantially the form attached hereto as Exhibit B) approving (i) the Bidding Procedures, (ii) the Expense Reimbursement provision of the Stalking Horse APA; (iii) the notice (the "Notice of Auction and Sale Hearing") establishing the dates, times, and locations of the deadline to bid on the Purchased Assets, the auction of the Purchased Assets (the "Auction") and the sale hearing for the Purchased Assets (the "Sale Hearing") pursuant to the dates proposed in the

5

Bidding Procedures Order, subject to the Court's availability; and (iv) the notice (the "Notice of Assumption and Assignment") of the Debtors' intent to assume, assign and/or transfer to the Buyer or, alternatively, to such other Successful Bidder, the contracts, commitments, leases, licenses, permits, purchase orders, and any other executory contracts and unexpired leases (collectively, the "Executory Contracts and Unexpired Leases"), and the corresponding cure amounts required to be paid in connection with such assumption, assignment and/or transfer.

(ii) The Sale Order: Following the Auction (if any), an order (the "Sale Order," in substantially the form attached hereto as Exhibit C) for the approval of (i) the sale of the Purchased Assets free and clear of Interests, and (ii) the assumption, assignment, and/or transfer of the Executory Contracts and Unexpired Leases to the Buyer or, alternatively, to such other Successful Bidder under the Bidding Procedures.

11.     The sale of the Debtors' businesses and assets must occur quickly. The Debtors believe that every day spent in chapter 11 increases the real and palpable risk of business loss and value deterioration. The Debtors' business is not the type of business that can survive a prolonged stay in chapter 11. The Debtors employ an "asset light" business model. As such, the Debtors' primary assets are their business relationships with their customers. Thus, in order to maximize value and ensure a successful result in these cases, a prompt and orderly sale of the Purchased Assets must take place. Moreover, the Debtors do not have sufficient cash on hand to fund operations through a protracted reorganization process. Absent a prompt sale pursuant to the procedures and timelines proposed, the Debtors believe that the going concern value of the Purchased Assets will be significantly compromised, and that their very viability will be at significant risk.

12.     The Debtors expressly reserve the right to modify the relief requested in this Motion, including the proposed Bidding Procedures, prior to or at the applicable hearing.

CURRENT 15545314v6

## THE STALKING HORSE APA[4]

13.     Following discussions and negotiations, the Debtors and the Buyer agreed to the terms of the Stalking Horse APA for the purchase of the Purchased Assets. Generally, the Stalking Horse APA involves a joint bid submitted by the First Lien Lenders, who may assign their rights and obligations under the Stalking Horse APA to an entity owned in whole or in part by such First Lien Lenders, comprised of: (i) the assumption or payment by the Buyer of (a) the Debtors' obligations under the DIP Facility[5] and (b) the Transaction Costs; [6] (ii) a credit bid of the First Lien Lender's claims under the First Lien Credit Agreement, pursuant to section 363(k) of the Bankruptcy Code, in the initial amount equal to $21,000,000; and (iii) the assumption by the Buyer (or at the option of the First Lien Lenders, one or more subsidiaries of the Buyer) of the Assumed Liabilities (as defined below).

14.     The significant terms of the Stalking Horse APA are:

(i)     **Purchased Assets:** Pursuant to <u>Section 2.1</u> of the Stalking Horse APA, and upon the terms and subject to the conditions of thereof, on the Closing Date, Sellers shall sell, transfer, assign, convey and deliver to Buyers, and Buyers shall purchase from Sellers, free and clear of all Encumbrances (except Permitted Encumbrances), all right, title and interest in, to and under all of the assets, rights and properties of Sellers related to the Business (other than the Excluded Assets) existing as of the Closing Date, real or personal, tangible or intangible, including but not limited to the following (collectively, the "<u>Purchased Assets</u>"):

---

[4]     The following is a summary of the terms set forth in the Stalking Horse APA annexed hereto as <u>Exhibit A</u>. Capitalized terms used but not defined in this section have the meanings given to them in the Stalking Horse APA. To the extent that this summary differs in any way from the terms set forth in the Stalking Horse APA, the terms of the Stalking Horse APA shall control.

[5]     By motion filed concurrently herewith, the Debtors are seeking entry of an emergency interim order (the "<u>Interim DIP Order</u>") and a final order (the "<u>Final DIP Order</u>") authorizing the Debtors to enter into a credit agreement (the "<u>DIP Credit Agreement</u>") for debtor in possession financing (the "<u>DIP Facility</u>"), grant senior liens, junior liens and superpriority administrative expense status, use cash collateral, and provide "adequate protection" to certain prepetition secured lenders.

[6]     "<u>Transaction Costs</u>" means an amount equal to all of the Debtors' out-of-pocket costs and expenses, as contemplated by the DIP Credit Agreement budget, incurred at or before Closing related to consummating the sale and transfer of the Purchased Assets to the Buyer, including without limitation Cure Amounts, but excluding the DIP Carve-Out Amount and the Senior Lender Costs. The Transaction Costs shall not exceed the amounts set forth in the DIP Credit Agreement budget.

(a)     Any and all real property owned by any Seller (the "Owned Real Property");

(b)     Any and all (i) owned personal property, including all computers, furniture, fixtures, machinery, tools, supplies, equipment, improvements, signage and other tangible personal property owned by Sellers (collectively, the "Owned Personal Property"), (ii) leased personal property, including all computers, furniture, fixtures, machinery, tools, supplies, equipment, improvements, signage and other tangible personal property which are leased by Sellers pursuant to an Assumed Contract (collectively, the "Leased Personal Property," and together with the Owned Personal Property, the "Personal Property"), and (iii) rights of Sellers to the warranties, express or implied, and licenses received from manufacturers, sellers and lessors of the Personal Property;

(c)     All supplies, items, spare parts, replacement and component parts and office and other materials and tangible items used, held for use or necessary to operate and maintain the Personal Property (the "Supplies");

(d)     Any and all (i) cars, trucks, forklifts, other industrial vehicles and other motor vehicles owned by Sellers and (ii) cars, trucks, forklifts, other industrial vehicles and other motor vehicles leased by Sellers pursuant to an Assumed Contract;

(e)     All Software owned by Sellers or leased or licensed by Sellers pursuant to an Assumed Contract;

(f)     All web sites owned or licensed by Sellers, including the URL addresses and related domain names;

(g)     All goodwill associated with the Business and/or the Purchased Assets;

(h)     All accounts receivable of Sellers;

(i)     All Real Property Leases of Sellers designated by Buyers in accordance with Section 2.2 of the Stalking Horse APA to be assumed and assigned to Buyers pursuant to the Sale Order (the "Assumed Leases"), together with all security deposits related thereto and all permanent fixtures, improvements and appurtenances thereto and associated with such Assumed Leases;

(j)     All Contracts of Sellers designated by Buyers in accordance with Section 2.2 of the Stalking Horse APA to be assumed and assigned to Buyers pursuant to the Sale Order (together with the Assumed Leases, the "Assumed Contracts"), together with all security deposits related thereto and the right to receive income in respect of such Assumed Contracts on or after the Closing Date, and any causes of action relating to breaches of the Assumed Contracts prior to the Closing;

8

(k)     (i) all rights in and to Intellectual Property rights owned or licensed by Sellers to the broadest extent Sellers are permitted by law to transfer such Intellectual Property (the "Purchased Intellectual Property") and (ii) to the extent such Intellectual Property may not be transferred to Buyers, each Seller shall be deemed to have granted to Buyers an exclusive, royalty free right and license to use the Intellectual Property from and after the Closing Date, to the broadest extent permitted by law and not prohibited by the terms of the applicable Contract;

(l)     All of Sellers' Cash and all of Sellers' right, title and interest in and to all deposit or similar accounts, including security deposits, in which Sellers deposit Cash, all rights and interests of any Seller in any letters of credit, prepayments and enhancements;

(m)     All Documents that are used in, held for use in or intended to be used in the Business and operations of Sellers, including Tax Returns, financial statements, Documents relating to services of Sellers, marketing, advertising, promotional materials, Documents relating to Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), customer lists, records, literature and correspondence, whether or not physically located on Leased Real Property;

(n)     All Permits used by Sellers that relate to the Purchased Assets, to the extent assignable (the "Assigned Permits");

(o)     All insurance policies and all rights of every nature and description under or arising out of such policies prior to Closing, except as provided in Section 2.3(e) of the Stalking Horse APA;

(p)     Any rights, claims, credits or causes of action or rights of set off of Sellers against third parties arising out of events occurring prior to the Closing Date, including any rights under or pursuant to the Assumed Contracts, Assumed Liabilities, any and all warranties, representations, guarantees, indemnities, avoidance claims and causes of action under the Bankruptcy Code or other Requirements of Law (including all rights and avoidance claims of Sellers arising under Chapter 5 of the Bankruptcy Code) and similar rights, excluding only the rights, claims and causes of action that are identified as Excluded Assets in Section 2.3 of the Stalking Horse APA;

(q)     All rights under the Asset Purchase Agreement, dated as of July 17, 2009, by and between iSG2 Technologies, Inc. and ADS Logistics and the ancillary documents thereto, including the warrants to purchase non-voting common stock and the note issued to a Seller thereunder;

(r)     All fuel inventory;

(s) All refunds of premiums, or receivables for such refunds, in connection with the Terminated Policies;

(t) only if Buyers make the election set forth in Section 8.10(b) of the Stalking Horse APA, all of the equity interests of all of the New Subsidiaries; and

(u) All other tangible or intangible assets or properties not expressly identified as Excluded Assets.

(ii) **Excluded Assets:** Pursuant to Section 2.3 of the Stalking Horse APA, the Purchased Assets shall not include the following (collectively, the "Excluded Assets"):

(a) All Excluded Contracts (including, for the avoidance of doubt, any Real Property Leases that are not Assumed Leases);

(b) All receivables, claims or causes of action related exclusively to any Excluded Assets;

(c) All Employee Plans and all fiduciary liability policies, benefit administration contracts, actuarial contracts, trusts, escrows, surety bonds, letters of credit and other contracts primarily relating to any Employee Plan, except for any employment or severance agreements expressly identified by Buyers on Schedule 2.2(a)(2) of the Stalking Horse APA;

(d) All rights under insurance policies relating to claims for losses related exclusively to any Excluded Asset;

(e) All Documents exclusively related to any Excluded Asset;

(f) Any amounts that a Seller is entitled to in connection with all prepaid expenses, letters of credit, security deposits or claims with respect to any Excluded Contracts;

(g) Any minute books, stock ledgers, corporate seals and stock certificates of Sellers, and other similar books and records that Sellers are required by law to retain or that Sellers determine are reasonably necessary to retain including corporate or other entity filings; provided that Sellers shall provide Buyers reasonable access to any Excluded Asset described in this subclause (g) that is related to the Business or the Purchased Assets; and

(h) Any rights of Sellers under the Stalking Horse APA.

(iii) **Purchase Price:** Pursuant to Section 3.1 of the Stalking Horse APA, the aggregate consideration and purchase price (the "Purchase Price") for the sale, transfer, assignment and conveyance of the Purchased Assets will be (a) the assumption by Buyers or payment by Buyers, at their election, of the DIP Carve-

Out Amount, (b) the payment by Buyers, on behalf of Sellers, of the Transaction Costs to the extent unpaid at Closing, (c) the payment by Buyers, on behalf of Sellers, of the DIP Obligations, (d) the waiver and relinquishment by the Senior Lenders of the Senior Lender Claims in an amount equal to $21,000,000, effective upon Closing through the Mutual Waiver and Release and (e) the assumption by Buyers of the Assumed Liabilities, effective upon Closing through the Assumption and Assignment Agreement.

(iv) **Assumed Liabilities:** Pursuant to Section 2.4 of the Stalking Horse APA, and upon the terms and subject to the conditions set forth therein, at the Closing, Buyers shall assume, and thereafter pay, perform and discharge when due (in accordance with their respective terms and subject to the respective conditions thereof), only the following liabilities (the "Assumed Liabilities") and no others:

    (a) All obligations of Sellers under the Assumed Contracts arising after the Closing Date, except to the extent such obligations, but for a breach or default by any Seller, would have been paid, performed or otherwise discharged on or prior to the Closing Date or to the extent the same arise out of any such breach or default;

    (b) All Postpetition Obligations;

    (c) All Senior Lender Costs;

    (d) The DIP Carve-Out Amount (as defined in the Interim and/or Final DIP Order) including budgeted and unpaid professional fees, solely in the event and to the extent Buyers do not elect to pay such amount on the Closing Date in accordance with Section 3.2 of the Stalking Horse APA; and

    (e) All other liabilities expressly set forth on Schedule 2.4(e) of the Stalking Horse APA;

(v) **Excluded Liabilities:** Pursuant to Section 2.5 of the Stalking Horse APA, and notwithstanding anything contained therein to the contrary, none of the Buyers shall assume or be obligated to pay, perform or otherwise discharge any other liability or obligation of Sellers whatsoever or any liabilities or obligations constituting an Encumbrance upon the Purchased Assets, regardless of whether any such liabilities or obligations are absolute or contingent, known or unknown, liquidated or unliquidated, or otherwise. Sellers shall remain liable for all liabilities or obligations other than the Assumed Liabilities (collectively, the "Excluded Liabilities"), including any liabilities or obligations arising prior to Closing, including under any Assumed Contract, any liabilities and obligations related to any Excluded Assets, any liabilities and obligations arising under the Excluded Contracts and all liabilities and obligations in respect of Taxes for which Sellers are liable pursuant to Section 8.3 of the Stalking Horse APA.

11

Without limiting the generality of the foregoing, in no event shall any Buyer assume any of the following liabilities or obligations:

(a)     All liabilities and obligations of any Seller relating to Excluded Assets;

(b)     All liabilities and obligations of any Seller for: (i) payments made to or fees and expenses accrued with respect to professionals retained or employed in connection with the Chapter 11 Cases or any official committee of creditors appointed in the Chapter 11 Cases, except to the extent specifically assumed pursuant to Section 2.4 of the Stalking Horse APA, (ii) reclamation Claims and (iii) any prepetition, priority or other Tax Claims;

(c)     Any liability or obligation of Sellers or their directors, officers, stockholders or agents, arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including, without limitation, all finder's or broker's fees and expenses and any and all fees and expenses of any representatives of Sellers;

(d)     Any liability or obligation relating to (i) events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or (ii) the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business);

(e)     Any liability or obligation to any Person at any time employed by Sellers or Affiliates or their predecessors-in-interest at any time or to any such Person's spouse, children, other dependents or beneficiaries, including with respect to incidents, events, exposures or circumstances occurring at any time during the period or periods of any such Person's employment by Sellers or their predecessors-in-interest, whenever such claims mature or are asserted, including, without limitation, all liabilities arising (i) under the Employee Plans, any other employment, change in control, termination, severance or similar agreement, (ii) under any employment, wage and hour law or restriction, equal opportunity, discrimination, plant closing or immigration and naturalization laws, or any other applicable laws related to employment or termination thereof, (iii) under any collective bargaining laws, agreements or arrangements or (iv) in connection with any workers' compensation or any other employee health, accident, disability or safety claims;

(f)     any liability or obligation of Sellers under Title IV of ERISA;

(g)     any liability or obligation of Sellers under COBRA;

(h) any incentive compensation, bonus, change in control, severance, pension or retirement liability or obligation of any Seller to its current or former employees whether or not accrued as of the Closing Date, whether or not under any Employee Plan, unless expressly identified on Schedule 2.4(e) of the Stalking Horse APA as an Assumed Liability;

(i) any liability or obligation of any Seller, or any member of any consolidated, affiliated, combined or unitary group of which any Seller is or has been a member, for (i) Taxes, or (ii) Taxes of any Person, pursuant to an agreement or otherwise;

(j) any liability or obligation incurred by (i) Sellers or (ii) their respective directors, officers, stockholders, agents or employees after the Closing Date;

(k) any liability of Sellers to any Person on account of any proceeding, including those proceedings set forth on Schedule 5.16 of the Stalking Horse APA;

(l) any liability or obligation arising out of the conduct of the Business prior to the Closing Date or arising out of the ownership or operation of an Excluded Asset;

(m) any liability or obligation of Sellers under any Indebtedness, including, without limitation, any Indebtedness owed to any stockholder or other Affiliate of any Seller, and any Contract evidencing any such financing arrangement;

(n) any liability or obligation, whether known or unknown, (i) under Environmental Laws attributable or relating to or incurred as a result of any acts, omissions, or conditions first occurring or in existence as of or prior to the Closing Date, including, but not limited to, any liability or obligation with respect to the release, handling, discharge, treatment, storage, generation, disposal, or presence of Hazardous Substances at any location (it being understood that Buyers shall be responsible for any liability or obligation arising out of or relating to its actions following the Closing), (ii) with respect to claims relating to health and safety, including claims for injury, sickness, disease or death of any Person (to the extent relating to or incurred as a result of any acts, omissions, or conditions first occurring or in existence as of or prior to the Closing Date ) or (iii) with respect to compliance with any legal requirement relating to any of the foregoing, to the extent relating to periods prior to the Closing; and

(o) fees or expenses of Sellers incurred with respect to the transactions contemplated herein, except to the extent that Buyers elect to treat the DIP Carve-Out Amount as an Assumed Liability in accordance with Section 3.2 of the Stalking Horse APA.

13

(vi) **Employees:** Section 8.1 of the Stalking Horse APA provides that:

(a) Unless otherwise agreed to by Buyers, between the date the Stalking Horse APA is entered into and Closing, each Seller shall use its commercially reasonable efforts to continue to employ all of the Business Employees, subject to normal workplace practices and discipline. In addition, between the date the Stalking Horse APA is entered into and Closing, Sellers shall inform Buyers if any such Business Employee has terminated or given notice of their intent to terminate employment.

(b) Between the date the Stalking Horse APA is entered into and Closing, Buyers may interview some or all of Sellers' employees to determine whether to offer employment to any of them (all of the Business Employees who accept such an offer and actually commence employment with Buyers after the Closing Date, the "Transferred Employees"). Buyers shall have no obligation to hire any Business Employee.

(c) Nothing contained in the Stalking Horse APA shall be considered or construed as an agreement to employ any Business Employee for any period of time. Except as specifically provided for in the Stalking Horse APA, Buyers assume no obligation with respect to any of Sellers' employees, whether hired by a Buyer or not, for any benefit, perquisite or remuneration accrued or earned while under Sellers' employ. Without limiting the generality of the foregoing, Buyers shall have no obligation or liability for such employees' accrued vacation time, bonuses, awards, commissions, salaries, reimbursements of any kind, health or disability benefit, insurance, severance pay, pension or profit sharing interests or any other benefits, compensation or remuneration of any nature whatsoever.

(d) No provision of Section 8.1 of the Stalking Horse APA shall create any third party beneficiary or other rights in any Business Employee (including any beneficiary or dependent thereof, and further including the Transferred Employees) of Sellers or of any of their Affiliates in respect of employment with any Buyer or any of their Affiliates, and no provision of Section 8.1 of the Stalking Horse APA shall create any rights in any such Persons in respect of any benefits that may be provided, directly or indirectly, under any Employee Plan or any plan or arrangement which may be established by any Buyers or any of their Affiliates. No provision of the Stalking Horse APA shall constitute a limitation on rights to amend, modify or terminate after Closing any such plans or arrangements of any Buyers or any of their Affiliates.

(vii) **Preservation of Records and Access to Information:** Sellers shall retain any minute books, stock ledgers, corporate seals and stock certificates of Sellers, and other similar books and records that Sellers are required by law to retain or that Sellers determine are reasonably necessary to retain including corporate or other entity filings pursuant to Sections 2.3(g) and 8.8 of the Stalking Horse APA.

14

(viii) **Expense Reimbursement**: Pursuant to <u>Section 7.2</u> of the Stalking Horse APA, Sellers agree, in the event that the Bankruptcy Court enters an order that becomes final approving a transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of the Purchased Assets to a purchaser or purchasers other than Buyers (an "<u>Alternate Buyer</u>") or effecting any other transaction (including a plan of reorganization, refinancing or liquidation) the consummation of which would be substantially inconsistent with the transactions contemplated hereby (any such transaction (or series of transactions) an "<u>Alternate Transaction</u>"), Sellers shall owe to Buyers an amount equal to all of the out-of-pocket expenses, up to a total of $500,000, incurred by Buyers or their Affiliates in connection with the transactions contemplated by the Stalking Horse APA (the "<u>Expense Reimbursement</u>"), which amount shall be paid immediately upon entry of the order approving such Alternate Transaction, in each case, without further order of the Bankruptcy Court. The Expense Reimbursement is intended to compensate Buyers and their Affiliates for the time and expense dedicated to this transaction and the value added by Buyers and their Affiliates in (i) establishing a bid standard or minimum for other bidders, (ii) placing Sellers' estate property in a sales configuration mode attracting other bidders to the auction and (iii) for serving, by its name and its expressed interest, as a catalyst for other potential or actual bidders. The Expense Reimbursement shall constitute an allowed super priority administrative claim against Sellers' estates under Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

(ix) **Termination**: Pursuant to <u>Section 10.1</u> of the Stalking Horse APA, and notwithstanding anything contained therein to the contrary, the Stalking Horse APA may be terminated at any time prior to the Closing Date as follows:

    (a)    by the mutual written consent of Buyers and Sellers;

    (b)    by Buyers if the Sale Procedures Order shall not have been entered by the Bankruptcy Court in substantially the form attached to the Stalking Horse APA as <u>Exhibit E-1</u> without modification or the imposition of any conditions or limitations with respect thereto (except for such immaterial modifications, conditions or limitations which do not individually or in the aggregate adversely affect Buyers) on or prior to the 15th calendar day following the date of the Petition Date;

    (c)    by Buyers if the Sale Order shall not have been entered by the Bankruptcy Court in substantially the form attached to the Stalking Horse APA as <u>Exhibit E-2</u> approving the Stalking Horse APA and the transactions contemplated thereby without modification or the imposition of any conditions or limitations with respect thereto (except for such immaterial modifications, conditions or limitations which do not individually or in the aggregate adversely affect Buyers) on or prior to the 50th calendar day following the Petition Date;

15

(d)      by Buyers in the event of any material breach by any Seller of any of Sellers' agreements, covenants, representations or warranties contained herein and such material breach is incapable of being cured or, if capable of being cured, shall not have been cured within fifteen (15) days following receipt by such Seller of notice of such material breach from Buyers;

(e)      by Sellers in the event of any material breach by any Buyer of any of Buyers' agreements, covenants, representations or warranties contained herein and such material breach is incapable of being cured or, if capable of being cured, shall not have been cured within fifteen (15) days following receipt by such Buyer of notice of such material breach from Sellers;

(f)      by Buyers, if Sellers' Chapter 11 Cases are (i) dismissed, (ii) converted to Chapter 7 or (iii) a trustee is appointed with respect to any Seller;

(g)      by Buyers, if (i) the DIP Credit Agreement is terminated or (ii) if any Seller is in default or breach of the DIP Credit Agreement, or a condition precedent to its borrowing thereunder has not been satisfied, and such default, breach or condition precedent is not waived and materially limits any Seller's ability to borrow funds thereunder; unless, in each case, such Seller obtains substitute financing on terms that are not materially less favorable to such Seller than the terms of the DIP Credit Agreement;

(h)      by either Buyers, on the one hand, or Sellers, on the other hand, if (a) an Alternate Transaction is consummated, or (b) the Bankruptcy Court shall have approved an Alternate Transaction; provided however, that if Buyers are the "Back-up Bidder" (as defined in the Sale Procedures Order), neither Buyers nor Sellers will terminate this Agreement, pursuant to this Section 10.1(h), until fifteen (15) days after entry of the order approving such Alternate Transaction;

(i)      by either Buyers or Sellers if any Governmental Body (as defined in the Stalking Horse APA) shall have issued a final and nonappealable order, decree or ruling permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; or

(j)      by either Buyers or Sellers if the Closing shall not have occurred on or before sixty (60) days after the Petition Date (or such later date as may be mutually agreed to in writing by Buyers and Sellers); provided, that the party seeking to exercise such right of termination has not breached its obligations hereunder.

(x)      **DOT Matters.** Section 8.10 of the Stalking Horse APA provides that:

(a)      Without limiting the obligations imposed by Section 8.5 of the Stalking Horse APA, Buyers shall, with the assistance and cooperation of Sellers,

16

use their reasonable best efforts to obtain either consents to the Transfer or replacements of the Required Material Permits (as defined below).

(b) Upon Buyers' election, which shall be made in writing and delivered to Sellers no less than six business days prior to the Closing Date, the Buyers and Sellers shall take the following actions on or prior to the Closing Date (provided that the parties may mutually agree to amend such actions from time to time): (a) approximately three to five days prior to the Closing (i) Sellers shall form one or more wholly owned subsidiaries of Sellers with names provided by Buyers (the "New Subsidiaries") and (ii) Buyers shall prepare and deliver, with the assistance and cooperation of Sellers, a Name Change Petition to the Federal Motor Carrier Safety Administration and/or the United States Department of Transportation (collectively, the "DOT") requesting that (A) the approval of the name change for the applicable material Permit (all of which are set forth on Schedule 8.10(b), collectively the "Required Material Permits") and (B) the name of the applicable New Subsidiary be reflected in the DOT's records with respect to the applicable Required Material Permit. Upon the granting of the petition, Buyers shall file a Form MCS 150 with the DOT to reflect the New Subsidiaries' name(s) and address(es) with respect to the applicable Required Material Permit. At the Closing, all of the equity interests of the New Subsidiaries will be transferred to the Buyers as Purchased Assets (unless the Buyers elect to exclude such Purchased Assets prior to the Closing

(xi) Subject to Court Approval: The Stalking Horse APA is subject to Court approval.

## ADDITIONAL LOCAL RULE 6004-1 DISCLOSURES

15. In addition to the terms of the Stalking Horse APA highlighted above, the Debtors wish to disclose the following terms of the proposed Sale pursuant to Local Rule 6004-1:

(i) **No Successor Liability:** The Debtors request that the Sale Order contain findings of fact and conclusions of law substantially as follows:

(a) The Buyer should not, and shall not, be liable for any of the Debtors' liabilities or for any claims, rights, or causes of action arising from or related to the Purchased Assets, except for and solely to the extent that such liabilities are expressly assumed pursuant to the Stalking Horse APA (the "Assumed Liabilities"). Pursuant to section 363(f) of the Bankruptcy Code, the Buyer is entitled to know that the Purchased Assets are not infected with latent claims that will be asserted against the Buyer after the Sale has been completed. Thus, the Buyer shall not be liable as a successor under any theory of successor liability for any Interests that arise from or relate to the Purchased Assets. Thus, other than with respect to the Assumed Liabilities, the Buyer shall not be liable as a successor

under any theory of successor liability for any Interests that arise from or relate to the Purchased Assets.

(b) As of the Closing Date, the transfer of the Purchased Assets to the Buyer will be a legal, valid, and effective transfer of the Purchased Assets and will vest the Buyer with all right, title, and interest of the Debtors in and to the Purchased Assets, free and clear of all liens (statutory or otherwise), pledges, mortgages, deeds of trust, security interests, claims, reclamation claims, charges, hypothecations, assignments, licenses, conditional sales or other retention agreements, liabilities, beneficial interests, options, rights of first or last refusal, options to purchase, priority or other security agreements or preferential arrangements of any kind or nature, rights of rescission (statutory or otherwise), causes of action, covenants, restrictions, easements, rights of setoff, defects in title or other encumbrances of any kind, including any claim as defined in Section 101(5) of the Bankruptcy Code, whether arising prior to or subsequent to the commencement of the Bankruptcy Case (but not subsequent to the Closing), and whether imposed by agreement, law, equity or otherwise, including, without limitation, any claims arising under doctrines of successor liability with respect to any of the Purchased Assets (collectively, the "Interests").

(c) The Buyer does not constitute a successor to the Debtors because: (i) except as otherwise set forth in the Stalking Horse APA, the Buyer is not expressly or impliedly agreeing to assume any of the Debtors' liabilities; (ii) the transactions contemplated by the Stalking Horse APA do not amount to a consolidation, merger or a de facto merger of the Debtors and any one or more of the Buyer or its affiliates; (iii) neither the Buyer nor its affiliates are a mere continuation of the Debtors; and (iv) the transactions contemplated by the Stalking Horse APA are not being entered into fraudulently or in order to escape liability from the Debtors' debts.

(d) Except as otherwise expressly provided for in the Sale Order or the Stalking Horse APA, neither the Buyer nor any of the Senior Lenders shall have any liability for any obligation of the Debtors arising under or related to any of the Purchased Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Sale Order or in the Stalking Horse APA, neither the Buyer nor any of the Senior Lenders shall be liable for any Interests against the Debtors or relating to any of the Purchased Assets, and neither the Buyer nor any of the Senior Lenders shall have any successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities

18

on account of any taxes arising, accruing or payable under, out of, in connection with, Purchased Assets prior to the Closing Date. The Buyer has agreed to provide substantial consideration to the Debtors under the Stalking Horse APA for the benefit of the holders of Interests. The consideration given by the Buyer constitutes valid and valuable consideration for the releases of any potential claims of successor liability against the Buyer, which releases shall be deemed to have been given in favor of the Buyer by all holders of Interests against the Debtors or the Purchased Assets.

(ii)     **Releases:** The Debtors request that the Sale Order contain findings of fact and conclusions of law substantially as follows:

    (a)     The Debtors and their estates, and their respective successors and assigns, including any chapter 7 trustee or chapter 11 trustee appointed in these chapter 11 cases, hereby waive, release, and forever discharge the Buyer, each of the Buyer's Affiliates and its respective trustees, officers, directors, employees, professionals, and agents (collectively, the "Released Parties") from and against any and all Interests, claims, liabilities, suits, debts, judgments and damages, of any kind whatsoever, whether matured or unmatured, foreseen or unforeseen, discoverable or undiscoverable, contingent or non-contingent, that the Debtors or their estates may have against the Released Parties based on any conduct, acts, or occurrences that arose prior to or as of the Closing Date, except for any claims expressly preserved under the Stalking Horse APA.

(iii)    **Sale to First Lien Lenders:** Local Rule 6004-1 requires that any sale motion that proposes a sale to an insider (as defined in section 101(31) of the Bankruptcy Code) contain a provision highlighting (a) the identify the insider, (b) describing the insider's relationship to the debtor and (c) setting forth any measures taken to ensure the fairness of the sale process and the proposed transaction. Pursuant to that certain Master Restructuring Agreement dated as of April 30, 2009 by and among the Debtors, Code Hennessy & Simmons III, L.P., William Blair Mezzanine Capital Fund II, L.P. and the First Lien Lenders, Debtors May Logistics Services, Inc. and Alternative Distribution Systems, Inc. each granted to the First Lien Lenders certain warrants for the purchase of non-voting common stock which is further convertible into voting common stock. The First Lien Lenders have not exercised the warrants and currently have no voting control over any of the Debtors. Accordingly, the Debtors do not believe that the First Lien Lenders or the Second Lien Lenders are insiders for the purposes of Local Rule 6004-1. Nevertheless, in an abundance of caution, the Debtors submit that the arm's-length nature of their negotiations with the First Lien Lenders regarding the terms of the Stalking Horse APA, together with the Debtors' marketing and proposed auction process for the sale of the Purchased Assets is sufficient to ensure the fairness of the sale of the Purchased Assets to the First Lien Lenders should they be deemed insiders of the Debtors.

CURRENT 15545314v6

## BIDDING PROCEDURES AND RELEVANT NOTICES

A.  Stalking Horse Bidding Procedures

16.     The Debtors believe the proposed Bidding Procedures, which are annexed as Schedule 1 to the Bidding Procedures Order, will maximize the realizable value of the Purchased Assets for the benefit of the Debtors' estates, creditors and other interested parties. The Bidding Procedures contemplate an auction process pursuant to which bids for the Purchased Assets will be subject to higher or otherwise better offers. While the Bidding Procedures afford the Buyer some measure of protection for its "stalking horse" bid by virtue of the Expense Reimbursement, they primarily benefit the Debtors by creating a bidding process that ensures, among other things: (i) structure and certainty to the process; (ii) the Debtors' ability to compare the relative values of competing offers, if any; (iii) that any potential Alternate Buyer has the financial wherewithal to timely consummate its purchase; and (iv) meaningful bidding increments. The Debtors seek to implement a competitive bidding process designed to maximize recovery for the benefit of their estates. As described below and more fully in the Bidding Procedures, only Qualified Bidders who timely submit Qualified Bids will be eligible to participate in the Auction. Specifically, the Bidding Procedures provide, in relevant part, as follows:[7]

(i)     Participation Requirements: In order to participate in the bidding process or otherwise be considered for any purpose hereunder, a person interested in the Purchased Assets (a "Potential Bidder") must first deliver the following materials to the Debtors and their counsel:

(a)     an executed confidentiality agreement in form and substance satisfactory to the Debtors and their counsel;

(b)     the most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder, or, if the Potential

---

[7]  The following description of the Bidding Procedures is a summary of the terms set forth in the Bidding Procedures annexed to the Bidding Procedures Order as Schedule 1. Capitalized terms used but not defined in this section have the meanings ascribed to them in the Bidding Procedures. To the extent that this summary differs in any way from the terms set forth in the Bidding Procedures, the terms of the Bidding Procedures shall control.

Bidder is an entity formed for the purpose of a sale transaction, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors that demonstrates the Potential Bidder's financial ability to consummate a competing sale transaction and (y) a written commitment acceptable to the Debtors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with a sale transaction (including being bound by the terms and conditions of the Bidding Procedures); _provided_ that if a Potential Bidder is unable to provide Financials, the Debtors may accept such other information sufficient to demonstrate to the Debtors' reasonable satisfaction that such Potential Bidder has the financial wherewithal to consummate a sale transaction. A Potential Bidder also must establish that it has the financial ability to consummate its proposed transaction within the timeframe contemplated for consummation of the Stalking Horse APA. A person meeting the requirements set forth in this paragraph shall be considered a "Qualified Bidder."

(ii)     Qualified Bid.  The Debtors shall determine whether a bid qualifies as a "Qualified Bid." To constitute a Qualified Bid, a bid (other than the Stalking Horse APA, which shall constitute a Qualified Bid) must be a written irrevocable offer from a Qualified Bidder and:

(a)     state that the Qualified Bidder offers to consummate the Sale pursuant to an agreement that is substantially similar to the Stalking Horse APA (or pursuant to an alternative structure that the Debtors determine is no less favorable to the Debtors than the terms and condition of the Stalking Horse APA) and has been marked to show amendments and modifications to the Stalking Horse APA, including price, assets to be purchased, and terms, that are being proposed by the Qualified Bidder, as applicable (the "Marked Purchase Agreement"). IF ANY BID IS CONDITIONED ON THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND/OR UNEXPIRED LEASES, THEN SUCH POTENTIAL BIDDER SHALL BE REQUIRED TO PROVIDE EVIDENCE OF ITS ABILITY TO PROVIDE ADEQUATE ASSURANCE OF FUTURE PERFORMANCE OF SUCH CONTRACTS OR LEASES ALONG WITH THE BID

(b)     be an all-cash bid; _provided_ that a bid need not be in cash for any amount in excess of the aggregate amount outstanding under the DIP Facility plus $21,000,000;

(c)     equal or exceed the consideration being paid by the Buyer pursuant to the Stalking Horse APA by $700,000, which is the sum of $500,000 (the maximum amount of the Expense Reimbursement) and $200,000;

(d)    contain a list of the Debtors' executory contracts and unexpired leases with respect to which the bidder seeks assignment from the Debtors (which may include some or all of the contracts and leases included in the Stalking Horse APA and some or all of the excluded contracts not included in the Stalking Horse APA);

(e)    confirm that the offer shall remain open and irrevocable as provided below;

(f)    enclose a copy of the proposed Marked Purchase Agreement;

(g)    be accompanied with a certified or bank check or wire transfer in an amount equal to $1.5 million as a minimum good faith deposit (the "Minimum Deposit"), which Minimum Deposit shall be used to fund a portion of the purchase price provided for in the bid;

(h)    be on terms that are not materially more burdensome or conditional than the terms of the Stalking Horse APA;

(i)    not be conditioned on obtaining financing or the outcome of any due diligence by the Qualified Bidder;

(j)    not request or entitle the Qualified Bidder to any break-up fee, expense reimbursement or similar type of payment; and

(k)    fully disclose the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

(iii)    <u>Bid Deadline and Submission</u>:  Bids must be received no later than 12:00 noon (prevailing Eastern Time) on [_____], **2009** (the "<u>Bid Deadline</u>") by: (i) Cole, Schotz, Meisel, Forman & Leonard, P.A., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 (Attn:  Norman L. Pernick, Esq.), co-counsel to the Debtors; (ii) Proskauer Rose LLP, 70 West Madison, Suite 3800, Chicago, Illinois 60602 (Attn:  Jeff J. Marwil, Esq. and Grayson T. Walter, Esq.), co-counsel to the Debtors; (iii) Alternative Distribution Systems, Inc., 116 East 1100 North, Chesterton, Indiana 46304 (Attn:  Timothy M. May); and (iv) the Office of the United States Trustee, 844 King Street, Room 2313, Wilmington, Delaware 19801 (Attn:  Richard Scheparcarter).  After the Bid Deadline, each Qualified Bidder that submits a Qualified Bid will be provided with a copy of any other Qualified Bid(s).

(iv)    <u>Auction</u>.  If a Qualified Bid by a Qualified Bidder is received by the Bid Deadline (other than the Stalking Horse APA), an auction (the "<u>Auction</u>") with respect to a sale of the Purchased Assets shall take place on [_____], **2009 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Cole, Schotz, Meisel, Forman & Leonard, P.A., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, or such other place and time as the Debtors shall notify all Qualified Bidders, any

statutory committee appointed in these cases, the Buyer and other invitees. If, however, no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held.

(v)    <u>Auction Rules</u>.

(a)    Only a Qualified Bidder and its authorized representatives who have submitted a Qualified Bid will be eligible to participate at the Auction. At the Auction, only the Buyer and Qualified Bidders who have submitted a Qualified Bid will be permitted to increase their bids. The bidding at the Auction shall start at the purchase price stated in the highest or otherwise best Qualified Bid as disclosed to all Qualified Bidders prior to commencement of the Auction (the "<u>Starting Qualified Bid</u>"), and then continue in increments of $200,000. The Debtors shall not consider any subsequent bid in the Auction unless any bid after the Starting Qualified Bid exceeds the previous highest bid by at least $200,000 in value. During the course of the Auction, the Debtors shall inform each participant which Qualified Bid reflects, in the Debtors' view, the highest or otherwise best offer. To the extent that such bid has been determined to be the highest or otherwise best offer entirely or in part because of the addition, deletion or modification of a provision or provisions in the Stalking Horse APA, or related ancillary agreement or, if applicable, in the Qualified Bid, other than an increase in the cash purchase price, the Debtors shall provide notice to each participant of the value ascribed by the Debtors to any such added, deleted or modified provision or provisions.

(b)    <u>Adjournment of Auction</u>. The Auction may be adjourned as the Debtors deem appropriate. Reasonable notice of such adjournment and the time and place for the resumption of the Auction shall be given to the Buyer, all Qualified Bidders that have submitted a Qualified Bid and counsel to any statutory committee appointed in these cases.

(c)    <u>Subsequent Bids by Buyer</u>. Buyer shall have the right to include the maximum amount of the Expense Reimbursement in the amount of any subsequent bid that it makes in the Auction and, in the event Buyer is the Successful Bidder as a result of a subsequent bid made at the Auction, Buyer shall be entitled to credit the maximum amount of the Expense Reimbursement against the Purchase Price payable at Closing.

(d)    Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(e)    Bidding at the Auction will be transcribed or videotaped.

(vi)    Other Terms. All Qualified Bids, the Auction, and the Bidding Procedures are subject to such additional terms and conditions as are announced by the Debtors not inconsistent with the Bidding Procedures Order. At the conclusion of the Auction, (i) the Successful Bid (as defined in the Bidding Procedures Order) shall be the bid made pursuant to the Bidding Procedures Order that represents, in the Debtors' sole discretion, the highest or otherwise best offer; and (ii) prior to the entry of the Sale Order, the Debtors shall announce their intention to either (a) pursue a transaction with the Successful Bidder at the Auction (and announce the identity of the Successful Bidder) or (b) not proceed with a sale to the Successful Bidder. If an Auction is held, the Debtors shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared the Successful Bid at the Auction and (ii) definitive documentation has been executed in respect thereof. Such acceptance by the Debtors is conditioned upon approval by the Court of the Successful Bid and the entry of an order approving such Successful Bid.

(vii)   Irrevocability of Certain Bids. The Successful Bid shall remain irrevocable in accordance with the terms of the purchase agreement executed by the Successful Bidder. The bid of the Qualified Bidder (the "Back-up Bidder") that submits the next highest or otherwise best bid (the "Back-up Bid") shall be irrevocable until the earlier of (a) 15 days after entry of the Sale Order approving the Successful Bid; (b) closing of the sale to the Successful Bidder or the Back-up Bidder; and (c) such date as the Debtors affirm in writing that, in lieu of pursuing the sale under the Stalking Horse APA or other Alternate Transaction with an Alternate Buyer, the Debtors do not intend to proceed with a sale to the Successful Bidder; provided, however, that notwithstanding the foregoing, in no event shall the Outside Back-up Date (defined below) for the Buyer be later than October 22, 2009. Following the entry of the Sale Order, if the Successful Bidder fails to consummate the Sale because of a breach or failure to perform on the part of the Successful Bidder, the Back-up Bidder will be deemed to have the new successful bid, and the Debtors will be authorized, but not required, to consummate the Sale with the Back-up Bidder without further order of the Court. In such case, the defaulting Successful Bidder's Minimum Deposit shall be forfeited to the Debtors and the Debtors shall have the right to seek any and all other remedies and damages from the defaulting Successful Bidder.

(viii)  Sale Hearing. Prior to October 19, 2009.

(ix)    Return of Deposit. Except as otherwise provided in this paragraph with respect to any Successful Bid and any Back-up Bid, the Minimum Deposits of all Qualified Bidders that submitted such a deposit under the Bidding Procedures shall be returned upon or within five (5) business days after the conclusion of the Auction. The Minimum Deposit of the Successful Bidder shall be held until the closing of the Sale of the Purchased Assets and applied in accordance with the Successful Bid. The Minimum Deposit of the Back-up Bidder shall be returned upon or within the earlier of 15 days after the date of entry of the Sale Order (the "Outside

Back-up Date") or the closing of the Sale of the Purchased Assets to the Successful Bidder.

(x) Failure to Close. If the Successful Bidder fails to consummate the transaction in accordance with the terms of the purchase agreement executed by the Successful Bidder by the closing date contemplated in the purchase agreement agreed to by the parties for any reason (except in the case of the Buyer, in which case the termination provisions in the Stalking Horse APA shall apply to the extent applicable), the Debtors shall: (i) retain the Successful Bidder's Minimum Deposit; (ii) maintain the right to pursue all available remedies, whether legal or equitable available to them; and (iii) be free to consummate the proposed transaction with the Back-up Bidder at the highest price bid by the Back-up Bidder at the Auction, without the need for an additional hearing or Order of the Court.

(xi) Reservation of Rights. Except as otherwise provided in the Stalking Horse APA or the Bidding Procedures Order, the Debtors reserve the right as they may reasonably determine to be in the best interests of their estates, subject to conformity with the Bidding Procedures, to: (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (c) contrary to the best interests of the Debtors and their estates; (v) remove some of the Purchased Assets from the Auction; (vi) waive terms and conditions set forth herein with respect to all potential bidders; (vii) impose additional terms and conditions with respect to all potential bidders; (viii) extend the deadlines set forth herein; (ix) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; and (x) modify the Bidding Procedures as they may determine to be in the best interests of its estate, to the extent not materially adverse to the Buyer or to withdraw the Motion at any time with or without prejudice.

(xii) Expenses. Any bidders presenting bids shall bear their own expenses in connection with the proposed sale, whether or not such sale is ultimately approved, in accordance with the terms of the purchase agreement. Notwithstanding the foregoing, Buyer may recover expenses in accordance with the provisions of the Stalking Horse APA.

17. The Debtors believe that the Bidding Procedures are fair and reasonable, and are not likely to dissuade any serious potential alternative purchaser from bidding in a manner permitted under the preceding paragraph.

B. Notice of Auction and Sale Hearing

25

18. The Debtors request that the Court schedule the Sale Hearing prior to October 19, 2009. The Debtors further request that the objection deadline with respect to the sale of the Purchased Assets be at least seven business days prior to such hearing.

19. On or before three (3) business days after entry of the Bidding Procedures Order, the Debtors will cause a notice in substantially the form attached as Schedule 2 to the Bidding Procedures Order (the "Notice of Auction and Sale Hearing") and a copy of the Bidding Procedures Order to be sent by first-class mail postage prepaid, to the following: (i) the Office of the United States Trustee; (ii) counsel for the Buyer; (iii) counsel for any statutory committee in these cases, if and when appointed; (iv) counsel to the administrative agent for the Debtors' prepetition First Lien Lenders; (v) counsel to the agent for the Debtors' postpetition secured lenders; (vi) counsel to the collateral agent for the Debtors' prepetition Second Lien Lenders; (vii) all taxing authorities and other governmental agencies having jurisdiction over any of the Purchased Assets, including the Internal Revenue Service; (viii) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002; (ix) all Persons known or reasonably believed to have asserted any lien, claim, encumbrance, right of first refusal, or other Interest in or upon any of the Purchased Assets; (x) the non-Debtor parties to the Executory Contracts and Unexpired Leases and any parties who are known to claim interests therein; (xi) all Persons known or reasonably believed to have expressed an interest in acquiring all or substantially all of the Purchased Assets within the last six months; (xii) the Attorneys General in the States where the Purchased Assets are located; (xiii) the United States Environmental Protection Agency; and (xiv) any applicable state environmental agency.[8] In addition to the foregoing, (i) electronic notification of this Motion,

---

[8] The Notice of Auction and Sale Hearing will direct parties to contact Proskauer Rose LLP, counsel to the Debtors, for more information and will provide that any party in interest that wishes to obtain a copy of any related document

the Bidding Procedures Order and the Notice of Auction and Sale Hearing also will be posted on: (a) the Court's website, www.deb.uscourts.gov; and (b) the case management website maintained by The BMC Group, Inc., noticing and claims agent for the Debtors; and (ii) on or before three (3) business days after entry of the Bidding Procedures Order, the Debtors will: (a) serve the Notice of Auction and Sale Hearing on all known creditors of the Debtors; and (b) subject to applicable submission deadlines, publish the Notice of Auction and Sale Hearing once in one or more publications the Debtors deem appropriate, including but not limited to The Wall Street Journal (national edition).

20.     In addition, to facilitate the sale of the Purchased Assets and the assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases, the Debtors shall serve a notice of potential assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases in substantially the form attached as <u>Schedule 3</u> to the Bidding Procedures Order (the "<u>Notice of Assumption and Assignment</u>") on all non-debtor parties to the Executory Contracts and Unexpired Leases, on or before three (3) business days after the entry of the Bidding Procedures Order by first class mail or hand delivery. If the Debtors identify additional executory contracts or unexpired leases that might be assumed by the Debtors and assigned to Buyer not set forth in the original Notice of Assumption and Assignment, the Debtors will promptly send a supplemental notice (a "<u>Supplemental Notice of Assumption and Assignment</u>") to the applicable counterparties to such additional executory contracts and unexpired leases.

21.     In the Notice of Assumption and Assignment, the Debtors will identify the calculation of the cure amounts that the Debtors believe must be paid to cure all defaults under the Executory Contracts and Unexpired Leases (the "<u>Cure Amounts</u>"). If no amount is listed on

---

(including the Stalking Horse APA), subject to any necessary confidentiality agreement, may make a request in writing as specified in the Notice of Auction and Sale Hearing.

the Notice of Assumption and Assignment with respect to an Executory Contract or Unexpired Lease, the Debtors believe that there is no Cure Amount applicable to such Executory Contract or Unexpired Lease. The Debtors request that unless the non-debtor party to an Executory Contract or Unexpired Lease files an objection (the "Cure Amount/Assignment Objection") to (a) its scheduled Cure Amount and/or (b) to the proposed assumption, assignment and/or transfer of such Executory Contract or Unexpired Lease by the later of (i) 4:00 p.m. (prevailing Eastern time) on the date that is three (3) business days prior to the Bid Deadline or (ii) ten (10) days after service of the relevant Supplemental Notice of Assumption and Assignment (such later date, the "Cure/Assignment Objection Deadline") and serves a copy of the Cure Amount/Assignment Objection so as to be received no later than the Cure/Assignment Objection Deadline on the same day to: (a) Cole, Schotz, Meisel, Forman & Leonard, P.A., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 (Attn: Norman L. Pernick, Esq.), co-counsel to the Debtors; (b) Proskauer Rose LLP, 70 West Madison, Suite 3800, Chicago, Illinois 60602 (Attn: Jeff J. Marwil, Esq. and Grayson T. Walter, Esq.), co-counsel to the Debtors; (c) Alternative Distribution Systems, Inc., 116 East 1100 North, Chesterton, Indiana 46304 (Attn: Timothy M. May); (d) Sidley Austin LLP, 1 South Dearborn, Chicago, Illinois, 60603 (Attn: Larry Nyhan, Esq.), co-counsel to the agent for the Debtors' postpetition lenders; (e) Richards Layton & Finger, 920 North King Street, Wilmington, Delaware, 19801 (Attn: Mark Collins, Esq.), co-counsel to the agent for the Debtors' postpetition lenders; (f) counsel to any statutory committee that may be appointed in these cases; and (g) the Office of the United States Trustee, 844 King Street, Room 2313, Wilmington, Delaware 19801 (Attn: Richard Scheparcarter); (collectively, the "Notice Parties"); then such non-debtor party should (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or

other amounts with respect to such Executory Contract and Unexpired Lease and the Debtors shall be entitled to rely solely upon the Cure Amount, and (ii) if the Executory Contract or Unexpired Lease is identified as a Purchased Asset and the Buyer is the Successful Bidder, be deemed to have consented to the assumption, assignment and/or transfer of such Executory Contract and Unexpired Lease and shall be forever barred and estopped from asserting or claiming against the Debtors, the Buyer or such other Successful Bidder or any other assignee of the relevant Executory Contract or Unexpired Lease that any additional amounts are due or defaults exist, or conditions to assumption, assignment and/or transfer must be satisfied, under such Executory Contract or Unexpired Lease.

22.     The Debtors also request that if an objection challenges a Cure Amount, the objection must set forth the cure amount being claimed by the objecting party (the "Claimed Cure Amount") with appropriate documentation in support thereof.  Upon receipt of a Cure Amount/Assignment Objection, the Debtors request that they be granted the authority, but not direction, to resolve any Cure Amount/Assignment Objection by mutual agreement with the objecting counterparty to any Executory Contract or Unexpired Lease without further order of the Court.  In the event that the Debtors and any objecting party are unable to consensually resolve any Cure Amount/Assignment Objection no later than three (3) business days prior to the Sale Hearing, the Debtors request that the Court resolve such Cure Amount/Assignment Objection at the Sale Hearing.

23.     The Debtors, the Buyer or the other Successful Bidder, as the case may be, may determine to exclude any Executory Contract or Unexpired Lease from the list of Purchased Assets no later than one (1) business day prior to the Sale Hearing, or, if the Court determines at any hearing on a Cure Amount/Assignment Objection that the applicable cure amount for such

contract is greater than the Cure Amount proposed by the Debtors, no later than five (5) business days following such hearing. The non-debtor party or parties to any such excluded contract or lease will be notified of such exclusion by written notice mailed within two (2) business days of such determination.

24.     In the event that the Buyer is not the Successful Bidder for the Purchased Assets and for those Executory Contracts and Unexpired Leases identified in the Notice of Assumption and Assignment, within two (2) business days after the conclusion of the Auction for the Purchased Assets, the Debtors will serve a notice identifying the Successful Bidder to the non-Debtor parties to the Executory Contracts and Unexpired Leases that have been identified in such Successful Bid. The Debtors propose that the non-Debtor parties to the Executory Contracts and Unexpired Leases have until 4:00 p.m. on the date that is two (2) business days prior to the Sale Hearing (the "Adequate Assurance Objection Deadline") to object to the assumption, assignment and/or transfer of such Executory Contract and Unexpired Lease solely on the issue of whether the Successful Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.

## AUTHORITY FOR REQUESTED RELIEF

A.     The Sale of the Purchased Assets is Within the Sound
       Business Judgment of the Debtors and Should be Approved

25.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary

course of business be based upon the sound business judgment of the debtors. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176(D.D.C. 1991).

26.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) that the sale was negotiated in good faith.  Abbotts Dairies, 788 F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign Estates. Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).  In this case, as set forth more fully herein, the Debtors submit that the decision to proceed with the Sale of the Purchased Assets and the Bidding Procedures is based upon sound business judgment and should be approved.  A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. Lionel, 722 F.2d at 1071; Montgomery Ward, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

31

27.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. In re Fesco Plastics Corp. 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

28.     The Debtors submit that more than ample business justification exists to sell the Purchased Assets to the Buyer (or other Successful Bidder) pursuant to the Bidding Procedures, thereby satisfying the first prong of Abbotts Dairies. The prompt sale of the Purchased Assets presents the best opportunity to maximize the value for the estates in light of the need to manage and transition the Purchased Assets to a Buyer. In addition, the Debtors believe that the Bidding Procedures are the best method by which they can obtain the best price for the Purchased Assets and provide interested parties with accurate and reasonable notice of the Sale. The Bidding

Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Purchased Assets by helping ensure a competitive and fair bidding process.

29. For reasons explained elsewhere herein, the Debtors believe the sale of their businesses and assets must occur quickly in order to maximize value in these cases, and that every day spent in chapter 11 increases the risk of business loss and value deterioration. Absent a prompt sale pursuant to the procedures and timelines proposed, the Debtors believe that the going concern value of the Purchased Assets will be significantly compromised. The success of the Debtors' businesses relies in great part on their reputations as reliable and efficient providers of logistics services. Their customers rely on them to provide seamless distribution and just-in-time delivery services. Every day that the Debtors remain in chapter 11 more of their customers will lose faith in their ability to provide the services on which their own businesses rely. This will lead to customers turning to competitors and result in the Debtors losing significant revenue. Moreover, the Debtors' precarious cash position and the terms of their DIP Facility require that the Sale occur quickly. It is therefore imperative that the Debtors effect a Sale as early on in these cases as possible. The Debtors further believe that a targeted sale process is most likely to achieve the highest and best price for the Purchased Assets and will do so in an efficient and timely manner, enabling the Debtors' businesses to emerge successfully from these cases. The Debtors respectfully submit that the relief sought by this Motion not only is reasonable, but necessary, to maximize the value of these estates for the benefit of the Debtors and their stakeholders.

CURRENT 15545314v6

30.     In addition, the notice described herein and in the Bidding Procedures Order is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Purchased Assets in the past six months. Accordingly, the proposed sale of the Purchased Assets satisfies the second prong of the Abbotts Dairies standard.

31.     The Bidding Procedures are also designed to maximize the value received for the Purchased Assets. The process proposed by the Debtors allows for a timely auction process while providing bidders ample time and information to submit a timely bid. Along with the Debtors' marketing process, the Bidding Procedures are designed to ensure that the Purchased Assets will be sold for the highest or otherwise best possible purchase price. The Debtors are subjecting the value of the Purchased Assets to market testing and permitting prospective purchasers to bid on the Purchased Assets, thereby subjecting the proposed sale to a market check through the solicitation of competing bids in a court-supervised auction process. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Purchased Assets will be fair and reasonable, and therefore the third prong of the Abbotts Dairies standard is satisfied. As discussed below, the "good faith" prong of the Abbotts Dairies standard is also satisfied here.

B.     The Proposed Sales are Proposed in "Good Faith"
        Under Section 363(m) of the Bankruptcy Code

32.     The Debtors request that the Court find that the Buyer (or other Successful Bidder) is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Purchased Assets.

33.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) ... of this section of a sale . . . of property does not

34

> affect the validity of a sale ... under such authorization to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. §363(m).

34.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets.  Additionally, the United States Court of Appeals for the Third Circuit (the "Third Circuit") has indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under Bankruptcy Code section 365.  See Krebs Chrysler- Plymouth, Inc. v. Valley Motors. Inc., 141 F.3d 490, 497-98 (3d Cir. 1998).  In Krebs, the Court considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)." Id. at 497.  Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Court in Krebs concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale. Like the franchise agreements protected in Krebs, the Executory Contracts and Unexpired Leases are contracts that may be assumed, assigned and/or transferred pursuant to section 365 of the Bankruptcy Code.  In light of Krebs, the Debtors respectfully submit that section 363(m) applies to protect the Buyer (or other Successful Bidder) with respect to both the Executory Contracts and Unexpired Leases and the Purchased Assets.

35.     As required by section 363(m) of the Bankruptcy Code, the Bidding Procedures have been proposed in good faith and provide for both the Debtors and the potential purchaser to

act in good faith in negotiating the sale of the Purchased Assets and the assignment of the Executory Contracts and Unexpired Leases related thereto. Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." Abbotts Dairies, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)). See also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

36.     Here, the sale of the Purchased Assets and the assignment and/or transfer of the Executory Contracts and Unexpired Leases, which have been designated by the Buyer in the Stalking Horse APA and/or will be designated by any Successful Bidder, is or will be in good faith.[9] As discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, any sale agreement will be the culmination of a solicitation and negotiation process in which all parties will be represented by counsel. No known potential bidder for the Purchased

---

[9] If the Debtors ultimately sell the Purchased Assets to an Alternate Buyer in a Alternate Transaction, the Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code would be appropriate for the Alternate Buyer as well. Pursuant to the Bidding Procedures, any Alternate Buyer will have had to present a proposal superior to that of the Buyer. Moreover, the Debtors will not choose any Alternate Buyer whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and would be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

Assets is an insider of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code, and all negotiations have been and will continue to be conducted on an arms length, good faith basis. Moreover, there is no evidence of fraud or collusion in terms of the proposed sale. With respect to the potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. Under the circumstances, the Buyer or any Alternate Buyer should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

37.     All parties in interest as described in paragraph 19 will receive notice of the sale proposed herein and will be provided with an opportunity to be heard. Additionally, all counterparties to Executory Contracts and Unexpired Leases will be provided notice of assumption, assignment and/or transfer and an opportunity to be heard. The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

C.     The Proposed Sale Satisfies the Requirements
of Section 363(f) of the Bankruptcy Code

38.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim, or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the

37

disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). See, e.g., In re Trans World Airlines, Inc., 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987). Because the Debtors expect that they will satisfy one or more of the requirements of section 363(f), as will be demonstrated at the Sale Hearing, approving the sale of the Purchased Assets free and clear of all Interests is warranted.

D.    Assumption and Assignment of Executory Contracts
      and Unexpired Leases Should be Approved

39.    To facilitate and effectuate the sale of the Purchased Assets, the Debtors seek authority to assume, assign and/or transfer various Executory Contracts and Unexpired Leases to the Buyer (or other Successful Bidder) to the extent required by such Buyer. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co., 318 U.S. 523 (1943) (applying Bankr. Act section 77 subsection (b), predecessor to Bankruptcy Code Section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1046-47 (4th Cir. 1985).

CURRENT 15545314v6

40. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. In re Bygaph, Inc., 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

41. The Buyer (or other Successful Bidder) will desire to take assignment of certain executory contracts and unexpired leases related to the Purchased Assets. To the extent Executory Contracts and Unexpired Leases are identified for assumption, assignment and/or transfer, the Debtors believe that they can and will demonstrate that all requirements for assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases will be satisfied at the Sale Hearing. The Debtors, as required by the Bidding Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Purchased Assets. Further, for the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that selling the Purchased Assets and assuming, assigning and/or transferring to the Buyer (or other Successful Bidder) the Executory Contracts and Unexpired Leases would be in the best interests of their estates. Moreover, the Debtors will provide all parties to the Executory Contracts and Unexpired Leases an opportunity to be heard.

42.     Specifically, the Debtors will serve the Notice of Assumption and Assignment on or before three (3) business days after entry of the Bidding Procedures Order on the non-debtor parties to the Executory Contracts and Unexpired Leases.  The Notice of Assumption and Assignment will, among other things, identify respective Cure Amounts, if any.  The Debtors request that unless the non-debtor party to an Executory Contract and Unexpired Lease files and serves a Cure Amount/Assignment Objection setting forth the Claimed Cure Amount or objecting to an assumption, assignment and/or transfer to the Buyer on or before the Cure/Assignment Objection Deadline, such non-debtor party should (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Executory Contract and Unexpired Lease and the Debtors shall be entitled to rely solely upon the Cure Amount; and (ii) if the Executory Contract and Unexpired Lease was identified as a Purchased Asset and the Buyer is the Successful Bidder, be deemed to have consented to the assumption, assignment and/or transfer of such Executory Contract and Unexpired Lease and shall be forever barred and estopped from asserting or claiming against the Debtors, the Buyer or such other successful bidder or any other assignee of the relevant Executory Contract and Unexpired Lease that any additional amounts are due or defaults exist, or conditions to assumption, assignment and/or transfer must be satisfied, under such Executory Contract.

43.     In the event that the Buyer is not the Successful Bidder for the Purchased Assets and for those Executory Contracts and Unexpired Leases that are included in a Successful Bid, within two (2) business days after the conclusion of the auction for the Purchased Assets, the Debtors will serve a notice identifying the Successful Bidders to the non-debtor parties to the Executory Contracts and Unexpired Leases that have been identified in such Successful Bid.

40

The Debtors request that objections by a non-debtor party to the Executory Contracts and Unexpired Leases to the assumption, assignment and/or transfer of such Executory Contract and Unexpired Lease solely on the issue of whether the Successful Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code be filed and served on or before the Adequate Assurance Objection Deadline.

44.     Thus, the Debtors request that the assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases be approved.

E.     The Expense Reimbursement is Reasonable and Appropriate

45.     Approval of the Expense Reimbursement is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999) ("In re O'Brien"). In In re O'Brien, the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, [the inquiry] ... depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." In re O'Brien, 181 F.3d at 535. Here, the Expense Reimbursement should be approved because it will provide a benefit to the Debtors' estates.

46.     In In re O'Brien, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award bidding protections:[10] (1) the presence of self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the fee relative to the purchase price;

---

[10]   The Third Circuit in O'Brien addressed the allowance of both break-up fees and expense reimbursement. Here, the Debtors seek authority to pay, if necessary, the Expense Reimbursement.

(4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction;" (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;" (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors committees of the break-up fee and expense reimbursement; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee and expense reimbursement] on unsecured creditors, where such creditors are in opposition to the break-up fee." See In re O'Brien, 181 F.3d at 536.

47.     Whether evaluated under the "business judgment rule" applied by certain courts[11] or the Third Circuit's "administrative expense" standard, the Expense Reimbursement should be approved.  First, the Debtors are not seeking authority to pay the Buyer a break-up fee, but, subject to this Court's approval, have agreed only to reimburse the Buyer for reasonable out of pocket expenses incurred in connection with the negotiation of the Stalking Horse APA.  The Buyer, therefore, is only receiving in return what it invested.  Several factors the Third Circuit considered in O'Brien related specifically to break-up fees, which arguably are and should be subject to higher scrutiny because they represent an award to an initial bidder beyond what such bidder spent in negotiating the terms of a proposed purchase agreement.  Regardless, the Expense Reimbursement passes the Third Circuit's standard.  First, all negotiations between the Debtors and the Buyer have been conducted in good faith, on an arm's-length basis.  Second, based on the Debtors' pre-filing discussions, the Debtors have determined that the Expense Reimbursement is necessary to attract and retain a stalking horse bidder.  Specifically, the Buyer

---

[11]    See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. ("In re Integrated Resources. Inc.). 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed 3 F.3d 49 (2d Cir. 1993).

insisted that it receive an expense reimbursement in the event the Debtors determined to sell the Purchased Assets to another bidder. The Debtors' ability to continue to seek a higher or better offer without risk of losing a "bird-in-the-hand" would be eliminated if the Debtors could not secure a stalking horse bidder.

48. The Debtors submit that authorization of the Expense Reimbursement will not chill the bidding (if any) for the Purchased Assets. The Expense Reimbursement was a negotiated item and the Debtors believe that the Expense Reimbursement is appropriate under the circumstances because: (i) the Buyer is providing a substantial benefit to the estates by acting as a "stalking horse" bidder for the Purchased Assets; (ii) the Stalking Horse APA will provide a floor by which other bids may be judged; and (iii) the Expense Reimbursement afforded to the Buyer was a condition to the Buyer's entry into the Stalking Horse APA. Further, payment of the Expense Reimbursement is not likely to diminish the Debtors' estates. The Debtors will incur the obligation to pay the Expense Reimbursement only if they receive from a third party a higher or better offer on the Purchased Assets, and that offer is subsequently approved by Court and closes, or if the court enters an order effecting any other transaction the consummation of which would be substantially inconsistent with the transaction contemplated in the Stalking Horse APA.

49. After considering the reasonableness of bidding incentives, courts have approved a range of break-up fees and expense reimbursements as being appropriate under the facts and circumstances of the case. In re Radnor Holdings, Case No. 06-10894 (Bankr. D. Del. September 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); In re Riverstone Networks, Case No. 06-10110 (Bankr. D. Del. February 24, 2006) (approving expense reimbursement up to $1 million where the stalking horse purchase price was

$170 million); In re Great Kansas City Paper, Inc., Case No. 03-10048 (Bankr. D. Me. February 18, 2003) (approving expense reimbursement up to $750,000 in addition to a break-up fee of 5.4%, the aggregate value of which was $5 million); In re FSC Corp., Case No. 00-04659 (Bankr. N.D. Ill. February 28, 2000) (approving expense reimbursement up to $500,000 in addition to a break up fee of 3.4%, valued at $1,500,000). Importantly, several of the cases cited involved expense reimbursements in addition to significant break-up fees, and yet were still approved; here, the Debtors seek approval only of the latter.

F.     Relief from the Ten-Day Waiting Periods
       Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

50.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease ... is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Bidding Procedures Order and the Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

51.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten-day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an

44

objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

52. Accordingly, the Debtors hereby request that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

53. Notice of this Motion has been given to: (a) the United States Trustee; (b) the Prepetition Agent for the First Lien Lenders; (c) counsel for the Prepetition Agent for the First Lien Lenders; (d) the Collateral Agent for the Second Lien Lenders; (e) counsel for the Collateral Agent for the Second Lien Lenders; (f) the Debtors' thirty largest unsecured creditors as set forth in the consolidated list filed with the Debtors' petitions; and (g) all required governmental agencies. In addition, the Notice of Auction and Sale Hearing, the Bidding Procedures Order, and the Notice of Assumption and Assignment will be served as set forth in paragraphs 19 and 20 above. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

*The remainder of this page was left intentionally blank.*

CURRENT 15545314v6

## CONCLUSION

WHEREFORE, the Debtors respectfully request: (a) entry of the proposed Bidding Procedures Order, substantially in the form attached hereto as Exhibit B; (b) entry of the proposed Sale Order, substantially in the form attached hereto as Exhibit C; and (c) such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
September 2, 2009

**COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.**

_____
Norman L. Pernick (No. 2290)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

-and-

**PROSKAUER ROSE LLP**
Jeff J. Marwil (*pro hac vice* pending)
Peter J. Young (*pro hac vice* pending)
Grayson T. Walter (*pro hac vice* pending)
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois 60602
Telephone: (312) 962-3550
Facsimile: (312) 962-3551

*Proposed Co-Counsel for Debtors and Debtors in Possession*

CURRENT 15545314v6