# **EXHIBIT A**

[Stalking Horse APA]

ASSET PURCHASE AGREEMENT

Dated as of September [__], 2009

by and among

ADS LOGISTICS, LLC,

MAY LOGISTICS SERVICES, INC.

ALTERNATIVE DISTRIBUTION SYSTEMS, INC.,

GENERAL ELECTRIC CAPITAL CORPORATION,

GLOBAL LEVERAGED CAPITAL CREDIT OPPORTUNITY FUND I
and
REGIMENT CAPITAL SPECIAL SITUATIONS FUND III, L.P.

# TABLE OF CONTENTS

**ARTICLE I**
    **DEFINITIONS** ........................................................................................................2
    1.1.   Definitions.....................................................................................................2
    1.2.   Additional Definitions ..................................................................................6
    1.3.   Interpretation.................................................................................................8

**ARTICLE II**
    **PURCHASE AND SALE** ......................................................................................8
    2.1.   Purchased Assets..........................................................................................8
    2.2.   Identification of Assumed Contracts; Transaction Costs; Cure Amounts. ..................10
    2.3.   Excluded Assets .........................................................................................12
    2.4.   Assumed Liabilities ....................................................................................12
    2.5.   Excluded Liabilities ...................................................................................13
    2.6.   Assignment of Contracts and Rights...........................................................15

**ARTICLE III**
    **PURCHASE PRICE** ...........................................................................................15
    3.1.   Purchase Price.............................................................................................15
    3.2.   Determination of Certain Obligations; Payment on Closing Date................15
    3.3.   Allocation of Purchase Price.......................................................................16

**ARTICLE IV**
    **CLOSING** ..........................................................................................................16
    4.1.   Closing Date................................................................................................16
    4.2.   Sellers' Closing Date Deliveries .................................................................16
    4.3.   Buyers' Closing Deliveries .........................................................................17

**ARTICLE V**
    **REPRESENTATIONS AND WARRANTIES OF SELLERS** ............................18
    5.1.   Organization................................................................................................18
    5.2.   Authorization and Validity .........................................................................18
    5.3.   No Conflict or Violation .............................................................................19
    5.4.   Consents and Approvals ..............................................................................19
    5.5.   Compliance with Law .................................................................................19
    5.6.   Taxes...........................................................................................................19
    5.7.   Title and Sufficiency of Purchased Assets..................................................20
    5.8.   Financial Schedules ....................................................................................20
    5.9.   Absence of Certain Developments...............................................................21
    5.10. No Undisclosed Liabilities..........................................................................22
    5.11. Customers and Suppliers.............................................................................22
    5.12. Real Property. .............................................................................................22
    5.13. Personal Property ........................................................................................23
    5.14. Employees...................................................................................................23
    5.15. Employee Benefits. .....................................................................................23

5.16. Legal Proceedings..................................................................................24
5.17. Intellectual Property.............................................................................25
5.18. Permits....................................................................................................25
5.19. Environmental Matters..........................................................................25
5.20. Material Contracts.................................................................................25
5.21. Insurance................................................................................................27
5.22. Affiliate Transactions............................................................................27
5.23. Broker.....................................................................................................27
5.24. Disclaimer of Other Representations and Warranties.........................27
5.25. New Subsidiaries. ..................................................................................27

**ARTICLE VI**
  **REPRESENTATIONS AND WARRANTIES OF BUYERS .................28**
6.1. Organization of Buyers.........................................................................28
6.2. Authorization and Validity ...................................................................28
6.3. No Conflict or Violation ........................................................................28
6.4. Consents and Approvals........................................................................28
6.5. Adequate Assurances Regarding Assumed Contracts .........................29
6.6. Broker.....................................................................................................29
6.7. "As Is" Transaction...............................................................................29
6.8. Disclaimer of Other Representations and Warranties..........................29

**ARTICLE VII**
  **COVENANTS AND AGREEMENTS REGARDING BANKRUPTCY ...................29**
7.1. Cooperation; Efforts.............................................................................29
7.2. Expense Reimbursement........................................................................30
7.3. Assignment of Rights.............................................................................30

**ARTICLE VIII**..............................................................................................**30**

**ADDITIONAL AGREEMENTS** ...............................................................**30**
8.1. Employees. .............................................................................................30
8.2. Interim Operations.................................................................................31
8.3. Taxes.......................................................................................................33
8.4. Access .....................................................................................................34
8.5. Third Party Consents.............................................................................34
8.6. Insurance................................................................................................35
8.7. Further Assurances................................................................................35
8.8. Access to Records ..................................................................................35
8.9. Payment of Transaction Costs ..............................................................35
8.10. DOT Matters ..........................................................................................35

**ARTICLE IX**..................................................................................................**36**

**CONDITIONS TO CLOSING**......................................................................**36**
9.1. Sellers' Condition to Closing................................................................36
9.2. Buyers' Conditions to Closing..............................................................37

**ARTICLE X**

    **TERMINATION** ...........................................................................................**38**

    10.1.   Termination ...........................................................................................38

    10.2.   Effect of Termination ...........................................................................39

**ARTICLE XI**

    **GENERAL PROVISIONS** ..........................................................................**39**

    11.1.   Survival ................................................................................................40

    11.2.   Specific Performance ...........................................................................40

    11.3.   Mutual Release .....................................................................................40

    11.4.   No Public Announcement .....................................................................40

    11.5.   Notices .................................................................................................40

    11.6.   Assignment; No Third Party Beneficiaries ..........................................41

    11.7.   Entire Agreement; Amendments ...........................................................41

    11.8.   Waivers ................................................................................................42

    11.9.   Expenses ..............................................................................................42

    11.10.  Partial Invalidity ..................................................................................42

    11.11.  Counterparts ........................................................................................42

    11.12.  Governing Law; Submission to Jurisdiction; Selection of Forum ..........42

    11.13.  Time is of the Essence .........................................................................43

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of September [___], 2009, by and among ADS Logistics, LLC, a Delaware limited liability company ("ADS Logistics"), May Logistics Services, Inc., a California corporation ("May Logistics"), Alternative Distribution Systems, Inc., a Delaware corporation ("ADS Inc." and together with May Logistics, the "Guarantors," and the Guarantors together with ADS Logistics, "Sellers"), General Electric Capital Corporation, a Delaware corporation ("GE Capital"), Global Leveraged Capital Credit Opportunity Fund I, a Cayman Islands exempted company ("GLC") and Regiment Capital Special Situations Fund III, L.P., a Delaware limited partnership ("Regiment," and together with GE Capital and GLC, "Buyers," provided, that following any assignment to Newco pursuant to Section 11.6, any references herein to "Buyer" or "Buyers" shall include Newco, and provided further that, following the Closing, any references herein to "Buyer" or "Buyers" shall mean and refer only to Newco).

WHEREAS, Sellers are engaged in the business of providing fully integrated supply chain management services, including logistics services, to the metals industry (the "Business");

WHEREAS, each of the Sellers has filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") voluntary petitions (Case Nos. [_____], collectively, the "Chapter 11 Cases") for relief under Chapter 11 of Title 11 of the United States Code §§ 101-1532 (as amended, the "Bankruptcy Code");

WHEREAS, Sellers intend to dispose of certain of their assets and liabilities through a sale or sales to be effected under the supervision of the Bankruptcy Court in the Chapter 11 Cases under the Bankruptcy Code;

WHEREAS, Sellers desire to sell to Buyers, and Buyers desires to purchase from Sellers, upon the terms and subject to the conditions set forth in this Agreement and in accordance with Sections 105, 363, 365 and other provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, the Purchased Assets (as defined below) in exchange for the payment to Sellers of the Purchase Price (as defined below) and the assumption by Buyers of the Assumed Liabilities (as defined below);

WHEREAS, the Purchased Assets are assets of Sellers, which are to be sold, assigned, transferred, conveyed and delivered at the Closing by Sellers to Buyers free and clear of any interest in such Purchased Assets, including Claims (as defined below) and all Encumbrances (as defined below) other than Permitted Encumbrances (as defined below), pursuant to the Sale Order (as defined below); and

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to a Sale Order (as defined below) to be entered in the Chapter 11 Cases and other applicable provisions of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

# ARTICLE I

# DEFINITIONS

1.1.    Definitions.  In this Agreement, the following terms have the meanings specified or referred to in this Section 1.1.

**"Affiliate"** means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person.

**"Ancillary Agreement"** means the Bill of Sale, Assumption and Assignment Agreement, IP Assignments, the Mutual Release and Waiver and any other agreement that any Seller or Buyer, as applicable, may reasonably enter into in connection with the consummation of the transactions contemplated hereby.

**"Assumption and Assignment Agreement"** means the Assumption and Assignment Agreement, to be delivered by Buyers and Sellers at Closing, in the form attached hereto as Exhibit A.

**"Bill of Sale"** means the Bill of Sale, to be delivered by Sellers at Closing, in the form attached hereto as Exhibit B.

**"Capital Stock"** means, with respect to any entity, (i) any equity securities of such entity, (ii) any securities that have any right or option to acquire any equity securities of such entity (whether through conversion, exercise, exchange or otherwise) and (iii) any right or option to acquire (whether through conversion, exercise, exchange or otherwise) any equity securities or other securities that are directly or indirectly convertible into, or exchangeable or exercisable for, any equity securities of such entity.

**"Cash"** means all cash and cash equivalents.

**"Claim"** has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, *inter alia*, all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

**"COBRA"** means the United States Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

**"Code"** means the Internal Revenue Code of 1986, as amended.

**"Contracts"** means any contract, agreement, lease or sublease, license or sublicense, instrument, indenture, commitment or undertaking.

"**Cure Amounts**" means the cure, compensation and restatement costs and expenses of or relating to the assumption and assignment of the Assumed Contracts pursuant to, and as required by, Section 365 of the Bankruptcy Code or otherwise hereunder.

"**DIP Carve-Out Amount**" has the meaning provided in the DIP Credit Agreement.

"**DIP Credit Agreement**" means the Debtor-in-Possession Credit Facility dated as of September [   ], 2009 by and among ADS Logistics, the Guarantors, the Senior Agent and the other parties thereto.

"**DIP Obligations**" means an amount equal to all obligations of Sellers under the DIP Credit Agreement and any orders issued in connection therewith.

"**Documents**" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, budgets, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specification, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), whether or not in electronic form.

"**Encumbrance**" means any lien, encumbrance, claim, charge, security interest, mortgage, pledge, assessment, levy, charge, option, right of first refusal, easement, conditional sale or other title retention agreement, defect in title, covenant, limitation on the use of ownership of real or personal property, or other restrictions of any kind, or any contract to give any of the foregoing.

"**Environmental Laws**" means all applicable federal, state and local statutes, ordinances, rules, orders, judgments, junctions, decrees, regulations and other provisions having the force of law, all judicial and administrative orders and determinations, or natural resources and all common law concerning pollution or protection of human health and the environment, including, without limitation, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, exposure to or cleanup of any Hazardous Substances.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended

"**Excluded Contract**" means any Contract that is not an Assumed Contract, including, without limitation, any Contract that Buyers designate as such pursuant to Section 2.2(b).

"**GAAP**" means United States generally accepted accounting principles, consistently applied.

**"Governmental Body"** means any foreign, federal, state, local or other governmental authority or regulatory body.

**"Hazardous Substances"** has the meaning set forth in Section 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, and will also expressly include petroleum, crude oil and any fraction thereof.

**"Indebtedness"** of any Person means, without duplication, (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for borrowed money and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities arising in the ordinary course of business (other than the current liability portion of any indebtedness for borrowed money)); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of such Person under interest rate or currency swap transactions (valued at the termination value thereof); (vi) all obligations with respect to any factoring programs of any Seller; (vii) all obligations of the type referred to in clauses (i) through (vi) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (viii) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Encumbrance on any property or asset of such Person (whether or not such obligation is assumed by such Person).

**"Intellectual Property"** means all intellectual property arising from or in respect of the following: (i) all patents and applications therefor, including continuations, divisionals, continuations-in-party, or reissues of patent applications and patents issuing thereon, (ii) all trademarks, service marks, trade secrets, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (iii) copyrights and registrations and applications therefor and works of authorship and (iv) all Software of Sellers.

**"Knowledge"** means, in the case of Sellers, the actual knowledge after due inquiry of each of Tim May, Patrick G. Sullivan and, only in the case of determining whether the representations and warranties of Sellers are true and correct as of the Closing Date in accordance with the terms of <u>Section 9.2(a)</u>, Robert Angart.

**"Material Adverse Effect"** means any condition, circumstance, change or effect (or any development that, insofar as can be reasonably foreseen, would result in any condition, circumstance, change or effect) that is materially adverse to the assets, business, financial condition, results of operations or prospects of Sellers and their subsidiaries, taken as a whole; <u>provided</u>, <u>however</u> that to the extent a condition, circumstance, change or effect is caused by any of the following, it shall not be taken into account in determining whether there has been a Material Adverse Effect: (i) adverse events in the industry in which the Business operates or in

which the Purchased Assets are held; (ii) any change in the general condition of the global or national economy; (iii) the taking of any action explicitly required to be taken by Sellers under the terms of this Agreement, except those actions required or permitted to be taken pursuant to Section 8.2; or (iv) the identity of Buyers; provided, however that in the case of the foregoing clauses (i)–(ii), any such condition, circumstance, change or effect shall only be excluded to the extent that they do not disproportionately impact or affect the Business or the Purchased Assets relative to other companies in the industry in which the Business operates or in which the Purchased Assets are held.

"**Mutual Waiver and Release**" means the Mutual Waiver and Release, to be delivered by Buyers and Sellers at Closing, in the form attached hereto as Exhibit C.

"**Permits**" means any approvals, authorizations, consents, licenses, permits, notices to or certificates of a Governmental Body.

"**Permitted Encumbrances**" means (a) encumbrances for taxes or assessments or other governmental charges that are not yet due and payable and (b) materialmen's, merchants', carriers', worker's, repairer's, or other similar Encumbrances arising in the ordinary course of business that are not yet due or payable.

"**Person**" means any individual, corporation, partnership, joint venture, trust, Governmental Body or other organization or entity.

"**Petition Date**" means September 2, 2009, the date the Sellers commenced the Chapter 11 Cases.

"**Postpetition Obligations**" means an amount equal to all unpaid postpetition obligations of Sellers related exclusively to the Business that are incurred in the ordinary course of business, constitute administrative expenses of Sellers pursuant to the Bankruptcy Code and are included in the DIP Credit Agreement budget (not including the DIP Obligations, the Transaction Costs, the DIP Carve-Out Amount or the Senior Lender Costs).

"**Real Property Leases**" means all unexpired leases, subleases, licenses or other agreements, including all amendments, extensions, renewals, guaranties or other agreements with respect thereto, pursuant to which any of the Sellers hold or use any non-residential real property.

"**Requirements of Law**" means any foreign, federal, state and local laws, statutes, regulations, rules, codes or ordinances enacted, adopted, issued or promulgated by any Governmental Body.

"**Schedules**" means the disclosure schedules attached to this Agreement.

"**Senior Credit Agreement**" means the Third Amended and Restated Secured Credit Agreement, dated as of January 18, 2008 (as amended, restated, supplemented, or otherwise modified from time to time) by and among ADS Logistics, the Guarantors, the Senior Agent and the Senior Lenders.

**"Senior Agent"** means GE Capital.

**"Senior Lender Costs"** means an amount equal to all of the Senior Agent's and Senior Lenders' incurred and unpaid costs and expenses owed by ADS Logistics and the Guarantors under the Senior Credit Agreement.

**"Senior Lenders"** means the Senior Agent, Global Leveraged Capital Credit Opportunity Fund I and Regiment Capital Special Situations Fund III, L.P.

**"Senior Lender Claims"** means, collectively, all obligations of Sellers under, and with respect to, the Senior Credit Agreement.

**"Software"** means any and all (i) computer programs, including any and all software implementations of algorithms, models, methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) description, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (iv) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (v) all documentation including user manuals and other training documentation related to any of the foregoing.

**"Straddle Period"** means any taxable year or period beginning on or before and ending after the Closing Date.

**"Tax"** means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs, ad valorem, duties, capital stock, franchise, profits, prescription tax or fee, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, unclaimed property, custom duties or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

**"Tax Return"** means any return, declaration, report, claim for refund, or information return or statement relating to Taxes required to be filed with any Governmental Body, including any schedule or attachment thereto, and including any amendment thereof.

**"Transaction Costs"** means an amount equal to all of Sellers' out-of-pocket costs and expenses, as contemplated by the DIP Credit Agreement budget, incurred at or before Closing related to consummating the sale and transfer of the Purchased Assets to Buyers, including without limitation Cure Amounts, but excluding the DIP Carve-Out Amount and the Senior Lender Costs. The Transaction Costs shall not exceed the amounts set forth in the DIP Credit Agreement budget.

1.2.    Additional Definitions. The following terms are defined in the Sections set forth across from such term in the following table:

| 363/365 Orders | 7.2 |
|---|---|
| ADS Inc. | Preamble |

| | |
|---|---|
| ADS Logistics | Preamble |
| Agreement | Preamble |
| Alternate Buyer | 7.3 |
| Alternate Transaction | 7.3 |
| Assigned Permits | 2.1(n) |
| Assumed Contracts | 2.1(j) |
| Assumed Leases | 2.1(i) |
| Assumed Liabilities | 2.4 |
| Bankruptcy Code | Preamble |
| Bankruptcy Court | Preamble |
| Business | Preamble |
| Business Employee | 5.14 |
| Buyers | Preamble |
| Chapter 11 Cases | Preamble |
| Chosen Courts | 11.12 |
| Closing | 4.1 |
| Closing Date | 4.1 |
| Consents | 5.4 |
| Customer | 8.2(b) |
| DOT | 8.10(b) |
| Employee Plans | 5.15(a) |
| Excluded Assets | 2.3 |
| Excluded Liabilities | 2.5 |
| Expense Reimbursement | 7.3 |
| Financial Statements | 5.8 |
| GE Capital | Preamble |
| GLC | Preamble |
| Guarantors | Preamble |
| IP Assignments | 4.2(c) |
| Latest Balance Sheets | 5.8 |
| Leased Personal Property | 2.1(b) |
| Leased Real Property | 5.12(b) |
| Material Contracts | 5.20(a) |
| May Logistics | Preamble |
| Newco | 11.6 |
| New Subsidiaries | 8.10(b) |
| Owned Personal Property | 2.1(b) |
| Owned Real Property | 2.1(a) |
| Personal Property | 2.1(b) |
| Purchase Price | 3.1 |
| Purchased Assets | 2.1 |
| Purchased Intellectual Property | 2.1(k) |
| Regiment | Preamble |
| Required Material Permits | 8.10(b) |
| Sale Order | 7.2 |

| Sale Procedures Order | 7.2 |
|---|---|
| Sellers | Preamble |
| Supplies | 2.1(c) |
| Terminated Policies | 8.6 |
| Transactions | Preamble |
| Transferred Employees | 8.1(b) |
| Transfer Taxes | 8.3(a) |

1.3.    Interpretation.  Article titles and headings to sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.  The Schedules and Exhibits referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein.  Any agreement referred to herein shall mean such agreement as amended, supplemented and modified from time to time to the extent permitted by the applicable provisions thereof and by this Agreement.

**ARTICLE II**

**PURCHASE AND SALE**

2.1.    Purchased Assets.  Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Sellers shall sell, transfer, assign, convey and deliver to Buyers, and Buyers shall purchase from Sellers, free and clear of all Encumbrances (except Permitted Encumbrances), all right, title and interest in, to and under all of the assets, rights and properties of Sellers related to the Business (other than the Excluded Assets) existing as of the Closing Date, real or personal, tangible or intangible, including but not limited to the following (collectively, the "Purchased Assets"):

(a)    Any and all real property owned by any Seller (the "Owned Real Property");

(b)    Any and all (i) owned personal property, including all computers, furniture, fixtures, machinery, tools, supplies, equipment, improvements, signage and other tangible personal property owned by Sellers (collectively, the "Owned Personal Property"), (ii) leased personal property, including all computers, furniture, fixtures, machinery, tools, supplies, equipment, improvements, signage and other tangible personal property which are leased by Sellers pursuant to an Assumed Contract (collectively, the "Leased Personal Property," and together with the Owned Personal Property, the "Personal Property"), and (iii) rights of Sellers to the warranties, express or implied, and licenses received from manufacturers, sellers and lessors of the Personal Property;

(c)    All supplies, items, spare parts, replacement and component parts and office and other materials and tangible items used, held for use or necessary to operate and maintain the Personal Property (the "Supplies");

(d)     Any and all (i) cars, trucks, forklifts, other industrial vehicles and other motor vehicles owned by Sellers and (ii) cars, trucks, forklifts, other industrial vehicles and other motor vehicles leased by Sellers pursuant to an Assumed Contract;

(e)     All Software owned by Sellers or leased or licensed by Sellers pursuant to an Assumed Contract;

(f)     All web sites owned or licensed by Sellers, including the URL addresses and related domain names;

(g)     All goodwill associated with the Business and/or the Purchased Assets;

(h)     All accounts receivable of Sellers;

(i)     All Real Property Leases of Sellers designated by Buyers in accordance with Section 2.2 to be assumed and assigned to Buyers pursuant to the Sale Order (the "Assumed Leases"), together with all security deposits related thereto and all permanent fixtures, improvements and appurtenances thereto and associated with such Assumed Leases;

(j)     All Contracts of Sellers designated by Buyers in accordance with Section 2.2 to be assumed and assigned to Buyers pursuant to the Sale Order (together with the Assumed Leases, the "Assumed Contracts"), together with all security deposits related thereto and the right to receive income in respect of such Assumed Contracts on or after the Closing Date, and any causes of action relating to breaches of the Assumed Contracts prior to the Closing;

(k)     (i) all rights in and to Intellectual Property rights owned or licensed by Sellers to the broadest extent Sellers are permitted by law to transfer such Intellectual Property (the "Purchased Intellectual Property") and (ii) to the extent such Intellectual Property may not be transferred to Buyers, each Seller shall be deemed to have granted to Buyers an exclusive, royalty free right and license to use the Intellectual Property from and after the Closing Date, to the broadest extent permitted by law and not prohibited by the terms of the applicable Contract;

(l)     All of Sellers' Cash and all of Sellers' right, title and interest in and to all deposit or similar accounts, including security deposits, in which Sellers deposit Cash, all rights and interests of any Seller in any letters of credit, prepayments and enhancements;

(m)     All Documents that are used in, held for use in or intended to be used in the Business and operations of Sellers, including Tax Returns, financial statements, Documents relating to services of Sellers, marketing, advertising, promotional materials, Documents relating to Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), customer lists, records, literature and correspondence, whether or not physically located on Leased Real Property;

(n)     All Permits used by Sellers that relate to the Purchased Assets, to the extent assignable (the "Assigned Permits");

(o)     All insurance policies and all rights of every nature and description under or arising out of such policies prior to Closing, except as provided in Section 2.3(e);

(p)     Any rights, claims, credits or causes of action or rights of set off of Sellers against third parties arising out of events occurring prior to the Closing Date, including any rights under or pursuant to the Assumed Contracts, Assumed Liabilities, any and all warranties, representations, guarantees, indemnities, avoidance claims and causes of action under the Bankruptcy Code or other Requirements of Law (including all rights and avoidance claims of Sellers arising under Chapter 5 of the Bankruptcy Code) and similar rights, excluding only the rights, claims and causes of action that are identified as Excluded Assets in Section 2.3;

(q)     All rights under the Asset Purchase Agreement, dated as of July 17, 2009, by and between iSG2 Technologies, Inc. and ADS Logistics and the ancillary documents thereto, including the warrants to purchase non-voting common stock and the note issued to a Seller thereunder;

(r)     All fuel inventory;

(s)     All refunds of premiums, or receivables for such refunds, in connection with the Terminated Policies;

(t)     only if Buyers make the election set forth in Section 8.10(b), all of the equity interests of all of the New Subsidiaries; and

(u)     All other tangible or intangible assets or properties not expressly identified as Excluded Assets.

2.2.    Identification of Assumed Contracts; Transaction Costs; Cure Amounts.

(a)     Prior to the date hereof, Sellers have delivered Schedule 2.2(a)(1) to Buyers, which schedule contains: (i) a list of all Sellers' Contracts related to the Business or Purchased Assets, (ii) with respect to each Contract that is listed on Schedule 2.2(a)(1), Sellers' good faith estimate of the Cure Amount in respect of such Contract that arose prior to the date hereof and (iii) Sellers' good faith estimate of the Transaction Costs (excluding the Cure Amounts). No later than five (5) business days prior to the Closing Date, Buyers shall provide Sellers with Schedule 2.2(a)(2), which shall include a list of Sellers' Contracts to be assumed, if applicable, by Sellers and assigned by Sellers to Buyers as part of the Assumed Contracts. As promptly as practicable following the determination of the Assumed Contracts by Buyers and in any event no later than the Closing Date, Sellers shall commence appropriate proceedings before the Bankruptcy Court and otherwise take all necessary actions in order to determine Cure Amounts with respect to any Assumed Contract.

(b)    (i)   At any time at least two (2) business day prior to the Closing Date, or such later date as the Bankruptcy Court approves the assumption and assignment of the Assumed Contracts and determines the actual Cure Amounts for the Assumed Contracts, if any, payable in connection therewith, Buyers may, in their sole discretion, modify Schedule 2.2(a)(2) to add a Contract to such Schedule or remove any Contract from such Schedule, for any reason whatsoever, including where the actual Cure Cost required to be paid or satisfied in order to assume an Assumed Contract is greater than disclosed on Schedule 2.2(a)(1).  Any Contract added to Schedule 2.2(a)(2) by Buyers pursuant to this Section 2.2(b) shall become an Assumed Contract, shall be deemed a Purchased Asset for all purposes of this Agreement.  Upon Buyers' request, Sellers shall provide additional information as to the liabilities under the Contracts listed on Schedule 2.2(a)(1) sufficient for Buyers to make an informed assessment whether to designate any such Contract as an Assumed Contract and accept an assignment and assumption of such Contract hereunder.  Any Contract removed from Schedule 2.2(a)(2) by Buyers pursuant to this Section 2.2(b) shall become an Excluded Contract, shall be deemed an Excluded Asset for all purposes of this Agreement and all liabilities under such Excluded Contract shall be Excluded Liabilities for all purposes of this Agreement.

(ii)   Any motion, application or other court document filed with, and the proposed orders submitted to, the Bankruptcy Court seeking authorization to assume and assign or reject or terminate any Contracts shall be provided to Buyers in advance of filing (with a reasonable opportunity to review and comment on same) and shall be in form and substance reasonably satisfactory to Buyers in all material respects.

(iii)  Sellers shall make available to Buyers as promptly as practicable after the date hereof (or, in the case of Contracts entered into after the date hereof, as promptly thereafter as practicable) true and complete copies of each of the Contracts listed, or required to be listed, on Schedule 2.2(a)(1), and true and complete summaries of the terms of any such oral Contracts; it being understood that, in any event, such copies and summaries shall be made available in respect of the Contracts listed on Schedule 2.2(a)(1) no later than 5 days prior to the Closing Date.

(c)    On the Closing Date, Sellers shall (i) cure, at Sellers' sole expense, any and all defaults (other than defaults cured through payment of the Cure Amounts) existing under each Assumed Contract to the extent required for Sellers to assume such Assumed Contract in the Chapter 11 Cases, (ii) provide sufficient information to Buyers in order for Buyers to pay, on behalf of Sellers, any and all Cure Amounts due with respect to each Assumed Contract, (iii) assume each Assumed Contract in the Chapter 11 Cases and (iv) subject to Buyers providing adequate assurance of performance to the counterparty thereto to the extent required by the Bankruptcy Court, assign such Assumed Contract to Buyers pursuant to an order of the Bankruptcy Court (which may be the Sale Order or one or more other orders that are no less favorable to Buyers than the provisions of the Sale Order).  Effective upon and concurrently with such assignment, Buyers shall assume, pursuant to Section 2.4, each Assumed Contract assigned to it pursuant to this Section 2.2.

2.3.    Excluded Assets. Notwithstanding the provisions of Section 2.1 the Purchased Assets shall not include the following (collectively, the "Excluded Assets"):

(a)    All Excluded Contracts (including, for the avoidance of doubt, any Real Property Leases that are not Assumed Leases);

(b)    All receivables, claims or causes of action related exclusively to any Excluded Assets;

(c)    All Employee Plans and all fiduciary liability policies, benefit administration contracts, actuarial contracts, trusts, escrows, surety bonds, letters of credit and other contracts primarily relating to any Employee Plan, except for any employment or severance agreements expressly identified by Buyers on Schedule 2.2(a)(2);

(d)    All rights under insurance policies relating to claims for losses related exclusively to any Excluded Asset;

(e)    All Documents exclusively related to any Excluded Asset;

(f)    Any amounts that a Seller is entitled to in connection with all prepaid expenses, letters of credit, security deposits or claims with respect to any Excluded Contracts;

(g)    Any minute books, stock ledgers, corporate seals and stock certificates of Sellers, and other similar books and records that Sellers are required by law to retain or that Sellers determine are reasonably necessary to retain including corporate or other entity filings; provided that Sellers shall provide Buyers reasonable access to any Excluded Asset described in this subclause (g) that is related to the Business or the Purchased Assets; and

(h)    Any rights of Sellers under this Agreement.

2.4.    Assumed Liabilities. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyers shall assume, and thereafter pay, perform and discharge when due (in accordance with their respective terms and subject to the respective conditions thereof), only the following liabilities (the "Assumed Liabilities") and no others:

(a)    All obligations of Sellers under the Assumed Contracts arising after the Closing Date, except to the extent such obligations, but for a breach or default by any Seller, would have been paid, performed or otherwise discharged on or prior to the Closing Date or to the extent the same arise out of any such breach or default;

(b)    All Postpetition Obligations;

(c)    All Senior Lender Costs;

(d)     The DIP Carve-Out Amount, solely in the event and to the extent Buyers do not elect to pay such amount on the Closing Date in accordance with Section 3.2 hereof; and

(e)     All other liabilities expressly set forth on Schedule 2.4(e).

2.5.     Excluded Liabilities.  Notwithstanding anything contained in this Agreement to the contrary, none of the Buyers shall assume or be obligated to pay, perform or otherwise discharge any other liability or obligation of Sellers whatsoever or any liabilities or obligations constituting an Encumbrance upon the Purchased Assets, regardless of whether any such liabilities or obligations are absolute or contingent, known or unknown, liquidated or unliquidated, or otherwise. Sellers shall remain liable for all liabilities or obligations other than the Assumed Liabilities (collectively, the "Excluded Liabilities"), including any liabilities or obligations arising prior to Closing, including under any Assumed Contract, any liabilities and obligations related to any Excluded Assets, any liabilities and obligations arising under the Excluded Contracts and all liabilities and obligations in respect of Taxes for which Sellers are liable pursuant to Section 8.3.  Without limiting the generality of the foregoing, in no event shall any Buyer assume any of the following liabilities or obligations:

(a)     All liabilities and obligations of any Seller relating to Excluded Assets;

(b)     All liabilities and obligations of any Seller for: (i) payments made to or fees and expenses accrued with respect to professionals retained or employed in connection with the Chapter 11 Cases or any official committee of creditors appointed in the Chapter 11 Cases, except to the extent specifically assumed pursuant to Section 2.4 hereof, (ii) reclamation Claims and (iii) any prepetition, priority or other Tax Claims;

(c)     Any liability or obligation of Sellers or their directors, officers, stockholders or agents, arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including, without limitation, all finder's or broker's fees and expenses and any and all fees and expenses of any representatives of Sellers;

(d)     Any liability or obligation relating to (i) events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or (ii) the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business);

(e)     Any liability or obligation to any Person at any time employed by Sellers or Affiliates or their predecessors-in-interest at any time or to any such Person's spouse, children, other dependents or beneficiaries, including with respect to incidents, events, exposures or circumstances occurring at any time during the period or periods of any such Person's employment by Sellers or their predecessors-in-interest, whenever such claims mature or are asserted, including, without limitation, all liabilities arising (i) under the Employee Plans, any other employment, change in control, termination, severance or similar agreement, (ii) under any employment, wage and hour law or restriction, equal

13

opportunity, discrimination, plant closing or immigration and naturalization laws, or any other applicable laws related to employment or termination thereof, (iii) under any collective bargaining laws, agreements or arrangements or (iv) in connection with any workers' compensation or any other employee health, accident, disability or safety claims;

(f)     any liability or obligation of Sellers under Title IV of ERISA;

(g)     any liability or obligation of Sellers under COBRA;

(h)     any incentive compensation, bonus, change in control, severance, pension or retirement liability or obligation of any Seller to its current or former employees whether or not accrued as of the Closing Date, whether or not under any Employee Plan, unless expressly identified on Schedule 2.4(e) as an Assumed Liability;

(i)     any liability or obligation of any Seller, or any member of any consolidated, affiliated, combined or unitary group of which any Seller is or has been a member, for (i) Taxes, or (ii) Taxes of any Person, pursuant to an agreement or otherwise;

(j)     any liability or obligation incurred by (i) Sellers or (ii) their respective directors, officers, stockholders, agents or employees after the Closing Date;

(k)     any liability of Sellers to any Person on account of any proceeding, including those proceedings set forth on Schedule 5.16;

(l)     any liability or obligation arising out of the conduct of the Business prior to the Closing Date or arising out of the ownership or operation of an Excluded Asset;

(m)     any liability or obligation of Sellers under any Indebtedness, including, without limitation, any Indebtedness owed to any stockholder or other Affiliate of any Seller, and any Contract evidencing any such financing arrangement;

(n)     any liability or obligation, whether known or unknown, (i) under Environmental Laws attributable or relating to or incurred as a result of any acts, omissions, or conditions first occurring or in existence as of or prior to the Closing Date, including, but not limited to, any liability or obligation with respect to the release, handling, discharge, treatment, storage, generation, disposal, or presence of Hazardous Substances at any location (it being understood that Buyers shall be responsible for any liability or obligation arising out of or relating to its actions following the Closing), (ii) with respect to claims relating to health and safety, including claims for injury, sickness, disease or death of any Person (to the extent relating to or incurred as a result of any acts, omissions, or conditions first occurring or in existence as of or prior to the Closing Date ) or (iii) with respect to compliance with any legal requirement relating to any of the foregoing, to the extent relating to periods prior to the Closing; and

(o)     fees or expenses of Sellers incurred with respect to the transactions contemplated herein, except to the extent that Buyers elect to treat the DIP Carve-Out Amount as an Assumed Liability in accordance with Section 3.2 hereof.

2.6.    Assignment of Contracts and Rights. To the maximum extent permitted by the Bankruptcy Code, the Purchased Assets shall be assumed, as applicable, and assigned to Buyers pursuant to Section 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in an order or this Agreement, as applicable. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any asset or any right thereunder if an attempted assignment without the consent of a third party would constitute a breach or in any way adversely affect the rights of Buyers or Sellers thereunder. If such consent is not obtained or such assignment is not attainable pursuant to Sections 105, 363 or 365 of the Bankruptcy Code other than as a result of the failure to pay Cure Amounts which are not Assumed Liabilities, Sellers shall use their reasonable best efforts to obtain such consent required to novate and/or assign any Assumed Contract to be assigned to Buyers hereunder. Sellers shall keep Buyers reasonably informed from time to time of the status of the foregoing and Buyers shall cooperate with Sellers in this regard. If any such consent has not been obtained or if any attempted assignment would be ineffective or would impair Buyers' rights under the instrument in question so that Buyers would not acquire the benefit of all such rights, then Sellers, to the maximum extent permitted by applicable law and the instrument, shall act as Buyers' agent in order to obtain for Buyers the benefits thereunder and shall cooperate, to the maximum extent permitted by applicable law and the instrument, with Buyers in any other reasonable arrangement designed to provide such benefits to Buyers (including, without limitation, by entering into an equivalent arrangement); provided, however, that after Closing, Buyers shall be responsible for all payment and other obligations under, and for all costs of obtaining such rights under such non-assignable Contract.

## ARTICLE III

## PURCHASE PRICE

3.1.    Purchase Price. The aggregate consideration and purchase price (the "Purchase Price") for the sale, transfer, assignment and conveyance of the Purchased Assets will be (a) the assumption by Buyers or payment by Buyers, at their election, of the DIP Carve-Out Amount, (b) the payment by Buyers, on behalf of Sellers, of the Transaction Costs to the extent unpaid at Closing, (c) the payment by Buyers, on behalf of Sellers, of the DIP Obligations, (d) the waiver and relinquishment by the Senior Lenders of the Senior Lender Claims in an amount equal to $21,000,000, effective upon Closing through the Mutual Waiver and Release and (e) the assumption by Buyers of the Assumed Liabilities, effective upon Closing through the Assumption and Assignment Agreement.

3.2.    Determination of Certain Obligations; Payment on Closing Date.

(a)     At least two (2) business days prior to the Closing Date, Sellers shall deliver to Buyers a certificate executed on behalf of each Seller by an authorized officer thereof, dated the date of its delivery, setting forth in reasonable detail the amount of each of the DIP Obligations, the Transaction Costs and the DIP Carve-Out Amount and also

including (i) an invoice from each party to whom Transaction Costs are due setting forth the full amount of Transaction Costs due to such party and (iii) such other evidence that is reasonably satisfactory to Buyers to support such amounts;

(b)     Prior to the Closing Date, Buyers shall elect, in writing, to either pay the DIP Carve-Out Amount pursuant to Section 3.1 or assume the DIP Carve-Out Amount, in which case the DIP Carve-Out Amount shall be deemed to be an Assumed Liability for purposes of Sections 2.4 and 3.1 hereof; and

(c)     On the Closing Date, Buyers shall (i) pay to the appropriate third parties the Transaction Costs, on behalf of Sellers, by bank wire transfer of immediately available funds to such bank account or accounts designated by such third parties for such purpose not less than two (2) business days before the date such payment is required to be made and (ii) pay to the Senior Lenders, on behalf of Sellers, their respective pro rata share of the DIP Obligations by bank wire transfer of immediately available funds to such bank account or accounts designated by the Senior Lenders not less than two (2) business days prior to the Closing Date.

3.3.     <u>Allocation of Purchase Price</u>.  To the extent required by Requirements of Law, promptly following the Closing Date, Buyers shall prepare and file those statements or forms (including Form 8594) required by Section 1060 of the Code and the Treasury regulations thereunder.  As promptly as practicable after such statements or forms are filed, Buyers shall provide Sellers with a copy of such statements or forms as filed.

# ARTICLE IV

# CLOSING

4.1.     <u>Closing Date</u>.  The consummation of the transactions contemplated hereby (the "<u>Closing</u>") shall take place at the offices of Sidley Austin LLP, One South Dearborn, Chicago, Illinois 60603 at 10:00 a.m., local time, no later than the later of (i) the second Business Day following the satisfaction or waiver by the appropriate party of all the conditions contained in Article IX or (ii) such other date or at such other place and time as may be mutually agreed to by the parties (the "<u>Closing Date</u>").  All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

4.2.     <u>Sellers' Closing Date Deliveries</u>.  At Closing, Sellers shall deliver to Buyers each of the following:

(a)     possession of the Purchased Assets, to be delivered to Buyers;

(b)     the Bill of Sale, the Mutual Waiver and Release and Assumption and Assignment Agreement and each other Ancillary Agreement to which any Seller is a party, duly executed by the applicable Sellers;

(c)     instruments of assignment of all of the Purchased Intellectual Property (the "IP Assignments"), duly executed by Sellers, in form for recordation with the appropriate Governmental Body, substantially in the form of Exhibit D hereto, and any other assignments or instruments with respect to the Purchased Intellectual Property for which an assignment or instrument is required to assign, transfer or convey such assets to Buyers;

(d)     evidence of receipt of Consents identified on Schedule 9.2(e) to the extent such consents are not provided for or satisfied by the Sale Order;

(e)     certified copy of the Sale Order;

(f)     the officer's certificate required to be delivered pursuant to Section 9.2(a), and (b);

(g)     a certificate of the secretary or an assistant secretary of each Seller, dated as of the Closing Date, in form and substance reasonably satisfactory to Buyers, as to (i) the certificate or articles of incorporation of such Seller; (ii) the by-laws (or similar document) of such Seller; (iii) the authority of such Seller regarding the due execution and performance of this Agreement and the contemplated transactions; and (iv) the incumbency and signatures of the officers of such Seller executing this Agreement and any document or agreement required to be delivered hereunder;

(h)     a certificate of good standing of each Seller in the jurisdiction of its organization or formation;

(i)     certificates executed by each Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(j)     all instruments and documents necessary to release any and all Claims and Encumbrances (other than Permitted Encumbrances);

(k)     true and complete files for all Assumed Contracts, including, to the extent in Sellers' possession, originally signed copies of each Assumed Contract and all correspondence, amendments, modifications and waivers related thereto; and

(l)     such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyers, as Buyers may reasonably request, to transfer to Buyers good and marketable title to the Purchased Assets, free and clear of any and all Encumbrances thereon (other than Permitted Encumbrances).

4.3.     Buyers' Closing Deliveries.  At Closing, Buyers shall:

(a)     deliver to Sellers each of the following:

(i)     the Assumption and Assignment Agreement, the Mutual Waiver and Release and each other Ancillary Agreement to which any Buyer is a party, duly executed by the applicable Buyers;

(ii)    the officer's certificates required to be delivered by Section 9.1(a) and (b);

(iii)   the Mutual Waiver and Release providing for the waiver and release of the portion of Senior Lender Claims included in the Purchase Price, duly executed by the Senior Lenders; and

(iv)    such other assignments and other good and sufficient instruments of assumption, in form reasonably satisfactory to Sellers, as Sellers may reasonably request to assign the Assumed Liabilities to Buyers; and

(b)     to the extent not already paid, pay to the appropriate third parties cash, by wire transfer of immediately available funds, in the amount of (i) the Transaction Costs due to such third party and (ii) solely in the event Buyers elect to pay such amount on the Closing Date in accordance with Section 3.2 hereof, the DIP Carve-Out Amount.


**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF SELLERS**

As an inducement to Buyers to enter into this Agreement and to consummate the transactions contemplated hereby, each Seller jointly and severally represents and warrants to Buyers and agrees as follows:

5.1.    Organization.  Each Seller is an entity duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization or formation and has the requisite corporate or limited liability company power and authority to own, lease and operate its properties and assets and to conduct its businesses as now conducted.  Each Seller is also duly qualified to do business and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the businesses conducted by it makes such qualification necessary, except where the failure to so qualify or be in good standing would not have a Material Adverse Effect.  Schedule 5.1 sets forth for each Seller, the jurisdiction of its organization and each jurisdiction in which it is qualified to do business.  Except as set forth on Schedule 5.1, no Seller has any subsidiaries or owns any equity interest in any other entity.

5.2.    Authorization and Validity.  Each Seller has all requisite corporate or limited liability company power and authority to enter into this Agreement and any Ancillary Agreements to which each such Seller is or will become a party and, subject to the Bankruptcy Court's entry of the 363/365 Orders, the execution and delivery of this Agreement and each Ancillary Agreement to which each such Seller is or will become a party and the performance of each such Seller's obligations hereunder and thereunder, have been, or on the Closing Date will be, duly authorized by all necessary corporate or limited liability company action of each such

Seller, and no other corporate or limited liability company proceedings on the part of any Seller are necessary to authorize such execution, delivery and performance. This Agreement and each Ancillary Agreement to which each Seller is or will become a party have been, or on the Closing Date will be, duly executed by each such Seller, and, subject to the Bankruptcy Court's entry of the 363/365 Orders, constitute, or will when executed and delivered constitute, each such Seller's valid and binding obligation, enforceable against each such Seller in accordance with their respective terms. The board of directors or board of managers (as applicable) of each Seller has resolved to request that the Bankruptcy Court approve this Agreement and the transactions contemplated hereby and each Ancillary Agreement to which each Seller is or will become a party.

5.3.  No Conflict or Violation.  Subject to the (a) receipt of all Consents and (b) the Bankruptcy Court's entry of the 363/365 Orders, the execution, delivery and performance by each Seller of this Agreement and each Ancillary Agreement to which any Seller is or will become a party does not and will not (i) violate or conflict with any provision of the organizational documents of any Seller, (ii) violate any provision of law, or any order, judgment or decree of any Governmental Body applicable to any Seller, other than immaterial violations (but not including immaterial violations of the Bankruptcy Code or arising under or in connection with the Chapter 11 Case) which do not impair the ability of Sellers to comply with their obligations hereunder or consummate the transactions contemplated hereby (iii) result in or require the creation or imposition of any Claims or Encumbrances (other than Permitted Encumbrances) on any of the Purchased Assets, (iv) violate or result in a material breach of or constitute (with due notice or lapse of time or both) a material default under any Assumed Contract or contract, agreement or understanding entered into by any Seller or by which any of the Sellers is bound or to which the assets of Sellers are subject or (v) require the approval, consent, authorization or act of, or the making by any Seller of any declaration, filing or registration with, any Person, except in the case of this clause (v), to the extent any failure to obtain an approval, consent or authorization from such Person would not be material to the Business or the Purchased Assets.

5.4.  Consents and Approvals.  Schedule 5.4 sets forth a true and complete list of each declaration to or filing or registration with any Governmental Body and each material consent, waiver, authorization or approval of any Person that is required to be obtained by Sellers in connection with the execution and delivery by Sellers of this Agreement and the Ancillary Agreements or the performance by them of their respective obligations hereunder or thereunder, including, without limitation, any and all consents and approvals that are required to be obtained, or rights of first refusal, first offer or other similar preferential rights to purchase that are required to be complied with, in connection with the assignment or transfer of any Purchased Assets to Buyers in accordance with the terms of this Agreement (collectively, the "Consents").

5.5.  Compliance with Law.  Except as set forth on Schedule 5.5, no Seller is (or within the past three years has been) in violation or contravention, in any material respect, of any law applicable to the Business or the Purchased Assets, nor is any Seller in (nor within the past three years has been in) default, in any material respect, with respect to any order applicable to the Business or the Purchased Assets.

5.6.  Taxes.

(a)     Except as set forth on Schedule 5.6, (i) each Seller has, in respect of the Business and the Purchased Assets, timely filed all Tax Returns which are required to be filed and has paid all Taxes which have become due pursuant to such Tax Returns or pursuant to any assessment which has become payable or for which Buyers may otherwise have any transferee liability; (ii) all such Tax Returns are complete and accurate and disclose all Taxes required to be paid in respect of the Business and the Purchased Assets; (iii) all such Tax Returns have been examined by the relevant taxing authority or the period for assessment of the Taxes in respect of which such Tax Returns were required to be filed has expired; (iv) there are no material liens for Taxes upon any of the Purchased Assets nor is any taxing authority in the process of imposing, or has threatened in writing (or verbally) to impose, any material Lien for Taxes on any of the Purchased Assets, other than liens for Taxes that are not yet due and payable or for Taxes the validity or amount of which is being contested by a Seller in good faith by appropriate action and for which appropriate provision has been made in accordance with GAAP and (v) all monies required to be withheld by Sellers (including from employees of the Business for income Taxes and social security and other payroll Taxes) have been collected or withheld, and either paid to the respective taxing authorities, set aside in accounts for such purpose, or accrued, reserved against and entered upon the books of the Business.

(b)     No transaction contemplated by this Agreement is subject to withholding under Section 1445 of the Code, and no sales Taxes, use Taxes, real estate transfer Taxes or other similar Taxes will be imposed on the transfer of the Purchased Assets or the assumption of the Assumed Liabilities pursuant to this Agreement.

5.7.    Title and Sufficiency of Purchased Assets.

(a)     On the Closing Date, Sellers will have, and, upon delivery to Buyers on the Closing Date of the instruments of transfer contemplated by Section 4.2, and subject to Section 2.6 and to  the terms of the Sale Order, Sellers will thereby transfer to Buyers, good and marketable title to, or, in the case of property leased or licensed by Sellers, a valid and subsisting leasehold interest in or a legal, valid and enforceable licensed interest in or right to use, all of the Purchased Assets, free and clear of all Claims and Encumbrances (except Permitted Encumbrances), except for the Assumed Liabilities.

(b)     Except as set forth on Schedule 5.7(b) and other than the Excluded Assets, the Purchased Assets constitute all of the material assets used or held for use in connection with the conduct of the Business, and are sufficient to carry on the Business as currently conducted.

(c)     Upon completion of the actions set forth in Section 8.10(b), if applicable, and consummation of the transactions contemplated by this Agreement, the Buyers shall have valid, legal title to the New Subsidiaries and the New Subsidiaries shall have valid, legal title to the Required Material Permits.

5.8.    Financial Schedules.  Schedule 5.8 consists of: (a) each of the Sellers' unaudited consolidated combined balance sheets as of July 31, 2009 (the "Latest Balance Sheets"), (b) each

of the Sellers' unaudited consolidated balance sheets and the statements of income and cash flows for the fiscal year ended December 31, 2008 (together with the Latest Balance Sheets, the "Financial Statements") and (c) each of the Sellers' annual budget for 2010. Except as set forth on Schedule 5.8, the Financial Statements have been based upon the information contained in each of the Sellers' books and records, have been prepared in accordance with GAAP, consistently applied throughout the periods indicated, and present fairly in all material respects the consolidated financial condition and results of operations of each of the Sellers as of the times and for the periods referred to therein, subject in the case of the unaudited financial statements to (i) the absence of footnote disclosures and (ii) changes resulting from normal and customary year-end adjustments.

5.9. <u>Absence of Certain Developments</u>. Except as set forth on the attached Schedule 5.9 or otherwise in the ordinary course of business consistent with past practice, since the date of the Latest Balance Sheets, there has not been any Material Adverse Effect and each of the Sellers has not:

(a) borrowed any amount or incurred or become subject to any material liabilities (other than liabilities incurred in the ordinary course of business, liabilities under contracts entered into in the ordinary course of business or disclosed on the disclosure schedules and borrowings from banks (or similar financial institutions) necessary to meet ordinary course working capital requirements);

(b) mortgaged, pledged or subjected to any material lien, charge or other Encumbrance, any material portion of its assets;

(c) sold, assigned or transferred any material portion of its tangible assets, except in the ordinary course of business;

(d) sold, assigned or transferred any material Intellectual Property, except in the ordinary course of business;

(e) issued, sold or transferred any of its Capital Stock or other equity securities, securities convertible into its Capital Stock or other equity securities or warrants, options or other rights to acquire its Capital Stock or other equity securities, or any bonds or debt securities other than pursuant to and in compliance with any Employee Plan;

(f) made any material capital investment in, or any material loan to, any other Person (other than a Subsidiary of any of the Sellers), except in the ordinary course of business;

(g) declared, set aside, or paid any dividend or made any distribution with respect to its Capital Stock (whether in cash or in kind) or redeemed, purchased, or otherwise acquired any of its Capital Stock, except for dividends or distributions made by the subsidiaries to their respective parents in the ordinary course of business;

(h)     made any material capital expenditures or commitments therefor, except for such capital expenditures or commitments therefor that are reflected in its budget for the fiscal year ending December 31, 2009 or the DIP Credit Agreement budget;

(i)     made any loan to, or entered into any other transaction with, any of its directors, managers, officers, and, other than in the ordinary course of business consistent with past practice, employees;

(j)     entered into or modified any employment contract or consulting contract (A) with any officer, manager or director or (B) any other employee or third party providing for payments exceeding $100,000 per year;

(k)     entered into any collective bargaining agreement, or modified the terms of any existing collective bargaining agreement; or

(l)     made any other change in employment terms (including compensation) for any of its directors, managers, officers or employees except in the ordinary course of business consistent with past practice.

5.10.   No Undisclosed Liabilities.  None of the Sellers is subject to any material liability (including unasserted claims, whether known or unknown), whether absolute, contingent, accrued or otherwise, which is not shown or which is in excess of amounts shown or reserved for on the Latest Balance Sheets, other than liabilities of the same nature as those set forth on the Latest Balance Sheets and the notes thereto and reasonably incurred in the ordinary course of business consistent with past practice after the date of the Latest Balance Sheets.

5.11.   Customers and Suppliers.  Except as set forth on Schedule 5.11, there are no outstanding material disputes between Sellers and any of their respective customers or suppliers and no material customer or supplier has notified any Seller in writing that it intends to terminate or materially reduce the amount of business it conducts with Sellers.

5.12.   Real Property.

(a)     Schedule 5.12(a)(1) sets forth, among other things, a true, correct and complete list of all Owned Real Property, together with a description of any buildings, and material improvements located on such real property.  Sellers have made available to Buyers prior to the execution of this Agreement true and complete copies of all deeds, leases, subleases, easements, mortgages, deeds of trust, certificates of occupancy, title insurance policies, title reports, surveys and similar documents, and all amendments thereof, with respect to the Owned Real Property, in each case, in Sellers' possession, custody or control.  Except as set forth on Schedule 5.12(a)(2), Sellers have obtained all easements and rights of way required to use and operate the Owned Real Property in the manner in which such Owned Real Property is currently being used and operated by Sellers.  No Seller is a party to any lease, assignment or similar arrangement under which such Seller is a lessor or assignor with respect to any of the Owned Real Property, or under which any portion of the Owned Real Property is made available for use by any third party.

(b)    Schedule 2.2(a)(1) sets forth, among other things, a true, correct and complete list of all Real Property Leases for all real property which Sellers are entitled to use and/or possess (including the date, if available, and name of each of the parties to such Real Property Leases) (collectively, the "Leased Real Property"). Except as set forth on Schedule 5.12(b), each Seller has complied in all material respects with the provisions of the Real Property Leases to which such Person is a party. Each of the Real Property Leases is in full force and effect. None of the Sellers has assigned its interest under any Real Property Lease to which it is a party, or subleased, licensed, encumbered or pledged all or any portion of its leasehold interest in any Real Property Lease, to any third party. No option has been exercised under any Real Property Lease, except options whose exercise have been evidenced by a written document delivered to Buyers. Except as set forth on Schedule 5.12(b), none of the Sellers is in default under any Real Property Lease and (i) no controversy, claim, dispute or disagreement exists between the parties to any Real Property Lease and (ii) no event has occurred which with the passage of time or giving of notice, or both, would constitute a default thereunder. There are no guarantees (from any Seller or any Affiliate of any Seller or, to the Knowledge of Sellers, from any other Person) in favor of the lessors under any of the Real Property Leases.

(c)    There are no condemnation, eminent domain or other similar proceedings pending or threatened affecting any portion of the Owned Real Property or Leased Real Property.

(d)    There are no Encumbrances on any of the Owned Real Property or Leased Real Property.

5.13.    Personal Property. All Personal Property is and shall be as of the Closing Date in good working order and condition, free of defect or damage, ordinary wear and tear excepted.

5.14.    Employees. Set forth on Schedule 5.14 is (a) a list of all employees of the Business on the date hereof (each, a "Business Employee"), including their full legal name and position and (b) a true and complete schedule of the salary, bonus and other compensation information for each Business Employee. Schedule 5.14 shall be updated as necessary to reflect new hires or other personnel changes occurring between the date hereof and Closing. None of the Sellers are bound by any oral or written employment agreement, consulting agreement, or deferred compensation agreement with any of the Business Employees. No Business Employee is a party to any collective bargaining agreement.

5.15.    Employee Benefits.

(a)    Set forth on Schedule 5.15(a) is a correct and complete list identifying each material "employee benefit plan," as defined in Section 3(3) of ERISA, each material employment, retention, severance or similar contract, plan, arrangement or policy and each other material plan or arrangement (written or oral) providing for compensation, bonuses, profit-sharing, stock option or other stock-related rights or other forms of incentive or deferred compensation, vacation benefits, insurance (including any self-insured arrangements), health or medical benefits, employee assistance program, disability or sick leave benefits, workers' compensation, supplemental unemployment

benefits, severance or retention benefits and post-employment or retirement benefits (including compensation, pension, health, medical or life insurance benefits) which is maintained, administered or contributed to by any Seller or any of their Affiliates or by which any of them are bound, and which covers any Business Employee as of the date hereof (all of the foregoing collectively referred to as the "Employee Plans"). Copies of such Employee Plans (and, if applicable, related trust or funding agreements or insurance policies) and all amendments thereto that Buyers have requested copies of have been made available to Buyers together with, if applicable, the most recently filed annual report (Form 5500 including, if applicable, Schedule B thereto) in connection with any such plan or trust.

(b)     Each Employee Plan is now and has been operated in all material respects in accordance with its terms and the Requirements of Law, including ERISA and the Code.

(c)     No Employee Plans are subject to Title IV or Section 302 of ERISA.

(d)     There are no pending or, to the Knowledge of Sellers, threatened claims by or on behalf of any Employee Plan, by any employee or beneficiary covered under any such Employee Plan, or otherwise involving any such Employee Plan (other than routine claims for benefits).

(e)     There are no material outstanding liabilities of, or related to, any Employee Plan, other than liabilities for benefits to be paid in the ordinary course to participants in such Employee Plan and their beneficiaries in accordance with the terms of such Employee Plan.

(f)     Each Employee Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service that it is so qualified, and no fact or event has occurred since the date of such determination letter that would reasonably be expected to adversely affect such qualification.

(g)     Sellers have made all required contributions to the Employee Plans, except for any contribution which is not yet due and payable.

(h)     None of the Purchased Assets is the subject of any Encumbrance arising under Section 302(f) of ERISA or Section 412(n) of the Code.

5.16.   Legal Proceedings.

(a)     Except as described on Schedule 5.16, there are no material claims, actions, suits or proceedings pending or, to the Knowledge of Sellers, threatened by or against any Seller relating to or affecting the Business or the Purchased Assets.

(b)     Except as described on Schedule 5.16, there are no material judgments, decrees, orders, writs, injunctions, rulings, decisions or awards of any court or

Governmental Body to which Seller is a party or is subject with respect to the Business or to which any of the Purchased Assets is subject.

5.17.  Intellectual Property.  Except as set forth on Schedule 5.17, Sellers own or have the right to transfer to Buyers all Purchased Intellectual Property.  Except as set forth on Schedule 5.17 no material claims are pending against Sellers before a Governmental Body or, to the Knowledge of Sellers, threatened with regard to the ownership by Sellers of any Purchased Intellectual Property.  No Seller has been notified in writing or, to the Knowledge of Sellers, otherwise, that the use of any such Purchased Intellectual Property by such Seller infringes on the rights of any Person.

5.18.  Permits.  Schedule 5.18 sets forth a true, complete and correct list of all material Permits, including all material Permits required under Environmental Laws, necessary for the ownership or operation of the Business by Sellers as of the date hereof.  Except as set forth on Schedule 5.18 and as may have resulted from the commencement of the Chapter 11 Cases, all Permits (a) are, in all material respects, valid an in full force and effect and none of the Sellers are in default under or in violation of any such Permit and no suspension or cancellation of any such Permit is pending or, to the Knowledge of Sellers, threatened and (b) except as set forth on Schedule 5.18 and subject to the entry of the Sale Order and the provisions of Section 2.6 hereof, may be transferred or reissued to Buyers in accordance with this Agreement and without the approval of any third party (other than the Bankruptcy Court).

5.19.  Environmental Matters.

(a)  Sellers have provided or made available to Buyers copies of all information in possession of Sellers relating to the presence, release or migration of Hazardous Materials on, in or under the Leased Real Property or Owned Real Property and the compliance with, and potential liability under, applicable Environmental Laws associated with the Purchased Assets.

(b)  Each of the Sellers is in compliance, in all material respects, with all applicable Environmental Laws and any written notice or demand letter issued, entered, promulgated or approved thereunder.

(c)  None of the Sellers have received, within the two (2) years prior to the date hereof, any written notice of material violations or material liabilities, and there are no claims or proceedings pending or threatened, arising under Environmental Laws, including relating to any investigatory remedial or corrective obligation, on the part of any Seller or its respective facilities or operations, the subject of which is unresolved.

5.20.  Material Contracts.

(a)  Schedule 5.20 sets forth a complete and correct list of the following Contracts to which any Seller is a party with respect to the Business or by which any of the Purchased Assets  are subject or bound, in each case as in effect on the date hereof, and, if such Contract is not in writing, a description of any material terms thereof (collectively, and together with the Real Property Leases, the "Material Contracts"):

(i)     credit agreements, loan agreements, letters of credit, repurchase agreements, mortgages, security agreements, guarantees, pledge agreements, trust indentures, promissory notes or other documents or arrangements relating to Indebtedness;

(ii)     Contracts under which Sellers have made advances or loans in excess of $25,000 individually or $200,000 in the aggregate to any other Person;

(iii)     (A) employment, severance, change of control or similar agreements that are not terminable by Sellers without penalty or (B) consulting, independent contractor or similar agreements that involve payments in excess of $100,000 in any calendar year and are not terminable by Sellers on 90 days' notice without penalty;

(iv)     Contracts of guaranty, surety or indemnification, direct or indirect, by Sellers;

(v)     Contracts with any labor union or association representing any employee of any Seller with respect to the conduct of the Business;

(vi)     Contracts for the sale or purchase of any assets, property or rights, in each case relating to the Business, except in the ordinary course of business consistent with past practice;

(vii)     Contracts relating to the acquisition (by merger, purchase of stock or assets or otherwise) by any Seller of any operating business or a material portion of the assets or the capital stock of any other Person, in each case relating to the Business;

(viii)     Contracts limiting or restraining any Seller, with respect to the conduct of the Business or the Purchased Assets, from engaging or competing in any lines of business with any Person or from soliciting or hiring any Person with respect to employment;

(ix)     Contracts for joint ventures, strategic alliances, partnerships, licensing arrangements, or sharing of profits or proprietary information, in each case relating to the conduct of the Business or the Purchased Assets;

(x)     material licenses or other material agreements pertaining to the Intellectual Property used in connection with the conduct of the Business;

(xi)     Contracts requiring payments to or by a Seller, with respect to the conduct of the Business or the Purchased Assets, of more than $100,000 in any year or $500,000 over the life of any such Contract; and

(xii)     all other Contracts that are material to the Business or the Purchased Assets.

(b)     Except as set forth on Schedule 5.20, each Material Contract is in full force and effect and is a valid and binding obligation of the Seller party thereto and, to

the Knowledge of Sellers, the other parties thereto, in accordance with its terms and conditions, except as such enforceability may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally and general principles of equity. No party to any Material Contract has notified any Seller in writing (or, to the Knowledge of Sellers, verbally), that it intends to terminate such Material Contract, and no party has given notice in writing (or, to the Knowledge of Sellers, verbally) of any significant dispute with respect to any Material Contract. Sellers have made available to Buyers true and complete originals or copies of all the Material Contracts, together with all amendments, modifications or supplements thereto.

5.21.    Insurance. Schedule 5.21 sets forth a correct and complete list of all current insurance policies covering Sellers. Except as set forth on Schedule 5.21, all premiums required to be paid under each insurance policy required to be set forth on Schedule 5.21 have been paid when due, and all such policies are in full force and effect.

5.22.    Affiliate Transactions. Except as set forth on Schedule 5.22, no Affiliate of Seller and no employee, officer or director of Seller or any of its Affiliates (a) owns, directly or indirectly, in whole or in part, any Permits, real property, leasehold interests or other property, the use of which is necessary for the operation of the Business, (b) has made any claim or is party to any other action, suit or proceeding against, or owes any amount to Seller related to the Business, or (c) is a party to any Contract related to the Business pursuant to which Seller provides to, or receives services from, any such Person, except as to any such individual in his or her capacity as a Business Employee.

5.23.    Broker. Except as set forth on Schedule 5.23, none of the Sellers nor any Person acting on any Seller's behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

5.24.    Disclaimer of Other Representations and Warranties. Except as expressly set forth in this Article V, Sellers make no representation or warranty, statutory, express or implied, at law or in equity, in respect of Sellers or any of their assets, liabilities or operations, and any such other representations or warranties are hereby expressly disclaimed, and there are no other warranties, statutory, express or implied, that extend beyond the warranties contained in this Agreement. Buyers hereby acknowledge and agree that, except to the extent specifically set forth in this Article V, Buyers are purchasing the Purchased Assets on an "as-is, where-is" basis and "with all faults."

5.25.    New Subsidiaries. From their formation through the Closing, none of the New Subsidiaries have any liability (including unasserted claims, whether known or unknown), whether absolute, contingent, accrued or otherwise, assets or operations except the Permits transferred pursuant to Section 8.10 and the post-Closing liabilities directly related thereto. Each of the New Subsidiaries is, and has been since its formation, disregarded as an entity separate from its owner for federal and state income tax purposes.

# ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF BUYERS

As an inducement to Sellers to enter into this Agreement and to consummate the transactions contemplated hereby, each Buyer severally and not jointly represents and warrants to Sellers and agrees as follows:

6.1. <u>Organization of Buyers</u>. Such Buyer is an entity duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization and in each jurisdiction where it is qualified to do business and has the requisite corporate or limited liability company power and authority to own, lease and operate its properties and assets and to conduct its businesses as now conducted.

6.2. <u>Authorization and Validity</u>. Such Buyer has all requisite corporate or limited partnership power and authority to enter into this Agreement and any Ancillary Agreements to which such Buyer is or will become a party and the execution and delivery of this Agreement and each Ancillary Agreement to which such Buyer is or will become a party and the performance of such Buyer's obligations hereunder and thereunder, have been, or on the Closing Date will be, duly authorized by all necessary corporate or limited partnership action of such Buyer, and no other corporate or limited liability company proceedings on the part of any Buyer are necessary to authorize such execution, delivery and performance. This Agreement and each Ancillary Agreement to which such Buyer is or will become a party have been, or on the Closing Date will be, duly executed by such Buyer, and, subject to the Bankruptcy Court's entry of the Sale Order, constitute, or will when executed and delivered constitute, such Buyer's valid and binding obligation, enforceable against such Buyer in accordance with their respective terms. The board of directors or board of managers (as applicable) of such Buyer has approved this Agreement and the transactions contemplated hereby and each Ancillary Agreement to which such Buyer is or will become a party.

6.3. <u>No Conflict or Violation</u>. The execution, delivery and performance by such Buyer of this Agreement and any Ancillary Agreement to which such Buyer is or will become a party do not and will not (i) violate or conflict with any provision of the organizational documents of such Buyer, (ii) violate any provision of law, or any order, judgment or decree of any court or Governmental Body applicable to such Buyer or (iii) violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contract to which such Buyer is party or by which such Buyer is bound or to which such Buyer's properties or assets are subject.

6.4. <u>Consents and Approvals</u>. No consent, waiver, authorization or approval of any Person and no declaration to or filing or registration with any Governmental Body is required in connection with the execution and delivery by such Buyer of this Agreement and each Ancillary Agreement to which such Buyer is or will become a party or the performance by such Buyer of its obligations hereunder or thereunder.

6.5.    Adequate Assurances Regarding Assumed Contracts.  Such Buyer is (or, after the Closing, will be) capable of satisfying the conditions contained in Sections 365(b)(l)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts.

6.6.    Broker.  Such Buyer has not, nor has any Person acting on such Buyer's behalf, paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

6.7.    "AS IS" TRANSACTION.  BUYERS HEREBY ACKNOWLEDGE AND AGREE THAT, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS.  ACCORDINGLY, BUYERS WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

6.8.    Disclaimer of Other Representations and Warranties.  Except as expressly set forth in this Article VI, Buyers make no representation or warranty, statutory, express or implied, at law or in equity, in respect of Buyers, and any such other representations or warranties are hereby expressly disclaimed, and there are no other warranties, statutory, express or implied, that extend beyond the warranties contained in this Agreement.

# ARTICLE VII

# COVENANTS AND AGREEMENTS REGARDING BANKRUPTCY

7.1.    Cooperation; Efforts. Sellers and Buyers shall use their reasonable best efforts to cooperate, assist and consult with each other to procure the entry of a sales procedures order (the "Sale Procedures Order") and a sale order (the "Sale Order" and together with the Sale Procedures Order, the "363/365 Orders") as promptly as practicable, in each case in the forms attached hereto as Exhibits E-1 and E-2.  Without limiting the generality of the foregoing, each Seller shall (i) comply with all requirements under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining the 363/365 Orders, (ii) agree to proceed with its Chapter 11 Cases pursuant to and in accordance with the terms and provisions contemplated by the 363/365 Orders, in each case after the order has been entered by the Bankruptcy Court and (iii) comply or cause the compliance with the notice requirements of the 363/365 Orders, in each case after the order has been entered by the Bankruptcy Court, and any other applicable order of the Bankruptcy Court as they relate to the Chapter 11 Cases, the Federal Rules of Bankruptcy Procedure (including, without limitation, Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure) and any applicable rules of the Bankruptcy Court with respect to the transactions contemplated by this Agreement.  In the event that the 363/365 Orders or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any party (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed

with respect to any such order), Sellers and Buyers will cooperate in taking such steps diligently to defend against such appeal, petition or motion and Sellers and Buyers shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion. None of the Sellers or Buyers shall make any filing in the Bankruptcy Court with respect to the 363/365 Orders (or otherwise take any position in the Bankruptcy Court proceedings with respect thereto) without the express written consent of the other party, which may not be unreasonably withheld, conditioned or delayed, or otherwise that would be reasonably likely to result in the failure of the transactions contemplated hereby. Notwithstanding anything to the contrary herein, however, nothing shall be deemed to prohibit or otherwise restrain Buyers from making any filing in the Bankruptcy Court to challenge or object to the entry of an order by the Bankruptcy Court approving the entry by Sellers into an Alternate Transaction.

7.2. <u>Expense Reimbursement</u>. Sellers hereby agree, in the event that the Bankruptcy Court enters an order that becomes final approving a transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of the Purchased Assets to a purchaser or purchasers other than Buyers (an "<u>Alternate Buyer</u>") or effecting any other transaction (including a plan of reorganization, refinancing or liquidation) the consummation of which would be substantially inconsistent with the transactions contemplated hereby (any such transaction (or series of transactions) an "<u>Alternate Transaction</u>"), Sellers shall owe to Buyers an amount equal to all of the out-of-pocket expenses, up to a total of $500,000, incurred by Buyers or their Affiliates in connection with the transactions contemplated by this Agreement (the "<u>Expense Reimbursement</u>"), which amount shall be paid immediately upon entry of the order approving such Alternate Transaction, in each case, without further order of the Bankruptcy Court. The Expense Reimbursement is intended to compensate Buyers and their Affiliates for the time and expense dedicated to this transaction and the value added by Buyers and their Affiliates in (i) establishing a bid standard or minimum for other bidders, (ii) placing Sellers' estate property in a sales configuration mode attracting other bidders to the auction and (iii) for serving, by its name and its expressed interest, as a catalyst for other potential or actual bidders. The Expense Reimbursement shall constitute an allowed super priority administrative claim against Sellers' estates under Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

7.3. <u>Assignment of Rights</u>. If, in connection with the auction or sale referred to in the Sale Procedures Order, Sellers or any of their Affiliates enter into confidentiality or similar agreements with any Person, Sellers shall assign all rights under those agreements to the extent relating to the Business to Buyers at the Closing.

**ARTICLE VIII**

**ADDITIONAL AGREEMENTS**

8.1. <u>Employees</u>.

(a) Unless otherwise agreed to by Buyers, between the date hereof and Closing, each Seller shall use its commercially reasonable efforts to continue to employ all of the Business Employees, subject to normal workplace practices and discipline. In addition, between the date hereof and Closing, Sellers shall inform Buyers if any such

Business Employee has terminated or given notice of their intent to terminate employment.

(b)     Between the date hereof and Closing, Buyers may interview some or all of Sellers' employees to determine whether to offer employment to any of them (all of the Business Employees who accept such an offer and actually commence employment with Buyers after the Closing Date, the "Transferred Employees"). Buyers shall have no obligation to hire any Business Employee.

(c)     Nothing herein contained shall be considered or construed as an agreement to employ any Business Employee for any period of time. Except as specifically provided for herein, Buyers assume no obligation with respect to any of Sellers' employees, whether hired by a Buyer or not, for any benefit, perquisite or remuneration accrued or earned while under Sellers' employ. Without limiting the generality of the foregoing, Buyers shall have no obligation or liability for such employees' accrued vacation time, bonuses, awards, commissions, salaries, reimbursements of any kind, health or disability benefit, insurance, severance pay, pension or profit sharing interests or any other benefits, compensation or remuneration of any nature whatsoever.

(d)     No provision of this Section 8.1 shall create any third party beneficiary or other rights in any Business Employee (including any beneficiary or dependent thereof, and further including the Transferred Employees) of Sellers or of any of their Affiliates in respect of employment with any Buyer or any of their Affiliates, and no provision of this Section 8.1 shall create any rights in any such Persons in respect of any benefits that may be provided, directly or indirectly, under any Employee Plan or any plan or arrangement which may be established by any Buyers or any of their Affiliates. No provision of this Agreement shall constitute a limitation on rights to amend, modify or terminate after Closing any such plans or arrangements of any Buyers or any of their Affiliates.

8.2.    Interim Operations.

(a)     Between the date hereof and the Closing Date, Sellers shall, subject to any restrictions and obligations imposed by the Bankruptcy Court and applicable laws, operate and carry on the Business in the ordinary course and substantially as currently operated. Consistent with the foregoing, Sellers shall use reasonable best efforts to preserve relationships with customers, suppliers and employees of the Business and to keep and maintain the Purchased Assets in good operating condition and repair, ordinary wear and tear excepted.

(b)     From and after the date hereof until the earlier of the Closing Date and the termination of this Agreement in accordance with Article X hereof, except as expressly contemplated by this Agreement or except with the express written approval of Buyers, no Seller shall, and Sellers shall cause their Affiliates not to:

(i)     take any action that is intended or may reasonably be expected to result in (x) any of the representations and warranties set forth in this Agreement being or becoming untrue in any material respect, (y) any of the conditions to the Closing set forth

in this Agreement not being satisfied or (z) any violation of any provision of this Agreement, except, in each case, as may be required by applicable law;

(ii)    to the extent related to any Purchased Asset, cancel, compromise or settle any debt or claim in excess of $7,500 individually or $40,000 in the aggregate or waive or release any material right;

(iii)    to the extent related to any Purchased Asset, accelerate or delay collection of any account receivable generated by the Business in advance of or beyond their regular due dates;

(iv)    to the extent related to any Purchased Asset, collect or agree to collect any account receivable for less than the full amount billed therefor;

(v)    to the extent related to any Purchased Asset or Assumed Liability, delay or accelerate payment of any account payable or other liability of the Business beyond or in advance of its due date, except as Sellers may lack authorization to make certain payments with respect to prepetition obligations pursuant to the Bankruptcy Code;

(vi)    make or rescind any material election in relation to Taxes other than as would not be material to the Purchased Assets;

(vii)    (A) enter into or amend any agreement (or incur any commitment) that involves or is reasonably likely to involve total annual expenditures by Sellers in respect of the Business or the Purchased Assets in excess of $40,000 or (B) enter into or amend any agreement (or incur any commitment) that provides for annual revenues (but not expenditures, which are covered by clause (A) above) to Sellers in respect of the Business or the Purchased Assets other than in the ordinary course of business consistent with past practice;

(viii)    incur any Indebtedness, enter into any guarantee, indemnity or other agreement to secure any obligation of a third party or voluntarily create any Encumbrance (other than Permitted Encumbrances) or Claim for the benefit of a third party over any of the Purchased Assets;

(ix)    change any accounting policy, principle or method or practice except as required by GAAP;

(x)    amend the certificate of incorporation or by-laws or comparable organization documents of any Seller in any manner that would impair or otherwise affect any Purchased Asset or Sellers' or Buyers' obligations hereunder;

(xi)    (A) (i) modify, assume, reject or terminate any Material Contract in any material respect, or (B) enter into or modify any Contract containing material penalties which would be payable as a result of, and upon the consummation of, the transactions contemplated by this Agreement;

(xii)    sell, lease (as lessor), transfer or otherwise dispose of (including any transfer from the Business to any subsidiaries or Affiliates of Sellers), or mortgage or pledge, or voluntarily impose or suffer to be imposed, any Encumbrance on (other than Permitted Encumbrances) any of the Purchased Assets except in the ordinary course of business consistent with past practice;

(xiii)   grant or acquire, agree to grant to or acquire from any Person, or dispose of or permit to lapse any rights to, any Intellectual Property (except for grants of non-exclusive licenses in the ordinary course of business);

(xiv)    fail to use its reasonable best efforts to perform and honor all of its postpetition obligations under any Contract as they become due and otherwise discharge and satisfy all liabilities thereunder as and when they become due;

(xv)     grant any license, sublicense or covenant not to sue to any Person relating to any material portion of the Purchased Intellectual Property; or

(xvi)    enter into any agreement or commitment to take any action prohibited by this Section 8.2(b).

(c)      Concurrently with the execution of this Agreement, Seller shall enter into the DIP Credit Agreement in the form attached hereto as Exhibit F.

8.3.    Taxes.

(a)      Sellers shall be liable for and covenant to pay (i) all Taxes (whether assessed or unassessed) applicable to the Business, the Purchased Assets or the Assumed Liabilities, in each case attributable to taxable years or periods (or portions thereof) ending on or prior to the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period ending on and including the Closing Date and (ii) all excise, sales, use, transfer (including real property transfer or gains), stamp, registration, documentary, filing, recordation and other similar Taxes which may be imposed or assessed as a result of the transactions effected pursuant to this Agreement (the "Transfer Taxes"), together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties; provided that Sellers shall use reasonable best efforts to establish an exemption from (or otherwise reduce) Transfer Taxes and other Taxes. Buyers shall be liable for and covenant to pay all Taxes (whether assessed or unassessed) applicable to the Business, the Purchased Assets or the Assumed Liabilities, in each case attributable to periods (or portions thereof) beginning after the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period beginning after the Closing Date; provided, however, that Buyers shall not be liable for or pay any Taxes for which Sellers are liable under this Agreement, including without limitation, pursuant to the preceding sentence or Section 5.6. For purposes of this Section 8.3, any Straddle Period shall be treated on a "closing of the books" basis as two partial periods, one ending at the close of the Closing Date and the other beginning on the day after the Closing Date, except that Taxes (such as property Taxes) imposed on a periodic basis shall be allocated on a daily basis.

(b)     Sellers or Buyers, as the case may be, shall provide reimbursement for any Tax paid by one party all or a portion of which is the responsibility of the other party in accordance with the terms of this Section 8.3. Within a reasonable time prior to the payment of any such Tax, the party paying such Tax shall give notice to the other party of the Tax payable and the portion which is the liability of each party, although failure to do so will not relieve the other party from its liability hereunder.

(c)     After the Closing Date, Sellers and Buyers shall (and cause their respective Affiliates to): (i) assist the other party in preparing any Tax Returns which such other party is responsible for preparing and filing; (ii) cooperate fully in preparing for any audits of, or disputes with taxing authorities regarding, any Tax Returns of the Business, the Purchased Assets or the Assumed Liabilities; (iii) make available to the other and to any taxing authority as reasonably requested all information, records, and documents relating to Taxes of the Business, the Purchased Assets or the Assumed Liabilities; (iv) provide timely notice to the other in writing of any pending or threatened Tax audits or assessments relating to Taxes of the Business, the Purchased Assets or the Assumed Liabilities for taxable periods for which the other may have a liability under this Section 8.3; and (v) furnish the other with copies of all correspondence received from any taxing authority in connection with any Tax audit or information request with respect to any such taxable period. Any returns or reports with respect to Transfer Taxes that are required to be filed shall be prepared and, to the extent Sellers are permitted by law or administrative practice, filed by Sellers when due.

(d)     Notwithstanding anything to the contrary in this Agreement, the obligations of the parties set forth in this Section 8.3 shall be unconditional and absolute and shall remain in effect without limitation as to time.

8.4.     Access. Sellers agree that, prior to the Closing Date, upon reasonable notice and during normal business hours, Sellers, each of their directors, officers, agents and employees shall afford Buyers and their representatives (i) reasonable access to the properties, business and operations of Sellers and of the books and records and financial and operating data of Sellers, the Business, the Purchased Assets, the Assumed Liabilities and the Owned and Leased Real Property, and (ii) access to all the officers, key employees, accountants and other representatives of Sellers, as Buyers reasonably request and Buyers shall be entitled to, at Buyer's sole expense, make extracts and copies of such books and records. Sellers shall, and shall cause their directors, officers, agents and employees to, cooperate in connection with the foregoing. Sellers shall provide to Buyers such information and access to documents concerning the Business as reasonably may be requested by Buyers. In exercising their rights under this Section 8.4, Buyers shall not unreasonably interfere with Sellers' business and shall coordinate the exercise of such rights through Sellers. Notwithstanding anything in this Agreement to the contrary, nothing in this Section 8.4, or elsewhere in this Agreement shall require any party to disclose any information that would compromise the viability of any attorney/client or attorney work product privilege (it being understood that Sellers shall use commercially reasonable efforts to coordinate means to avoid such impediments).

8.5.     Third Party Consents. Sellers shall, at their sole cost and expense, use their reasonable best efforts to obtain the Consents set forth on Schedule 9.2(e) to the extent such

consents are not provided for or satisfied by the Bankruptcy Sale Order; provided, however, that Sellers shall not be required to expend any funds to obtain the Consents.

8.6.    Insurance.  Until the Closing, Sellers shall maintain (including necessary renewals thereof) insurance policies against risk and liabilities to the extent and in the manner and at the levels maintained by Sellers as of the date hereof with respect to the Business and the Acquired Assets.  Prior to the Closing, Sellers shall prepare notices of termination reasonably satisfactory to Buyers in connection with any and all insurance policies that cover any Purchased Asset or that relate to the Business.  Pursuant to such notices, Sellers shall request the termination of such policies (the "Terminated Policies") effective as of the Closing Date.  Sellers shall also request refunds of any and all premiums paid in respect of the Terminated Policies for periods following the Closing Date, which refunds shall be Purchased Assets.

8.7.    Further Assurances.  At any time and from time to time at or after the Closing, Buyers and Sellers agree to cooperate with each other to execute and deliver such other documents, instruments of transfer or assignment, files, books and records and do all such further acts and things as may be reasonably required in order to carry out the purposes of this Agreement.

8.8.    Access to Records. From the Closing Date through the third anniversary of the Closing Date, Sellers shall afford to Buyers and, upon request, Buyers' counsel, accountants and other representatives, reasonable access at reasonable times and occasions to access and inspect information not included in the Purchased Assets but relating to the Purchased Assets, the Business or any Transferred Employee if and to the extent Sellers are legally required to maintain records relating to such information.  In the event that Sellers determine to dispose of such records or information prior to the third anniversary of the Closing Date, Sellers shall provide Buyers with reasonably advanced notice of such disposal and an opportunity to copy or take possession of such records or information.

8.9.    Payment of Transaction Costs.  Through the Closing Date, Sellers shall pay the Transaction Costs (other than Cure Amounts) as incurred as contemplated by the DIP Credit Agreement budget.

8.10.   DOT Matters.  (a) Without limiting the obligations imposed by Section 8.5 hereof, Buyers shall, with the assistance and cooperation of Sellers, use their reasonable best efforts to obtain either consents to the transfer or replacements of the Required Material Permits.

(b)    Upon Buyers' election, which shall be made in writing and delivered to Sellers no less than six business days prior to the Closing Date, the Buyers and Sellers shall take the following actions on or prior to the Closing Date (provided that the parties may mutually agree to amend such actions from time to time): (a) approximately three to five days prior to the Closing (i) Sellers shall form one or more wholly owned subsidiaries of Sellers with names provided by Buyers (the "New Subsidiaries") and (ii) Buyers shall prepare and deliver, with the assistance and cooperation of Sellers, a Name Change Petition to the Federal Motor Carrier Safety Administration and/or the United States Department of Transportation (collectively, the "DOT") requesting that (A) the approval of the name change for the applicable material Permit (all of which are set forth

on Schedule 8.10(b), collectively the "Required Material Permits") and (B) the name of the applicable New Subsidiary be reflected in the DOT's records with respect to the applicable Required Material Permit. Upon the granting of the petition, Buyers shall file a Form MCS 150 with the DOT to reflect the New Subsidiaries' name(s) and address(es) with respect to the applicable Required Material Permit. At the Closing, all of the equity interests of the New Subsidiaries will be transferred to the Buyers as Purchased Assets (unless the Buyers elect to exclude such Purchased Assets prior to the Closing).

## ARTICLE IX

## CONDITIONS TO CLOSING

9.1. <u>Sellers' Condition to Closing</u>. The obligations of Sellers under this Agreement are subject to the satisfaction at or prior to the Closing of each of the following conditions, but compliance with any or all of such conditions may be waived, in writing, by Sellers in their sole discretion:

(a) The representations and warranties of Buyers set forth in this Agreement shall be true and correct (i) on and as of the date hereof and (ii) on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specific date or time which need only be true and correct as of such date or time), except in each of cases (i) and (ii) for such failures of representations and warranties to be true and correct (without giving effect to any materiality qualification or standard contained in any such representations and warranties) which would not reasonably be expected to materially and adversely affect the ability of Buyers to perform their obligations under this Agreement or consummate the transactions contemplated hereunder;

(b) Buyers shall have performed and complied in all material respects with all of the covenants and agreements contained in this Agreement and satisfied all of the conditions required by this Agreement to be performed or complied with or satisfied by Buyers at or prior to the Closing;

(c) There shall be no injunction, restraining order or decree of any nature of any court or Governmental Body in effect that restrains or prohibits the consummation of the transactions contemplated by this Agreement and no action, suit or proceeding shall have been instituted by any Person or entity, or threatened by any Governmental Body, before a court or Governmental Body, to restrain or prevent the carrying out of the transactions contemplated by this Agreement;

(d) Buyers shall have delivered all documents required to be delivered under Section 4.3; and

(e) The Bankruptcy Court shall have entered the Sale Order substantially in the form attached hereto as <u>Exhibit E-2</u>, without modification or the imposition of conditions or limitations with respect thereto, except for such immaterial modifications, conditions or limitations which do not, individually or in the aggregate, adversely affect

Sellers and the Sale Order shall not have been vacated, stayed, amended, reversed or modified.

9.2. <u>Buyers' Conditions to Closing</u>. The obligations of Buyers under this Agreement are subject to the satisfaction at or prior to the Closing of each of the following conditions, but compliance with any or all of any such conditions may be waived, in writing, by Buyers in their sole discretion:

(a) Except for the representations and warranties contained in <u>Sections 5.1</u>, <u>5.2</u>, <u>5.7</u>, <u>5.19</u>, <u>5.25</u> and, in respect of matters related to product liability, <u>Section 5.16</u>, the representations and warranties of Sellers set forth in this Agreement shall be true and correct in all respects (i) on and as of the date hereof and (ii) on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specific date or time which need only be true and correct as of such date or time), except in each of cases (i) and (ii) for such failures of representations and warranties to be true and correct (without giving effect to any Material Adverse Effect or materiality qualification or standard contained in any such representations and warranties) which would not, individually or in the aggregate, have a Material Adverse Effect. The representations and warranties contained in <u>Sections 5.1</u>, <u>5.2</u>, <u>5.7</u>, <u>5.19</u>, <u>5.25</u> and, in respect of matters related to product liability, <u>5.16</u> hereof, shall be true and correct (without giving effect to any Material Adverse Effect or materiality qualification or standard contained in any such representations and warranties) in all material respects (i) on and as of the date hereof and (ii) on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specific date or time which need only be true and correct as of such date or time).

(b) Sellers shall have performed and complied in all material respects with all the covenants and agreements contained in this Agreement and satisfied all the conditions required by this Agreement to be performed or complied with or satisfied by them at or prior to the Closing Date;

(c) There shall be no injunction, restraining order or decree of any nature of any court or Governmental Body in effect that restrains or prohibits the consummation of the transactions contemplated by this Agreement and no action, suit or proceeding shall have been instituted by any Person or entity, or threatened by any Governmental Body, before a court or Governmental Body, to restrain or prevent the carrying out of the transactions contemplated by this Agreement;

(d) Sellers shall have delivered all documents required to be delivered under <u>Section 4.2</u>;

(e) Those Consents identified on <u>Schedule 9.2(e)</u> shall have been obtained in form and substance satisfactory to Buyers;

(f)     The Bankruptcy Court shall have authorized the assumption and assignment of the Assumed Contracts set forth on Schedule 9.2(f);

(g)     If Buyers do not make the election set forth in Section 8.10(b), Buyers shall have obtained all licenses, Permits or similar items set forth on Schedule 9.2(g);

(h)     If Buyers make the election set forth in Section 8.10(b), all of the Required Material Permits shall have been transferred to the New Subsidiaries pursuant to Section 8.10(b), all of the equity interests of the New Subsidiaries shall be included in the Purchased Assets as of the Closing Date (unless the Buyers elect to exclude such Purchased Assets) and all of the Required Material Permits shall be in full force and effect as necessary for Buyers to continue to conduct the Business in the ordinary course immediately after the Closing Date; and

(i)     The Bankruptcy Court shall have entered the Sale Order substantially in the form attached hereto as Exhibit E-2 (together with any related findings of fact or conclusions of Law), without modification or the imposition of conditions or limitations with respect thereto, except for such immaterial modifications, conditions or limitations which do not, individually or in the aggregate, adversely affect Buyers and the Sale Order shall not have been violated, vacated, withdrawn, overruled, resolved or stayed, amended, reversed or modified and shall have become final and nonappealable.

## ARTICLE X

## TERMINATION

10.1.   Termination.  Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Closing Date as follows:

(a)     by the mutual written consent of Buyers and Sellers;

(b)     by Buyers if the Sale Procedures Order shall not have been entered by the Bankruptcy Court in substantially the form attached hereto as Exhibit E-1 without modification or the imposition of any conditions or limitations with respect thereto (except for such immaterial modifications, conditions or limitations which do not individually or in the aggregate adversely affect Buyers) on or prior to the 15th calendar day following the Petition Date;

(c)     by Buyers if the Sale Order shall not have been entered by the Bankruptcy Court in substantially the form attached hereto as Exhibit E-2 approving this Agreement and the transactions contemplated hereby without modification or the imposition of any conditions or limitations with respect thereto (except for such immaterial modifications, conditions or limitations which do not individually or in the aggregate adversely affect Buyers) on or prior to the 50th calendar day following the Petition Date;

(d)     by Buyers in the event of any material breach by any Seller of any of Sellers' agreements, covenants, representations or warranties contained herein and such

material breach is incapable of being cured or, if capable of being cured, shall not have been cured within fifteen (15) days following receipt by such Seller of notice of such material breach from Buyers;

(e)     by Sellers in the event of any material breach by any Buyer of any of Buyers' agreements, covenants, representations or warranties contained herein and such material breach is incapable of being cured or, if capable of being cured, shall not have been cured within fifteen (15) days following receipt by such Buyer of notice of such material breach from Sellers;

(f)     by Buyers, if Sellers' Chapter 11 Cases are (i) dismissed, (ii) converted to Chapter 7 or (iii) a trustee is appointed with respect to any Seller;

(g)     by Buyers, if (i) the DIP Credit Agreement is terminated or (ii) if any Seller is in default or breach of the DIP Credit Agreement, or a condition precedent to its borrowing thereunder has not been satisfied, and such default, breach or condition precedent is not waived and materially limits any Seller's ability to borrow funds thereunder; unless, in each case, such Seller obtains substitute financing on terms that are not materially less favorable to such Seller than the terms of the DIP Credit Agreement;

(h)     by either Buyers, on the one hand, or Sellers, on the other hand, if (a) an Alternate Transaction is consummated, or (b) the Bankruptcy Court shall have approved an Alternate Transaction; provided however, that if Buyers are the "Back-up Bidder" (as defined in the Sale Procedures Order), neither Buyers nor Sellers will terminate this Agreement, pursuant to this Section 10.1(i), until fifteen (15) days after entry of the order approving such Alternate Transaction;

(i)     by either Buyers or Sellers if any Governmental Body shall have issued a final and nonappealable order, decree or ruling permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; or

(j)     by either Buyers or Sellers if the Closing shall not have occurred on or before sixty (60) days after the Petition Date (or such later date as may be mutually agreed to in writing by Buyers and Sellers); provided, that the party seeking to exercise such right of termination has not breached its obligations hereunder.

10.2.    Effect of Termination.  In the event of the termination of this Agreement pursuant to Section 10.1 hereof, all further obligations of the parties under this Agreement shall be terminated without further liability of any party or its stockholders, directors or officers to the other parties, except that the parties shall perform their obligations contained in Sections 11.4, 11.9 and 11.12; provided, that nothing in this Article X shall relieve any party of its liability for a willful breach of its obligations under this Agreement.

## ARTICLE XI

## GENERAL PROVISIONS

11.1.  <u>Survival</u>.  None of the representations and warranties, covenants or agreements of Sellers or Buyers made in this Agreement shall survive the Closing Date; <u>provided</u>, <u>however</u>, that any covenant or agreement in this Agreement which, by its terms, is to survive the Closing Date, or which is to be performed after the Closing Date, shall survive the Closing Date for the duration of such covenant or agreement.

11.2.  <u>Specific Performance</u>.  Sellers, on the one hand, and Buyers, on the other hand, each acknowledge that in case of any breach of their covenants or other obligations, the other would suffer immediate and irreparable harm, which money damages would be inadequate to remedy, and accordingly, in case of any such breach each non-breaching party shall be entitled to obtain specific performance and other equitable remedies, in addition to other remedies provided in this <u>Article XI</u>.

11.3.  <u>Mutual Release</u>.  Notwithstanding any other term in this Agreement to the contrary, the waivers, covenants and agreements contained in the Mutual Waiver and Release shall survive the Closing and shall bind and inure to the benefit of, as the case may be, Buyers and their successors and assigns and Sellers, their Affiliates, and their estate, creditors, successors and assigns, including, without limitation, any trustee in any case under Chapter 7 of the Bankruptcy Code.

11.4.  <u>No Public Announcement</u>.  Sellers, on the one hand, or Buyers, on the other hand, shall not, without the prior written approval of, in the case of Sellers, Buyers, and in the case of Buyers, Sellers, make any press release or other public disclosure concerning the transactions contemplated by this Agreement, except as and to the extent that a party may be so obligated by law or judicial order.  If any party determines, after consultation with legal counsel, that any such press release or public disclosure is so required, it shall, if practicable, a reasonable time before making any such press release or public disclosure, consult with the other party regarding such release or disclosure and disclose only such information as is so required to be disclosed.  Prior to Closing, no party to this Agreement shall make any statement containing non-public information to, or otherwise communicate (whether orally or in writing) with, any customer, employee or advertiser of, or supplier to, Sellers, regarding this Agreement or the transactions contemplated hereby except for any statement or communication with respect to which either (i) the other parties hereto shall have previously consented in writing, which consent will not be unreasonably withheld, conditioned or delayed or (ii) is consistent with the general communications plan agreed to by Sellers and Buyers.

11.5.  <u>Notices</u>.  All notices or other communications required or permitted under this Agreement shall be in writing, shall be deemed to have been given when delivered in person, by telex or telecopier, when delivered to a recognized next business day courier, or, if mailed, when deposited in the United States mail, first class, registered or certified, return receipt requested, with proper postage prepaid, addressed as follows or to such other address as notice shall have been given pursuant hereto:

If to Sellers:

ADS Logistics, LLC
116 East 1100 North

Chesterton, IN 46304
Attn: [              ]
Fax: [              ]

with a copy to:

Proskauer Rose LLP
Three First National Plaza
70 West Madison Street, Suite 3800
Chicago, IL 60602
Attn: Jeff Marwil
Fax: (312) 962-3551

If to Buyers, to:

General Electric Capital Corporation
500 West Monroe
Chicago, Illinois 60661
Attn: Jack Steidle
Fax: (312) 441-7211

with a copy to:

Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603
Attention: Larry Nyhan
Phone: (312) 853-7000
Fax: (312) 853-7036

11.6.  Assignment; No Third Party Beneficiaries.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the Parties (whether by operation of law or otherwise) to any Person without the prior written consent of the other parties, provided, however, that Buyers may assign their rights and obligations pursuant to this Agreement and any Ancillary Agreement to an entity ("Newco") owned in whole or in part by Buyers, or any of them; provided, further, however, that such assignment shall not relieve any Buyers of any of their obligations under this Agreement unless and until the Closing shall have occurred.  If, following such assignment to Newco, the Closing occurs, each of the Buyers, other than Newco, shall be relieved of all of such Buyer's obligation under this Agreement.  Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this Section 11.6 any right, remedy or claim under or by reason of this Agreement.

11.7.  Entire Agreement; Amendments.  This Agreement and the Exhibits and Schedules referred to herein and the documents delivered pursuant hereto contain the entire understanding of the parties hereto with regard to the subject matter contained herein or therein, and supersede all prior agreements, understandings or letters of intent between or among any of the parties

hereto, including any confidentiality agreement between the parties or their Affiliates. This Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the parties hereto.

11.8. Waivers. Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the party or parties entitled to the benefit thereof. Any such waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as to any party, it is authorized in writing by an authorized representative of such party. The failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

11.9. Expenses. Except as expressly set forth herein, each of the parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

11.10. Partial Invalidity. Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

11.11. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement.

11.12. **GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE. EACH PARTY HERETO AGREES THAT IT SHALL BRING ANY ACTION OR PROCEEDING IN RESPECT OF ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTAINED IN OR CONTEMPLATED BY THIS AGREEMENT, WHETHER IN TORT OR CONTRACT OR AT LAW OR IN EQUITY, EXCLUSIVELY (A) IN THE BANKRUPTCY COURT TO THE EXTENT THAT THE BANKRUPTCY COURT HAS JURISDICTION OVER SUCH ACTION OR PROCEEDING, AND (B) IN ALL OTHER CASES IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE (THE "CHOSEN COURTS") AND (I) IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE CHOSEN COURTS, (II) WAIVES ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THE CHOSEN COURTS, (III) WAIVES ANY OBJECTION THAT THE CHOSEN COURTS ARE AN INCONVENIENT FORUM OR DO NOT HAVE JURISDICTION OVER ANY PARTY HERETO AND (IV) AGREES THAT SERVICE OF PROCESS UPON SUCH PARTY IN ANY SUCH ACTION OR**

**PROCEEDING SHALL BE EFFECTIVE IF NOTICE IS GIVEN IN ACCORDANCE WITH <u>SECTION 11.5</u> OF THIS AGREEMENT.**

      11.13.  <u>Time is of the Essence.</u>  With respect to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

* * * * * * *

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

**ADS LOGISTICS, LLC**

By: _____
      Name:
      Title:

**MAY LOGISTICS SERVICES, INC.**

By: _____
      Name:
      Title:

**ALTERNATIVE DISTRIBUTION SYSTEMS, INC.**

By: _____
      Name:
      Title:

**GENERAL ELECTRIC CAPITAL CORPORATION**

By: _____
      Name:
      Title:

**GLOBAL LEVERAGED CAPITAL CREDIT OPPORTUNITY FUND I**

**By: GLOBAL LEVERAGED CAPITAL MANAGEMENT, LLC**, as Collateral Manager


By: _____

     Name:

     Title:


**REGIMENT CAPITAL SPECIAL SITUATIONS FUND III, L.P.**

**By: REGIMENT CAPITAL GP, LLC**, its general partner


By: _____

     Name:

     Title:

# EXHIBIT INDEX

**<u>Exhibits</u>**

Exhibit A – Assumption and Assignment Agreement

Exhibit B – Bill of Sale

Exhibit C – Mutual Waiver and Release

Exhibit D – IP Assignments

Exhibit E-1 – Sale Procedures Order

Exhibit E-2 – Sale Order